# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 22-cr-15 (APM)** |
| **ELMER STEWART RHODES, III et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Defendants in this case—nine in total—are Elmer Stewart Rhodes, III; Kelly Meggs; Kenneth Harrelson; Jessica Watkins; Roberto Minuta; Joseph Hackett; David Moerschel; Thomas Caldwell; and Edward Vallejo.  They are alleged to be members of a group known as the Oath Keepers.  Defendants stand accused of four common counts related to the Certification of the Electoral College vote on January 6, 2021, before a Joint Session of Congress.  Those counts are: (1) seditious conspiracy, in violation of 18 U.S.C. § 2384 (Count One); (2) conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Two); (3) obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2 (Count Three); and (4) conspiracy to prevent an officer from discharging any duties, in violation of 18 U.S.C. § 372 (Count Four).  All Defendants have moved to dismiss each of these counts.

In addition, all Defendants except Watkins and Vallejo are charged with tampering with documents or proceedings and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(1), 2

(Counts Nine–Eleven, Thirteen–Fifteen, Seventeen).[1]    Four Defendants—Hackett, Meggs, Harrelson, and Minuta—have moved to dismiss their respective tampering counts or, in the alternative, to sever them from the remaining charges.[2]

Last, all Defendants seek to transfer the case from this District Court to the Alexandria Division of the U.S. District Court for the Eastern District of Virginia.

For the reasons that follow, the court holds that the indictment sufficiently states the offenses of seditious conspiracy, obstruction and conspiracy to obstruct an official proceeding, and conspiracy to prevent an officer from discharging official duties.  It also sufficiently states offenses of tampering with documents or proceedings.  Additionally, Defendants have not shown that a change in venue is warranted.  Accordingly, Defendants' motions are denied.

## II.    BACKGROUND

### A.    *United States v. Caldwell*

The roots of this case trace back to the weeks immediately following the attack on the U.S. Capitol Building on January 6, 2021.  On or about January 27, 2021, a grand jury charged Defendants Caldwell and Watkins and a third person, Donovan Crowl, in a four-count indictment in a case titled *United States v. Caldwell*.  The lead charges in that case were (1) conspiracy to "stop, delay, and hinder Congress's certification of the Electoral College vote," in violation of 18 U.S.C. § 371, and (2) obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).  *See* Indictment, *United States v. Caldwell*, 21-cr-28 (APM) (D.D.C.) [hereinafter *Caldwell* Docket], ECF No. 4, ¶¶ 18, 55–56.

---

[1]  On or about June 22, 2022, the grand jury returned a Superseding Indictment that, among other things, renumbered the tampering counts to reflect that two defendants have entered guilty pleas.  *See* Superseding Indictment, ECF No. 167.  This Memorandum Opinion, however, refers to the counts as numbered in the original indictment.

[2]  In addition, Defendants Meggs, Harrelson, Watkins, Hackett, and Moerschel are charged with destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361, 2 (Count Five), and Defendant Watkins is accused of civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2 (Count Six). No Defendant has moved to dismiss any of these counts.

Over time, the grand jury issued multiple superseding indictments in *Caldwell*, adding both new defendants and counts. The Sixth Superseding Indictment, returned on or about December 1, 2021, named 17 defendants and charged them with seven different offenses over 15 counts. *See* Sixth Superseding Indictment, *Caldwell* Docket, ECF No. 513. The lead counts against all 17 *Caldwell* defendants remained violations of § 371 and § 1512(c)(2). *See id.* ¶¶ 36–180. The *Caldwell* defendants moved to dismiss those counts, and the court denied their motions on December 20, 2021. *See United States v. Caldwell* (*Caldwell I*), No. 21-cr-28 (APM), 2021 WL 6062718, at *22 (D.D.C. Dec. 20, 2021). The court also denied a motion for reconsideration. *See United States v. Caldwell* (*Caldwell II*)*,* No. 21-cr-28 (APM), 2022 WL 203456, at *3 (D.D.C. Jan. 24, 2022).

The *Caldwell* defendants also filed a motion to transfer the case from the District of Columbia. The court denied the request. Omnibus Order, *Caldwell* Docket, ECF No. 415 [hereinafter *Caldwell* Omnibus Order], at 10–11.

### B.    *United States v. Rhodes*

In mid-January 2022, the *Caldwell* matter split into three different cases. The grand jury returned the indictment in the present case, titled *United States v. Rhodes*, on January 12, 2022, against 11 defendants alleging eight separate violations of law over 17 counts. Indictment, ECF No. 1. The persons charged included nine original *Caldwell* defendants—Kelly Meggs, Kenneth Harrelson, Jessica Watkins, Joshua James, Roberto Minuta, Joseph Hackett, David Moerschel, Brian Ulrich, and Thomas Caldwell—plus the alleged leader of the Oath Keepers, Elmer Stewart Rhodes, III and one other alleged member, Edward Vallejo.[3]  *Id.* The remaining *Caldwell* defendants, except Jonathan Walden, were named in a new indictment on the same docket, with

---

[3] Joshua James and Brian Ulrich have since pleaded guilty to some charges. *See* James Plea Agreement, ECF No. 59; Ulrich Plea Agreement, ECF No. 116.

the case re-titled *United States v. Crowl*.  Seventh Superseding Indictment, *Caldwell* Docket, ECF No. 583.  Walden was spun out to a stand-alone case.  Indictment, *United States v. Walden*, 22-cr-14 (APM) (D.D.C.), ECF No. 1.

In mid-April 2022, various Defendants in this matter filed motions to dismiss the first four counts of the *Rhodes* indictment for failure to state an offense, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(v).  The lead motion is Defendant Caldwell's Motion to Dismiss Counts 1, 2, 3 & 4 of the Indictment, ECF No. 84 [hereinafter Caldwell MTD].[4]  All other Defendants joined in this motion.[5]  Defendants Meggs, Hackett, and Vallejo also filed motions advancing complementary theories of dismissal.  *See* Def. Kelly Meggs's Mot. to Dismiss Count I of the Indictment, ECF No. 82 [hereinafter Meggs MTD]; Def. Hackett's Mot. to Dismiss Counts One, Two, Three, & Four of the Indictment & Mem. of L. in Supp. Thereof, ECF No. 89 [hereinafter Hackett MTD Counts 1–4]; Def. Vallejo's Mot. to Dismiss Count One & to Strike Any Remaining Surplusage, ECF No. 94 [hereinafter Vallejo MTD].  Defendants Hackett and Vallejo, in particular, assert that Counts One through Four must be dismissed for lack of specificity pursuant to Rule 12(b)(3)(v).

In addition, Defendant Hackett filed a motion to dismiss Count Fourteen, which charges a violation of § 1512(c)(1).  *See* Def. Hackett's Mot. to Dismiss Count Fourteen of the Indictment & Mem. of L., ECF No. 90 [hereinafter Hackett MTD Count 14].  Alternatively, he moved to sever that count pursuant to Rule 12(b)(3)(D).  *See* Def. Hackett's Mot. to Sever Count Fourteen & Mem. of L., ECF No. 91 [hereinafter Hackett Mot. to Sever].  Defendants Meggs, Harrelson, and Minuta,

---

[4] The Superseding Indictment amends "The Conspiracy" and "Purpose of the Conspiracy" sections of Count One to add: "to oppose by force the authority of the Government of the United States."  Superseding Indictment ¶¶ 15, 16. This new language tracks the text in § 2348 that makes it unlawful to "conspire . . . to oppose by force the authority" of the "Government of the United States."  The amendment does not affect the court's analysis in this Memorandum Opinion, but it may lead to additional challenges to Count One.

[5] *See* ECF No. 81 (Meggs); ECF No. 83 (Minuta); ECF No. 87 (Moerschel); ECF No. 89 (Hackett); ECF No. 92 (Watkins); ECF No. 97 (Rhodes); ECF No. 103 (Harrelson); ECF No. 115 (Vallejo).

charged, respectively, in counts Ten, Eleven, and Thirteen with violations of § 1512(c)(1), joined in Hackett's motions. *See* Hr'g Tr. (draft), June 24, 2022 [hereinafter June Status Conf. Tr.], at 31 (Meggs); ECF No. 103 (Harrelson); ECF No. 101 (Minuta).

Finally, pursuant to Rule 21(a), Defendant Caldwell and a defendant in the now-*Crowl* matter, Connie Meggs, jointly moved to transfer both cases from this District to the U.S. District Court for the Eastern District of Virginia, Alexandria Division. Defs.' Joint Mot. to Transfer Venue & Mem. of P. & A. in Supp., ECF No. 93 [hereinafter Defs.' Mot. to Transfer]. All Defendants joined in this request.[6]

The court first addresses the motions to dismiss Counts One through Four, then takes up Defendant Hackett's motions as to the tampering counts, and concludes with the motion to transfer venue.

## III.  DISCUSSION

### A.  Count One:  Seditious Conspiracy

Defendants' challenges to the seditious conspiracy charge fall into two general categories. First, Defendants argue that Count One fails to state an offense. *See* Caldwell MTD at 5–19; Meggs MTD at 6–15; Vallejo MTD at 2–4. Second, they contend that Count One fails to sufficiently apprise them of the factual basis for the charge. *See* Hackett MTD Counts 1–4 at 11–13; Vallejo MTD at 4–5. Applying the relevant legal standards, the court finds neither argument persuasive. *See United States v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38, 44 (D.D.C. 2018) (setting forth the applicable legal standards of review for motions to dismiss under Rule 12(b)(3)(B)(iii) and (v)).

---

[6] *See* ECF No. 96 (Hackett); ECF Nos. 97, 99 (Rhodes); ECF No. 98 (Watkins); ECF No. 101 (Minuta); ECF No. 103 (Harrelson); ECF No. 115 (Vallejo); June Status Conf. Tr. at 31 (Meggs).

