**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 22-cr-15 (APM)** |
| | : | |
| **v.** | : | |
| | : | |
| **ELMER STEWART RHODES III,** | : | |
| | : | |
| **KELLY MEGGS,** | : | |
| | : | |
| **KENNETH HARRELSON,** | : | |
| | : | |
| **JESSICA WATKINS,** | : | |
| | : | |
| **ROBERTO MINUTA,** | : | |
| | : | |
| **JOSEPH HACKETT,** | : | |
| | : | |
| **DAVID MOERSCHEL,** | : | |
| | : | |
| **THOMAS CALDWELL, and** | : | |
| | : | |
| **EDWARD VALLEJO,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S MOTION REGARDING ANTICIPATED TRIAL EVIDENCE AND NOTICE PURSUANT TO FEDERAL RULE OF EVIDENCE 404(b)

Elmer Stewart Rhodes, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, Roberto Minuta, Joseph Hackett, David Moerschel, Thomas Caldwell, and Edward Vallejo (collectively, "the defendants") have been charged by indictment for their participation in a plot to use force to oppose the authority of the Government of the United States and to prevent, hinder, or delay the execution of specific laws and provisions of the Constitution of the United States governing the transfer of presidential power.

The government respectfully submits this motion and notice of its intent to introduce certain evidence at trial including: First, evidence that certain co-conspirators traveled to

Case 1:22-cr-00015-APM    Document 187    Filed 07/08/22    Page 2 of 28

Washington, D.C., in November 2020 and, like for January 6, 2021, organized an armed Quick Reaction Force ("QRF"). Second, evidence that co-conspirator Jeremy Brown transported explosives to the Washington, D.C., area on January 6, 2021. Third, evidence that certain co-conspirators including Stewart Rhodes, Kelly Meggs, and Jessica Watkins discussed and prepared for violent conflict with government actors after January 6 and before January 20, demonstrating the co-conspirators' plan to oppose the lawful transfer of power before Inauguration Day. Fourth, evidence that co-conspirator Jessica Watkins possessed bomb-making instructions during the charged conspiracy as evidence of Watkin's preparation to use force against the government. And fifth, evidence that co-conspirator Thomas Caldwell possessed a "death list" with the names of Georgia election officials and, later, attempted to have someone build him firearms before January 20, showing Caldwell's intent to oppose government actors by force to stop the transfer of presidential power.

All of this evidence constitutes intrinsic evidence of the conspiracy and falls outside Rule 404(b)'s notice requirement. That said, this evidence is also admissible pursuant to Rule 404(b). While the primary purposes for the admission of the other crimes evidence are noted above, the proffered other crimes evidence will serve multiple, appropriate purposes. *United States v. Crowder*, 141 F.3d 1202, 1208 (D.C. Cir. 1998) (*en banc*) ("Rule 404(b) evidence will often have such multiple utility, showing at once intent, knowledge, motive, preparation, and the like."). Regardless, the government provides notice of its intent to introduce the evidence below so that the defense and the Court may consider the relevance and admissibility of this evidence well in advance of trial.

## I.    Procedural History

The indictment charges all defendants with seditious conspiracy, in violation of 18 U.S.C. § 2384 (Count One); conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Two); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count Three); and conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Four). ECF No. 167. Some defendants were additionally charged with destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361 and 2; civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2; and tampering with documents or other objects and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(1) and 2. *Id.*

## II.    Factual Background

The conspiracy charged in the indictment alleges a plot to oppose by force the authority of the Government of the United State and the execution of the laws and provisions of the Constitution governing the transfer of presidential power. The indictment states that days after the 2020 U.S. Presidential Election, Stewart Rhodes began disseminating messages to Oath Keepers members and affiliates delegitimizing the results of the election and encouraging members and affiliates of his organization to forcibly oppose the lawful transfer of presidential power from former President Trump to President Biden. *See* ECF No. 167 at ¶ 18(a) (telling those on the "Leadership intel sharing secured" chat ("Leadership Intel chat"), on November 5, 2020, that they "MUST refuse to accept Biden as a legitimate winner" and warning, "We aren't getting through this without a civil war. Too late for that. Prepare your mind, body, spirit."); *id.* ¶ 18(b) (posting to the Oath Keepers' website a document that described a plan for violent regime change in Serbia that included "[m]illions gather[ing] in our capital," breaking through barricades, and

storming the legislature).   At Rhodes' direction, several co-conspirators who served as regional leaders of the Oath Keepers began recruiting others into the conspiracy, *id.* at ¶ 20, and preparing for operations inside Washington, D.C., *id.* at ¶ 21.

Those plans included preparing multiple ways to deploy force to achieve their aim of stopping the transfer of presidential power, including the organization of armed "quick reaction force" or "QRF" teams to support those on the ground.   ECF No. 167 at ¶¶ 4, 42-45.   Co-conspirators similarly participated and planned trainings to teach and learn paramilitary combat tactics.   In November 2020, for example, the Florida chapter of the Oath Keepers held a training on "unconventional warfare."   *Id.* at ¶ 22.   The North Carolina chapter of the Oath Keepers held a training session focused on, among other topics, setting up "hasty ambushes." *Id.* at ¶ 24. Similarly, Watkins stated her militia was organizing a "military-style basic" training class for the beginning of January 2021, so that "recruits" could be "fighting fit" by inauguration.   *Id.* at ¶ 20.

