IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 22-cr-15 (APM)** |
| | : | |
| v. | : | |
| | : | |
| **ELMER STEWART RHODES III,** | : | |
| | : | |
| **KELLY MEGGS,** | : | |
| | : | |
| **KENNETH HARRELSON,** | : | |
| | : | |
| **JESSICA WATKINS,** | : | |
| | : | |
| **ROBERTO MINUTA,** | : | |
| | : | |
| **JOSEPH HACKETT,** | : | |
| | : | |
| **DAVID MOERSCHEL,** | : | |
| | : | |
| **THOMAS CALDWELL, and** | : | |
| | : | |
| **EDWARD VALLEJO,** | : | |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE*
TO EXCLUDE ANTICIPATED TRIAL EVIDENCE NOTICED PURSUANT TO
<u>FEDERAL RULE OF EVIDENCE 404(b)</u>**

From November 2020 through January 2021, the co-conspirators organized combat training, planned for violent conflict, and staged certain weapons around Washington, D.C. All of this evidence is admissible as intrinsic to the defendants' intent and agreement to oppose the authority of the government of the United States by force or pursuant to Federal Rule of Evidence 404(b). Defendants Thomas Caldwell, Kelly Meggs, and Jessica Watkins have raised a number of arguments challenging the evidence's admissibility. ECF Nos. 216, 217, 219. All three motions should be denied.

1

I.    **Thomas Caldwell's "Death List" and Attempts to Acquire Firearms**

The government intends to introduce evidence that Caldwell possessed a "Death List" of election workers and later attempted to acquire certain firearms—all within the timeline of the charged conspiracy.  Caldwell argues this evidence is unrelated to any plan to keep President-elect Biden from becoming President.   His arguments miss the mark.

*First,* Caldwell makes a series of arguments regarding his "Death List."  He argues that the words "Death List" followed by a colon and two names is a "doodle pad" and "not a list." ECF No. 217 at 5.   A photograph of the evidence is below:



This is not a doodle.   In its own words, it is a "Death List."   One that Caldwell kept in his house during the charged conspiracy that names individuals involved in the 2020 Presidential Election and includes details about where they worked and how they were related to one another.

2

That different pens were used to draft the list does not change those facts (and Caldwell's focus on the different color inks ignores the much more likely possibility, given the scribbles in the middle of the pad, that Caldwell switched pens because the first one was running out of ink).

Caldwell then contends that this list has "little to no relevance" to unlawfully stopping President-elect Biden from becoming President. ECF No. 217 at 7. As Caldwell himself notes, however, conspiracy theories circulated during the charged conspiracy that falsely accused *these two individuals* as "examples" of people responsible for fraudulently helping President-elect Biden win the election. ECF No. 217 at 5. His argument that attacking these individuals would not impact whether President Biden assumed the White House, *id*. at 6, erroneously focuses on the efficacy of Caldwell's actions and ignores that the evidence is relevant to Caldwell's criminal intent. Likewise, the fact that Caldwell may have drafted the death list before any January 6 event was announced assumes this evidence is only relevant if it pertains to obstructing the electoral college certification vote. Caldwell is not only charged with obstructing the congressional proceeding, but also with conspiring to oppose the authority of the government by force—namely by opposing the transfer of presidential power. Simply put, possessing a list of the names of two Georgia election officials under the header, "Death List," is directly relevant to wanting and planning to do just that. While certainly prejudicial, this evidence is not unfairly prejudicial and should be admitted. *United State v. Sitzmann*, 866 F. Supp. 2d 55, 61-62 (D.D.C. 2012) ("[T]he test under 403 is 'unfair prejudice,' not just any prejudice or harm to the defense").

Indeed, Caldwell messaged others about having his own "lists" and using force against those responsible for what he believed was election fraud. *See, e.g.*, December 20 Facebook messages ("Yeah, but what are WE supposed to do? Tell me who to shoot first and I'm all in!"