1.      *Failure to State an Offense*

a.      <u>Historical background</u>

At the start of the Civil War, the national government had limited authority under federal criminal law to detain and punish those who supported the rebellion.  The charge of treason, which carried the death penalty, was the primary tool available, but the Constitution defined that offense strictly, and judicial opinions imposed rigorous elements of proof.  *See* Catherine M. Tarrant, *To "insure domestic Tranquility":  Congress and the Law of Seditious Conspiracy, 1859-1861*, 15 AM. J. LEGAL HIST. 107, 107 (1971).  "As part of the effort to meet the emergency war posed, Congress enacted statutes to define crimes less than treason.  Congressmen believed these measures were necessary since no statute law on the subject existed, and the common law was not applicable."  *Id.* at 118.  Approximately 100 days after the first shots were fired at Fort Sumter on April 12, 1861, Congress passed "An Act to Define and Punish Certain Conspiracies," which eventually would become the seditious conspiracy statute.  *Id.* at 118–19.  The Act became law on July 31, 1861.  *Id.*; *see* Act of July 31, 1861, ch. 33, 12 Stat. 284.  One of the bill's sponsors, Senator Lyman Trumbull of Illinois, explained that the "object of this bill is not under any other name to punish traitors, but it is to punish persons who conspire together to commit offenses against the United States not analogous to treason."  *Cong. Globe*, 37th Cong., 1st Sess. 277 (1861).

Ten years later, Congress passed the Enforcement Act of 1871, also known as the Ku Klux Klan Act, "to enforce the Provisions of the Fourteenth Amendment of the Constitution of the United States."  *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13, 13 (codified at 70 Rev. Stat. § 5336 (1878)).  That law contained a nearly identically worded conspiracy provision as the Act of July 31, 1861.  *See id.*; *Baldwin v. Franks*, 120 U.S. 678, 693 (1887) (observing that § 5336 "is

a reenactment of similar provisions in the act of July 31, 1861"). This enactment eventually would become the seditious conspiracy statute under the modern federal criminal code. *See* Act of Mar. 4, 1909, ch. 1, § 6, 35 Stat. 1089 (codified at 18 U.S.C. § 6 (1940)).

Now codified at 18 U.S.C. § 2384, the seditious conspiracy statute reads as follows:

> If two or more persons in any State or Territory, or in any place subject to the jurisdiction of the United States, conspire to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, they shall each be fined under this title or imprisoned not more than twenty years, or both.

Defendants in this case are not charged with a conspiracy to overthrow the government or to levy war against it. Nor are they charged with attempting to seize property of the United States. Rather, Defendants stand accused of conspiring "by force to prevent, hinder, and delay the execution of any law of the United States." Indictment ¶ 15.[7] The indictment spells out the "law[s] of the United States" that they allegedly tried to prevent, hinder, and delay: "the Twelfth Amendment and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code," *id.* ¶ 16.

### b. "Execution of any law of the United States"

Defendants' assertion that Count One fails to state an offense rests on their reading of the words "execution of any law of the United States." Caldwell MTD at 7–19. According to them, "[s]ince laws do not 'execute' themselves the target of the seditious conspiracy, logically, must be *both* the federal law itself and at least one person attempting to execute that law." *Id.* at 7. Such person must be "authorized" to execute the law, Defendants assert, and under Article II of the

---

[7] As noted, the Superseding Indictment now alleges that Defendants sought "to oppose by force the authority" of "the Government of the United States." *See* p. 4 n.4, *supra*.

Constitution, only the President is vested with the authority to "execute" the laws of the United States. *See id.* at 8; U.S. CONST. art. II, § 3 (granting authority to the President to "take Care that the Laws be faithfully executed"). So, Defendants say, because only persons acting pursuant to the authority of the President "execute" laws, members of Congress (including the Vice President acting as President of the Senate), whose offices are constitutionally separate from the Executive Branch, cannot be the object of a seditious conspiracy. Caldwell MTD at 16–17. In other words, because members of Congress on January 6th were not "executing" any constitutional or statutory election-related law within the meaning of § 2384, Count One fails to state an offense. *Id.* at 15 ("Count 1 is defective because . . . it fails to identify, as the target of the conspiracy, an *individual* authorized to *execute* the *election laws*.").

The government's response is twofold. First, the government maintains that Defendants' hyper-focus on identifying a particular person as the object of the conspiracy is misguided. Gov't Resp. to Caldwell MTD, ECF No. 123 [hereinafter Gov't Opp'n], at 10. It contends that § 2384 only requires that the conspiracy be directed against the government of the United States as a whole in its execution of its laws. Gov't Opp'n at 14–17. And that is precisely what the indictment charges: Defendants conspired to resist the government's execution of the "law governing the transfer of power," Indictment ¶ 16; Hr'g Tr., ECF No. 159 [hereinafter Oral Arg. Hr'g Tr.], at 39. Second, the government argues that, even if Count One must identify a person authorized to "execute" the law at issue, it does so: the Vice President and members of Congress who gathered for the Joint Session on January 6th. Gov't Opp'n at 16–17. The government maintains that the word "execution" in § 2348 carries its ordinary, not Article II, meaning. *Id.* at 14–16. The term's common meaning easily reaches the Vice President and members of Congress carrying out their duties in certifying the Electoral College vote. *Id.*

The court thinks the government has the better reading of the seditious conspiracy statute. To understand why, one must first look to the history of § 2348.

   c. <u>Seditious conspiracy is a crime against the government, not an individual federal official</u>

As noted, in 1871, Congress included the seditious conspiracy provision in the Ku Klux Klan Act. Section 2 of the Act enumerated a series of crimes in a single unbroken paragraph, all punishable by up to six years in prison. The seditious conspiracy portion of Section 2 forbade

> [t]wo or more persons within any State or Territory of the United States [to] conspire together to overthrow, or to put down, or to destroy by force the government of the United States, or to levy war against the United States, or to oppose by force the authority of the government of the United States, or by force, intimidation, or threat to prevent, hinder, delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof,

§ 2, 17 Stat. at 13. Section 2 continued:

> or by force, intimidation, or threat to prevent any person from accepting or holding any office or trust or place of confidence under the United States, or from discharging the duties thereof, or by force, intimidation, or threat to induce any officer of the United States to leave any State, district, or place where his duties as such officer might lawfully be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or to injure his person while engaged in the lawful discharge of the duties of his office, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duty . . . .

*Id.* This "prevention of duties" provision is now codified, in sum and substance, at 18 U.S.C. § 372. The indictment charges Defendants with violating § 372 in Count Four.

When Congress enacted the Criminal Code of 1909, it split the above-quoted provisions in two and placed them in different code sections.[8] The seditious conspiracy provision was codified

---

[8] For a history of the Criminal Code of 1909, *see* John L. McClellan, *Codification, Reform, and Revision: The Challenge of the Modern Penal Code*, 1971 Duke L.J. 663, 677–79.

in Chapter One, Section 6. § 6, 35 Stat. at 1089.  Chapter One contained eight sections under the heading "Offenses Against the Existence of the Government."  *Id.* at 1088.  The "prevention of duties" provision was codified in Chapter Three, Section 21, which also contained eight sections. *Id.* at 1092.  The heading of that chapter was "Offenses Against the Elective Franchise and Civil Rights of Citizens."  *Id.*

This history is significant for two reasons.  First, when Congress enacted the Ku Klux Klan Act in 1871, it understood how to distinguish crimes against the United States from those against a federal official.  Within the first eight clauses of Section 2, Congress proscribed conspiracies to overthrow, put down, and destroy by force "the government of the United States"; to oppose by force "the authority of the United States"; to prevent, hinder, or delay by force "the execution of any law of the United States"; and to seize by force "any property of the United States."  § 2, 17 Stat. at 13.  The clauses that immediately follow in Section 2 proscribed conspiracies aimed at individual federal officials.  Those provisions criminalized conspiracies whose purpose was, among other things, to prevent a person by force, intimidation, or threat from accepting or holding office and from discharging the duties of such office.  *Id.*  Congress's placement of a conspiracy against "the execution of any law of the United States" among other conspiracies against the United States, rather than among those against federal officials, demonstrates that Congress viewed conspiracies under that provision as crimes against the government.  A seditious conspiracy charge therefore need not allege a conspiracy aimed at a particular federal official authorized to execute the law.

Second, if there were any doubt left about this understanding, the Criminal Code of 1909 resolved it.  That Congress separated the seditious conspiracy and "prevention of duties" provisions and placed them under different chapter headings is telling.  *See Almendarez-Torres v.*

*United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (internal quotation marks omitted)).  Congress put the seditious conspiracy provision among other "Offenses Against the Existence of the Government."  By contrast, it placed the "prevention of duties" provision alongside other "Offenses Against the Elective Franchise and Civil Rights of Citizens."  These placements within the Criminal Code of 1909 make clear that Congress viewed seditious conspiracy to prevent the "execution of any law" as a crime against the United States, and not a particular federal official.  Count One therefore is not "defective because . . . it fails to identify, as the target of the conspiracy, an *individual* authorized to *execute* the *election laws.*"  Caldwell MTD at 15.  It is enough that the count alleges that Defendants forcibly interfered with the United States' execution of its laws.

Defendants point to the Supreme Court's decision in *Baldwin v. Franks*, 120 U.S. 678 (1887), as support for their position.  Caldwell MTD at 12–14.  In that case, the defendant was charged with seditious conspiracy for conspiring to kidnap and remove a group of Chinese immigrant laborers from a town in California.  *Baldwin*, 120 U.S. at 680–81.  The United States had entered into a treaty with China in which it promised to accord rights and privileges to Chinese immigrants and to protect them from "ill treatment."  *Id.* at 683.  The Court held that the defendant's actions did not make out a seditious conspiracy.  The Court so ruled because "[h]is conspiracy is for the ill treatment itself, and not for hindering or delaying the United States in the execution of their measures to prevent it.  His force was exerted against the Chinese laborers, and not against the government in its efforts to protect them."  *Id.* at 694.