In December 2020, Rhodes focused his co-conspirators on the Certification proceeding set to take place on January 6, 2021.   During a December 22 interview with a regional Oath Keepers leader, Rhodes described January 6 as "a hard constitutional deadline" for stopping the transfer of presidential power and warned that if President-Elect Biden were to assume the presidency, "We will have to do a bloody, massively bloody revolution against them."   ECF No. 167 at ¶ 30.   On December 23, Rhodes published an open letter on the Oath Keepers website in which he noted that, on January 6, 2021, "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C."   *Id.* at ¶ 31.   Rhodes warned in the open letter that he and others may have to "take to arms in defense of our God given liberty."   *Id.*

4

Rhodes and his co-conspirators created and administered chats on the Signal platform with titles like "DC OP: Jan 6 21" and "OK FL DC OP Jan 6" for coordinating their plans for January 6.  ECF No. 167 at ¶¶ 38-40.  On these chats, they discussed, among other topics, what weapons they would bring and plans for the QRF.  *Id.* at ¶¶ 41-56, 58-60.  They used encrypted messaging applications for these planning chats and stressed the need for operational security.  *See, e.g.*, *id.* at ¶ 27.  On December 25, Kelly Meggs messaged an encrypted Signal group chat titled "OKFL Hangout," in reference to the January 6 Joint Session, "We need to make those senators very uncomfortable with all of us being a few hundred feet away."  *Id.* at ¶ 34.  Rhodes wrote in the same chat, "I think Congress will screw him [President Trump] over.  The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing.  But I don't think they will listen."  *Id.*

On these platforms and elsewhere, Rhodes and the co-conspirators coordinated their transportation of weapons to the Washington, D.C. area.  On December 31, an Arizona QRF team member messaged Rhodes that Vallejo and others were traveling to Washington, D.C., and that "everyone coming has their own technical equipment and knows how to use it," adding a "winky face" emoji.  *Id.* at ¶ 44.  This individual added that the group would have "rifles" and "man power."  *Id.*  On January 4, 2021, Watkins asked the Florida Signal Chat where she should "drop off weapons to the QRF team?"  *.Id.* at ¶ 58.  The day before the Capitol attack, on January 5, Meggs and his Florida team dropped off at least three luggage carts' worth of gun boxes, rifle cases, and suitcases filled with ammunition with their QRF team.  Members of the Arizona QRF team wheeled in bags and large bins of weapons, ammunition, and essential supplies to last 30 days.  On the morning of January 6, Rhodes messaged a Signal chat of co-conspirators, "We will have several well equipped QRFs outside DC.  And there are many, many others, from other

groups, who will be watching and waiting on the outside in case of worst case scenarios." *Id.* at ¶ 70.  44.  A third QRF team from North Carolina kept their rifles ready to go in a vehicle parked in the hotel lot.  Throughout, the QRF team leaders updated Rhodes of the extent of their weapons stock and apprised him of their readiness to support the Washington-based operation on January 6.  On January 5, for example, Meggs messaged Rhodes from near the Comfort Inn that served as the staging area for the QRF, "[W]e are just outside of town unloading at QRF on our way in." *Id.* at ¶ 65.

On January 6, as a large crowd gathered on the Capitol grounds and converged on the building, an Oath Keeper affiliate on the "Leadership Intel Chat" claimed that "Antifa" had breached the Capitol.  ECF No. 167 at ¶ 77.  Rhodes replied: "Nope.  I'm right here.  These are Patriots."  *Id.*  Rhodes elaborated on a different chat that Vice President Pence—who was presiding over the counting of electoral votes in Congress in his capacity as President of the Senate—was "doing nothing.  As I predicted. . . .  All I see Trump doing is complaining.  I see no intent by him to do anything.  So the patriots are taking it into their own hands.  They've had enough."  *Id.*  Meanwhile, on yet another encrypted, invitation-only group chat titled "Jan 5/6 DC Op Intel team," which included Rhodes, co-conspirator Joshua James, and others, a participant posted a link to a video titled "live stream of patriots storming capital," and another participant asked, "Are they actually Patriots - not those who were going to go in disguise as Patriots and cause trouble[?]"  *Id.* at ¶ 79.  Rhodes responded, "Actual Patriots.  Pissed off patriots[.]  Like the Sons of Liberty were pissed off patriots[.]"  *Id.*  James responded, "Were coming to Capitol ETA 30 MIN," and then he and several co-conspirators (including Roberto Minuta and Brian Ulrich) headed toward the Capitol.  *Id.*

Around 2:30 p.m. on January 6, Rhodes explicitly directed his co-conspirators to go to the Capitol.   ECF No. 167 at ¶¶ 88-89.   Rhodes then spoke with Meggs.   *Id.* at ¶ 92.   Moments later, a group of the defendants in stack formation ("Stack One") marched up the east steps of the Capitol, joined the mob that was trying to force the doors open, and breached the building.   *Id.* at ¶¶ 93-95, 97-99.   Once inside, half of Stack One was rebuffed as they tried to force their way past riot police to the Senate Chamber; the other half went in search of Speaker of the House Nancy Pelosi.   *Id.* at ¶¶ 100-106.   Meanwhile, another group of the defendants ("Stack Two"), led by James and Minuta, arrived at the Capitol grounds shortly after 2:30 p.m.   *Id.* at ¶ 111.   Stack Two then penetrated the Capitol grounds, marched to the east side doors through which Stack One had entered, and breached the Capitol at approximately 3:15 p.m.   *Id.* at ¶¶ 113-118.   Members of Stack Two tried to force their way into the Rotunda but were expelled by riot police officers who had begun clearing the building.   *Id.* at ¶¶ 119-121.   After they left the Capitol, members of both Stack One and Stack Two met up with Rhodes and other Oath Keeper members and affiliates just outside the Capitol.   *Id.* at ¶ 124.

On the evening of January 6, Rhodes gathered some of his co-conspirators at a restaurant to celebrate their attack on the Capitol and discuss next steps. ECF No. 167 at ¶ 125.   Rhodes also sent messages to the "DC OP: Jan 6 21" Signal chat, including: "Thousands of ticked off patriots spontaneously marched on the Capitol. . . . You ain't seen nothing yet," and, "Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming." *Id.* at ¶ 126.

In the weeks after January 6, Rhodes purchased a large volume of firearms pieces and related equipment.