3

and "The socialists say they have 'lists,' well me, too."); January 1 Facebook message ("I swore to support and defend the Constitution of the United States against all enemies foreign and domestic. I did the former, I have done the latter peacefully but they have morphed into pure evil even blatantly rigging an election and paying off the political caste. We must smite them now and drive them down."). These messages buttress the relevance of Caldwell in fact possessing a list of people accused of fraudulently helping President-elect Biden that he titled, "Death List." His response that these messages are an "obvious joke," "political humor," and "banter," ECF No. 217 at 18, ring hollow and, further, do not address their admissibility so much as their weight before a fact finder. He is free to make these arguments at trial.

Finally, Caldwell argues that the "Death List" and North Carolina notes were drafted at different times, stripping the former of its relevance. As an initial matter, the North Carolina notes are highly probative: the notation "40+ from N.C." indicates that Caldwell was taking notes on his conversation with a member of the North Carolina contingent of Oath Keepers, who informed him of the North Carolina contingent's plans for travel and weapons transportation. *See* Dec. 30 text message from Caldwell to Watkins (after writing, "Talked to [Person Three, the leader of North Carolina Oath Keepers]. At least one bus full 40+ people coming from N.C.," Caldwell explained to Watkins that Person Three would be driving separately from the bus filled with people so that the "boys don't have to try to schlep weps on the bus"). Moreover, by Caldwell's own posited timeline, both the list and Caldwell's North Carolina notes occurred during the charged conspiracy, likely during December. That he may have drafted them on different days in a multiple-months long conspiracy does not support exclusion. If anything, the presence of Caldwell's notes about plans with North Carolina indicates that he, in fact, was using this particular

4

piece of paper during the charged conspiracy. This fact further bolsters the reasonable inference that he also drafted the "Death List" on the same paper and that this evidence is directly relevant to his intent, planning, and preparation to oppose the transfer of power by force.

*Second*, Caldwell argues that attempting to purchase a firearm that looks like a smartphone during the charged conspiracy timeline is irrelevant. ECF No. 217 at 8-9. The thrust of his argument is that he attempted to purchase the firearm before any event in Washington, D.C., was scheduled for January 6. Again, the defendant mistakenly assumes this evidence is relevant only if the government can connect it to his intent to obstruct the official proceeding on January 6. Caldwell is charged with conspiring over the course of months to oppose the authority of the government by force. He is specifically alleged to have helped plan and *arm with firearms* a QRF staged on the outskirts of Washington, D.C., as part of his and others' preparation. In that same timeframe, Caldwell ordered a "Double Barreled .380 Caliber" firearm that was intentionally designed to look like a smartphone for easy concealment. The defendant rhetorically asks why he would need to seek out additional firearms when he "already possessed a large collection of various types of weapons." ECF No. 217 at 11 n.11. Yet, on December 23—*after* Caldwell and his co-conspirators began to focus on the January 6 event—Caldwell was "eager to receive this weapon." *See* ECF No. 187 at 26. His attempts to acquire the smartphone gun are admissible.

*Third*, Caldwell similarly argues that evidence of his attempts to acquire "uppers" for his firearms on January 13, should be excluded as irrelevant. ECF No. 217 at 10-11. He attempts to address what he characterizes as the government's "confusion" by pointing out that he simply sought "uppers," or firearms parts. Whether he was attempting to purchase parts or whole firearms, Caldwell does not dispute that he was looking to end up with fully functioning firearms.

5

And he was doing so for a reason. Critically, Caldwell ignores the most relevant part of the message at issue: "Looks like things will get hairy." It is unlikely Caldwell intended to address the "hairy" situation by arming himself with firearms parts. The defendant's attempts to upgrade his firearms during the charged conspiracy and before President-elect Biden was sworn in on January 20 is directly relevant to the charged conspiracy and, therefore, admissible.