Defendants read *Baldwin* to mean that "the Government must allege . . . that the *Rhodes* defendants' purpose in conspiring together was to use force against a person 'who has authority to

execute and who is immediately engaged in executing a law of the United States.'" Caldwell MTD at 14 (quoting *Haywood v. United States*, 268 F. 795, 800 (7th Cir. 1920)). But *Baldwin* says no such thing. Rather, it read two of the seditious conspiracy statute's clauses in tandem— (1) "opposition" by force to the authority of United States and (2) preventing, hindering, or delaying the "execution of any law of the United States." Those clauses, the Court said, "evidently impl[y] force against the government as a government." *Baldwin*, 120 U.S. at 693. The Court further observed that the "execution" clause "means something more than setting the laws themselves at defiance. There must be a forcible resistance of *the authority of the United States* while endeavoring to carry the laws into execution." *Id.* (emphasis added). Thus, under *Baldwin*, "resistance to the authority of the United States" is what must be alleged. It does not require the government to plead that the conspiracy was directed at a particular federal official.

Defendants also rely on two circuit court decisions—*Anderson v. United States*, 273 F. 20 (8th Cir. 1921), and *Haywood v. United States*, 268 F. at 795—that, to be fair, contain language supporting their position. For example, the court in *Anderson* said that a seditious conspiracy count must "charge that the purpose of the conspiracy was the exertion of force against those charged with the duty of executing the laws of the United States." 273 F. at 26. Similarly, in *Haywood*, the court stated that the seditious conspiracy statute's "prima facie meaning condemns force only when a conspiracy exists to use it against some person who has authority to execute and who is immediately engaged in executing a law of the United States." 268 F. at 800. These cases, however, are better read to emphasize that the seditious conspiracy must be directed at government officials or employees, as opposed to nongovernment actors, to effect "a forcible resistance of the authority of the United States while endeavoring to carry the laws into execution." *Baldwin*, 120 U.S. at 693. In *Anderson*, the court ultimately deemed the charge deficient because the force

alleged was aimed not at federal officials but "against industrial and commercial activities and interests by lawless acts during strikes for the purpose of accomplishing alleged socialistic ends in the overthrow and destruction of the present civil compact." *Id.* at 26–27. Likewise, the *Haywood* court found the seditious conspiracy count lacking because its object was "the operations of producers from whom the government was expecting to buy or had contracted to buy war munitions and supplies," and "[p]roducers, who have contracts to furnish the government with supplies, are not thereby made officials of the government." *Id.* at 799–800.

The seditious conspiracy charge here poses none of the problems found in *Anderson* and *Haywood*. Count One alleges that Defendants conspired to "oppose the lawful transfer of presidential power by force, by preventing, hindering, or delaying by force the execution of the law governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code." Indictment ¶ 16. That assertion, along with the facts alleged in support, *see id.* ¶¶ 17–134, are sufficient to plead "a forcible resistance of the authority of the United States while endeavoring to carry the laws into execution," *Baldwin*, 120 U.S. at 693.

### d.    Execution of the laws on January 6th

Defendants' challenge to Count One fails for another reason. Even accepting their premise that a seditious conspiracy charge must identify a person authorized to execute the laws of the United States as the target of the conspiracy, this indictment does so. It alleges that the Vice President and members of Congress were "execut[ing]" the election laws of the United States on January 6th, as that term is used in § 2384. Indictment ¶¶ 1, 6. This allegation is legally sufficient.

Courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment. After all, only the words on the page constitute the law adopted

by Congress and approved by the President." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020). When Congress enacted the Conspiracies Act and the Ku Klux Klan Act during the mid-nineteenth century, "execution" meant "[t]he completion of an act or proceeding, by which it is rendered operative or effectual; a following out or carrying into effect." 1 ALEXANDER M. BURRILL, A LAW DICTIONARY AND GLOSSARY 584 (2d ed. 1860). Other dictionaries from that era are to the same effect. *See also* JOHN BOUVIER, LAW DICTIONARY, ADAPTED TO THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA, AND OF THE SEVERAL STATES OF THE AMERICAN UNION 495 (2d ed. 1867) (defining "execution" to mean "[t]he act of carrying into effect the final judgment of a court, or other jurisdiction"); *Execution*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (defining "execution" as "[p]erformance; the act of completing or accomplishing"; "the last act of the law in completing the process by which justice is to be done"; or "something done or accomplished").

Applying this common meaning, the Vice President and members of Congress do "carry[] into effect" the "laws governing the transfer of power." The Twelfth Amendment directs that the "President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates [of the Electors] and the votes shall then be counted." U.S. CONST. amend. XII. The Electoral Count Act of 1887 provides additional, precise instructions. *See* Electoral Count Act of 1887, Pub. L. No. 49-90, 24 Stat. 373 (1887). Before a Joint Session of Congress, the President of the Senate serves as the presiding officer, opens the certificates of the electoral votes, and hands them to tellers appointed by each House who make a list of the votes. 3 U.S.C. § 15. When announcing each certificate, the President of the Senate calls for objections, which if made must be in writing and signed by one Senator and one member of the House of Representatives. *Id.* Thereafter, the Senate and the House withdraw to their respective chambers to consider each

14

objection, and "each Senator and Representative may speak to such objection or question five minutes, and not more than once[.]" *Id.* § 17.  The President of the Senate is empowered to cut off debate after two hours, *id.*, and he also has the "power to preserve order" during the session, *id.* § 18.  The Electoral Count Act even details where the presiding officer, the Speaker, the Senators, the Representatives, the tellers, and others are to sit in the chamber.  *Id.* § 16.  And it commands that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared."  *Id.*  According to the indictment, the Vice President and members of Congress had gathered in a Joint Session on January 6th to carry out these mandated constitutional and statutory acts.  Indictment ¶¶ 1, 6.  Count One therefore asserts that the alleged seditious conspiracy targeted federal officials engaged in "the execution," or the "carrying out," "of any law of the United States."

Defendants urge the court to abandon the ordinary meaning of "execution" in favor of a constitutional one.  They insist that "execution" as used in § 2384 must be construed in the same sense as in the Take Care Clause, which places within the Executive Branch the duty to "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 3.  And, because the Constitution places the duty to execute the laws only in the executive, they say, "Members of Congress . . . are constitutionally prohibited from executing federal law," Caldwell MTD at 19, and therefore cannot be the target of a seditious conspiracy aimed at impeding "the execution of any law of the United States."

But Defendants' argument fails in its premise.  The term "execution" as used in § 2384 does *not* import the meaning of that term as it is used in Article II, Section 3.  As this court has previously observed, "the Supreme Court has not reflexively imported constitutional meanings

into federal statutes." *Thompson v. Trump*, No. 21-cv-400 (APM), 2022 WL 503384, at *26 (D.D.C. Feb. 18, 2022). That is particularly true as to criminal statutes.

The prosecution of David Lamar in 1914 illustrates the point. Lamar was alleged to have falsely pretended to be a member of the House of Representatives in a scheme to defraud a bank and a corporation. *Lamar v. United States* (*Lamar I*), 240 U.S. 60, 64 (1916). He was charged with impersonating an "officer of the Government of the United States" under a penal statute that made it unlawful for a person, with the intent to defraud, to "falsely assume or pretend to be an officer or employee acting under the authority of the United States, or any Department, or any officer of the government thereof." *Lamar v. United States* (*Lamar II*), 241 U.S. 103, 111 (1916). Lamar filed two writs of error from his conviction with the Supreme Court.[9] In his first, he argued "that the interpretation of the Constitution was involved in the decision that a Congressman is an officer of the United States." *Lamar I*, 240 U.S. at 64. The Court summarily rejected that argument, saying that "[a]s to the construction of the Constitution being involved, it obviously is not." *Id.* at 65. "[W]ords may be used in a statute in a different sense from that in which they are used in the Constitution." *Id.* The pertinent question, the Court said, was what "officer" meant not in the Constitution but in the criminal code. *Id.*

The Court expounded on this decision in *Lamar II*. There, Lamar asserted "that no offense under the statute was stated in the indictment because a member of the House of Representatives of the United States is not an officer acting under the authority of the United States within the meaning of" the penal code provision on which the indictment was based. *Lamar II*, 241 U.S. 112. Lamar contended that "officer" as used in the statute carried the same meaning as "civil

---

[9] The complex procedural aspects of Lamar's appeals are described in *Lamar II*, 241 U.S. at 107–10.

officer" in the Constitution, which he asserted did not include members of Congress.[10]  The Court

again rejected that argument and reaffirmed its earlier decision.  This time the Court gave more

guidance on how a penal statute that contains words specially used in the Constitution should be

construed:

> [T]he issue here is not a constitutional one, but who is an officer
> acting under the authority of the United States within the provisions
> of the section of the Penal Code under consideration?  And that
> question must be solved by the text of the provision, not shutting out
> as an instrument of interpretation proper light which may be
> afforded by the Constitution, and not forgetting that a penal statute
> is not to be enlarged by interpretation, but also not unmindful of the
> fact that a statute, because it is penal, is not to be narrowed by
> construction so as to fail to give full effect to its plain terms as made
> manifest by its text and its context.

*Id.*  Taking this approach, the Court had little trouble concluding that a congressman was an

"officer" for purposes of the penal statute.  *Id.*  It stated:

> Guided by these rules, when the relations of members of the House
> of Representatives to the government of the United States are borne
> in mind, and the nature and character of their duties and
> responsibilities are considered, we are clearly of the opinion that
> such members are embraced by the comprehensive terms of the
> statute.

*Id.*  The Court further stated, if there remained any uncertainty on the issue, "all ground for doubt

would be removed" by various other considerations.  *Id.* at 112–13.  Among them was that "prior

to and at the time of the original enactment in question the common understanding [was] that a

member of the House of Representatives was a legislative officer of the United States."  *Id.* at 113.

For that proposition, the Court cited dictionary definitions of "officer" and related terms.  *Id.*

---

[10] For this interpretation, Lamar pointed to the impeachment of Senator William Blount of Tennessee in 1799, during which the Senate had concluded early in the proceedings that "a Senator of the United States was not a civil officer subject to impeachment within the meaning of § 4 of article 2 of the Constitution."  *Lamar II*, 241 U.S. at 112; *see also Impeachment Trial of Senator William Blount, 1799*, U.S. SENATE, https://www.senate.gov/about/powers-procedures/impeachment/impeachment-blount.htm (last visited June 23, 2022).