- On January 10, he spent approximately $6,000 on sights, bipods, a scope, mounts, backpacks, a gun grip, a magazine pouch, and other related items.

- On January 11, he spent over $1,500 on scopes, magazines, and other items.

- On January 12, he spent nearly $7,000 on hundreds of rounds of ammunition, duffel bags, magazines, rifle scopes, a scope mount, a gun light, and other items.

- On January 13, he spent approximately $1,000 on firearms parts.

- From January 14 through January 19, he spent more than $2,000 on firearms parts, mounts, magazines, a scope leveler, targets, ammunition, a gun case, holsters, and gun-maintenance equipment, among other items.

ECF No. 167 at ¶ 129.   In total, during the two-week period from the January 6 attack to the Inauguration, Rhodes spent more than $17,000 on firearms-related equipment.

Rhodes also summoned co-conspirators to join him in Texas.   ECF No. 167 at ¶ 130. James collected what he referred to as "all available firearms" and traveled to Texas where he stayed with Rhodes and others.   *Id.*   On January 10, James sent Meggs a message asking if Meggs and other Florida Oath Keepers were coming to Texas to join him and Rhodes, and Meggs responded, "Fl stays home until shots fired !"   *Id.* at ¶ 131.

## III.    Legal Standard

### a.    Intrinsic Evidence is Admissible

"Rule 404(b) excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'"   *United States v. Allen*, 960 F.2d 1055, 1058 (D.C. Cir. 1992) ("[The evidence] was an intrinsic part of the witness' account of the circumstances surrounding the offense for which [defendant] was indicted (and also was relevant both to [defendant's] intent to distribute and his knowledge about [a co-conspirator's] drug cache."); *see also United States v. Miller*, 799 F.3d 1097, 1105 (D.C. Cir. 2015) ("The Rule does not bar 'evidence . . . of an act that is part of the charged offense,'"); *United States v. Mahdi*, 598

F.3d 883, 891 (D.C. Cir. 2010) ("No [404(b)] notice is required, however, for evidence of an 'intrinsic act,' that is, an act that is 'part of the crime charged.'"); *United States v. Gartmon*, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (evidence that defendant charged with fraud had threatened a co-conspirator not "other crime evidence" but instead "inextricably intertwined" with charged offense); *United States v. Washington*, 12 F.3d 1128, 1135 (D.C. Cir. 1994) ("Moreover, 'Rule 404(b) excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'"); Fed. R. Evid. 404(b), Advisory Comm. Note regarding 1991 Amendment ("The amendment does not extend to evidence of acts which are 'intrinsic' to the charged offense."); *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) ("[U]ncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime," thus taking such acts outside the scope of Rule 404(b).)[1]

This well-established principle applies with particular force in cases, such as this, that involve a conspiracy: "When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994). Moreover, where evidence of the defendants' acts is either inextricably

---

[1] It should be noted that *Bowie,* 232 F.3d 923 seems to have questioned the admission of intrinsic other crimes evidence without a 404(b) analysis, but one panel of the Circuit cannot overrule standing precedent. *See, e.g., United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("panels of this court [] are obligated to follow controlling circuit precedent until either [the Court of Appeals] sitting *en banc*, or the Supreme Court, overrule it."); *see also United States v. Alexander*, 331 F.3d 116, 125-26 (D.C. Cir. 2003) ("Although we have recently expressed our dissatisfaction with the extrinsic-intrinsic distinction . . . we have nonetheless recognized that at least in a narrow range of circumstances ... evidence can be 'intrinsic to' the charged crime"). In any event, the *Bowie* court recognized that its position does not affect the admissibility of the evidence: the "only consequences of labeling evidence 'intrinsic" are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon the defense counsel's request." *Id.* at 927.

intertwined with the charged conspiracy, or provides evidence of the conspiracy itself, it is admissible without Rule 404(b) analysis even if those acts fall outside the period during which the indictment alleges the conspiracy existed.   *United States v. Diaz*, 878 F.2d 608, 614-16 & n.2 (2nd Cir. 1989) (crimes, wrongs or acts occurring before alleged inception date of conspiracy were relevant and admissible in drug conspiracy prosecution and did not raise Rule 404(b) question); *United States v. Bates*, 600 F. 2d 505, 509 (5th Cir. 1979) (testimony concerning acts and backgrounds of co-conspirators, including evidence of behavior antedating period covered by indictment, was not extraneous evidence of other crimes, but admissible as bearing on the existence and purpose of the conspiracy and the significance of later behavior).

### b.   Other Acts Evidence is Admissible under Rule 404(b)

Evidence subject to Federal Rule of Evidence 404(b) is nevertheless still admissible.   The Federal Rules of Evidence simply prohibit "[e]vidence of a crime, wrong, or other act . . .   to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."   Fed. R. Evid. 404(b).   As the Court of Appeals has reiterated, however:

> Although stated as a restriction, the Rule is actually one of "inclusion rather than exclusion."   *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000). Evidence is only prohibited if it is offered for the impermissible inference that a defendant is of bad character resulting in bad conduct.   *See, e.g., United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990).   Thus evidence of a defendant's prior bad acts is admissible for purposes *unrelated* to the defendant's character or propensity to commit crime, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."   Fed. R. Evid. 404(b); *see also Miller*, 895 F.2d at 1436 ("[U]nder Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character.").

*United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) (emphasis in original).   The Rule's list of permissible uses of bad-act evidence is illustrative, not exhaustive.   2 J. Weinstein and M.

Berger, WEINSTEIN'S FEDERAL EVIDENCE § 404.22[6][a] (2017); *see, e.g., Bowie*, 232 F.3d at 933 (approving admission of other crimes evidence to corroborate other evidence).    The D.C. Circuit has held that Rule 404(b) is "quite permissive, excluding evidence only if it is offered for the sole purpose of proving that a person's actions conformed to his or her character."    *United States v. Long*, 328 F.3d 655, 660-61 (D.C. Cir. 2003) (quotations and citations omitted); *see also United States v. Loza*, 764 F. Supp. 2d 55, 57 (D.D.C. 2011) (citing *United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010)); *United States v. Pettiford*, 517 F.3d 584, 588 (D.C. Cir. 2008); *Miller*, 895 F.2d at 1436.