Caldwell's argument that he could do nothing to stop President-elect Biden from assuming the White House after January 6 is not to the contrary. As the Court noted in denying the defendants' similar argument in their Rule 12 motions:

> For the alleged conspiracy to have continued beyond January 7th, Defendants had to have targeted the execution of some other law (besides the Twentieth Amendment) governing the presidential transfer of power; or, if there is no such law, they must have then plotted a related form of seditious conspiracy under § 2384 (*for example, "to oppose by force the authority" of "the Government of the United States"*).

ECF No. 176 at 20-21 (emphasis added). The defendants, including Caldwell, did both. After January 6, many of the co-conspirators continued planning for armed conflict with the government and plotting to prevent President-elect Biden from exercising his presidential authority under Article II of the Constitution. *See* January 11 Rhodes message to co-conspirators (telling them to "Get ready to rock and roll, shit's about to go down," and that those who were fit enough to move, shoot, and communicate should be organized and prepared to do so); January 11 Crowl and Watkins messages (Crowl: "We will have our answers by the 20th." Watkins: "Aye aye. That we will."). Caldwell did the same. *See* January 7 message ("Most people talk a lot of shit, few are up for the moment. We were THERE, man! So it begins."); January 8 message ("I feel that evil has succeeded but short of armed insurrection I think we have done all that we could have."). Further, Caldwell is charged with conspiring to oppose by force the authority of the government

6

of the United States, and his discussion of armed insurrection and attempts to acquire firearms before "things [got] hairy"—all before President-elect Biden assumed office—are relevant to his criminal intent and preparation.[1]

**II.     Jeremy Brown's Explosives and Messages**

The government also intends to introduce evidence of co-conspirator Jeremy Brown's messages and transportation of military-ordinance grenades to the Washington, D.C., area on January 6. Caldwell, Meggs, and Watkins all assert that the explosives fall outside of the conspiracy and are unfairly prejudicial. All of their arguments fail.

The defendants argue that the nine months between January 6 and the government's discovery of Brown's grenades is fatal to the grenades' admission. ECF 216 at 9; ECF 217 at 12-13; ECF No. 219 at 3-5. But they ignore evidence that ties these explosives to the defendants' knowledge and actions *on* January 6. Cooperating-defendant Caleb Berry is anticipated to testify that he caravanned with Brown, Meggs, and others from Florida to Washington, D.C. Soon after arriving, Brown deposited weapons with the QRF at the pre-arranged staging location in Virginia,

---

[1] Defendant Caldwell later makes the same argument that defendant Rhodes's post-January 6 firearms purchases are irrelevant because there is no way for the defendants to stop the lawful transfer of power after January 6. ECF No. 217 at 19. Again, the defendants are alleged to have conspired to oppose the authority of the government of the United States, and purchasing firearms as part of a plan to stop President-elect Biden from assuming office on January 20 is directly relevant to the charged conspiracy. Additionally, the government's anticipated evidence will illustrate that Rhodes intended to engage in a violent shootout with law enforcement should officers attempt to arrest him, making his firearms purchases directly relevant as evidence of his consciousness of guilt. *See, e.g.*, *United States v. Gartmon*, 146 F.3d 1015, 1019 (D.C. Cir. 1998) (admitting tapes of defendant's profane and abusive conversations with his co-conspirator to prove consciousness of guilt); *United States v. Johnson*, 46 F.3d 1166, 1171 (D.C. Cir. 1995) (defendant's "untruthful statement was probative of consciousness of guilt and was not likely in itself to give rise to any substantial prejudice on the part of the jury").

and Meggs informed Berry that Brown possessed explosives in his R.V.[2] This connective tissue between Meggs and Brown's explosives amounts to far more than the government simply discovering some explosives in Florida nine months after January 6. It is a reasonable inference, beyond mere speculation (ECF No. 217 at 14), that the explosives the government seized in the very R.V. that Brown used to travel to Washington, D.C., are exactly what Meggs and others knew were available in the area while they stormed the Capitol.[3]