What was true in *Lamar* is equally true here.  When the relations of the Vice President and members of Congress "to the government of the United States are borne in mind, and the nature and character of their duties and responsibilities are considered," *id.* at 112*, the court has little trouble concluding that the Vice President and members of Congress were engaged in "the execution of any law of the United States" on January 6th.  And, if there were any remaining ambiguity as to this understanding, as already discussed, the common understanding of the term "execution" at the time of the original enactment of § 2384 removes "all ground for doubt."  *Id.* at 112–13.[11]  Defendants' interpretation, on the other hand, would produce an incongruous result:  it would mean that *no one* was "executing" the election laws on January 6th.  That makes little sense.[12]

     e.    *Buckley v. Valeo*

Defendants also assert that the Supreme Court has already decided that Congress is not "executing" any law when it acts pursuant to the Twelfth Amendment and the Electoral Count Act.  Caldwell MTD at 17–19.  Defendants point to *Buckley v. Valeo*, 424 U.S. 1 (1976), in which the Court commented that Congress's actions pursuant to the Twelfth Amendment were "judicial in character."  424 U.S. at 134 (internal quotation marks omitted).  But Defendants' reliance on

---

[11] Because of this conclusion, the court does not reach the government's additional contention that, even if the word "execution" is read in its constitutional sense, the Constitution grants Congress executive authority with respect to the Certification of the Electoral College vote, just as it does for certain other "special powers," such as impeachment, ratification of treaties, and the declaration of war.  *See* Gov't Opp'n at 17–20.

[12] The government adds a historical note to support its reading of § 2384.  It points to the 1954 attack on the House of Representatives, in which an armed group of Puerto Rican nationalists opened fire on members on the House floor, leaving five wounded.  That group and others were charged with and convicted of a single count of seditious conspiracy.  *See United States v. Lebron*, 222 F.2d 531, 532 (2d Cir. 1955).  Following that episode, Congress increased the penalties for seditious conspiracy from six to 20 years of imprisonment.  *See* Act of July 24, 1956, Pub. L. No. 84-766, 70 Stat. 623; H.R. Rep. No. 84-922, at 2 (1955) (stating that the 1954 attack "clearly demonstrated" the need to increase the maximum penalties for seditious conspiracy).  This episode provides clear evidence that Congress believed as of 1956 that a seditious conspiracy could target the federal legislature, but it tells the court little about whether Congress viewed itself as a target of an "execution" clause conspiracy.  The readily available historical record does not indicate under which clause the defendants in *Lebron* were prosecuted.

*Buckley* is simply another unsuccessful effort to import constitutional concepts into a criminal statute.

The Federal Election Campaign Act of 1971 established the Federal Election Commission ("FEC") and authorized it to exercise certain executive functions, including rulemaking and civil enforcement. *See id.* at 111–12. The Act gave Congress the power to appoint the majority of the FEC's Commissioners. The question before the Court in *Buckley* was whether that grant of authority violated the Appointments Clause. *See id.* at 113, 137–38. The Court held that it did. *See id.* at 140–41. The Court said that only "Officers of the United States," as that term appears in Article II, Section 2, clause 2, could perform executive functions and that the Constitution required such Officers to be appointed by the President. *Id.* at 125–26. Because the newly formed FEC would perform some executive functions, and some of its Commissioners were appointed not by the President but by Congress, that arrangement violated the Appointments Clause. *See id.* at 140–42.

As part of its ruling, the Court considered the argument that Congress's power to appoint Commissioners was derived from the Twelfth Amendment, "insofar as the authority of the Commission to regulate practices in connection with the Presidential election is concerned." *Id.* at 133. The Court held that the Twelfth Amendment granted no such power. It explained: "The method by which Congress resolved the celebrated disputed Hayes-Tilden election of 1876, reflected in 19 Stat. 227"—a reference to the Electoral Count Act—"supports the conclusion that Congress viewed [the Twelfth] Amendment as conferring upon its two Houses the same sort of power 'judicial in character,' as was conferred upon each House by Art. I, s 5, with respect to elections of its own members." *Id.* at 134 (citation omitted). Defendants' favored quotation from *Buckley*—that the Twelfth Amendment is "judicial in character"—thus arose in the context of the

Court dismissing the Twelfth Amendment as a source of congressional authority to appoint officials with executive power. Viewed in this light, Defendants' reliance on *Buckley* is just another way of framing their Take Care Clause argument: that because the Constitution vests the President, and not Congress, with executive power, Congress was not "executing" any law on January 6th for purposes of § 2384. The court rejects Defendants' *Buckley* argument for the reasons already discussed.

f.    Execution of the Twentieth Amendment

Recall that in addition to the Twelfth Amendment and Electoral Count Act, the indictment identifies the Twentieth Amendment as a law whose execution Defendants sought to prevent, hinder, and delay by force. Defendants advance a specific argument about this allegation. They maintain that the Twentieth Amendment is not a law that is "executable" for purposes of § 2384. It is, they say, "a statement of *de jure* authority, specifying when a presidential term lawfully ends. It neither requires nor specifies any further action by implementation, but is simply a statement of legal status than neither requires nor is capable of being 'executed.'" Vallejo MTD at 3; *see also* Meggs MTD at 8–11. The court agrees with this reading, but because the court has found that Count One otherwise states an offense it will not dismiss the count.

The Twentieth Amendment states as follows:

> The terms of the President and Vice President shall end at noon on the 20th day of January, and the terms of Senators and Representatives at noon on the 3d day of January, of the years in which such terms would have ended if this article had not been ratified; and the terms of their successors shall then begin.

U.S. CONST. amend. XX. As written, the Twentieth Amendment contemplates no "execution" to come into effect. That is, the Amendment does not call for the "completion of an act or proceeding, by which it is rendered operative or effectual." 2 BURRILL, *supra*, at 584. It is fully self-executing.

It is therefore difficult to imagine a seditious conspiracy directed at the execution of a law that requires none.

The government's response to this line of argument is limited. The government states that "the transfer of presidential power is no foreordained process; indeed, it is impossible to carry out without a certified election result and other steps that the government must undertake pursuant to the Constitution and various federal statutory provisions." Gov't Opp'n at 25. The court has no quibble with that statement on its face, but it raises the question of what "other steps" the government must undertake to transfer presidential power. The indictment itself does not identify the "other steps" after the election results are certified. One possibility suggested by the government is "stop[ping] the Inauguration in addition to the January 6 Certification proceeding." *Id.* at 23. But the Twentieth Amendment does not require an inauguration for a presidential term to begin and the other to end. And, if what the government really means is the taking of the oath of office in public, that condition is found not in the Twentieth Amendment but in Article II, Section 8, clause 1, which does not require the oath to be administered publicly at an inaugural ceremony.[13]

Identifying the "other steps" that need to be "executed" to enable the transfer of presidential power following January 6th is no mere technicality. Count One alleges overt acts in furtherance of the charged conspiracy continuing through January 20, 2021. Indictment ¶¶ 133–134. To the extent the conspiracy involved the use of force to stop the Certification of the Electoral College, that effort failed—and ended—in the early morning hours of January 7, 2021, when Vice President Pence declared the results of the vote tally. For the alleged conspiracy to have continued beyond

---

[13] President Obama, for example, took his oath of office twice in nonpublic settings. *See* Nina Totenberg, *The Presidential Oath: Not Always Perfect, but It Gets the Job Done*, NPR News (Jan. 20, 2013), https://www.npr.org/2013/01/20/169809880/the-presidential-oath-not-always-perfect-but-it-gets-the-job-done.

January 7th, Defendants had to have targeted the execution of some other law (besides the Twentieth Amendment) governing the presidential transfer of power; or, if there is no such law, they must have then plotted a related form of seditious conspiracy under § 2483 (for example, "to oppose by force the authority" of "the Government of the United States").  But the original indictment makes neither allegation.[14]  *See* Indictment ¶ 17(a)–(j).[15]

At oral argument, the government further explained its theory involving the Twentieth Amendment.  It stated that it believes the evidence will show that Defendants endeavored "to keep President Trump in office" and "to delay Joe Biden from assuming that office," which would not "allow the 20th Amendment to be executed by the government; in other words, not allow the changeover in power on January 20th at noon."  Oral Arg. Hr'g Tr. at 49.  But if that is the government's theory, Defendants' goal was not to impede the execution of the Twentieth Amendment.  It was to "prevent, hinder, or delay" President Biden from exercising presidential authority under Article II of the Constitution.  In other words, because Joseph Biden had prevailed in the Electoral College vote on January 7th, by operation of the Twentieth Amendment his term of office would begin at noon on January 20th and President Trump's term would end.  If Defendants nevertheless continued to conspire after January 7th to "keep President Trump in office," their acts were not in furtherance of resisting the execution of the Twentieth Amendment

---

[14] Again, the Superseding Indictment now alleges that Defendants sought "to oppose by force the authority" of "the Government of the United States."  *See* p. 4 n.4, *supra*.

[15] In a footnote in its brief, the government suggests a third possibility:  it does not matter if there was an additional executable law after January 7th so long as Defendants believed there was one because "impossibility is not a defense to an inchoate crime."  Gov't Opp'n at 25 n.3.  The indictment does not explicitly advance this theory.  And, even if it did, the court is unsure whether it is correct.  It is true that *factual* impossibility is not a defense to an inchoate crime like conspiracy, but "[p]ure *legal* impossibility is always a defense."  *In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000) (emphasis added).  The court need not, however, decide at this juncture whether the government's footnote implicates factual or legal impossibility.  If the government wishes to proceed on an impossibility theory before the jury, it must advise the court and defense counsel, so that the issue can be considered before trial.

but rather in furtherance of resisting Joseph Biden's ability to execute Article II powers as the new, lawful President of the United States. That is not, however, what the indictment says.