Analysis of the admissibility of bad-acts evidence involves two steps.    First, the Court determines "whether the evidence is probative of some issue other than character."    *Cassell*, 292 F.3d at 792.    Evidence of other crimes is admissible if it "is relevant, relates to something other than character or propensity, and supports a jury finding that the defendant committed the other crime or act."    *Id.* (citing *Bowie*, 232 F.3d at 926-27); *see also Huddleston v. United States*, 485 U.S. 681, 685 (1988).    "Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect of character is more likely than men generally to have committed the act in question." *United States v. Moore*, 732 F.2d 983, 987 n.30 (D.C. Cir. 1984).    Second, the court must decide if the evidence should be excluded under Rule 403 of the Federal Rules of Evidence, *United States v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994), which precludes evidence only if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly cumulative evidence," Fed. R. Evid. 403. "[T]he test under 403 is 'unfair prejudice,' not just any prejudice or harm to the defense."    *United*

*States v. Sitzmann*, 856 F. Supp. 2d 55, 61-62 (D.D.C. 2012).

Notably, other crimes evidence is often relevant to several issues.    In its *en banc* decision

in *Crowder*, the Court of Appeals stated the following:

> Rule 404(b) evidence will often have such multiple utility, showing at once intent, knowledge, motive, preparation and the like.   Proof of an individual's intent to commit an act may itself serve as proof that the individual committed the act, as the Supreme Court recognized more than a century ago.   In proving that a defendant intended to distribute crack cocaine, for instance, the government might simultaneously be showing the defendant's motive to possess the crack, which Rule 404(b) permits.   Intent would thereby serve as an intermediate fact from which the jury could infer another intermediate fact − motive −   from which it could in turn infer the element of possession.   Thus, other-offense evidence of intent would have probative value not just on the intent element, but also on the possession element of the offense.

*Crowder*, 141 F.3d at 1208 (citation omitted).   Thus, in *Crowder*, other crimes evidence was

admitted to show the defendant's knowledge, intent, and motive.   And these admissible other acts

may occur before or after the charged offense.   *See, e.g., United States v. Watson*, 894 F.2d 1345,

1349 (D.C. Cir. 1990) (admitting other crimes that occurred three months after charged offense);

*United States v. Bibo-Rodriguez*, 922 F.2d 1398, 1400 (9th Cir. 1991) ("By it its very terms, 404(b)

does not distinguish between 'prior' and 'subsequent' acts"); *United States v. Johnson*, 934 F.2d

936, 940 (8th Cir. 1991) ("the mere subsequency of an act . . . does not on that ground alone make

it incompetent").

## IV.    The Government's Proffered Evidence is Admissible

The government will seek to introduce the following categories of evidence at trial that are

not explicitly cited in the indictment and that involve allegations of the use, training to use, and

plotting to use weapons, force, and violence.   All of the proffered evidence is admissible as

intrinsic evidence that "arose out of the same transaction or series of transactions as the charged

offense."    *United States v. Badru*, 97 F.3d 1471, 1474 (D.C. Cir. 1996); *see also United States v. Lorenzana-Cordon*, 141 F. Supp. 3d 35, 40 (D.D.C. 2015) ("[W]here the crime charged is conspiracy, evidence closely related to the conspiracy alleged in the indictment is admissible as intrinsic evidence.").    All of this evidence is also relevant to issues other than the co-conspirators' character and, therefore, admissible pursuant to Rule 404(b).

### a.  Co-conspirators' Travel to Washington, D.C., on November 14, 2020

The government anticipates introducing evidence regarding the defendants' pre-January 6 coordination and travel to Washington, D.C.   Specifically, the government anticipates introducing evidence that on November 14, 2020, Rhodes, Watkins, Minuta, James, Caldwell, and other co-conspirators were present in and around Washington, D.C., for an event referred to as the "Million MAGA March" and that certain defendants and others helped organize an armed QRF for the event.

Ahead of the event, Rhodes called upon Oath Keepers to participate and travel to Washington, D.C.   On November 10, 2020, Rhodes published an article on the Oath Keepers' website entitled, "Call to Action! March on DC, Stop the Steal, Defend the President, & Defeat the Deep State."   He began the article by stating: "Oath Keepers and patriots, duty calls!   We must all march on Washington D.C. and directly back-up and defend President Trump as he fights against the ongoing coup that is attempting to steal the election."   Rhodes then provided information about ways people could participate in the event, including by serving as part of the QRF.

Rhodes, Watkins, James, Minuta, and Caldwell, among others, attended the November 14 event, and some visited Caldwell's property in Virginia, which served as a rally point.   Watkins

and others likewise helped organize an armed QRF for the event.   On November 9, 2020, Watkins messaged another individual, "If it gets bad, they QRF to us with weapons for us.   We can have mace, tasers, or night sticks.   QRF staged, armed, with our weapons, outside the city."   The government's evidence demonstrates that Watkins and others contributed firearms to a vehicle staged in Arlington, Virginia, with others prepared to drive the firearms to the co-conspirators in Washington, D.C., if called upon.