This evidence is intrinsic to the co-conspirators' plans and preparation of an armed QRF to support their objective of halting the transfer of presidential power by force. That is especially so for defendant Meggs, who knew about Brown's explosives. But, beyond direct knowledge of the grenades, possessing, transporting, and storing various weapons around the Washington, D.C., area was part and parcel to the QRF for January 6, which, as alleged in the indictment, the co-conspirators either organized or at least relied on as part of their plan. *See Lorenzana-Corden*, 141 F. Supp. 3d at 43. The time that elapsed before the government discovered those explosives is irrelevant—the grenades are either admissible as intrinsic to the conspiracy itself or as other-

---

[2] Defendant Meggs's conclusory assertion that cooperator-defendant Berry's statement "on its face lacks credibility," ECF No. 219 at 5, is refuted by Berry having caravanned with Meggs and others, accurately identified that Brown owned and traveled in an R.V. on January 6, and correctly informed the government that Brown possessed explosives. Similarly, his argument that the government's evidence does not indicate that Meggs "condoned" the possession of illegal grenades, *id.*, does not address whether he *knew* about them when he helped supply the QRF and subsequently stormed the Capitol.

[3] Defendants Caldwell and Meggs both highlight that the government and the judge who ruled on co-conspirator Brown's motion to suppress indicate that Brown likely moved the grenades from his house to his R.V. sometime after January 6. ECF No. 217 at 13-14; ECF No. 219 at 4. That is not mutually exclusive with the government's argument here that the evidence indicates Brown also possessed the explosives in his R.V. on and around January 6.

acts evidence illustrating the co-conspirators' opportunity to possess such weapons and their knowledge of and planning for the potential for violence in Washington, D.C.

### III.    Jessica Watkins's Bomb-Making Instructions and Combat Trainings

The government additionally intends to introduce evidence that defendant Watkins possessed bomb-making instructions and arranged combat trainings during the alleged conspiracy timeline. The defendants' various arguments as to both categories of evidence should be rejected.

*First*, both defendants Watkins and Caldwell oppose the admission of her bomb-making instructions written by "Jolly Roger" as irrelevant, overly prejudicial propensity evidence. ECF No. 216 at 9; ECF No. 217 at 15-16. They both primarily argue that the government cannot prove when Watkins came into possession of the bomb-making instructions or that she ever possessed explosives. ECF No. 216 at 6; ECF No. 217 at 15-16. Regardless of whether the government discovered any bombs or ingredients in Watkins's residence, the instructions alone are evidence of Watkins's motive, opportunity, and knowledge under Rule 404(b) to use that information to accomplish her criminal objective involving force against the government. Watkins often discussed with co-conspirators the need to prepare for violence against the government. *See* November 9 messages regarding training to be "fighting fit by innauguration"; January 11 messages with Crowl ("We've been organizing a bugout plan if the usurper is installed…. Gives us the high ground, and makes tunneling out fighting positions great (above water line). Be like the NVA and network tunnels."). Explosives, of course, are one way to successfully engage in such conflict. And there is sufficient evidence linking Watkins to these bomb-making instructions—including naming her bar the "Jolly Roger," and using the "Jolly Roger" moniker on social media, and storing the bomb-making instructions in her residence where she also stored

9

other items she used during the conspiracy—to conclude that she knew how to make these explosives and had the opportunity to do so during the charged conspiracy. Watkins's argument that the government cannot tie her bomb-making instructions to Brown's grenades, ECF No. 216 at 9, draws a connection the government does not, and need not, make. Watkins' instructions, separate and apart from Brown's grenades, are intrinsic evidence of her intent to use force to oppose the government.