In the end, though, the above analysis does not require the court to dismiss Count One because it otherwise states an offense: a seditious conspiracy to obstruct the execution of the Twelfth Amendment and the Electoral Count Act. The court also declines at this time to "strike" reference to the Twentieth Amendment from the indictment pending further discussion of that potential remedy with the parties.

g.    Additional failure-to-state-an-offense arguments

The court quickly disposes of two additional failure-to-state-an-offense arguments advanced by Defendants.[16] First, they contend that Count One fails because it alleges only lawful conduct. Meggs MTD at 12. Specifically, Defendants insist that the indictment only charges them with calling upon President Trump to invoke the Insurrection Act of 1807, which is "a lawful act." *Id.* at 12–13. The indictment, however, nowhere mentions the Insurrection Act. Instead, it alleges a conspiracy in which Defendants "are charged with plotting to use force to stop the transfer [of] presidential power from one administration to the next." Gov't Opp'n at 27. Defendants might try to advance the defense at trial that they were doing no more than urging the President to invoke the Insurrection Act, but that will be for a jury to decide.

Second, Defendants say that the indictment charges Defendants for their "political opinions" about how Congress should have "appl[ied] the laws to the facts, amidst unprecedented, massive alterations." Meggs MTD at 9. Defendants do not specify what they mean by "unprecedented, massive alterations," but they seem to say that they are being prosecuted for

---

[16] "Defendants," as used in this section, refers to Defendant Meggs, the author of the motion, and Defendants Caldwell, Watkins, Rhodes, and Vallejo, who join in the motion. *See* ECF No. 86 (Caldwell); ECF No. 92 (Watkins); ECF No. 97 (Rhodes); ECF No. 115 (Vallejo).

exercising their First Amendment rights of expression. However, "[s]editious conduct can always be punished," *Dennis v. United States*, 341 U.S. 494, 590 (1951) (Douglas, J., dissenting), and the indictment sufficiently pleads the offense.

### 2. Failure to Provide Adequate Notice

Certain Defendants seek dismissal of Count One for another reason: "for lack of specificity and for failing to inform [them] of the nature and cause of the accusation against [them]." Hackett MTD Counts 1–4, at 1; *see also* Vallejo MTD at 4–5 (arguing that Count One must be dismissed because "it does not provide [Defendants] with notice regarding which statute(s) [they] opposed executing").[17] That argument rests primarily on the Supreme Court's directive in *Russell v. United States*, 369 U.S. 749, 763 (1962), that an indictment must "sufficiently apprise[] the defendant of what he must be prepared to meet," as well as Rule 7(c)'s requirement that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," FED. R. CRIM. P. 7(c)(1). "[F]atal" to Count One, Defendants say, "is the failure to give [them] notice which law [they have] allegedly violated as a result of the specifically-described conduct. . . . Knowing which U.S. law is the subject of the seditious conspiracy statute is crucial information for the preparation of [their] defense." Hackett MTD Counts 1–4 at 13.

But as detailed above, Count One does identify the United States laws whose execution were the target of the alleged seditious conspiracy: "the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code" (that is, the Electoral Count Act). The indictment thus provides the specifics that were found wanting in *United States v. Murphy*, 762 F.2d 1151, 1153 (1st Cir. 1985), the other case on which Defendants primarily rely.

---

[17] Defendants Hackett, Rhodes, Watkins, Minuta, Vallejo, and Meggs joined in these motions. *See* ECF No. 96 (Hackett); ECF No. 98 (Watkins); ECF No. 99 (Rhodes); ECF No. 101 (Minuta); ECF No. 103 (Harrelson); ECF No. 115 (Vallejo); June Status Conf. Tr. at 31 (Meggs).

*See* Hackett MTD Counts 1–4 at 12–13. There, the court held invalid an indictment that charged the defendant with threatening a witness with intent to influence that person's testimony in "an official proceeding" but failed to identify the official proceeding. *Murphy*, 762 F.2d at 1153. But no comparable deficiency appears in Count One of this indictment.[18]

At oral argument, Defendants asserted that Count One lacks specifics because, although it identifies three laws whose execution Defendants allegedly targeted, it also contains the word "including" before them, which might enable the government to rely on other laws at trial without adequate notice to Defendants. Oral Arg. Hr'g Tr. at 25; *see also* Vallejo MTD at 5 (arguing that Defendants would be left with "no protection should the government come up with a new theory at trial other than the three laws it has expressly listed in the Indictment"). But the solution to that concern is not dismissal of Count One but a bill of particulars. "A bill of particulars can be used to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges." *United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987). This case does not involve a "fatally defective indictment" that cannot be cured by a bill of particulars. *United States v. Nance*, 533 F.2d 699, 701 (D.C. Cir. 1976). Therefore, Defendants in the first instance should ask the government to specify the additional laws, if any, on which it intends to rely to support Count One, and if a response is not forthcoming or otherwise satisfactory to them, Defendants can file a bill of particulars.

---

[18] Defendants also seek to dismiss Counts Two, Three, and Four for failing to provide sufficient detail, but the motion nowhere states what factual specifics are missing from those counts. *See* Hackett Mot. at 13 (only identifying a factual deficiency as to Count One of the indictment).

B.      **Counts Two and Three: Conspiracy to Obstruct an Official Proceeding and Obstruction of an Official Proceeding**

The court now turns to Counts Two and Three. Those counts charge, respectively, that Defendants conspired to obstruct an official proceeding in violation of 18 U.S.C. § 1512(k), and that each of them committed the substantive offense of obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2). Indictment ¶ 136. In moving to dismiss these counts, Defendants largely repeat the same arguments advanced to dismiss Counts One and Two of the Sixth Superseding Indictment in the predecessor case, *United States v. Caldwell*, Case No. 21-cr-28 (APM) (D.D.C.). *See* Caldwell MTD at 20 n.12.[19] In *Caldwell*, the court rejected the defendants' arguments for dismissal and denied their motions to dismiss and for reconsideration. *See Caldwell I*, 2021 WL 6062718, at *11–19; *Caldwell II*, 2022 WL 203456, at *2–3. By an Order issued on January 19, 2022, the court adopted the record in the *Caldwell* matter through January 12, 2022, as the record in the instant case. Order, ECF No. 8. The court's prior decisions in *Caldwell* are therefore the law of the case as to Defendants Meggs, Harrelson, Watkins, Minuta, Hackett, Moerschel, and Caldwell, each of whom was originally a defendant in that matter. *See Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) ("'Law-of-the-case doctrine' refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided (i.e., established as the law of the case) by that court . . . ."). As for Defendants Rhodes and Vallejo, who were charged for the first time in this case, the court applies its rulings in *Caldwell* to them.

In a footnote, Defendants cite in passing *United States v. Miller*, No. 21-cr-119 (CJN), 2022 WL 823070 (D.D.C. Mar. 7, 2022), issued after the *Caldwell* decisions, in which another

---

[19] The only meaningful difference is that Count One in *Caldwell* charged the conspiracy under 18 U.S.C. § 371, *see* Sixth Superseding Indictment, *Caldwell* Docket, ECF No. 513, whereas the conspiracy in this case is brought under § 1512(k). Indictment ¶ 136.

judge in this District dismissed conspiracy and substantive § 1512(c)(2) counts for failure to state

an offense.  Caldwell MTD at 20 n.12.  Defendants do not expressly urge the court to follow *Miller*.

Nevertheless, the court has considered *Miller* and disagrees with its analysis.  The court joins the

judges of this District Court who have done the same and adopts and incorporates their reasoning

here.  *See United States v. McHugh*, No. 21-cr-453 (JDB), 2022 WL 1302880 (D.D.C. May 2,

2022); *United States v. Reffitt*, No. 21-cr-32 (DLF), 2022 WL 1404247, at 7–10 (D.D.C. May 4,

2022); *United States v. Bingert*, No. 1:21-cr-91 (RCL), 2022 WL 1659163, at 7–11 (D.D.C. May

25, 2022); *United States v. Fitzsimons*, No. 21-cr-158 (RC), 2022 WL 1698063, at 6–12 (D.D.C.

May 26, 2022); *United States v. Williams*, No. 21-cr-0618 (ABJ), 2022 WL 2237301, at *17 n. 13

(D.D.C. June 22, 2022).

### C.    Count Four:  Conspiracy to Prevent an Officer from Discharging Any Duties

Like the seditious conspiracy count, Count Four of the *Rhodes* indictment is a first-time

charge not carried over from *Caldwell*.  It accuses Defendants of violating 18 U.S.C. § 372.

Indictment ¶¶ 139–140.  Section 372 makes it a crime for two or more persons to

> conspire to prevent, by force, intimidation, or threat, any person
> from accepting or holding any office, trust, or place of confidence
> under the United States, or from discharging any duties thereof, or
> to induce by like means any officer of the United States to leave the
> place, where his duties as an officer are required to be performed, or
> to injure him in his person or property on account of his lawful
> discharge of the duties of his office, or while engaged in the lawful
> discharge thereof, or to injure his property so as to molest, interrupt,
> hinder, or impede him in the discharge of his official duties.

18 U.S.C. § 372.  Count Four specifically charges Defendants with conspiring, by force,

intimidation, or threat, to prevent members of Congress from discharging the duties of their office

and to induce them to leave the place where their duties as officers were required to be performed.

Indictment ¶¶ 139–140.

Defendants offer two related reasons for why Count Four fails.  They contend that because (1) members of Congress do not occupy "any office, trust, or place of confidence under the United States," and (2) members of Congress are not "officer[s] of the United States," Defendants could not have conspired to violate § 372.  Caldwell MTD at 31–40.  In other words, Defendants' position is that it was legally impossible for them to violate § 372 because members of Congress are not protected under the statute.  *See In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000) ("Pure legal impossibility is always a defense.  For example, a hunter cannot be convicted of attempting to shoot a deer if the law does not prohibit shooting deer in the first place." (internal quotation marks omitted)); *United States v. Oviedo*, 525 F.2d 881, 883 (5th Cir. 1976) ("Legal impossibility occurs when the actions which the defendant performs or sets in motion, even if fully carried out as he desires, would not constitute a crime.").