The November 14, 2020 event in Washington, D.C., occurred within the timeline of the charged conspiracy.   *See* ECF No. 167 ¶ 15.   The co-conspirators' actions leading up to and on November 14 were therefore "contemporaneous[] with the charged crime," *Bowie*, 232 F.3d at 929, and constitute evidence of the charged offense.   Indeed, the defendants' previous travels to Washington D.C., are directly relevant to their actions on January 6.   Co-conspirators believed November 14 to be a significant opportunity to forcibly oppose the lawful transfer of presidential power.   *See* November 9, 2020 Watkins text massage ("We march on D.C. on Saturday.   This is the real for real shit.   No weapons allowed, be prepared to fight hand to hand. Want to come? It's now or never time.").   Ultimately, the co-conspirators did not activate their plans on that date; however, this first operation in support of the goals of the conspiracy, which occurred during the alleged time period of the conspiracy, is relevant evidence of the conduct charged in the indictment.   As this conduct is "intrinsic" to the charged offense, it is not subject to the notice requirements under Rule 404(b).   *Bowie*, 232 F.3d at 929.

Nevertheless, if it were, this evidence would be admissible as evidence of the co-conspirators' intent, preparation, plan, knowledge, and association.   Fed. R. Evid. 404(b).   The November 14 event sheds light on the relationships among a number of the co-conspirators and

was a precursor to the co-conspirators' actions on January 6, where they followed many of the same protocols they described in the lead up to the November event.    *See, e.g.*, *United States v. Gaviria*, 116 F.3d 1498, 1532-33 (D.C. Cir. 1997) (other crimes evidence properly admitted where "'it shows or tends to show the existence of a relationship between the defendants, and whether it shows or tends to show the defendants had a common scheme or plan which included the offenses for which they are now charged.'"); *United States v. Graham*, 83 F.3d 1466, 1473 (D.C. Cir. 1996) (evidence of the criminal activity preceding the charged conspiracy helped explain the subsequent formation of the larger conspiracy).    While co-conspirators contributed weapons to a QRF that supported this November operation, the co-conspirators are not alleged to have engaged in any direct acts of violence on November 14.    Such evidence is not unfairly prejudicial and therefore subject to exclusion pursuant to Rule 403.    As such, at trial, the government intends to introduce evidence of the co-conspirators' travel to Washington, D.C., in November 2020.

### b.  Jeremy Brown's Transportation and Possession of Explosives

Jeremy Brown is currently an unindicted co-conspirator in the Oath Keeper conspiracy.[2] In November 2020, Brown led the Florida chapter of the Oath Keepers in a training on "unconventional warfare."    *See* ECF No. 167 at ¶ 22.    During this period, he messaged extensively with Florida-based co-conspirators on Signal.[3]    For example, on November 9, he

---

[2] Brown is charged in the District of Columbia with 18 U.S.C. §§ 1752(a)(1) and (2), relating to his actions on January 6, 2020, Case No. 21-CR-609, and also charged in the Middle District of Florida with various offenses including 26 U.S.C. § 5861(d) and 18 U.S.C. § 842(j), relating to his illegal possession of firearms and explosives, Case No. 21-CR-348.    In Florida, Brown is also charged with 18 U.S.C. § 793(e), relating to his illegal retention of classified documents.    The government does not seek to introduce evidence related to those documents in this case.

[3] Brown participated in the "OKFL Hangout" and "OK FL DC OP Jan 6."

15

messaged, "As I am sure you all have plenty of ammo and guns. What I suspect we are not deep on are burner phones and phone cards. These will be needed in great numbers as part of a clandestine comms plan."

In preparation for January 6, 2021, Brown continued to participate on Signal chats with Rhodes and various Florida Oath Keepers, including Meggs, Kenneth Harrelson and Caleb Berry, regarding transportation to Washington, D.C. on January 6:

> We have a RV an Van going. Plenty of Gun Ports left to fill. We can pick you up… If you can, come to my house anytime Saturday. You can stop by and drop stuff off, or stay the night. This way we can load plan, route plan, and conduct PCIs (Pre Combat Inspections). I would LIKE to depart by 0645 on Sunday morning, Jan 3rd. Push through to the NC linkup on the 3rd, RON (Rest Over Night) there, then push to DC on the 4th. This will give us the 4th/5th to set up, conduct route recons, CTR (Close Target Reconnaissance) and any link ups needed with DC elements.

On January 4, 2021, Brown supplied a helmet to Florida Oath Keeper Berry, who met Brown at Brown's house, and then caravanned with Berry, Meggs, Harrelson and other Florida Oath Keepers first to North Carolina, where they rendezvoused with additional Oath Keepers, and then to the Washington, D.C. area.

The same day, January 4, Meggs informed Jessica Watkins and other co-conspirators via Signal that Brown would be assisting in the Washington, D.C. operation, writing, "Jessica you have 4 working the detail from Ohio. Padimaster you have 6 confirmed for detail from SC. If correct that gives us 27 man team I like it!! Perfect mi with 4-5 medics in the group. I'll keep working on overall contact between Natl/congress team and stop the steal team for scheduling etc... Kenneth Harrelson runs the ground team. Whippit and Jeremy Brown will assist him especially when we are moving!" Upon arrival in the Washington, D.C. area, Brown deposited various weapons at the Comfort Inn hotel in Virginia that served as the staging area for the QRF.

During this same period, Meggs informed Berry that Brown possessed explosives in his Recreational Vehicle ("RV").[4]

The government subsequently seized explosives from Brown.  On September 30, 2021, pursuant to an authorized search warrant, the government seized two illegal short barrel firearms from Brown's residence and military ordinance grenades from Brown's RV—the same RV that Brown used to travel to Washington, D.C. on January 6.