*Second*, defendant Watkins argues that the government has "failed to provide evidence of whether the alleged training camps were discussed and anticipated prior to the actual election in November 2020 and that the participants were to have been used for any nefarious purpose." ECF No. 216 at 6. The government does not simply assume that "because the training camps existed, they must have existed to support the overthrow of the government." *Id*. Rather, the defendant's own words support that argument. *See* November 9 message (recruiting others to complete her training to be "fighting fit by innauguration"); November 9 message (stating she and her co-conspirators were "all hands on deck" to "help out President stop this coup"); November 9 message to co-coconspirator Michael Greene (informing Greene that her militia had an upcoming "Basic Training class," in case Greene "ha[d] any guys who don't have formal training, that you want to send," because "I want my guys on the same page before innaugeration"); November 17 message (warning a recruit that "if Biden get the steal, none of us have a chance in my mind. We already have our neck in the noose. They just haven't kicked the chair yet."); *See* November 17 message (warning a recruit to get comfortable with the idea of death). And, counter to Watkins's argument that the government "simply cannot show a degree of contemporaneousness" to the conspiracy, ECF No. 216 at 7, she made all of these training statements during the charged conspiracy and,

10

specifically, nearly immediately after co-conspirator Rhodes ordered her and others to be prepared to fight during the November 9 GoToMeeting referenced in paragraph 19 of the indictment, ECF No. 167. Thus, Watkins's endeavor to train others to be "fighting fit" before the Inauguration is only prejudicial because it is so probative of Watkins's intent to oppose the authority of the government by force and her preparation and planning to do so.

### IV. Evidence of a Quick Reaction Force

Finally, the government intends to introduce evidence that various co-conspirators participated in, planned, organized, or relied on an armed QRF staged outside of Washington, D.C. on January 6. Defendant Caldwell raises an assortment of arguments to exclude this evidence, none of which are persuasive.

*First*, Caldwell misunderstands the government's case. He repeatedly "challenges" the government to provide evidence of the defendants' specific plan to attack the Capitol. ECF No. 217 at 16-17; *Id*. at 17 n.12. As alleged in the indictment, however, the co-conspirators,

> planned to stop the lawful transfer of presidential power by January 20, 2021, which included multiple ways to deploy force. They coordinated travel across the country to enter Washington, D.C., equipped themselves with a variety of weapons, donned combat and tactical gear, and were prepared to answer Rhodes's call to take up arms at Rhodes's direction. Some co-conspirators also amassed firearms on the outskirts of Washington, D.C., distributed them among "quick reaction force" ("QRF") teams, and planned to use the firearms in support of their plot to stop the lawful transfer of presidential power.

ECF No. 167 at ¶4. The evidence makes clear that the QRF had a broader purpose than simply to support an "attack on the Capitol," and certainly broader than Caldwell's specious claim that the QRF was narrowly focused on responding to violence from "Antifa," ECF No. 217 at 17 n.12. The co-conspirators organized the QRF to support their mission to halt the transfer of power by force.

Indeed, Rhodes repeatedly made clear the QRF's purpose of keeping President Trump in power. On November 9, for example, Rhodes told co-conspirators, "Our mission is going to be to go into D.C. But I do want some Oath Keepers to stay on the outside, and to stay fully armed and prepared to go in armed, if they have to, so if the shit kicks off, then you rock n' roll." Antifa was not the target; the election was. Rhodes continued, "We're very much in exactly the same spot that the founding fathers were in like March 1775. And Patrick Henry was right: Nothing left but to fight. And that's true for us, too. We're not getting out of this without a fight. It's gonna be a fight." Throughout the charged conspiracy, Rhodes continued to press the inevitability that co-conspirators and others would need to fight, in part by taking up arms, to stop President-elect Biden from becoming the President. *See* December 12 message ("[W]e the people will have to fight a bloody civil war and revolution against these two illegitimate Communist China puppets."); December 23 message (warning that he and others will "walk in the Founders footsteps, by declaring the regime illegitimate . . . and, like the Founding generation, we will take to arms in defense of our God given liberty"); January 6 message ("We will have several well equipped QRFs outside DC. And there are many, many others, from other groups, who will be watching and waiting on the outside in case of worst case scenarios.").