Defendants' arguments once more largely turn on the premise that the statute's terms carry their constitutional meaning.  They maintain that "[b]ecause Members of Congress are not 'officer[s] of the United States' as that term is used in the Appointments Clause . . . they likewise are not 'officers' for purposes of § 372."  Caldwell MTD at 32.  Similarly, they insist, the term "office" means the same as it does under the Ineligibility Clause, which excludes members of Congress from appointment to any "civil Office."  *See* U.S. CONST. art. I, § 6, cl. 2 ("No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created . . . .").  *Id.* at 35–36.  As for the words "trust" and "confidence," Defendants argue those words are found in presidential commissions and therefore are limited by Article II, Section 3, clause 4, which states that the President "shall Commission all the Officers of the United States."  *Id.* at 37–38.

This court has previously rejected similar contentions, albeit in a different context. In *Thompson v. Trump*, members of Congress sued President Trump pursuant to 42 U.S.C. § 1985(1) for injuries arising out of the events of January 6th. 2022 WL 503384, at *2. Section 1985(1) is the civil analogue of § 372, and the statutes are identically worded.[20] In the context of arguing that the plaintiffs in *Thompson* lacked statutory standing, President Trump invoked the Constitution, as Defendants do here, to urge that members of Congress neither are "officer[s] of the United States" nor occupy "any office, trust, or place of confidence." *See id.* at *25. The court, however, rejected the premise that "Congress intended to use the Constitution as a dictionary for interpreting the words found in § 1985(1)." *Id.* at *26. Looking instead to the ordinary meaning of the terms found in Reconstruction-Era law dictionaries, the court concluded that Congress would have understood its members to have occupied an "office, trust, or place of confidence under the United States" and to be "officer[s] of the United States" for purposes of § 1985(1). *Id.* at *26–28. That same conclusion applies equally here.

Defendants contend that the court got it wrong in *Thompson*. They first argue that the "Court's analysis in *Thompson* . . . is in direct conflict with *United States v. Hartwell*, where the Supreme Court, referencing the Appointments Clause, held that 'an office is a public station, or employment, *conferred by the appointment of government*.'" Def. Caldwell's Reply in Supp. of Caldwell MTD, ECF No. 131 [hereinafter Caldwell Reply], at 16 (quoting *United States v.*

---

[20] Title 42 U.S.C. § 1985(1) provides a civil remedy for a party injured by a conspiracy in which

> two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties.

42 U.S.C. § 1985(1).

*Hartwell*, 73 U.S. 385, 393 (1867)).  Defendants also rely on other post-*Hartwell* decisions in which the Supreme Court held that the statutory term "officer" mirrored the use of that term in the Appointments Clause.  *See* Caldwell MTD at 33–34 (first citing *United States v. Germaine*, 99 U.S. 508, 510 (1878); then citing *United States v. Smith*, 124 U.S. 525, 531–32 (1888); and then citing *United States v. Mouat*, 124 U.S. 303, 307 (1888)).

But *Hartwell* and the other cases on which Defendants rely are fundamentally different from this one.  *Hartwell*, *Germaine*, and *Smith* were all criminal cases in which the penal statute forbade "officers" from engaging in certain acts.  Animating the Supreme Court's evaluation of whether the defendants were "officers" under the statutes was the principle, articulated in *Germaine*, that "[i]t is . . . not to be supposed that Congress, when enacting a criminal law for the punishment of officers of the United States, intended to punish any one not appointed in one of those modes."  99 U.S. at 510.  So, in *Hartwell*, it was determined that a clerk who "was appointed by the head of a department within the meaning of the constitutional provision upon the subject of the appointing power" was subject to a criminal statute applicable to "officers" charged with safe-keeping of public monies.  *See* 73 U.S. at 393–94.  In *Germaine*, the Court held that a surgeon who worked sporadically at the request of the Commissioner of Pensions was not an "officer" for purposes of an extortion statute.  99 U.S. at 511–12.  And, in *Smith*, the Court held that a clerk in a collector-of-customs office likewise was not an "officer" for purposes of an embezzlement statute.  124 U.S. at 532.  In each of these cases, a narrow construction of the term "officer" was appropriate because, as the Court said during that era, a "penal statute is not to be enlarged by interpretation."  *Lamar II*, 241 U.S. at 112.

The other early Supreme Court case that Defendants cite, *Mouat*, is not a criminal case, but it is one in which the Court similarly applied a narrow construction of the term "officer."  There,

the question was whether the claimant was an "officer[] of the navy," for purposes of a statute that exempted naval officers from keeping an account of their actual expenses when on employment-related travel and permitted them instead to claim "eight cents per mile . . . in lieu of their actual expenses." *Mouat*, 124 U.S. at 305–06. The Court construed the term "officer" narrowly because at issue was a "special statute, exempting for particular reasons a certain class of persons from the operation of a general law," making it "obviously proper to confine that class to those who are, properly speaking, officers of the navy." *Id.* at 306–07.

Contrast these provisions with the historical roots of § 372 and the reasons for its passage. The Ku Klux Klan Act "was enacted by a Congress acutely aware of the massive and frequently violent resistance in the southern states to federal Reconstruction after the Civil War." *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1334 (7th Cir. 1977). Section 372 itself "was designed to protect Federal officers by providing for Federal prosecution whenever they were injured because of or in the course of their duties." Conspiracy to Impede or Injure an Officer of the United States, 18 U.S.C. § 372, 1 Op. O.L.C. 274, 276 (1977) [hereinafter OLC Conspiracy Memo]. The Supreme Court has said of a related Reconstruction-Era conspiracy provision, now codified at 18 U.S.C. § 241,[21] "We think that history leaves no doubt that, if we are to give § 241 the scope that its origins dictate, we must accord it a sweep as broad as its language." *United States v. Price*, 383 U.S. 787, 801 (1966). The same must be true of § 372. "The broad purpose of protecting the Federal presence as fully as possible . . . supports a broad, rather than narrow, reading of the word 'office.'" OLC Conspiracy Memo, 1 Op. O.L.C. at 276. The history of § 372 therefore defeats

---

[21] Section 241 was enacted on May 31, 1870, as part of the Enforcement Act of 1870, 16 Stat. 140, only a few months after the passage of the Fifteenth Amendment. *See United States v. Price*, 383 U.S. 787, 801–02 (1966). The provision later was codified as Section 19 of the Criminal Code of 1909, only two sections before the code provision that would become § 372. *See* 35 Stat. at 1092.

Defendants' effort to tie the term "officer of the United States" to its Appointments Clause meaning.

Defendants also miss the Supreme Court's clear instruction in the cases from that era and afterward that courts should not automatically import constitutional meaning into similar statutory terms. For instance, in *Mouat*, the Court said:

> Undoubtedly congress may have used the word "officer" in some other connections in a more popular sense, as will be shown in the case of *U.S. v. Hendee*, . . . in which case it will be the duty of the court in construing such an act of congress to ascertain its true meaning, and be governed accordingly.

124 U.S. at 308. In *Hendee*, issued the same day as *Mouat*, the Court held that Congress used the term "officer" in a statute concerning time credit in the Navy "in the more general sense," and not to mean "an officer nominated and appointed by the president." 124 U.S. 309, 313 (1888). Later, in *Steele v. United States*, the Court held that when Congress required a search warrant to be issued to a "civil officer of the United States duly authorized to enforce or assist in enforcing any law thereof," as used in the Espionage Act, it did not "mean an officer in a constitutional sense." 267 U.S. 505, 507 (1925).

Defendants believe *Steele* aids their cause, but it does not. They quote this passage from *Steele*: "It is quite true that the words 'officer of the United States,' when employed in the statutes of the United States, [are] to be taken usually to have the limited constitutional meaning." Caldwell MTD at 34 (quoting *Steele*, 267 U.S. at 507). However, they do not quote the very next sentence: "But we find that this court, in consideration of the context, has sometimes given it an enlarged meaning, and has found it to include others than those appointed by the President, heads of departments, and courts." *Steele*, 267 U.S. at 507. Thus, *Steele* does not supply an unqualified rule that similar constitutional and statutory terms must be interpreted coextensively.

Then there are the Court's two decisions in *Lamar*, which were discussed earlier. In those cases, the Court declined to read the word "officer" in a criminal statue to carry its constitutional meaning. It held instead that a member of the House of Representatives is an "officer acting under the authority of the United States" for purposes of a statute making it a crime for a person to "falsely assume or pretend to be an officer or employee acting under the authority of the United States." *Lamar II*, 241 U.S. at 111–13. Defendants attempt to distinguish the *Lamar* decisions on the grounds that Lamar was indicted under that portion of the statute making it unlawful to impersonate an "officer of the Government of the United States," not an "officer of the United States." Caldwell Reply at 17–20. But Defendants are splitting hairs. The Court did not make any such distinction, and importantly, it relied on definitions found in ordinary and legal dictionaries to conclude that it was understood "prior to and at the time of the original enactment" that "a member of the House of Representatives was a legislative officer of the United States." *Lamar II*, 241 U.S. at 113. Defendants also suggest that the Court's decision not to import the Appointment Clause's meaning of "officer of the United States" was due to the "comprehensive terms of the statute." Caldwell Reply at 20 (quoting *Lamar II*, 241 U.S. at 112). But the terms in § 372 are no less comprehensive in describing the persons protected than those used in the false-impersonation statute at issue in *Lamar*.

Defendants also put forward a textual argument that was not made in *Thompson* as to the meaning of "office, trust, or place of confidence," as it appears in § 372. Defendants focus on the words "accepting and holding" that are immediately before "office, trust, or place of confidence," and they assert that, because members of Congress do not "accept" their positions—they are elected—they do not occupy an "office, trust, or place of confidence." Caldwell MTD at 35–36. This argument, however, ignores the word "holding." Regardless of how they enter their positions,

members of Congress certainly "hold" office.  The ordinary meaning of the word "holding" in 1870 was "a tenure; anything that is held."  WEBSTER'S A DICTIONARY OF THE ENGLISH LANGUAGE 2020 (1878).  The term also meant "to carry on; to continue" and "to maintain."  *Id.*  Thus, in 1871, members of Congress would have understood themselves to be "holding" an "office, trust, or place of confidence under the United States."