The government plans to introduce Brown's statements and the evidence collected from the search of Brown's property.   Brown's statements, firearms, and explosives are intrinsic to the co-conspirators' charged offense as contemporaneous, direct evidence of the manner and means used by the co-conspirators to advance the goals of the charged conspiracy.   Indeed, possessing, transporting, and storing various weapons around the Washington, D.C., area was part and parcel to organizing and executing the QRF for January 6, which, as alleged in the indictment, co-conspirators relied on as part of the plan to oppose the lawful transfer of power by force.   *See Lorenzana-Corden*, 141 F. Supp. 3d at 43 ("Defendants' alleged possession and use of weapons, as well as their reliance on heavily-armed security, are part and parcel to the alleged drug trafficking operation and constitute contemporaneous conduct designed to facilitate and advance the goals of the charged conspiracy."); *Cf. United States v. Lerma-Plata*, 919 F. Supp. 2d 152, 158 (D.D.C. 2013); *United States v. Edwards*, 889 F. Supp. 2d 47, 49-51 (D.D.C. 2012) (listing cases finding evidence admissible in conspiracy cases applying the "*Bowie* formulation"); *United States v. Davis*, 402 F. Supp. 2d 252, 262 (D.D.C. 2005).   Even if this uncharged co-conspirator's actions

---

[4] The government is unaware whether Brown deposited the explosives at the Comfort Inn in Virginia or retained them in his RV, which he parked in College Park, Maryland.

17

are not intrinsic to the offense, they are admissible under Rule 404(b).   Brown's transportation of firearms and explosives to the Washington, D.C., area on January 6 and, particularly, Meggs' and others' knowledge about the firearms and explosives are directly relevant to the co-conspirators' intent, preparation, knowledge, and planning.   That some of the charged co-conspirators messaged with Brown about "gun ports" to fill, "Pre Combat Inspections," and "Close Target Reconnaissance," as it related to their travel to Washington, D.C., for January 6, paired with their learning that Brown in fact brought firearms and explosives, is all directly relevant to these co-conspirators' knowing participation in plans to engage in violence in advance of the charged conspiracy.

### c.   Co-conspirators' Preparations for Violence After January 6

Following January 6, Rhodes attempted to escape law enforcement and directed his followers to prepare for violence.

On the evening of January 6, for example, Rhodes fled from a restaurant and then the Washington, D.C., Metropolitan area after becoming suspicious that law enforcement was potentially seeking to find and arrest him.   Immediately, Rhodes took a number of steps to avoid detection—divvying up thousands of dollars' worth of firearms and related equipment across four vehicles, discarding his personal cell phone with another individual that departed in a different vehicle, traveling west with a separate individual, and later suggesting co-conspirators alter their physical appearance and use burner phones detached from their true identities.

On or about January 11, Rhodes told co-conspirators, "Get ready to rock and roll, shit's about to go down," and that those who were fit enough to move, shoot, and communicate should be organized and prepared to do so.   As referenced in the indictment, Rhodes also summoned co-

conspirators like James to his side in Texas.   ECF. No. 167 at ¶ 130.   James collected what he referred to as "all available firearms," and traveled to Texas where he stayed with Rhodes and others, in part, to serve as Rhodes' security against law enforcement until February 2021.   *Id.* Rhodes continued to discuss saving the Republic and, to that effect, told his co-conspirators to organize local militias to oppose President Biden's Administration and to be prepared to travel to and open-carry firearms at their state capitals on Inauguration Day.   *Id.* at ¶ 134.   Around this time, Rhodes made thousands of dollars' worth of purchases of various kinds of tactical gear, firearms, ammunition, and related equipment.   The government may also seek to introduce evidence that Rhodes suggested to James that he change his physical appearance and use a burner phone disconnected from his identity—later giving James multiple burner phones to distribute to other co-conspirators.   Rhodes also solicited help in fighting against law enforcement in the event officers attempted to arrest Rhodes.   The government may seek to introduce evidence that, on at least one occasion, Rhodes was in a vehicle with James and gave him a loaded AR-platform rifle, explaining that he did not intend to be taken by law enforcement alive.   On January 10, James sent Meggs a message asking if Meggs and other Florida Oath Keepers were coming to Texas to join him and Rhodes, and Meggs responded, "Fl stays home until shots fired!"   *Id.* at ¶ 131.

Watkins similarly expressed an expectation that violence would continue after January 6. As further detailed below, when texting Donovan Crowl in January 2021, Watkins wrote "We've been organizing a bugout plan if the usurper is installed," elaborating that, "Something like 20+ Oathkeepers going to Kentucky mountains on hundreds of acres . . . ."   She also wrote that one location would make "tunneling out fighting positions great (above water line).   Be like the NVA and network tunnels."

Such co-conspirator statements and actions following January 6, but before January 20, are within the charged timeline and constitute evidence of the charged crime.   Accordingly, notice under Rule 404(b) is not required.   Were it to fall within 404(b)'s ambit, however, this evidence would be clearly admissible as evidence of the co-conspirators' plan and consciousness of guilt. Rhodes and others fled from the Washington, D.C., area on the evening of January 6.   Afterward Rhodes, Meggs, and Watkins all discussed preparations for potentially violent conflict with government actors.   Other acts are routinely admitted to demonstrate consciousness of guilt. *See, e.g.*, *Gartmon*, 146 F.3d at 1019 (admitting tapes of defendant's profane and abusive conversations with his co-conspirator to prove consciousness of guilt); *United States v. Johnson*, 46 F.3d 1166, 1171 (D.C. Cir. 1995) (defendant's "untruthful statement was probative of consciousness of guilt and was not likely in itself to give rise to any substantial prejudice on the part of the jury").

*United States v. Tracy* is instructive.   989 F.2d 1279, 1285 (1st Cir. 1993).   There, the district court held that evidence of the defendant's flight and efforts at concealment were admitted as evidence of consciousness of guilt.   On appeal, the court rejected the defendant's challenge of that evidence: "[E]vidence of a defendant's flight and attempts to conceal or falsify identity may be presented at trial as probative of a 'guilty mind' if 'there is an adequate factual predicate creating an inference of guilt of the crime charged.'" *Id.*; *see also United States v. Acevedo*, 28 F.3d 686, 688 (7th Cir. 1994) ("The possession of false identification by a drug trafficking defendant at the time of the trafficking, however, is not merely generalized evidence of bad character.   Rather, by indicating that the defendant wished to conceal his identity during ongoing involvement with

drugs, it can help prove an element of the offense charged, namely that the defendant possessed a culpable state of mind.")