Caldwell echoed these sentiments in his own messages with co-conspirators. On December 12, Caldwell told Person Three, the North Carolina Oath Keeper leader with whom he organized plans for the Comfort Inn Ballston to be the QRF staging area, that he had recently begun to think "that maybe I should be planning a MUCH bigger op, for like when we have to roll into town to actually save the Republic." Ten days later, on December 22, Caldwell described

12

the hotel as giving "us a spot to stage materials should things go high order. 10 minutes from the potomac."

*Second*, Caldwell incorrectly claims there is no evidence regarding the co-conspirator's intent to attack the Capitol on January 6. ECF No. 217 at 17-18. As early as November 7—four days after the presidential election—Rhodes messaged to certain co-conspirators a plan of action shared from a foreign acquaintance that Rhodes titled, "What We The People Must Do." The plan called for committing "complete civil disobedience," "swarm[ing] the streets and . . . confront[ing] opponents," "gather[ing] in our capital . . . [with] no barricades strong enough to stop them, nor the police determined enough to stop them," and "storm[ing] the Parliament." On November 10, Rhodes sent the same plan of action to all Oath Keepers.

And Rhodes and others sent messages ahead of the Capitol attack, illustrating their intent to prevent Congress from completing the certification of the Electoral College vote. *See* Kelly Meggs, December 23 message ("We need to surround the Capitol all the way around with Patriots screaming so they hear us inside ! Scare the hell out of them with about a million surrounding them should the trick ! . . . These will be flying Jan 6th in front of the Capitol !! [including picture of black flag with yellow letters spelling "Oath Keepers"]); Rhodes, December 25 message ("I think Congress will screw him over. The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing."); Caldwell, December 31 message ("It begins for real Jan 5 and 6 on Washington D.C. when we mobilize in the streets. Let them try to certify some crud on capitol hill with a million or more patriots in the streets. This kettle is set to boil."); Watkins, January 6 statements on a recorded Zello channel ("Trump's been trying to drain the swamp with a straw. We just brought a shop vac . . . We have

a good group. We got about 30 or 40 of us. We're sticking together and sticking to the plan . . . Yeah, we're one block away from the Capitol now. I'm probably going to go silent when I get there because Imma be a little busy.").

When Watkins, Meggs, and their co-defendants got to the Capitol grounds, Meggs called Rhodes and then, moments later, led Stack One up the steps of the Capitol and into the building. While the co-conspirators were marching onto the Capitol grounds and breaching the building, QRF member and co-defendant Edward Vallejo sent multiple messages to the Signal group chats reminding the co-conspirators that the QRF was "standing by." There could not be clearer evidence that the purpose of the QRF was to support the co-conspirators' plans to forcibly oppose the lawful transfer of presidential power.

For these reasons, the defendants' motion to exclude evidence of the QRF must also be denied.

## **CONCLUSION**

The government respectfully requests that the Court reject the defendants' arguments and permit at trial the introduction of the government's noticed evidence.

                    Respectfully submitted,

                    MATTHEW M. GRAVES
                    UNITED STATES ATTORNEY
                    D.C. Bar Number 481052

By:                    /s/
                    Troy A. Edwards, Jr.
                    Assistant United States Attorney
                    N.Y. Bar No. 5453741
                    Ahmed M. Baset
                    Louis Manzo
                    Jeffrey S. Nestler
                    Kathryn Rakoczy
                    Assistant United States Attorneys
                    U.S. Attorney's Office, District of Columbia
                    601 D Street NW
                    Washington, D.C. 20530

                    /s/
                    Alexandra Hughes
                    Justin Sher
                    Trial Attorneys
                    National Security Division,
                    950 Pennsylvania Avenue, N.W.
                    Washington, D.C. 20004