Finally, Defendants insist that the terms "trust" and "place of confidence" import the meaning of those terms as used in presidential commissions; therefore, "trust" and "confidence" encompass only those positions in government appointed by the President, such as "military officers, executive branch officials, and judges."  Caldwell MTD at 36–38.  As an example of such commissions, Defendants point to commissions of naval officers, which state:  "Know Ye that, reposing special trust and confidence in the patriotism, valor, fidelity and abilities . . . [t]his Officer will therefore carefully and diligently discharge the duties of the office to which appointed."  *Id.* at 37–38 (quoting *Officer's Commissioning Certificate*, BOB NEENER MILITARY CERTIFICATES, https://www.expressmilitary.com/navy-dd-1.htm (last visited June 23, 2022)).  Defendants have not, however, cited a single case in which a court has looked to the language of a presidential commission to interpret the words of a criminal statute.  This court will not be the first.

The court therefore concludes that Count Four states a violation of § 372.

### D.    Counts Ten, Eleven, Thirteen, and Fourteen:  Tampering with Evidence

Seven Defendants are charged with tampering with evidence in violation of § 1512(c)(1).  *See* Indictment, Counts Nine–Eleven, Thirteen–Fifteen, Seventeen.  That statute imposes a maximum 20-year penalty for "[w]hoever corruptly alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding."  18 U.S.C. § 1512(c)(1).  Defendant

Hackett, joined by Defendants Meggs, Harrelson, and Minuta, move to dismiss the § 1512(c)(1) counts against them (Counts Fourteen, Ten, Eleven, and Thirteen, respectively) or, alternatively, sever them from the other charges.  The court denies their motions.

>    *1.    Motion to Dismiss*

Defendants contend that the tampering counts do not adequately apprise them of the charges against them.  Specifically, they assert that the counts fail because they do "not allege specific or essential facts as required by the Sixth Amendment and Rules 7 and 12 of the Federal Rules of Criminal Procedure."  Hackett MTD Count 14 at 2.

To provide constitutionally adequate notice, an indictment "need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense."  *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014).  Rule 7(c)(1) effectuates that requirement, stating that an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  FED. R. CRIM. P. 7(c)(1).  To meet those requirements, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished."  *Hamling v. United States*, 418 U.S. 87, 117 (1974) (internal quotation marks omitted).

Although "an indictment parroting the language of a federal criminal statute is often sufficient, there are crimes that must be charged with greater specificity."  *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007).  The Supreme Court's decision in *Russell*, on which Defendants rely heavily, provides a "clear example."  *Id.*  There, the Court held that an indictment charging a defendant with refusing to answer a question "pertinent to the question under inquiry"

by a congressional committee was deficient where it failed to allege the subject of the inquiry. *See id.* (citing 2 U.S.C. § 192). The Court later emphasized in *Resendiz-Ponce* that what required the *Russell* indictment to "descend to particulars," *Russell*, 369 U.S. at 765 (internal quotation marks omitted), was that the offense in question "depend[ed] so crucially upon such a specific identification of fact." *Resendiz-Ponce*, 549 U.S. at 789 (quoting *Russell*, 369 U.S. at 764).

The government urges the court to "decline to apply *Russell* here," Gov't Opp'n at 7, but the court need not decide whether to do so. The indictment here sets forth sufficient factual particularity, even under *Russell*, to obviate Defendants' concerns about adequate notice and double jeopardy. The indictment alleges that "[s]ometime on or after January 6," Defendants "deleted from [their] cellular telephone[s] certain media, files, and communications that showed [their] involvement in the conduct alleged" elsewhere in the indictment, "with the intent to impair [the evidence's] integrity and availability for use in an official proceeding, that is, the Grand Jury investigation into the attack of the Capitol on January 6, 2021." Indictment ¶¶ 167–168 (Hackett); *id.* ¶¶ 154–155 (Meggs); *id.* ¶¶ 157–158 (Harrelson); *id.* ¶¶ 164–165 (Minuta). That allegation does more than "parrot" the language of the statute. It identifies when Defendants allegedly tampered with evidence ("sometime on or after January 6"), the nature of that evidence ("certain media, files, and communications that showed [their] involvement in the conduct alleged"), the location of that evidence ("from [their] cell telephone[s]"), and the official proceeding that Defendants sought to obstruct by their alleged tampering ("the Grand Jury investigation into the attack on the Capitol on January 6, 2021"). *Id.* No more is needed to satisfy the Constitution and Rule 7(c)(1). *See United States v. Williamson*, 903 F.3d 124, 130–31 (D.C. Cir. 2018) (holding that indictment charging a violation of 18 U.S.C. § 115(a)(1)(B)[22] that "parrot[ed] the statutory

---

[22] 18 U.S.C. § 115(a)(1)(B) makes it a crime to "threaten[] to assault . . . or murder" a "Federal law enforcement officer . . . with intent to retaliate against" the "officer on account of the performance of official duties."

language and specif[ied] the time and place of the offense and the identity of the threatened officer"
was not deficient because it did not identify the official duty the officer was performing).

Defendants nevertheless demand more. They say the indictment is deficient because it
"does not allege what was deleted from [their] cellular phone[s], nor does it allege with specificity
when material[s] were deleted." Hackett MTD Count 14 at 3–4 (third alteration in original). But
the tampering counts do not "depend so crucially upon such a specific identification of fact."
*Resendiz-Ponce*, 549 U.S. at 789. To the extent Defendants need greater specificity in identifying
precisely what material the government alleges they deleted from their phones, they can, again,
seek a bill of particulars. *See Butler*, 822 F.2d at 1193.

Defendants also complain about a different element of the offense: the corrupt purpose.
In passing, they argue that "[t]o demonstrate a corrupt purpose, the government must show that
[Defendants were] aware of the existence of a criminal investigation or a Grand Jury investigation
at the time materials were deleted." Hackett MTD Count 14 at 4; *see also id.* at 3 n.1 (asserting
that there "is no allegation that Mr. Hackett knew, or should have known, about the existence of
either a criminal investigation or Grand Jury investigation"). But that is not the law. The official
proceeding "need not be pending or about to be instituted at the time of the offense," 18 U.S.C.
§ 1512(f)(1); it need only be "foreseen." *Arthur Andersen, LLP v. United States*, 544 U.S. 696,
707–08 (2005). And there must be some "nexus" between the defendant's actions and the official
proceeding. *Id.*; *see also United States v. White Horse*, 35 F.4th 1119, 1121 (8th Cir. 2022) (stating
it "is correct that a conviction under § 1512(c)(1) requires proof of a nexus between the defendant's
action and an official proceeding"); *United States v. Johnson*, 655 F.3d 594, 605 (7th Cir. 2011)
(approving jury instruction reflecting § 1512(c)(1)'s "nexus" requirement). Here, the indictment
pleads that a grand jury opened an investigation after January 6th. Indictment ¶ 150. "Sometime

on or after January 6, 2021," *id.* ¶¶ 157, 164, 167, Defendant Minuta discarded his cell phone, *id.*
¶ 164, and Defendants Hackett, Meggs, and Harrelson deleted evidence on their cell phones, *id.*
¶¶ 154, 157, 167, each "with the intent to impair [the evidence's] integrity and availability for use
in . . . the Grand Jury investigation into the attack on the Capitol on January 6, 2021," *id.* ¶¶ 155,
158, 165, 168. That pleading is sufficient to support both the foreseeability and the nexus
requirements.

2.    <i>Motion to Sever</i>

As an alternative to dismissal, Defendants request that the tampering counts be severed
under Rule 14(a) from the rest of the indictment. *See* Hackett Mot. to Sever at 3. Defendants
contend that they "cannot be fairly and adequately presented to the jury if [they are] forced to
defend all six counts in one, single trial." *Id.* at 3–4. More specifically, they insist that the jury
may infer guilt as to other counts "*because* [Defendants] deleted something from [their] cellular
phone[s]," and that "*because* of [their] conduct prior to and on January 6, 2021, [they] *must* have
known [they were] committing obstruction when [they] deleted items from [their] phone[s]." *Id.*
at 5. They also express concern about the "danger that the jury may cumulate the evidence from
all charges and find [them] guilty of all counts." *Id.*

The D.C. Circuit has said that

> [t]hree kinds of prejudice warrant relief under Rule 14: 1) the jury
> may cumulate evidence of the separate crimes; 2) the jury may
> improperly infer a criminal disposition and treat the inference as
> evidence of guilt; 3) the defendant may become embarrassed or
> confounded in presenting different defenses to the different charges.

*Blunt v. United States*, 404 F.2d 1283, 1288 (D.C. Cir. 1968) (internal quotation marks omitted).
Defendants only assert the first two of these risks. These dangers, however, "are largely absent in
a situation where evidence of each of the joined offenses would be admissible in a separate trial

for the other." *Id.* (internal quotation marks omitted).  That is the case here.  "[I]t is well settled that any act or statement of the accused tending to show consciousness of guilt . . . is admissible against him to be considered with other evidence in the case." *Beck v. United States*, 140 F.2d 169, 170 (D.C. Cir. 1943).  And the reverse is true as well:  evidence of Defendants' conduct on January 6th would be admissible in a separate trial on tampering, at least, to prove their motive, intent, and the absence of mistake.  *See Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir. 1964).  Therefore, the motion to sever the tampering counts is denied.

### E.   Motion to Transfer

The court now arrives at Defendants' final request for relief:  to transfer this case out of this District to the Alexandria Division of the Eastern District of Virginia.  *See* Defs.' Mot. to Transfer.  The court previously denied a similar motion in the *Caldwell* matter because the defendants there had "utterly failed to present any evidence of *actual* bias in the jury pool." *Caldwell* Omnibus Order at 11.  Defendants now come forward with claimed evidence of incurable actual juror bias.  They commissioned a "Multi-District Survey," conducted by In Lux Research, to determine whether "the qualified jury pool" in the District of Columbia "harbors bias prejudicial to defendants . . . who are facing criminal prosecution related to incidents at the U.S. Capitol . . . on January 6, 2021."  Defs.' Mot. to Transfer, Ex. A, ECF No. 93-1 [hereinafter In Lux Survey], at 1.  They also rely on similar community-attitude surveys.  *See* Defs.' Mot. to Transfer, Ex. B, ECF No. 93-2 [hereinafter Select Litigation Survey]; Defs.' Mot. to Transfer, Ex. C, ECF No. 93-3 [hereinafter Zogby Strategies Survey].