### d.  Watkins' Bomb-Making Instructions

On January 17, 2021, law enforcement executed a search warrant of Watkins' residence. Inside, they located two bomb making recipes.  The purported author was an individual named "Jolly Roger."  The Jolly Roger is the ghost author of various manuals and instructions on committing violent crimes, acts of destruction, and financial fraud.  The recipes found relate to "Making Plastic Explosives from Bleach" and producing "Thermite," a known pyrotechnic. Based on the investigation, the government believes these recipes are derived from the website, "The Anarchist's Cookbook."  The government has not established when Watkins came into possession of these instructions.[5]

The bomb-making instructions found in Watkins' house are intrinsic to the charged conspiracy.  First, Watkins is alleged in the indictment to have recruited several people for a "military style basic" training class her militia was organizing for the beginning of 2021.  ECF No. 167 at ¶ 20.  On November 9, 2020, as alleged in the indictment, Rhodes held a GoToMeeting in which he "outlined a plan to stop the lawful transfer of presidential power, including preparations for the use of force, and urged those listening to participate."  *Id*. at ¶ 19.  Watkins was a participant in that meeting.  That day, Watkins actively recruited individuals to attend her training to be "fighting fit by innauguration."  *Id*. at ¶ 20.  In another message, Watkins made it clear that she and her co-conspirators were "all hands on deck" to "help out President stop this

---

[5] The government can provide additional information to the Court should there be a hearing on this matter.

coup." Later, on November 17, she messaged another recruit, "if Biden get the steal, none of us have a chance in my mind. We already have our neck in the noose. They just haven't kicked the chair yet." The recruit responded, "So I should get comfortable with the idea of death?" Watkins replied, "That's why I do what I do." Relying on Watkins' training, the recruit noted, "I hope the training will help me be ok with dying for country."

Second, after the events at the Capitol, Watkins used the moniker "Jolly Roger" on Facebook and continued to discuss with co-conspirator Donovan Crowl future plans to prevent the lawful transfer of presidential power. On January 11, 2021, Crowl messaged, "We will have our answers by the 20th." Watkins responded, "Aye aye. That we will. We've been organizing a bugout plan if the usurper is installed…. Something like 20+ Oathkeepers going to Kentucky mountains on hundreds of acres apparently…. Tons of tree cover too they said. Good defense against pesky drone surveillance…. Gives us the high ground, and makes tunneling out fighting positions great (above water line). Be like the NVA[6] and network tunnels." The bomb-making instructions—like her other weapons, including firearms, ammunition, and tactical gear— highlight the extent of Watkins' preparation to use force to oppose the laws and authority of the Government of the United States and to recruit and train others to do the same before President-Elect Biden was sworn in as president on January 20, 2021.

Third, law enforcement discovered these bomb-making instructions at a time and place that further illustrate their intrinsic nature. Law enforcement discovered the instructions at Watkins' residence in Ohio—the same place they discovered a number of other relevant items, including

---

[6] The "NVA," also referred to as the North Vietnamese Army, killed thousands of American soldiers in guerilla warfare from the 1950s through the 1970s.

her cellular phone she used to participate in and plan for the charged conspiracy, some of the tactical gear Watkins wore and used on January 6, and other weapons (including pool sticks) she discussed in messages regarding January 6.  Relatedly, law enforcement discovered these bomb-making instructions in January 2021— still within the charged timeline of the conspiracy and mere days after many of Watkins' alleged criminal actions, including storming the Capitol.

Were these instructions to fall within Rule 404(b)'s scope, however, the evidence is still admissible.  In light of Watkins' numerous messages about organizing trainings and recruiting individuals to be prepared to "fight" to stop President-Elect Biden from taking office, possession of bomb-making instructions, like other weapons, constitutes admissible evidence of "opportunity, preparation, [and] plan[ning]" related to Watkins' criminal objectives.  Fed. R. Evid. 404(b)(2); *see also United States v. Arroyo*, 600 Fed. Appx. 11, 13 (2d Cir. 2015) ("[E]vidence that [the defendant] possessed a firearm less than seven months after the September 2011 drug sales is certainly relevant to show that he had an opportunity to possess a gun at the time of those sales.") (citing *United States v. Robinson*, 560 F.2d 507, 513 (2d Cir. 1977)); *United States v. Field*, 875 F.2d 130, 135 (7th Cir. 1989) (in prosecution for altering postal money orders, defendant's possession in his prison cell of tools and materials that witness testified were used to alter money orders was relevant to show capacity to commit the crime).

### e.  Caldwell's "Death List" and Attempt to Build Firearms

The government anticipates introducing evidence related to a "death list" discovered at Caldwell's residence and his attempts to acquire firearms after January 6 and before January 20.

*Caldwell's "Death List"*

On January 19, 2021, law enforcement searched Caldwell's Virginia residence pursuant to a search warrant issued in the Western District of Virginia.   From the search, law enforcement recovered a document that included the words "DEATH LIST" hand-written across the top with the name of a Georgia election official, a purported family member of that official, and the county and state associated with that official all hand-written underneath.   The document also included hand-written notes relevant to the defendants' preparations in advance of January 6: at the top of the document is written, "40+ from N.C," and on the next page, "[Person Three] is in Room 252" next to a phone number known to be associated with Person Three.

This evidence is intrinsic to the charged conspiracy.   First, the notes "40+ from N.C." and "[Person Three] is in Room 252" are consistent with the government's evidence that Caldwell spoke with Oath Keeper members from North Carolina and learned they would be traveling by bus to Washington, D.C.   Specifically, on December 30, 2021, Caldwell wrote Watkins, "Talked to [a North Carlina Oath Keeper].   At least one bus 40+ people coming from NC."   And evidence indicates that Person Three reserved and stayed in room 252 at the Comfort Inn in Virginia that served as the QRF staging area on January 6.   It is a reasonable inference that these notes were taken contemporaneous to Caldwell's discussions when Caldwell was preparing to travel to Washington, D.C., in advance of January 6. *See Bowie*, 232 F.3d at 929 (finding acts performed contemporaneously with the charged crime to be intrinsic).