In Lux Research surveyed potential jurors in the District of Columbia and in three other jurisdictions: (1) the Eastern District of Virginia, (2) the Middle District of Florida, Ocala Division, and (3) the Eastern District of North Carolina.  In Lux Survey at 1.  The company interviewed over

1,500 randomly selected potential jurors across the four jurisdictions, yielding over 350 responses from each. *Id.* at 1. The survey attempted to identify juror bias and the intensity of such bias. *See id.*

Defendants point to the following "key findings" to support their motion: (1) 91% of District respondents who answered four questions designed to test prejudicial prejudgment answered at least one of those questions affirmatively, while other surveyed jurisdictions recorded percentages ranging from 49% to 63%, *id.* at 2; (2) among District respondents to the survey, 72% said that they are "likely to" convict even when given the choice to respond "It is too early to decide," whereas the median of the survey was 48%, *id.* at 3; (3) 82% of District respondents who answered each personal impact and victimization question indicated "high levels of personal impact and perceived victimization caused by the Events of January 6th," *id.* at 4; (4) respondents in the other jurisdictions were more likely to avoid exposure to January 6th news coverage and had a higher rate of potential jurors who said they were "never or almost never" exposed to such media coverage, *id.* at 5; and (5) although District respondents answered that they could be fair and impartial at a higher rate than those in other jurisdictions, In Lux Research opined that "this representation may actually indicate a failure to recognize or admit threats to fairness and impartiality," *id.* at 5. The other surveys similarly suggest that District of Columbia residents harbor traits of juror bias against January 6th defendants. *See* Select Litigation Survey at 3 ("[A] majority of jury-eligible residents of the District of Columbia (52%) admit . . . that if they were 'on a jury for a defendant charged with crimes for his or her activities on January 6th,' they would be more likely to vote the defendant 'guilty.'"); Zogby Strategies Survey at 3 ("Nearly 3 out of 4 respondents (73%) believe that any individual who was inside the Capital on January 6, 2021 should be convicted of insurrection.").

Having considered all of the survey evidence presented by Defendants, the court holds that this is not an "extreme case" in which juror prejudice can be presumed and mandatory transfer is warranted. *See Skilling v. United States*, 561 U.S. 358, 381 (2010); *United States v. Bochene*, No. 21-cr-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (holding that a January 6th defendant had failed to establish the "extreme circumstances" required for mandatory venue transfer under Federal Rule of Criminal Procedure 21(a)).

In *Skilling*, the Court relied on a non-exhaustive list of four factors in deciding that a presumption of prejudice was not warranted in the prosecution of former Enron executive Jeffrey Skilling in Houston, where the company was headquartered. First, the Court considered the "size and characteristics of the community" and noted that Houston was the nation's "fourth most populous city" with a "large, diverse pool of residents eligible for jury duty." 561 U.S. at 382. Second, although media stories were not kind to Skilling, "they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* at 383. Third, "the decibel level of media attention [had] diminished somewhat in the years following Enron's collapse." *Id.* And, fourth, "and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which countered the "supposition of juror bias." *Id.*

Applying the *Skilling* factors here does not give rise to a presumption of prejudice. To begin, the "size and characteristics" of the District of Columbia do not support such a presumption. Defendants note that the District has a "transient" population of approximately 700,000, making "the potential jury pool . . . much smaller than a comparable federal district." Defs.' Mot. to Transfer at 6. But the District's population is greater in size than those few cases in which the Court has found that transfer to a different jurisdiction was constitutionally required.

41

*See, e.g.*, *Rideau v. Louisiana*, 373 U.S. 723, 724 (1963) (murder committed in parish of only 150,000 residents); *Irvin v. Dowd*, 366 U.S. 717, 719 (1961) (murder committed in county of only "30,000 inhabitants"). And it is larger than population sizes that the Supreme Court has found reduced the likelihood of prejudice. *See, e.g.*, *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (plurality opinion) (finding likelihood of prejudice reduced where venire was drawn from a pool "in excess of 600,000 persons"); *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (finding no presumption of prejudice applied based, in part, on a jury pool of 182,000).

Defendants also point to the Multi-District Survey as evidence of biased juror "characteristics," particularly its findings that over 91% of District survey respondents answered a question revealing "prejudicial prejudgment" and that many felt personally impacted by the events of January 6th. Defs.' Mot. to Transfer at 6, 9. But Defendants are quick to dismiss the fact that District survey respondents reported a higher rate of expressing their ability to be "fair and impartial" compared to the other jurisdictions. In Lux Survey at 5. That fact strongly rebuts any notion of presumed prejudice. The survey administrators nevertheless suggest that this higher degree of confidence in being fair and impartial among potential District jurors "may actually indicate a failure to recognize or admit threats to fairness and impartiality." In Lux Survey at 5. But that is at best pure conjecture, and at worst an intentionally contrived theory meant to explain away an unfavorable finding. Indeed, the survey administrators allow for no possibility that the very opposite could be true: District residents in fact can put aside their feelings and decide cases in a fair and impartial manner based on the evidence presented.

In any event, the D.C. Circuit has held that such survey results do not compel mandatory transfer before questioning a single potential juror. In *United States v. Haldeman*, the defendants tried for the Watergate scandal commissioned a poll that showed:

42

> 93% of the Washington, D.C. population was found to know of the indictments. 73% of those people were found to have an opinion of guilt or innocence—a proportion 15% more than the corresponding national average and 23% more than in one other sampled area, closeby Richmond, Virginia. Moreover, the proportion of the total Washington, D.C. population that thought the appellants here to be in fact guilty was about 61% (84% of 73%), significantly higher than the corresponding national average of about 43%.

559 F.2d 31, 144 (D.C. Cir. 1976) (MacKinnon, J., concurring in part and dissenting in part). Despite these numbers suggesting prejudice, the D.C. Circuit held that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive *voir dire* examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43. The Multi-District Survey in this case, as in *Haldeman*, does not evidence, let alone establish, a presumption of prejudice.

As to the second *Skilling* factor—pretrial publicity—Defendants have identified no news stories concerning these Defendants that contain a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. To be sure, news coverage of the events of January 6th has been extensive locally. But "[p]rominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance." *Id.* at 381. There is simply "[n]o evidence of the smoking-gun variety [that would] invite[] prejudgment of [Defendants'] culpability." *Skilling*, 561 U.S. at 383.

Third, it is difficult to assess to what extent the passage of time has lessened the "decibel level of media attention" concerning January 6th. *Id.* at 383. Now, in particular, media coverage has been heavy due to the ongoing public hearings of the Select Committee to Investigate the January 6th Attack on the United States Capitol. That said, the first group of these Defendants are not scheduled to be tried for another three months. The passage of time may diminish the

likelihood of prejudice. But even if news coverage does not ebb, "pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). Ultimately, "the measures a judge takes or fails to take to mitigate the effects of pretrial publicity . . . may well determine whether the defendant receives a trial consistent with the requirements of due process." *Id.* at 555.

And, finally, multiple other January 6th cases have proceeded to jury trials, including one over which this court presided, in which voir dire has been successful in identifying unbiased jurors. *Skilling*, 561 U.S. at 384 ("Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron, the extensive screening questionnaire and followup *voir dire* were well suited to that task."). Defendants point out that, unlike in *Skilling*, in which the jury acquitted Skilling of multiple charges, each of the January 6th cases that has come before a jury has resulted in a conviction. Defs.' Mot. for Transfer at 16. That is true, but guilty verdicts are hardly unusual in federal criminal prosecutions. The mere existence of other guilty verdicts does not mean that the jury pool is inherently tainted.

In the end, the appropriate way to identify a biased juror pool is through voir dire. *See Haldeman*, 559 F.2d at 63. Still, Defendants attempt to cast doubt on the capacity of the voir dire process to identify fair and impartial jurors. But "if an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*." *Id.* Defendants remain free to renew their motion to transfer during or following the voir dire process.

Before concluding, the court observes that Defendants' specific request to transfer this matter to the Alexandria Division of the Eastern District of Virginia is unlikely to fix the problems Defendants have expressed about the District's jury pool. *See Haldeman*, 559 F.2d at 64 n. 43 (stating that a change of venue "would have been of only doubtful value" given the national media

44

attention of the Watergate prosecution).  The two jurisdictions are not so dissimilar as it relates to the events of January 6th.  Both are part of the same media market, so potential jurors are getting January 6th news coverage from largely the same sources in both jurisdictions.  People who work or do business at the U.S. Capitol Building often live in and commute from the northern Virginia suburbs.  Residents of Arlington County and Alexandria were subject to a curfew on January 6th, and the Governor of Virginia issued a state of emergency and sent the Virginia National Guard and state troopers to assist on Capitol Hill the same day.[23]  And Defendants' own survey surely underreports the likelihood of bias among jurors in their preferred venue.  The Multi-District Survey polled residents from the *entire* Eastern District of Virginia, which stretches from northern Virginia south to Richmond, and even further south to Hampton Roads and the Virginia-North Carolina border, instead of just the six northern counties and five independent cities that comprise the Alexandria Division.  In Lux Survey at 1 n.2.  The attitudes of residents of the Alexandria Division are more likely to mirror those of the District of Columbia than those of the Eastern District as a whole.  Defendants therefore have not demonstrated that a jury pool in the Alexandria Division will cure the problems that they have with the District's jury pool.

## IV.    CONCLUSION AND ORDER

For the foregoing reasons, Defendants' motions are denied.

Dated:  June 28, 2022

Amit P. Mehta
United States District Court Judge

---

[23] NBC12 Newsroom, *Northam Issues State of Emergency in Virginia; Sends Help to DC*, WHSV3 News (Jan. 6, 2021),   https://www.whsv.com/2021/01/06/virginias-governor-says-he-is-sending-200-state-troopers-and-members-of-the-state-national-guard-to-the-us-capitol/.