The two names handwritten on the document are likewise admissible as intrinsic evidence. The government's evidence reveals that Caldwell believed that the 2020 Presidential Election was the result of election fraud and that conflict would be necessary to combat this perceived wrong.

24

On November 4, 2020, one day after the election, Caldwell texted another individual, "Wisconsin just announced they have more ballots than total number of people registered to vote. Can you say fucking fraud?"   On December 20, Caldwell wrote to another individual on Facebook, "Yeah, but what are WE supposed to do?   Tell me who to shoot first and I'm all in!"   That same day, he messaged another individual, "The socialists say they have "lists," well me, too."   Later, on January 1, 2021, Caldwell noted on Facebook, "I swore to support and defend the Constitution of the United States against all enemies foreign and domestic.   I did the former, I have done the latter peacefully but they have morphed into pure evil even blatantly rigging an election and paying off the political caste.   We must smite them now and drive them down."

The names on the "death list" included a Georgia election official during the 2020 Presidential Election and a purported relative.   Following the election, they became the target of unfounded conspiracy theories that they were involved in voter fraud.   That Caldwell made and kept a "death list" that includes officials involved in the presidential election process— contemporaneous with his preparation to travel to Washington, D.C.—illustrates his actions during the alleged conspiracy and intent to oppose by force the transfer of power.   And the fact that law enforcement discovered this record within the timeframe of the charged conspiracy in January 2021, and at Caldwell's residence—where agents also discovered flags with other co-conspirators' names on them and the phone Caldwell used to engage in the conspiracy—all further indicates that this record is intrinsic to the conspiracy charged in the indictment.

Nevertheless, even under Rule 404(b), such evidence is still admissible.   Caldwell's hand-written "death list" including an official involved in the 2020 presidential election (and their family member) is directly relevant to his intent to perpetuate the charged conspiracy of opposing by force

the lawful transfer of power.   This evidence is likewise not barred by Federal Rule of Evidence 403, under which "unfair evidence" may be precluded.   Unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."   *Old Chief v. United States*, 519 U.S. 172, 180 (1997).   Rule 403 "tilts . . . toward the admission of evidence in close cases."   *Moore*, 732 F.2d at 989.   Here, the evidence is directly relevant to the charged offense and is not "substantially outweighed" by the danger of "unfair prejudice."   Caldwell's travels to Washington, D.C., for January 6, as evidenced by his statements, were informed by a belief that the election was fraudulent and that the lawful transfer of presidential power must be thwarted by force.   His writings targeting election workers are directly relevant to this point.

*Caldwell's Attempt to Acquire Firearms*

In late November 2020, Caldwell purchased a "Double Barreled .380 Caliber" firearm that, according to the description for this item from the manufacturer's website, was "[i]ngeniously designed to resemble a smartphone, yet with one click of the safety it opens and is ready to fire." On December 23, Caldwell followed up on the status of the order, noting, "I am eager to receive this weapon."   The retailer of the firearm explained that they were behind in filling orders due to pandemic-related reasons.   Ultimately, the weapon did not ship prior to Caldwell's arrest, and someone utilizing Caldwell's email account requested a refund for the item the day after the government referenced this firearm during this Court's hearing on Caldwell's motion to reconsider his detention.   Similarly, before Inauguration Day on January 20, Caldwell attempted to have another individual build multiple rifles.

Evidence that Caldwell was seeking to acquire firearms during the time period of the charged conspiracy is intrinsic to said conspiracy and, regardless, is evidence of Caldwell's motive, intent, preparation, and planning regarding his criminal purpose.  In Caldwell's words, after yelling "let's take the damn capitol … and hang the traitors," he stormed the restricted area while communicating with other co-conspirators who breached the building.  Caldwell made it clear that January 6 was not the end, especially after Congress eventually certified Biden as President despite Caldwell's and others' actions.  On January 7, Caldwell messaged another individual, "Most people talk a lot of shit, few are up for the moment.  We were THERE, man! So it begins."  On January 8, Caldwell continued to message others, noting, "I feel that evil has succeed but short of armed insurrection I think we have all that we could have."  Later, on January 13, Caldwell messaged another individual, asking, "Don't know how hard it is for you to get those uppers.  Do you think you could build me one or two fully working.  I have what you need and would gladly bring to you….  Looks like things will get hairy."

Caldwell's attempts to acquire a firearm that could be disguised as a cellphone and carried to a protest event, and his efforts to have others build him rifles between January 6 and January 20 are acts within the time frame of the charged conspiracy and intrinsic to the conspiracy.  The transfer of presidential power was not complete until January 20, and Caldwell made clear in messages to others that January 6 was not the end of his efforts to stop that transfer.  He was looking to acquire fully functioning firearms, because things were going to "get hairy."  In any event, under Rule 404(b), that Caldwell attempted to acquire function firearms is directly relevant to Caldwell's motive, intent, preparation, and planning for his criminal goals.

## <u>CONCLUSION</u>

Accordingly, for the foregoing reasons, the government respectfully requests that the Court

permit at trial the introduction of the evidence proffered above, as evidence of the charged offenses

or, in the alternative, pursuant to Federal Rule of Evidence 404(b).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:    _____
Troy A. Edwards, Jr.
Assistant United States Attorney
N.Y. Bar No. 5453741
Ahmed M. Baset
Louis Manzo
Jeffrey S. Nestler
Kathryn Rakoczy
Assistant United States Attorneys
U.S. Attorney's Office, District of Columbia
601 D Street NW
Washington, D.C. 20530

_____
/s/
Alexandra Hughes
Justin Sher
Trial Attorneys
National Security Division,
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

28