IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )    CR No. 22-15
                                    )    Washington, D.C.
        vs.                         )    December 15, 2022
                                    )    1:23 p.m.
ROBERTO A. MINUTA, ET AL.,          )
                                    )    Day 7
            Defendants.             )    Afternoon Session
_____)

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        **Jeffrey Nestler, AUSA**
                           **Alexandra Hughes, AUSA**
                           **Troy Edwards, AUSA**
                           **Louis Manzo, AUSA**
                           U.S ATTORNEY'S OFFICE
                           601 D Street, NW
                           Washington, D.C., 20579
                           (202) 252-7277

```
1    APPEARANCES CONTINUED:

2    For Defendant
     Roberto A. Minuta:              William Lee Shipley, Jr.
3                                    LAW OFFICES OF WILLIAM L. SHIPLEY
                                     PO Box 745
4                                    Kailua, HI 96734
                                     (808) 228-1341
5

6    For Defendant
     Joseph Hackett:                 Angela Halim
7                                    3580 Indian Queen Lane
                                     Philadelphia, PA 19129
8                                    (215) 300-3229

9
     For Defendant
10   David Moerschel:                Connor Robert Martin
                                     BROWN, SUAREZ, RIOS & WEINBERG
11                                   1532 Jackson Street
                                     Fort Myers, FL 33901
12                                   (239) 337-9755

13                                   Scott Weinberg
                                     BROWN, SUAREZ, RIOS & WEINBERG
14                                   265 E Marion Avenue
                                     Suite 114
15                                   Punta Gorda, FL 33950
                                     (941) 575-8000
16

17   For Defendant
     Edward Vallejo:                 Matthew J. Peed
18                                   CLINTON & PEED
                                     1775 Eye Street, NW
19                                   Suite 1150
                                     Washington, D.C. 20006
20                                   (202) 919-9491

21

22

23

24

25
```

**I N D E X**

WITNESSES                                                          PAGE

**KELSEY HARRIS**

    CROSS-EXAMINATION BY MS. HALIM.................1411

    CROSS-EXAMINATION BY MR. WEINBERG..............1462

    CROSS-EXAMINATION BY MR. SHIPLEY...............1491

    CROSS-EXAMINATION BY MR. PEED..................1526

1    (Court resumed at 1:23 p.m.)

2    - - - -

3    (Jury not present.)

4    - - - -

5    THE COURT:  All right, everyone.  So, never a

6    dull moment.  During the break the juror in seat 16 informed

7    Mr. Douyon the following.  I'm paraphrasing.

8    By all accounts he is a D.C. resident.  He votes here.

9    He receives mail here.  But he has been living with his

10    girlfriend in Alexandria, Virginia for some period of time,

11    about a year.  So that is unexpected news.

12    So what I would propose we do is bring him out, I'd

13    like to get a little bit more detail about this, and then we

14    can sort of assess what all of this means.  Let's gather the

15    facts, and then we can figure out what the law is.

16    (Juror enters courtroom.)

17    THE COURT:  You are Juror 16?

18    JUROR:  Yes.  Correct.

19    THE COURT:  Juror Seat 16, I should say.

20    Thank you for coming in.  We just wanted to follow up

21    with you about the conversation you had with Mr. Douyon

22    during the break.  Can you just share with us what you said

23    to him?

24    JUROR:  Absolutely.

25    So I'm a resident of D.C., D.C. license, vote in D.C.,

1    all my pay stubs for work go to D.C., but actually live in

2    Alexandria, Virginia with my girlfriend right now.  There's

3    a long reason why that's the case, but basically I was doing

4    a house renovation for my family's house in D.C., which had

5    been in my family for many generations, and I didn't want to

6    transfer all my cars and everything between the two places

7    quickly.  And so that's the case.

8              THE COURT:  So the address that is on your

9    license, for example, that is your family's residence in the

10   district?

11             JUROR:  Correct.  And I lived there for many

12   years.  After I graduated school I lived there for a few

13   years, did a basement renovation as well in that time for

14   that house, lived in the basement after I did the

15   renovation, and then I lived with my girlfriend for the last

16   year and few months.

17             THE COURT:  But if you can just help me

18   understand, so that home, is it currently occupied?

19             JUROR:  Correct.

20             THE COURT:  And it's occupied by whom?

21             JUROR:  My two parents and my brother.

22             THE COURT:  All right.  And when you were

23   there, can you just tell us what years you were there after

24   you -- you said after graduation?

25             JUROR:  Yeah.  So I graduated in

1    December 2016, was going to travel for six months, and so I

2    got back -- what is that, like -- so like December -- so,

3    yeah, summer, got back around summertime 2017, and then from

4    there until July 2021 I lived there full time.

5                THE COURT:  And while you were living there

6    full time, you had a -- can you just describe what your sort

7    of living conditions were?  In other words, did you have a

8    room?  Did you have a floor?  Did you pay rent?

9                JUROR:  Yeah.  So I first just lived in the

10   attic in my own room, and then I built a basement apartment

11   for my family to help them be able to rent out in some

12   case -- I don't know if that detail is necessary, but then I

13   lived there for the remainder, for a year or two, basically

14   through COVID in a basement apartment.  So that's a full

15   apartment with, you know, a kitchen, bathroom, et cetera.

16               THE COURT:  And I'm sorry if this sounds

17   personal, but -- and your reason for moving away or no

18   longer living in that house and moving to Alexandria was?

19               JUROR:  Just to live with my girlfriend and

20   cat.  That's basically it.

21               THE COURT:  As you sit here today, do you have

22   any intention to return to your family's home to live?

23           When I say intention, I don't mean something that is

24   theoretical but an actual present intention to return there

25   in the near future.

1   JUROR:  Yeah.  So that is why I brought this

2   to the attention right now.  So I had permits for building a

3   full townhouse on my parents' house to continue -- it's kind

4   of a concept of before of renovating this asset, it's been

5   in my family for a very long time.  To get into I guess

6   personal finance reasons, home equity line credit, with the

7   rising interest rates I decided to hold off on that as of

8   like last week.  But it's already in permitting, so I'm out,

9   you know, X amount of money.  And that was my intention

10   right up until, like I said, about last week.

11   THE COURT:  And so your intention as you sit

12   here today is to continue to live with your girlfriend for

13   the foreseeable future in Alexandria?

14   JUROR:  Yeah.  I think she's going to --

15   again, I think she's going to buy a house maybe in D.C. in

16   June, in which case I would be moving back to the district,

17   as is common in this area, right?  People are very

18   transient, people move between the district and D.C. pretty

19   often.

20   THE COURT:  But as of right now there is no

21   purchased home in the district --

22   JUROR:  Correct.

23   THE COURT:  -- that she owns or is in the

24   process of owning?

25   JUROR:  Correct.

1    THE COURT:  Okay.  So you've kept your

2    driver's license, voter registration in the district?

3    JUROR:  Yes.

4    THE COURT:  And where do you receive mail?

5    JUROR:  To my parents' house, which I go to a

6    few times a week, maybe once or twice a week depending on

7    what's going on.

8    THE COURT:  And the nature of your work, does

9    it physically bring you into the district, or are you --

10   does it bring you physically into the district?

11   JUROR:  Not often.  I mostly work from home or

12   work out of Tysons Corner, Virginia.  Occasionally I'll have

13   meetings with something in D.C. or, you know, corporate

14   events, things of that nature.

15   THE COURT:  Counsel, any additional questions

16   either side wish to ask?

17   MR. EDWARDS:  Not from the government, Your

18   Honor.

19   THE COURT:  Sir, thank you very much.  You can

20   return to the jury room, and we'll provide you with

21   additional instructions when it's appropriate.

22   JUROR:  Thank you.

23   (Juror exits courtroom.)

24   THE COURT:  I do not know the specifics of

25   the -- well, someone clearly needs to be a resident of the

1   District of Columbia in order to serve on a jury in this

2   court.  Our jury plan -- this is paragraph 9.1 of our jury

3   plan, specifically states that:  "If after summoning a

4   prospective juror no longer appears to reside in District of

5   Columbia, that perspective juror will be disqualified to

6   serve."  The jury plan does not define the term "reside" or

7   "resident," as far as I can tell.  In the federal jury

8   statute, Jury Selection Service Act of 1868, I checked,

9   doesn't define the term "resident" or "reside" either.

10         I just quickly looked.  And for purposes of the D.C.

11   voting requirements, you need to be a resident, that is

12   someone who resides or is domiciled in the district.  The

13   election statute, which is D.C. Code 1-1302.16(a), contains

14   a definition of residence, which is:  "The term 'residence'

15   for purposes of voting means the principal or primary home

16   or place of abode of a person; principal or primary home or

17   place of abode is that home or place in which the person's

18   habitation is fixed; and to which a person, whenever he or

19   she is absent, has the present intention of returning after

20   a departure or absence therefrom, regardless of the duration

21   of the absence."

22         So that is what I've been able to cobble together in

23   the quick 30 minutes over lunch that I've had a chance to

24   look at this.

25         The jury selection -- sorry -- the Federal Jury Act, I

1    think it says that any objection to a juror needs to be made

2    essentially at the time of the voir dire or within seven

3    days after which the basis for the disqualification becomes

4    known to the defendant.

5        This is 28 U.S.C. 1867(a).  "In criminal cases before

6    the voir dire examination begins or within seven days after

7    the defendant discovered or could have discovered by the

8    exercise of due diligence, the grounds therefore, whichever

9    is earlier, defendant may move to dismiss the indictment or

10   stay the proceedings against him on the grounds of

11   substantial failure to comply with provisions of the title

12   and the act."

13       I don't know if that applies to objecting to a juror's

14   being seated, but it may.  I'll take a closer look.

15       What I would propose is the following, is that we can

16   proceed at this point, and then let's think about it

17   overnight, and then we can decide what to do in the morning,

18   if that's acceptable to everybody.

19                   MR. SHIPLEY:  Don't have a lot of experience

20   with out-of-district jurors.

21                   THE COURT:  I never had this come up, although

22   it came up in the first trial in a slightly different

23   context.

24       So if everyone's okay with that, we now have the facts

25   we can take a look at what the law says overnight and then

1  come back in the morning and figure out what to do, okay?

2              MR. EDWARDS:  Yes, Your Honor.

3              THE COURT:  By the way, let me just -- did I

4  give you the cites for the tax code provision?  It's D.C.

5  Code 1-1302.16(a).

6      And just for everyone's information, if you don't

7  know, one of the sources for our jury pool is the D.C. tax

8  records.  I'm sorry.  D.C. voter records.  That's what we're

9  talking about here.

10             MS. HALIM:  That was the one -- I wasn't

11 thinking quickly enough, I wish we would have asked where he

12 votes.

13             THE COURT:  He said he's a registered voter in

14 D.C.

15             MS. HALIM:  In D.C.  Thank you.

16             (Jury enters courtroom.)

17             THE COURT:  Welcome back.  Thank you for your

18 patience for the additional time.  We just had to take care

19 of something.  So let us proceed.

20      Agent Harris, why don't you come back up.

21      And we'll begin with Agent Harris's cross-examination.

22      Ms. Halim.

23             MS. HALIM:  Thank you, Your Honor.

24             **CROSS-EXAMINATION OF KELSEY HARRIS**

25 **BY MS. HALIM:**

1    **Q**    Agent Harris, good afternoon.

2    **A**    Good afternoon, ma'am.

3    **Q**    My name is Angie Halim.  We have not met before, have

4    we?

5    **A**    We have not.

6    **Q**    Nice to meet you.

7    **A**    Nice to meet you as well.

8    **Q**    On the other hand, you know these folks well, correct?

9    **A**    I do know them well.

10   **Q**    Over here at the government table?

11          You've been working with them since, as I understand

12   it, in the end of January 2021, right?

13   **A**    Yes, ma'am.

14   **Q**    All right.  So I'm actually going to -- I might be

15   skipping around just a little bit here, I'm going to start

16   with the -- some of the things you talked about today, okay?

17   **A**    Okay.

18   **Q**    Let me start by asking --

19               MS. HALIM:  Justin, can you pull up -- it's

20   marked as Government Exhibit 2413.2.

21          And I don't believe this was admitted, so I think this

22   is for witness and parties only.  Am I correct about that?

23   BY MS. HALIM:

24   **Q**    I'm going to ask you some questions about this

25   document.  For the record, 2413.2.

1          Agent Harris, you testified on direct examination that

2    this is a record regarding a TracFone, right?

3    **A**    Yes, ma'am.

4    **Q**    And this was one -- this record is associated with one

5    of the phone numbers that Mr. Hackett used when

6    participating in Signal messages, correct?

7    **A**    I believe so.

8    **Q**    And on direct examination you suggested that this

9    phone number was obtained to in some way conceal his

10   identity, right?

11   **A**    Yes, ma'am.

12   **Q**    So I'm going to direct your attention, this is -- you

13   see where it says that Mr. Hackett has been a customer since

14   December 6, 2014?

15   **A**    Yes, ma'am.

16   **Q**    So that's not something that he obtained in 2020, did

17   he?

18   **A**    2014.

19   **Q**    2014.

20         And then you'll also see, if you look a little further

21   down on the service start date, that's December 18th, 2004,

22   right?

23   **A**    Yes, ma'am.

24   **Q**    Going on almost 20 years at this point, correct?

25   **A**    18 or so.  18 to 20.

1414

1    **Q**    18 or so.  Thank you for the precision.

2                    MS. HALIM:  All right.  We can take that down.

3    Thank you.

4        If we could pull up -- this is one of the messages

5    from Government Exhibit 6778 that was admitted, so the jury

6    can see this.

7        And, Justin, are you ready now?

8        Okay.  1.S.656.10075, please.

9    BY MS. HALIM:

10   **Q**    That was -- not too worried about the message or

11   substance of it, I want to focus on something else.

12       On the bottom left-hand corner of that exhibit, Agent,

13   1 means it comes from Stewart Rhodes's phone, is that

14   correct?

15   **A**    That's correct.

16   **Q**    The S means it's a Signal message, is that right?

17   **A**    Yes, ma'am.

18   **Q**    As opposed to a text or some other kind of message,

19   correct?

20   **A**    Correct.

21   **Q**    656 means that this was the 656th chat in Stewart

22   Rhodes's phone, right?

23   **A**    Yes, ma'am.

24   **Q**    And 656 chat attaches to the OKFL Hangout chat group,

25   right?

1  **A**      Yes, ma'am.

2  **Q**      And then that last number down at the bottom left-hand

3  corner, 10,075, that means that's the 10,075th message in

4  that particular chat, is that right?

5  **A**      That's correct.

6  **Q**      So what that means is we're looking at more than

7  10,000 messages in just the OKFL Hangout chat, right?

8  **A**      That's correct.

9  **Q**      All told, you got probably hundreds of thousands of

10  messages from Signal, right?

11  **A**      It was a lot.  I wouldn't stick a number on it, but it

12  was a lot.

13  **Q**      All right.  Well, let me tell you something you did

14  stick a number on.

15         Mr. Nestler asked you at the very beginning today of

16  his direct examination how many messages you had reviewed,

17  and you said, and I quote, "I've reviewed maybe hundreds of

18  messages."  Right?

19  **A**      Correct.

20  **Q**      Okay.  Thank you, sir.

21              MS. HALIM:  I'd like to now refer to

22  Government Exhibit 1557.  And if you could pull that up,

23  please, Justin.

24  BY MS. HALIM:

25  **Q**      All right.  So this is a summary exhibit, correct?

1    **A**    Yes, ma'am.

2    **Q**    Did you create this exhibit?

3    **A**    No, ma'am.  I didn't.

4    **Q**    Who created this exhibit?

5    **A**    Most likely someone on the prosecution team.

6    **Q**    But you don't know who?

7    **A**    No, ma'am.

8    **Q**    All right.  So someone on the prosecution team created

9    the summary exhibit, and then they showed it to you, right?

10   **A**    No.  I actually took the exhibit and compared it to

11   the originals.

12   **Q**    Okay.  And in this particular exhibit, this is a

13   summary of which participants are in which chat groups,

14   right?

15   **A**    Yes, ma'am.

16   **Q**    And when it says selected participants there, that is

17   a -- as it suggests, just a selection of some of the

18   participants, right?

19   **A**    That's correct.

20   **Q**    Whose decision was it, which participants to include

21   on this summary exhibit?

22   **A**    The prosecution team.

23   **Q**    All right.  And then they provided that to you, right?

24   **A**    That's correct.

25   **Q**    So DC Op Jan 6 21, this first slide that we see here,

1    Mr. Hackett is not a member of that chat group, correct?

2    **A**    You're correct, ma'am.

3    **Q**    And I'm just going to go through a few others.  And if

4    you don't remember, we'll navigate through.  I suspect you

5    might, though.

6           Mr. Hackett was not a part of the GA OK general chat

7    group, right?

8    **A**    I don't believe he was.

9    **Q**    He was not a part of the Old Leadership chat?

10   **A**    No, ma'am.

11   **Q**    He was not a part of the Jan 5-6 DC Op Intel chat

12   group, correct?

13   **A**    I don't think he was.

14   **Q**    And he was also not a participant -- you remember when

15   you referenced some of the text messages, it was today

16   between Mr. Rhodes, Ms. SoRelle, and it said three others?

17   **A**    It's a group chat.

18   **Q**    Right, a group chat.

19          Mr. Hackett's not a participant in that group chat,

20   correct?

21   **A**    No, ma'am.  He wasn't.

22                   MS. HALIM:  Thank you.  We can take that down.

23   BY MS. HALIM:

24   **Q**    Now I am going to refer you to -- again, this comes

25   from Government's 6778.

1        MS. HALIM:  And, Justin, the specific number

2   is going to be message 1.S.656.6541.

3   BY MS. HALIM:

4   **Q**    This is a message that Mr. Hackett sent, correct?

5   **A**    Yes, ma'am.

6   **Q**    This is a message that was sent on December 6th, 2020,

7   right?

8   **A**    That's correct.

9   **Q**    So at this point in time there are no plans whatsoever

10  for being in D.C. on January 6, correct?

11  **A**    I don't know if I can accurately answer that.  I would

12  have to review, you know, messages we have discussing the DC

13  Op to see what those dates were, but not off the top of my

14  head.

15  **Q**    Okay.  Well, let's put it this way.  Former President

16  sent a tweet on December 19th, right?  Do you remember that?

17  **A**    If you can refresh my memory of which tweet you're

18  referring to.

19  **Q**    Sure.

20       I don't know exactly, but I remember the phrase "will

21  be wild."  Do you remember the tweet?

22  **A**    I remember the tweet.  I don't know what date that was

23  tweeted.

24  **Q**    That was not something that came up during the course

25  of your investigation?

1    **A**      No.  I'm familiar with the tweet.

2    **Q**      Okay.  But you -- it was not important to you or your

3    investigation to pay attention to the date and the timing of

4    that tweet, is that what your testimony is?

5    **A**      That's not what my testimony is.  I'm not saying it's

6    not important because I don't remember the date, but we've

7    reviewed a lot of messages here, and it'd be pretty big of

8    me to remember every single message we've discussed and the

9    dates and times of every one of those messages.

10   **Q**      Well, you will agree with me -- we'll just stick with

11   this.  You'll agree with me that December 6, 2020, predates

12   December 19th?

13   **A**      Yes.  And to your point about that tweet --

14   **Q**      That's all I asked.  That's all I asked.

15          12-6 predates 12-19, yes or no?

16   **A**      Yes.

17   **Q**      Thank you.  I appreciate that.

18          Okay.  Now if we look at the substance of this message

19   here, do you see in the second line where it says:  "I have

20   the opportunity to take my family and bolt"?

21   **A**      Yes, ma'am.

22   **Q**      It's possible that there's a typo, and what he meant

23   to say is "I don't have the opportunity to take my family

24   and bolt"?

25   **A**      A typo is a misspelling, and the word "don't" just

1    doesn't appear in --

2    **Q**    I'm sorry.  The word "don't" doesn't appear, correct?

3    **A**    No.

4    **Q**    It's possible that it was meant to appear, is it not?

5    **A**    I can't get in Mr. Hackett's head.  We have to rely on

6    what we have, which is the message itself.

7    **Q**    Later in the message, though, he does say that he has

8    to stay here, right, and his heart isn't in staying here in

9    the United States, correct?

10   **A**    That may be true, but if you could flip to the next

11   page, we could see that --

12   **Q**    I mean, I see it right there.  Do you not see that?

13         "For me my heart is in the United States."  Doesn't it

14   say that?

15   **A**    Well, I thought you meant he said physically stay

16   here, and here he's saying his heart is in the U.S.

17   **Q**    Did you consider the possibility that perhaps what he

18   meant to say was "I don't have the opportunity to take my

19   family and bolt"?  Did you consider that?

20   **A**    No.  We consider evidence.  I -- we don't take things

21   and try to get into someone's mental state.  We have what

22   they said.

23   **Q**    Can I confirm that your testimony is that you don't

24   try to get into the mental state of people -- what people

25   mean when they say certain things on Signal messages?

1    **A**    That's correct.

2    **Q**    Thank you, sir.

3                    MS. HALIM:  We can take that down.  Thank you

4    so much.

5    BY MS. HALIM:

6    **Q**    Now we'll turn back to some of the testimony that you

7    gave back on Tuesday when we were last here, okay?

8            Agent Harris, how long have you been with the FBI?

9    **A**    A little over five-and-a-half years.

10   **Q**    And that's total, correct?

11   **A**    Yes, ma'am.

12   **Q**    So when you were assigned to this case -- help me do

13   some math.  Back in the very early part of 2021, that would

14   mean you had about three-and-a-half years experience with

15   the FBI?

16   **A**    Sounds about right.

17   **Q**    And prior to 2020 your experience in the FBI was

18   investigating white collar and financial fraud crimes,

19   right?

20   **A**    That's correct.

21   **Q**    You were not the lead case agent on this

22   investigation, correct?

23   **A**    On particular -- which defendant?

24   **Q**    Well, the entirety of the investigation.

25   **A**    No.  I'm one of several case agents.

1    **Q**    Agent Michael Palian, he's the lead case agent of the

2    overall investigation, right?

3    **A**    Correct.

4    **Q**    You were assigned specifically more towards the

5    Florida people, right?

6    **A**    Yes, ma'am.

7    **Q**    You're in Florida?

8    **A**    Yes.

9    **Q**    That's where your headquarters are as an FBI agent,

10    down there?

11    **A**    Yes, ma'am.

12    **Q**    As part of your investigation, you learned that

13    Mr. Hackett lives in Sarasota, Florida, correct?

14    **A**    Yes, ma'am.

15    **Q**    You learned he's a chiropractor?

16    **A**    I have been told that.

17    **Q**    You learned that his office is in Sarasota along with

18    his residence, correct?

19    **A**    I don't know that for a fact, but one would assume if

20    he lives there, that's most likely where he works.

21    **Q**    Well, did you investigate that?

22    **A**    No.  I don't think that was something that needs to be

23    investigated as far as the allegations against him, as far

24    as where his office -- where he works.

25    **Q**    So who Mr. Hackett is as a person and what he does for

1    a job was not something that warranted being part of your

2    investigation, is that your testimony, agent?

3    **A**    No, ma'am.  That's not correct.

4    **Q**    All right.  You learned as part of your investigation,

5    did you not, that Mr. Hackett has no prior military

6    experience, correct?

7    **A**    Yes, ma'am.

8    **Q**    You learned that he has no prior law enforcement

9    experience, correct?

10   **A**    That's correct.

11   **Q**    You learned as part of your investigation that the

12   Oath Keeper group, that's a reference to the oath that is

13   taken by either military or law enforcement, right?

14   **A**    Not only military and law enforcement.

15   **Q**    But it's a reference to an oath taken to uphold the

16   Constitution, right?

17   **A**    Yes.

18   **Q**    Let me talk to you generally about use of some of the

19   lingo that came up in the Signal messages.

20        Ops, for example.  That's a word that came up a lot,

21   right?

22   **A**    Yes, ma'am.

23   **Q**    And it specifically is O-P-S is how it comes up for

24   the most part in the message, is that right?

25   **A**    That's how it's spelled.

1    **Q**    That's shorthand for operations, right?

2    **A**    That's correct.

3    **Q**    And something that in his messages, you see the word

4    "op" all over the place, right?

5    **A**    Yes, ma'am.

6    **Q**    Not just for January 6th in D.C., right?

7    **A**    That's correct.

8    **Q**    You saw ops in connection with Louisville, Kentucky,

9    correct?

10    **A**    Correct.

11    **Q**    You saw ops in connection with Ferguson, Missouri?

12    **A**    Correct.

13    **Q**    You saw ops in connection with Lafayette?

14    **A**    Yes.

15    **Q**    You saw ops in connection with attending hurricane

16    relief efforts, right?

17    **A**    Yes, ma'am.

18    **Q**    You also saw the term "QRF" come up quite a lot,

19    right?

20    **A**    Correct.

21    **Q**    And QRF, as you understand it, stands for quick

22    reaction force, right?

23    **A**    Yes, ma'am.

24    **Q**    QRF is not something that was unique or specific to

25    January 6th in D.C., was it?

1   **A**    I believe they had used it before.

2   **Q**    Actually at all of those ops I just listed, there were

3   QRFs at every single one of those, right?

4   **A**    I know for a fact some of them, I can't say all of

5   them, but I know they had used QRFs before.  I've seen

6   messages saying they have been used before.

7   **Q**    Thank you.

8        Now I'm going to turn to the Combat Arts Training.

9   You know what I'm referencing, right?

10  **A**    Yes, ma'am.

11  **Q**    That was in September of 2020, right?

12  **A**    That's correct.

13  **Q**    Specifically September 20th, 2020, right?

14  **A**    Yes.

15  **Q**    That was before the election?

16  **A**    Yes, ma'am.

17  **Q**    So at that point -- at risk of stating the obvious, at

18  that point no one had won or lost the presidential election,

19  correct?

20  **A**    That's correct.

21  **Q**    Now, let me just double check.

22       I took note of when you started -- what time it was

23  when you started testifying specifically about the Combat

24  Arts Training, and I have that you started testifying about

25  that at 4 PM that day.  Do you have any reason to dispute

1    that?

2    **A**    I don't know what time it was, but no.  If that's what

3    you wrote down, then hopefully that's accurate.

4    **Q**    And then by 4:30 you're still talking about Combat

5    Arts Training.  Do you have any reason to dispute that it

6    took about 30 minutes of your testimony to talk about Combat

7    Arts Training?

8    **A**    I know Tuesday I was here from 11 to the end of the

9    day.  I can't tell you, you know, what timeframe I talked

10    about everything.  But I'll take your word for it if you

11    took that note.

12    **Q**    Thank you.  I appreciate that.  And I understand it

13    was -- you were in fact up there for a very long time.

14        Does it sound right to you that there were 14 separate

15    exhibits that were admitted relating specifically to Combat

16    Arts Training?

17    **A**    I couldn't tell you.

18    **Q**    We can count those up separately later.

19        Would you be willing to take my word for it that it

20    was 14 exhibits that were admitted, since I was taking some

21    notes?

22    **A**    I'll take your word for it.

23    **Q**    Thank you, sir.

24        Now, Combat Arts Training is a business that is owned

25    by the --

1    **A**      Andrew Smrecek.

2    **Q**      Andrew Smrecek owns a business called Combat Arts

3    Training, right?

4    **A**      Yes, ma'am.

5    **Q**      And as you understand it, Combat Arts Training is a

6    traveling business, so-to-speak; he doesn't have a brick and

7    mortar store that you're aware of, right?

8    **A**      Yeah.  I know his training takes place at the Ares

9    training facility, but I don't know if he travels around and

10   gives training or not.

11   **Q**      Is that something you investigated?

12   **A**      Not me personally, no.

13   **Q**      Now, there is nothing unlawful at Smrecek -- it's

14   Smrecek, correct?

15   **A**      I hope it is.  I believe so.

16   **Q**      There's nothing unlawful about the business that

17   Mr. Smrecek owns and operates, correct?

18                  MR. NESTLER:  Objection.  Calls for legal

19   conclusion.

20                  THE COURT:  I think he can answer to the

21   extent he has knowledge and understanding of the business.

22        Go ahead.  It's overruled.

23   **A**      Can you repeat your question, ma'am?

24   BY MS. HALIM:

25   **Q**      Sure.

1        There is nothing unlawful about the business that

2   Mr. Smrecek operates and owns?

3   **A**    Not to my knowledge.

4   **Q**    I mean, you certainly didn't investigate any portion

5   of it for wrongdoing, correct?

6   **A**    No, ma'am.

7   **Q**    Now, same with the Ares facility, that is the

8   actual -- the plot of land, correct?

9   **A**    That's correct.

10  **Q**    And that is, for lack of a better word, a shooting

11  range?

12  **A**    There is -- yes, they have shooting ranges there.

13  **Q**    And it's a massive plot of land, correct?

14  **A**    I believe it is.

15  **Q**    And there is nothing -- as far as you know, there is

16  nothing unlawful about that shooting range, right?

17  **A**    Not to my knowledge.

18  **Q**    Nothing unlawful with people showing up and shooting

19  at the shooting range, right?

20  **A**    There could be, but not to my knowledge of having, you

21  know, evidence of, you know, crimes being committed there,

22  but potentially there could be.

23  **Q**    There could be, but in connection with this case and

24  your investigation, you didn't uncover anything unlawful,

25  did you?

1    **A**    No, ma'am.

2    **Q**    All right.  So the particular training that you talked

3    about or you testified about that took place on

4    September 20th, 2020, it was Kelly Meggs who had arranged

5    that particular training session, right?

6    **A**    Yes, ma'am.

7    **Q**    In fact, we saw some e-mail correspondence between

8    Mr. Meggs and either Mr. Smrecek or the folks associated

9    with Ares, right?

10   **A**    Yes, ma'am.

11   **Q**    And all of the negotiation and coordination of

12   arrangements, as far as you know, were made by Kelly Meggs,

13   right.

14   **A**    Yes, ma'am.

15   **Q**    And then there were five people total, Mr. Meggs,

16   Mr. Hackett, and at least three others --

17   **A**    Yes, ma'am.

18   **Q**    -- who took that class, correct?

19   **A**    That's correct.

20   **Q**    And, again, there was nothing unlawful about those

21   five people taking that class, correct?

22   **A**    Not to my knowledge.

23   **Q**    There is nothing unlawful about the firearms that they

24   were using that day, correct, as far as you know?

25   **A**    I don't know the types of firearms.  I'll say they

1    were rifles, but, you know, there can be -- if your rifle is

2    fully automatic, if you have an attachment you're not

3    supposed to have and -- you know, I haven't handled those

4    firearms to know if they are or not, so I couldn't answer

5    that question.

6    **Q**    Well, you've reviewed the video very closely, did you

7    not?

8    **A**    We've seen some of them shoot.  We didn't see shooting

9    from everyone that was listed in those five individuals.

10   **Q**    Well, let me just make it specific to Mr. Hackett, how

11   about.  You saw the rifle that Mr. Hackett was using on

12   September 20th, right?

13   **A**    I believe the video that showed Mr. Hackett shooting

14   was the filtered video Mr. Meggs shared to their group, and

15   I don't recall being able to specifically hear or see the

16   rounds that were being fired from Mr. Hackett's gun.

17   **Q**    Well, you know from your experience, Agent, you

18   know -- from your experience hearing the shots, you know

19   that that was not fully automatic weaponry, correct?

20   **A**    That's not the only thing that can make a weapon

21   illegal.  And usually fully automatic firearms, they're not

22   just fully automatic.  They have switches that can be

23   enabled and disabled.

24   **Q**    Let's come back to my question.

25            You heard the shots as they were registering on the

1   video that was admitted into evidence at that trial,

2   correct?

3   **A**    I heard multiple shots from multiple firearms being

4   fired.

5   **Q**    And the shots that you heard were single shots,

6   correct?

7   **A**    Yes, ma'am.

8   **Q**    They were not the shots indicative of a fully

9   automatic firearm, correct?

10  **A**    Not those shots.

11  **Q**    All right.  Now if I can ask --

12                  MS. HALIM:  Justin, if you'll pull up the

13  video, specifically it's 1.S.656.1854.V.  and I'm going to

14  ask you to fast-forward to about the 30-second mark.

15  BY MS. HALIM:

16  **Q**    That's Mr. Hackett, correct, in the green T-shirt?

17  **A**    Yes, ma'am.

18                      (Video played.)

19  BY MS. HALIM:

20  **Q**    Agent, would you agree with me that that is not the

21  footwork of an experienced man?

22  **A**    No, ma'am.  I would not agree.

23  **Q**    Let me ask you this question.  When a shot is fired,

24  if the shot hits the target, there's a ping, right?

25  **A**    That's correct.

1    **Q**    And if there's no ping, that means it misses the

2    target, correct?

3    **A**    I wouldn't say that because most of the ranges I've

4    shot at, there is still targets, there's paper targets, and

5    we can't see down ranges to know which type of target they

6    were firing at.  We know that someone within this range was

7    hitting a steel target.  We also saw he was giving them

8    instructions on where to shoot them.  Those were also --

9    wouldn't register a ping when hit.

10   **Q**    In this sequence, though, there are shots and then

11   there are pings, correct?

12   **A**    From someone.

13   **Q**    And then there are shots and there are no pings from

14   someone else, correct?

15   **A**    Correct.

16              MS. HALIM:  Thank you.  We can take that down.

17   BY MS. HALIM:

18   **Q**    I'm going to ask you a question -- some questions now

19   about Government Exhibit 1531.

20              MS. HALIM:  And if we could pull that up.

21   BY MS. HALIM:

22   **Q**    This exhibit here that we're looking at is the same

23   thing that's on that big board you were referring to

24   earlier, right?

25   **A**    Yes, ma'am.

1    **Q**    Agent, who is the person that put all of those photos

2    and names into this particular summary exhibit?

3    **A**    I don't know.

4    **Q**    It wasn't you?

5    **A**    No, ma'am.

6    **Q**    So you had no decision-making authority as it

7    pertained to whose picture gets put on this, right?

8    **A**    You're correct.

9    **Q**    Okay.  Presumably someone from the prosecution team?

10   **A**    Most likely.

11   **Q**    All right.  Now, I'm going to talk about a couple of

12   people that aren't on this exhibit or on that big board,

13   okay?

14        Terry Cummings, that's a name you're familiar with,

15   right?

16   **A**    Yes, ma'am.

17   **Q**    Terry Cummings is associated with the Oath Keepers,

18   correct?

19   **A**    Yes, ma'am.

20   **Q**    In Florida, right?

21   **A**    Yes, ma'am.

22   **Q**    He traveled with a group from Florida up to D.C. for

23   January 6th, correct?

24   **A**    Correct.

25   **Q**    He was at the Ellipse with several other Oath Keepers

1    on January 6th, right?

2    **A**    I believe he was.

3    **Q**    He walked with several other Oath Keepers from the

4    Ellipse all the way to the grounds of the Capitol, correct?

5    **A**    I believe so.

6    **Q**    He's not on this board?

7    **A**    No, ma'am.

8    **Q**    Let's talk about Jeffrey Morelock.  You're familiar

9    with that name, right?

10   **A**    Slightly.  I've heard the name.  I didn't personally

11   investigate Mr. Morelock, but I've heard his name throughout

12   the case.

13   **Q**    And throughout the case you've learned he's an Oath

14   Keeper also from Florida, correct?

15   **A**    I believe he is.

16   **Q**    And that's not someone that you investigated?

17   **A**    No, ma'am.

18   **Q**    Have you heard or did you learn during your

19   investigation that Mr. Morelock was another Florida Oath

20   Keeper who traveled from Florida up to D.C. for January 6th?

21   **A**    I believe Mr. Morelock was there.

22   **Q**    He was present at the Ellipse where the former

23   President spoke, correct?

24   **A**    I couldn't speak confidently about that.

25          So, just to explain to you how Florida works and where

1    my investigations occur, you know, our -- each FBI division

2    is broken up into a headquarter office and then satellite

3    offices in a certain area.  So, you know, I didn't

4    particularly investigate Mr. Morelock, so I don't really

5    know the specifics.  But I've heard the name, and I do know

6    he's an Oath Keeper that was with everyone else.

7    **Q**    On January 6th in D.C.?

8    **A**    Yes, ma'am.

9    **Q**    Did you also hear that he walked with several other

10   Oath Keepers from the Ellipse to the Capitol grounds?

11   **A**    I can't say that confidently.

12   **Q**    You can confidently say, though, he's not on that

13   board, right?

14   **A**    Correct.

15   **Q**    Let me start with Alondra Propes.  You're familiar

16   with that name, correct?

17   **A**    Yes, ma'am.

18   **Q**    She is also a resident of Florida, right?

19   **A**    That's correct.

20   **Q**    Also a member of the Oath Keepers, correct?

21   **A**    Yes, ma'am.

22   **Q**    She also traveled from Florida with other Oath Keepers

23   up to D.C. for January 6th, right?

24   **A**    Yes, ma'am.

25   **Q**    She was present at the Ellipse where the former

1    President spoke, right?

2    **A**    I believe she was.

3    **Q**    She walked a group of Oath Keepers to the Capitol

4    grounds, correct?

5    **A**    I believe that's correct.

6    **Q**    She's not on that board either?

7    **A**    She's not.

8    **Q**    Do you remember -- if you remember off the top of your

9    head, maybe you don't -- someone named Chris who right after

10   the election way back on November 3rd said:  "What's the

11   game plan?"  Do you remember that message?

12   **A**    Yes, ma'am.

13   **Q**    Chris isn't on this board, right?

14   **A**    No, ma'am.

15            MS. HALIM:  We can take that down now.  Thank

16   you.

17   BY MS. HALIM:

18   **Q**    I'm going to ask you some questions now about messages

19   that were in the compilation that is Government

20   Exhibit 6770.

21            MS. HALIM:  And if we could pull up

22   specifically 1.S.696.12391.

23   BY MS. HALIM:

24   **Q**    You see that, Agent?

25   **A**    Yes, ma'am.

1    **Q**    So now there at the bottom left-hand corner, let's

2    just orient ourselves.  This comes from Stewart Rhodes's

3    phone, right?

4    **A**    Yes.

5    **Q**    It's a Signal message, correct?

6    **A**    Yes.

7    **Q**    It is the 696th message in Mr. Rhodes's group in the

8    phone, correct?

9    **A**    That's correct.

10    **Q**    And that is message 12,391, right?

11    **A**    That's correct.

12    **Q**    Which means there are at least 12,391 messages in just

13    that chat, correct?

14    **A**    At least, yes.

15    **Q**    And that is the Old Leadership, right?

16    **A**    Correct.

17    **Q**    Which is one that Mr. Hackett is not a part of?

18    **A**    That's correct.

19    **Q**    The date on that is November 4th, 2020, correct?

20    **A**    Yes, ma'am.

21    **Q**    That was just after Election Day 2020, right?

22    **A**    Yes, ma'am.

23    **Q**    Now, when Mr. Rhodes says here "we are establishing a

24    QRF for D.C.," that's not about January 6th, right?

25                    MR. NESTLER:  Objection.  Calls for a

1     conclusion.

2                    THE COURT:  Just rephrase the question,

3     please.

4     BY MS. HALIM:

5     **Q**     Your investigation did not reveal that these early

6     messages are about January 6th, correct?

7     **A**     I believe they went to multiple events.

8     **Q**     In D.C., right?

9     **A**     In D.C., yes, ma'am.

10    **Q**     In fact, there were at least two prior events in D.C.

11    before January 6th, correct?

12    **A**     Yes, ma'am.

13    **Q**     Now, the first one was I believe November 14th, 2020,

14    does that sound right?

15    **A**     I believe that's correct.

16    **Q**     And that was what is often referred to as the Million

17    Man March, correct?

18    **A**     I believe so.

19    **Q**     Sometimes we'll see references to MMM, is that right?

20    **A**     Yes, ma'am.

21    **Q**     And then the second event in D.C. was December 12th,

22    2020, correct?

23    **A**     That's correct.  The Jericho March.

24    **Q**     Now Mr. Hackett -- your investigation revealed that

25    Mr. Hackett was at neither of those, right?

1    **A**    I don't believe he was.

2    **Q**    Reading this message -- taking a look at this message

3    again from November 4th, Mr. Rhodes is not talking about

4    January 6th, right?

5                MR. NESTLER:  Objection.

6                THE COURT:  Sustained.

7                MS. HALIM:  Let's move I believe in -- I

8    believe we're in the same exhibit, if we could go to

9    2000.T.89.

10   BY MS. HALIM:

11   **Q**    This is a Facebook comment, correct?

12   **A**    Yes, ma'am.

13   **Q**    And as you explained during your testimony on Tuesday,

14   you don't see -- when you get the records, you can't see the

15   actual post, right?

16   **A**    That's correct.

17   **Q**    So all you can see is Mr. Meggs's comment to some

18   unknown post?

19   **A**    That's correct.

20   **Q**    Mr. Hackett was not a Facebook friend with Mr. Meggs,

21   correct?

22   **A**    I don't recall if they were friends or not.  I do

23   recall seeing records in Mr. Meggs's Facebook where he

24   searched for Mr. Hackett's name several times.  I don't

25   recall if they were friends or not.

1    **Q**    Mr. Hackett is not one of Mr. Minuta's Facebook

2    friends, right?

3    **A**    I don't know.

4    **Q**    Let's take a look at same exhibit, moving along to

5    message 1.S.696.13376.

6          This is -- once again, I'm going to ask you the

7    question, this is message number 13376, correct?

8    **A**    Yes, ma'am.

9    **Q**    Of the Old Leadership chat, right?

10   **A**    That's correct.

11   **Q**    And this is from Stewart Rhodes, right?

12   **A**    Yes, ma'am.

13   **Q**    And this is in reference to that November 9th

14   GoToMeeting that was held, correct?

15   **A**    I believe it is.  It was posted on November 9th.

16   **Q**    And it says right here that it's to discuss the

17   election fraud issue, correct?

18   **A**    Yes, ma'am.

19   **Q**    This message doesn't say anything about January 6th,

20   does it?

21   **A**    It does not.

22   **Q**    It doesn't say anything about planning for D.C. on

23   January 6th, does it?

24   **A**    No, ma'am.

25   **Q**    All right.  Now I'm going to refer you to the

1    compilation of messages from Mr. Hackett, all right?  And

2    that is Exhibit 6776.

3                    MS. HALIM:  If we can just go ahead and pull

4    that up, please.

5    BY MS. HALIM:

6    **Q**    All right.  I want to take a look right here at this

7    first screen.  This is in the OKFL Hangout chat group,

8    correct?

9    **A**    Yes, ma'am.

10   **Q**    Up there on the top left corner, this particular

11   slide, the date is September 28th, 2020, right?

12   **A**    Yes, ma'am.

13   **Q**    The time as indicated is 9-18-20 PM, right?

14   **A**    That's correct.

15   **Q**    It says it's from Faith, right?

16   **A**    Yes, ma'am.

17   **Q**    Now, when the Signal messages were extracted from

18   Mr. Rhodes's phone, they don't look like this, correct?

19   **A**    As far as the blue bubbles?

20   **Q**    Correct.

21   **A**    Correct.

22   **Q**    So the blue bubbles is something that was created by

23   the government, right?

24   **A**    Yes, ma'am.

25   **Q**    Was it created by you?

1    **A**    No, ma'am.

2    **Q**    Someone else on the prosecution team?

3    **A**    Yes, ma'am.

4    **Q**    All right.  Now, when it's extracted from the phone,

5    it's not in Eastern Standard time, is it?

6    **A**    No, ma'am.  It's UTC.

7    **Q**    UTC.  That's how it comes out of the extraction when

8    you take it from the phone, correct?

9    **A**    Correct.

10    **Q**    So there's actually a conversion that had to be done

11    from UTC from the actual evidence to this page that the

12    government created, right?

13    **A**    It's not a physical -- it's a conversion within

14    Cellebrite.  It gives you the option, once you open the

15    Cellebrite to view the report, to select the time zone.

16    **Q**    And so you have chosen to put the Eastern Standard

17    instead of the UTC that comes from the actual forensic

18    extraction, correct?

19    **A**    Yes, ma'am.

20    **Q**    This says from Faith, right?

21    **A**    That's correct.

22    **Q**    And that is the name that Mr. Hackett began using as

23    of January 7, correct?

24    **A**    I know it was the name he used.  I can't -- without

25    looking at the records, I can't tell you the specific date

1    he began using it.

2    **Q**    Fair enough.

3         Prior to using Faith, it was Ahab, right?

4    **A**    Yes, ma'am.

5    **Q**    And prior to using Ahab, it was JW, right?

6    **A**    That's correct.

7    **Q**    Now, this message on September 28th, 2020, which by

8    the way is before the election, correct?

9    **A**    Correct.

10   **Q**    So at this point, at risk of stating the obvious,

11   there is no winner or loser of the presidential election,

12   right?

13   **A**    Correct.

14   **Q**    Now, on September 28th, 2020, it wasn't Faith he was

15   using, correct?

16   **A**    I have to go back and look at the records, but I'm not

17   sure.

18   **Q**    Well --

19   **A**    I'll tell you I believe the -- well -- yeah, I'm not

20   sure about the -- we have to look at the records.  I'm not

21   sure there was -- Joe H, Joe Hackett, you know, several

22   names he used.  I'm not sure as far as all the dates.

23   **Q**    Stick with me.

24              MS. HALIM:  If we can pull up -- this is only

25   going to be for parties and witness only -- marked as JH-12.

1    BY MS. HALIM:

2    **Q**    And let me know, Agent, when you can see that on your

3    screen.  Do you see that up there?

4    **A**    Yes, ma'am.

5    **Q**    This is what the extraction looks like when it comes

6    out of the phone, right?

7    **A**    I viewed the extraction in the Excel report.  You

8    know, it gives you an option to do Excel or PDF when you do

9    the extraction.  I haven't viewed it in a text field like

10   this.  It's been Excel, but this does look like an

11   extraction.

12   **Q**    And, to be clear, the very first thing that happens

13   forensically when something is taken out is the extraction,

14   correct?

15   **A**    Yes, ma'am.

16   **Q**    And then from the extraction you can manipulate that

17   into the different formats like Excel, correct?

18   **A**    Yes.  You can convert it.

19   **Q**    So I'm going to -- if you see here:  "Time to be

20   passive is over."  That's that first message that was in

21   government exhibit?

22   **A**    Yes, ma'am.

23   **Q**    You see that that was sent by JW, right?

24   **A**    Yes, ma'am.

25   **Q**    And the number there is 941-704-6396, correct?

1    **A**    Yes, ma'am.

2    **Q**    You know that to be Mr. Hackett's cell phone number,

3    correct?

4    **A**    That's correct.

5    **Q**    Registered -- and it's with AT&T, right?

6    **A**    I believe it is.  Yes, ma'am.

7    **Q**    That's his service provider, correct?

8    **A**    Yes, ma'am.

9    **Q**    So Faith didn't send this.  Mr. Hackett, using his

10   cell phone number, sent that message on 9-28-2020, correct?

11   **A**    Using the Signal app.  Yes, ma'am.

12   **Q**    Correct.  Using Signal app.  But with that number

13   that's associated with his name through AT&T, correct?

14   **A**    Yes, ma'am.

15   **Q**    All right.  Now, I'd like to refer you to the video

16   that was attached because the message "Time to be passive is

17   over" is a commentary on a video that Mr. Hackett posted,

18   correct?

19   **A**    Yes, ma'am.

20   **Q**    Now, if you remember on Tuesday --

21            MS. HALIM:  We can take that down.

22       If you can pull the video up.

23   BY MS. HALIM:

24   **Q**    On Tuesday when you testified, Mr. Nestler played a

25   clip of the video, correct?

1    **A**    Yes, ma'am.

2    **Q**    A 30-second clip, right?

3    **A**    I believe it was 30 seconds.

4    **Q**    Who chose that particular 30 seconds?

5    **A**    I believe Mr. Nestler did.

6    **Q**    All right.  Have you seen the entire video?

7    **A**    I have.

8    **Q**    It's about five minutes and change?

9    **A**    Yes, ma'am.

10                   MS. HALIM:  Your Honor, I'd like to play the

11   entire video at this time, please.

12                   THE COURT:  Okay.

13                        (Video played.)

14   BY MS. HALIM:

15   **Q**    You see right there at the bottom of the screen,

16   Agent -- it's cut off, but do you believe that to say:

17   "Lessons from Ronald Reagan in uncertain"?  Do you believe

18   those words to say that at the bottom of the screen?

19   **A**    Yes, ma'am.

20   **Q**    Thank you.

21                   MS. HALIM:  We can continue.

22                        (Video played.)

23   BY MS. HALIM:

24   **Q**    You see there at the bottom now it says Fox &

25   Friends?

1    **A**    Yes, ma'am.

2    **Q**    That's something that's one of the -- it's a national

3    media outlet?

4    **A**    This is one of Fox News's segments.

5                    MS. HALIM:  Continue.

6                         (Video played.)

7    BY MS. HALIM:

8    **Q**    That is the entirety of the clip, correct?

9    **A**    Yes, ma'am.

10   **Q**    That's the entire clip that Mr. Hackett posted to the

11   group chat, right?

12   **A**    It is.

13   **Q**    Before the election, correct?

14   **A**    Yes, ma'am.

15   **Q**    The OKFL Hangout group chat has over 80 members in it,

16   right?

17   **A**    Somewhere around there.

18                    MS. HALIM:  If we could go back to Government

19   Exhibit 6776 and advance to the second message.

20   BY MS. HALIM:

21   **Q**    All right.  So this is on September 29, 2020, correct?

22   **A**    That's correct.

23   **Q**    It is a message from Stewart Rhodes, right?

24   **A**    Yes, ma'am.

25   **Q**    To the OKFL Hangout chat, right?

1   **A**    Yes, ma'am.

2   **Q**    Who is Stewart Rhodes talking about here, if you know?

3   **A**    Joe Biden.

4   **Q**    Now, you know that because prior to this message there

5   must have been 20, 30, or 40 messages about people watching

6   the Trump/Biden debate, correct?

7   **A**    That's correct.

8   **Q**    So a number of users or members of the group are

9   talking about the debate specifically, correct?

10   **A**    Yes, ma'am.

11          MS. HALIM:  And then lastly if we could go

12   to -- I think it's the fourth message.

13          That works right there.  Sorry.

14   BY MS. HALIM:

15   **Q**    So this particular message from Mr. Hackett, that's

16   still while they're talking about the debate, right?

17   **A**    I believe it was.

18   **Q**    Comes at the tail end, correct?

19   **A**    Yes, ma'am.

20   **Q**    And it's a comment -- if you know, it appears to be a

21   commentary on the media's reaction to Trump's performance in

22   the debate, correct?

23   **A**    I believe that's correct.

24          MS. HALIM:  If we could advance forward,

25   please.

1    BY MS. HALIM:

2    **Q**    Actually, while we're doing that, rather than showing

3    all of the messages, whoever put this together just chose

4    these select messages, correct?

5    **A**    These aren't all of the messages from all of the group

6    chats.

7    **Q**    It's not even -- it's barely a fraction of the

8    messages from all the chats, correct?

9    **A**    That's correct.

10    **Q**    And was it you who selected which messages to put into

11    that exhibit?

12    **A**    No, ma'am.

13    **Q**    It was someone over here from the prosecution team?

14    **A**    That's correct.

15    **Q**    They picked which of the 16 or 17 messages to put into

16    that compilation exhibit, correct?

17    **A**    That's correct.

18                    MS. HALIM:  If we can go to the message about

19    the med kit.  Right here.

20    BY MS. HALIM:

21    **Q**    On October 17th, 2020, do you see that?

22    **A**    Yes, ma'am.

23    **Q**    And, again, at this time Mr. Hackett isn't going by

24    Faith, he's actually using the 6396 cell phone number that

25    is registered in his name, correct?

1   **A**    I can't say without looking at the records.

2                   MS. HALIM:  Can you pull up JH-12, please.

3        Or is it in 13?

4        I'm sorry.  It's what we have marked, Your Honor, for

5   identification as JH-13.

6        And this would be for parties and witness only,

7   please.

8   BY MS. HALIM:

9   **Q**    Do you see this record in front of you?

10  **A**    Yes, ma'am.

11                  MS. HALIM:  And we're going to scroll down I

12  think all the way to the end, Justin.

13  BY MS. HALIM:

14  **Q**    Do you see that there?

15  **A**    Yes, ma'am.

16  **Q**    This is dated 10-17-2020?

17  **A**    Yes, ma'am.

18  **Q**    And this is from JW, right?

19  **A**    Yes, ma'am.

20  **Q**    And the phone number 941-704-6396, correct?

21  **A**    Yes, ma'am.  But I don't believe this is the same

22  message.

23  **Q**    Oh, I'm so sorry.  It's not.

24                      (Pause in proceedings.)

25  BY MS. HALIM:

1    **Q**    Do you see that?  It's kind of small.  Do you need us

2    to make it bigger?

3    **A**    No, ma'am.  I can see it.

4    **Q**    So this is the correct message, right?

5    **A**    Yes, ma'am.

6    **Q**    JW is the one who sent that message, correct?

7    **A**    Yes, ma'am.

8    **Q**    Phone number there, 941-704-6396, correct?

9    **A**    Yes, ma'am.

10   **Q**    And this is Mr. Hackett's cell phone number registered

11   with AT&T, correct?

12   **A**    That's correct.

13   **Q**    Now, this message comes after pages and pages and

14   pages of messages talking about medical kits and other

15   emergency medical procedures, right?

16   **A**    Yes, ma'am.

17   **Q**    Thank you.

18              MS. HALIM:  You can take that down.

19   BY MS. HALIM:

20   **Q**    So whoever chose to put that message in, they only

21   chose that message, not the scores of messages that came

22   before also about medical kits and medical procedures,

23   right?

24   **A**    Yes.  It's just one of many messages.

25   **Q**    Let's change topics now and go to the GoToMeetings.  I

1  want to talk about first GoToMeetings generally.  It is -- I

2  think you said it was similar to Zoom, right?

3  **A**    Yes, ma'am.

4  **Q**    It's software that allows you to do conference calling

5  with as many participants as you want, for the most part,

6  right?

7  **A**    That's correct.

8  **Q**    GoToMeeting application uses audio more so than the

9  video feature, correct?

10  **A**    I believe they do have a video feature.  I could be

11  wrong, but it was -- to my knowledge, I believe they did

12  have a video feature, but in the context of this, these were

13  all audio calls.

14  **Q**    They were audio calls.  So your investigation revealed

15  that all of the GoToMeetings that you learned about were

16  audio only, correct?

17  **A**    That's correct.

18  **Q**    And we saw the person who recorded a portion of the

19  November 9th meeting, we saw that he was using it on just

20  his cell phone, right?

21  **A**    That's correct.

22  **Q**    And so it's just like having a call on your cell

23  phone, right?

24  **A**    Yes, ma'am.

25  **Q**    It's the kind of thing you can put the speaker on and

1    just walk away from, right?

2    **A**    That's possible.

3    **Q**    Now, specific to the November 9th GoToMeeting, you got

4    a recording of 29 minutes out of a meeting that lasted for a

5    total of 125 minutes, right?

6    **A**    That's correct.

7    **Q**    So that's right about a third of the meeting?

8    **A**    That's about right.

9    **Q**    And of the 29 minutes that you got, you only played

10   for this jury 11 clips, right?

11   **A**    I didn't play anything.

12   **Q**    That's fair enough.

13       You were asked questions after Mr. Nestler played 11

14   clips, right?

15   **A**    Yes, ma'am.

16   **Q**    Now, those clips, if we took all 11 clips, they don't

17   total up to 29 minutes, correct?

18   **A**    I don't believe so.

19   **Q**    Did you decide which clips to play?

20   **A**    No, ma'am.

21   **Q**    It was someone from the prosecution team, right?

22   **A**    Yes, ma'am.

23   **Q**    Okay.  Now, that tip that you received about the

24   person who recorded 29 minutes of 125-minute meeting, that

25   came to the FBI's attention on November 25th, 2020, right?

1    **A**     That's correct.

2    **Q**     Despite receiving that tip on November 25th, no one

3    from the FBI reached out to that person, correct?

4    **A**     Not to my knowledge.  I believe it was received by

5    this office here in D.C.  At the time I was the Florida

6    agent working there, so, you know, I don't have direct

7    knowledge of what was done with it, but I don't -- I believe

8    they followed up with him later and got the recording.

9    **Q**     And by later, you know as part of your investigation

10   as part of being on the case at this time it was March

11   of 2021 when the FBI reached out to that individual, right?

12   **A**     I don't know if it was when they reached out, but I do

13   believe it was when the recording was turned over.

14   **Q**     After January 6th, correct?

15   **A**     That's correct.

16   **Q**     In the 29 minutes -- you've listened to all 29 minutes

17   I assume, right?

18   **A**     Yes, ma'am.

19   **Q**     And in those 29 minutes you don't ever hear

20   Mr. Hackett's voice, correct?

21   **A**     No, ma'am.

22   **Q**     You do hear the voices of some other people, right?

23   **A**     Yes, ma'am.

24            MS. HALIM:  Bear with me one moment, please.

25   BY MS. HALIM:

1    **Q**    All right.  I am going to focus now on Mr. Hackett's

2    Signal name Ahab.  You're familiar that he used the name

3    Ahab for some portion of time, right?

4    **A**    Yes, ma'am.

5    **Q**    Are you aware that Ahab refers to a mountain bike

6    trail in Moab, Utah?

7    **A**    No, ma'am.  I'm not aware of that.

8    **Q**    Are you aware that Mr. Hackett is an avid cyclist?

9    **A**    No, ma'am.

10    **Q**    That's not something that you learned about as part of

11    your investigation into him?

12    **A**    No.  I didn't know that.

13    **Q**    Let's talk about VPNs.

14        VPNs are something that are used so that your Internet

15    activity doesn't tie back to the IP address at your home,

16    correct?

17    **A**    That's correct.

18    **Q**    VPN is something that can be used to minimize the risk

19    of being a victim of hacking, for example, is that right?

20    **A**    That's correct.

21    **Q**    VPN is a more secure way to use the Internet, correct?

22    **A**    Yes, ma'am.

23    **Q**    Nothing unlawful about owning or using a VPN, right?

24    **A**    Not to my knowledge.

25    **Q**    And, in fact, during the pandemic, a lot of employers

1    asked their employees to use a VPN when they worked from

2    home, right?

3    **A**    I wouldn't know that.

4    **Q**    Okay.  Lastly, I'm going to talk about the video that

5    was taken inside the Capitol building on January 6th.

6    That's how your testimony started back on Tuesday, right?

7    Looking at the video footage of the people inside the

8    Capitol building?

9    **A**    The CCTV footage.

10   **Q**    CCTV?

11   **A**    That's correct, ma'am.

12   **Q**    CCTV stands for closed circuit TV?

13   **A**    Yes, ma'am.

14   **Q**    And that's what was -- the kind of cameras that were

15   inside the Capitol building?

16   **A**    That's correct.

17   **Q**    And I think you mentioned there were hundreds of

18   cameras throughout the Capitol building, correct?

19   **A**    Maybe even thousands.

20   **Q**    Maybe even thousands.

21         It's a pretty secure building in that way, right?

22   **A**    Yes, ma'am.

23   **Q**    There's not really much area of the Capitol that's not

24   covered by direct video, correct?

25   **A**    We uncovered some throughout the investigation.  There

1   were some dead spots or blind spots where there was no

2   coverage.

3   **Q**    But there was not very many, right?

4   **A**    I couldn't tell you.  That would probably be a better

5   question for one of those Capitol officers.

6   **Q**    Fair enough.

7        So this is Government Exhibit 1056.029.  Actually

8   that's just a portion of the number.

9             MS. HALIM:  Can you pull that up so we can see

10  the entire number, please.

11  BY MS. HALIM:

12  **Q**    Do you recognize this?

13  **A**    Yes, ma'am.  I believe that's camera number 7029, if

14  I'm not mistaken.

15  **Q**    Thank you.  Thank you.

16        And the time here is 2:40 PM, correct?

17  **A**    Yes, ma'am.

18  **Q**    We're going to play this video.  The circles that you

19  see currently are the two Capitol police officers, Officers

20  Salke and Officer -- I'm blanking on his name.

21  **A**    Carrion.

22  **Q**    Carrion.  Thank you so much.

23        Those are what those circles are right there?

24  **A**    Yes.

25             MS. HALIM:  Play the video.

1                          (Video played.)

2                MS. HALIM:  Can we pause it?

3      BY MS. HALIM:

4      **Q**    We're going to play it at half speed so we can see it

5      a little more clearly.  Okay, Agent?

6                MS. HALIM:  Go ahead.

7                          (Video played.)

8      BY MS. HALIM:

9      **Q**    And I'm going to focus your attention, once we get it

10     playing, the top of the screen where we see the doorway, all

11     right?

12          And then specifically the left side of that doorway in

13     the center top screen, okay?

14                         (Video played.)

15               MS. HALIM:  Can you pause for a second?

16     BY MS. HALIM:

17     **Q**    See this circle?

18     **A**    Yes, ma'am.

19     **Q**    Do you see the head there with the glasses on inside

20     that yellow circle on the top left of the screen?

21     **A**    Yes, ma'am.

22     **Q**    Top left center I should say.

23          That's Mr. Hackett, correct?

24     **A**    Looks to be him, but I'll confirm once it moves

25     forward a little bit, but I believe it is.

1    **Q**    Sure.

2        Before we play further, though, did you see that

3    person next to him just lift his arm up and put his arm on

4    Mr. Hackett?  Can you see an arm there?

5    **A**    I see an arm.  Yes, ma'am.

6            MS. HALIM:  Okay.  Go ahead.  Keep playing,

7    please.

8                    (Video played.)

9    BY MS. HALIM:

10   **Q**    You see Mr. Hackett's hands there grasping onto the

11   door?

12   **A**    Yes, ma'am.  I saw him touch the door there.

13           MS. HALIM:  Now, if we can play that again and

14   enhance that portion, please.

15                   (Video played.)

16   BY MS. HALIM:

17   **Q**    There you see Mr. Hackett?

18           MS. HALIM:  Stop, please.

19   BY MS. HALIM:

20   **Q**    He's almost on the other side of the door there,

21   right?

22   **A**    Yes, ma'am.

23   **Q**    And then someone reaches up an arm and grabs him,

24   correct?

25   **A**    When you play it forward, it doesn't look like he's

1    being grabbed, it just looks like his arm is around his

2    shoulders.  His hand is on his shoulder there.

3                        (Video played.)

4    BY MS. HALIM:

5    **Q**    But that is Mr. Hackett, right, with the gray and blue

6    checkered face gaiter we'll call it?

7    **A**    Yes, ma'am.

8    **Q**    Thank you.

9                    MS. HALIM:  You can take that down.

10   BY MS. HALIM:

11   **Q**    Lastly, this has been marked for identification

12   purposes as JH-17.  This will be just for parties and

13   witness at this moment.

14            Do you recognize this photo, Agent?

15   **A**    Yes, ma'am.

16   **Q**    Does that appear to be a photo -- a still shot taken

17   from the CCTV from camera number 7029?

18   **A**    Yes, I believe this was when they were exiting.

19   **Q**    Correct.

20                   MS. HALIM:  Move to admit JH-17 at this time,

21   Your Honor.

22                   MR. NESTLER:  No objection, Your Honor.

23                   THE COURT:  JH-17 is admitted.

24                   MS. HALIM:  If we can publish that to the

25   jury.

1    BY MS. HALIM:

2    **Q**    That pink circle, do you see that there, Agent?

3    **A**    Yes, ma'am.

4    **Q**    That is -- Mr. Hackett is in the front with the helmet

5    on, is that right?

6    **A**    Yes.  I believe so.

7    **Q**    And then the person almost directly behind him with

8    the backwards hat, you know that to be Mr. Moerschel,

9    correct?

10   **A**    Yes, ma'am.

11   **Q**    Mr. Hackett and Mr. Moerschel left the building

12   together, right?

13   **A**    Yes.

14   **Q**    The timestamp on here is 19:51:53, correct?

15   **A**    Yes.

16   **Q**    Which is UTC time?

17   **A**    Yes.

18   **Q**    If we back that up and convert it into eastern time,

19   that would be 2:51:53, is that right?

20   **A**    That's correct.

21   **Q**    PM.

22        Once Mr. Moerschel and Mr. Hackett left, they remained

23   outside, correct?

24   **A**    I don't believe they reentered the building.

25        MS. HALIM:  Thank you, Agent.

1        At this time, Your Honor, that's all I have.

2            THE WITNESS:  Thank you.

3            THE COURT:  Thank you, Ms. Halim.

4        Okay.  Who's next?

5                **CROSS-EXAMINATION OF KELSEY HARRIS**

6    **BY MR. WEINBERG:**

7    **Q**    Good afternoon, Agent Harris.

8    **A**    Good afternoon, sir.

9    **Q**    I guess I get to go second again.  Tough act following

10   Ms. Halim, isn't it?  Maybe.

11           MR. WEINBERG:  Let's pull up that video, if we

12   can, of 105.1.E.2.  That's the line.

13   BY MR. WEINBERG:

14   **Q**    Do you recall testifying about that on Tuesday?

15   **A**    Which one were you referring --

16   **Q**    The line going up the steps?

17   **A**    Yes, sir.

18   **Q**    And I believe this is the exhibit where it identifies

19   everybody in the line.

20                    (Video played.)

21   BY MR. WEINBERG:

22   **Q**    So this is the line that everybody came up, correct?

23   **A**    Yes, sir.

24   **Q**    In that line there's 14 people, is there -- there's 14

25   Oath Keepers in the steps --

1463

1   **A**    There's 12 people in that line.

2   **Q**    And there's two people already at the top of the

3   steps?

4   **A**    Yes, sir.

5   **Q**    So those two people were Harrelson and Dolan?

6   **A**    Yes, sir.

7   **Q**    Now, of the 14 people, only three of those people had

8   military experience, correct?

9   **A**    I couldn't tell you off the top of my head without

10  going through each of their names and trying to recall.

11  **Q**    Okay.  Well, Harrelson had military experience,

12  correct?

13  **A**    That's correct.

14  **Q**    And so did Dolan, correct?

15  **A**    Yes, sir.

16  **Q**    And Watkins did as well?

17  **A**    Yes, sir.

18  **Q**    Did Mr. Moerschel have any military experience?

19  **A**    Not to my knowledge.

20  **Q**    Or any police experience?

21  **A**    I don't believe so.

22  **Q**    Okay.  Kelly Meggs?

23  **A**    No, sir.

24  **Q**    Mr. Hackett?

25  **A**    No, sir.

1    **Q**    Mr. Isaacs?

2    **A**    No, sir.

3    **Q**    What about Caleb Berry?

4    **A**    I don't believe so.

5    **Q**    Connie Meggs?

6    **A**    No, sir.

7    **Q**    Do you recall how old Connie Meggs was at the time?

8    **A**    I do not recall her age.  She's Mr. Meggs's wife, so I

9    would think they're around the same age.

10   **Q**    Would 59 sound correct?

11   **A**    I would say they're in their 50s.

12   **Q**    What about Mr. Steel?  If --

13   **A**    Ms. Steel?

14   **Q**    Yes.

15   **A**    I don't believe she was in the military.

16   **Q**    Okay.  What about Young, Graydon Young?

17   **A**    I don't believe so.  I don't recall what his

18   profession is.  I don't believe he was in the military.

19   **Q**    And Crowl?

20   **A**    I'm not sure about Mr. Crowl.

21   **Q**    What about Parker or Beeks?

22   **A**    I don't believe so.

23   **Q**    So we can agree that only three of these 14 had

24   military experience, to the best of your knowledge?

25   **A**    Yes, sir.

1      MR. WEINBERG:  If we can press play again.

2                          (Video played.)

3    BY MR. WEINBERG:

4    **Q**    So we can agree that the line doesn't go straight to

5    the Columbus door, correct?

6    **A**    Yes, sir.  It appears that they turned left.

7    **Q**    And there's not a very good shot of it, but when they

8    turn left, they stop, they disperse a little, and they sing

9    the National Anthem, correct?

10   **A**    I believe so.

11   **Q**    And we can also agree that when the Oath Keepers enter

12   the Capitol, they're not in the same order as this line?

13   **A**    That's correct.

14   **Q**    Speaking of the Capitol --

15                      MR. WEINBERG:  Can we go to Exhibit 1056A?

16           This is the video of the Columbus doors.

17   BY MR. WEINBERG:

18   **Q**    Now, I believe Ms. Halim already elicited this, but

19   you watched lots of videos, correct?

20   **A**    Yes, sir.

21   **Q**    CCTV, Facebook, Parlor, anything anybody recorded, you

22   probably watched it if you could?

23   **A**    I'd say we probably have hundreds of thousands of

24   videos.  We watched a lot.  I couldn't say I watched

25   everything, that would be physically impossible.

1    **Q**    So those Columbus doors, their windows are broken, is

2    that right?

3    **A**    Yes.

4    **Q**    Do you know who broke those windows?

5    **A**    No, sir.

6    **Q**    We can agree you don't believe it was any of the Oath

7    Keepers that broke those windows?

8    **A**    No, sir.

9    **Q**    In fact, those windows were already broken when the

10   Oath Keepers got there?

11   **A**    I know they were -- they were broken before they

12   entered.  But no, sir.  I don't believe any of the Oath

13   Keepers broke those windows.

14   **Q**    And do you know when the first breach of the Capitol

15   was, like what time that happened?

16   **A**    I don't recall.

17   **Q**    Okay.  Do you recall if that was on the west side?

18   **A**    Yes, sir.

19   **Q**    Do you know the name of Dominic Pezzola?

20   **A**    Yes, sir.

21   **Q**    I believe he's the gentleman who first breached the

22   Capitol on the west side, does that sound right?

23   **A**    I've never investigated him, only in the context of

24   a -- I've seen his name pop up, but I haven't investigated

25   him to know that that was what he did.

1   **Q**    Then let's talk about -- do you know what time Mike

2   Pence left the Capitol?

3   **A**    I've seen a video of him being ushered out.  I don't

4   recall what time it was.

5   **Q**    Does like 2:13 sound about right?

6   **A**    If you have a video, we can pull it up.  I know we've

7   used it before or watched it.  I don't want to stick a

8   number on it.  I'm not particularly sure.

9   **Q**    Well, I'm sure the government will show the video

10  later in the trial.

11              MR. WEINBERG:  Can we play this video now,

12  please.

13                       (Video played.)

14  BY MR. WEINBERG:

15  **Q**    So while this video is playing, the first Oath Keeper

16  that enters through the Columbus door, that was Mr. Isaacs,

17  correct?

18  **A**    Yes, sir.

19  **Q**    And we can agree that Mr. Isaacs is by himself?

20  **A**    Yes, sir.

21  **Q**    And he's not acting in concert with anybody?

22              MR. NESTLER:  Objection.  Calls for legal

23  conclusion.

24              THE COURT:  Sustained.

25              MR. WEINBERG:  So if we can pause it.

1  BY MR. WEINBERG:

2  **Q**    So the yellow -- could you tell us who's in the yellow

3  right now, the yellow circles?

4  **A**    Can you let it play forward a little bit more?

5  **Q**    Sure.

6                         (Video played.)

7  **A**    I believe that's Mr. Meggs on front.

8  BY MR. WEINBERG:

9  **Q**    Okay.  And who's directly behind him?

10  **A**    I believe that's Mr. Dolan.

11                  MR. WEINBERG:  Can we pause it?

12  BY MR. WEINBERG:

13  **Q**    And who's the one with the backwards hat on right in

14  the middle there, if you can tell?

15  **A**    Next to the Trump beanie, the red, to the --

16  **Q**    Yes.

17  **A**    I believe that's Mr. Moerschel.

18  **Q**    The one behind it, correct?

19  **A**    Referring right here?

20  **Q**    No.  The one right above that I believe is

21  Mr. Moerschel.

22                  MS. HALIM:  Can we roll it on for just ten

23  seconds?

24                         (Video played.)

25  **A**    I see now.  Yes, sir.

1    BY MR. WEINBERG:

2    **Q**    Okay.  So we have -- who's the gentleman right behind

3    Mr. Moerschel?

4    **A**    I believe Mr. Graydon Young.

5    **Q**    So Mr. Graydon Young has his hand on Mr. Hackett's

6    shoulder, do we agree?

7    **A**    Can you play it forward a little bit?

8                        (Video played.)

9    **A**    I believe so.

10   BY MR. WEINBERG:

11   **Q**    Okay.  And directly in front of him is Mr. Moerschel,

12   correct?

13   **A**    Yes, sir.

14   **Q**    And directly behind Mr. Graydon Young is a large mass

15   of people, we can agree on that?

16   **A**    To all sides of everyone, it's just a crowd.

17   **Q**    And the crowd is pushing forward, it looks like,

18   right?

19   **A**    It looks like they all are.

20                  MR. WEINBERG:  Can we go to video time 15:30?

21                        (Video played.)

22   BY MR. WEINBERG:

23   **Q**    I believe at the top it's about 2:51, correct?

24   **A**    Yes, sir.

25   **Q**    Do you recognize these two individuals at the bottom

1    of the screen?

2    **A**    I believe that's Mr. Moerschel and Mr. Hackett.

3    **Q**    That's correct.

4                    MR. WEINBERG:  Can we play it?

5                        (Video played.)

6    BY MR. WEINBERG:

7    **Q**    And this is a video of them leaving the Capitol,

8    correct?

9    **A**    Yes, sir.

10    **Q**    It's fair to say they're not being escorted out of the

11    Capitol, correct?

12    **A**    No.  Looks like they're walking under their own power.

13    Can't see if there's any officers out of frame, but from

14    here they are -- the whole crowd is walking out.

15    **Q**    So you've watched a lot of videos inside the Capitol,

16    correct?

17    **A**    Yes, sir.

18    **Q**    And we can agree that you never saw Mr. Moerschel

19    confronting any law enforcement, correct?

20    **A**    I haven't seen any videos of that.

21    **Q**    In fact, you haven't seen any video of Mr. Moerschel

22    encouraging people to approach law enforcement?

23    **A**    There's no audio on any of these videos, so I can't

24    say whether he did or not.

25    **Q**    What about on all the cell phone videos you watched?

1    **A**    I don't recall watching cell phone video with

2    Mr. Moerschel.

3    **Q**    But you do recall there were lots of videos taken

4    inside of the Capitol by people with their cell phones?

5    **A**    Yes, sir.

6    **Q**    And you just never saw Mr. Moerschel with any of

7    those?

8    **A**    Correct.

9    **Q**    We can agree you haven't seen any video of

10   Mr. Moerschel destroying any property inside the Capitol?

11   **A**    I have not seen that.

12   **Q**    You didn't see any video of him celebrating being

13   inside of the Capitol?

14   **A**    I have not seen any videos of him celebrating.

15   **Q**    You didn't see any videos of him fist-pumping or

16   yelling and screaming inside the Capitol?

17   **A**    Not that I can recall.

18   **Q**    And it's fair to say he was only inside of the Capitol

19   for about 11-ish minutes?

20   **A**    Sounds about correct.  2:40 to 2:51.

21   **Q**    So I want to change topics a bit.  Let's talk about

22   the Comfort Inn in Arlington.  That's basically what's known

23   as the QRF hotel.  Do you recall watching videos about that?

24   **A**    Yes, sir.

25   **Q**    We saw that Mr. Moerschel was at that hotel, correct?

1    **A**    I believe so.

2    **Q**    But in your investigation he did not actually spend

3    the night at that hotel?

4    **A**    No, sir.  He didn't.

5    **Q**    And at that hotel was a Mr. Caldwell, correct?

6    **A**    Yes, sir.

7    **Q**    And Mr. Caldwell, according to the government's chart,

8    is part of the QRF, correct?

9    **A**    Yes, sir.

10    **Q**    Mr. Caldwell and Mr. Moerschel were never on any

11    chats, correct?

12    **A**    Together or just in general?

13    **Q**    Together.

14    **A**    I don't believe so.

15    **Q**    Okay.  And they were never on the same group chats

16    either, were they?

17    **A**    Not that I've seen.

18    **Q**    So if David is at the Capitol, he can't call

19    Mr. Caldwell by himself, correct?

20    **A**    You're asking if he can call Mr. Caldwell?

21    **Q**    Well, if they have no chats together and they don't

22    know each other, how is David Moerschel supposed to contact

23    Mr. Caldwell?

24            MR. NESTLER:  Objection.  Assumes facts not in

25    evidence.  And compound.

1              MR. WEINBERG:  I can rephrase, Your Honor.

2              THE COURT:  Please do.  Go ahead.

3    BY MR. WEINBERG:

4    **Q**    So you found no evidence that my client ever spoke to

5    Mr. Caldwell, correct?

6    **A**    Correct.

7    **Q**    And you found no evidence that my client had

8    Mr. Caldwell's contact information, correct?

9    **A**    I don't recall seeing Mr. Caldwell's contact in his

10   device.

11   **Q**    And if we look at the group chats in the exhibit,

12   you'll see that Mr. Caldwell and my client aren't on the

13   same chats?

14   **A**    That's correct.

15   **Q**    So my client could not call Mr. Caldwell when he was

16   at the Capitol without help from somebody else?

17   **A**    I can't say if he can call him or not.  Anyone can

18   call anyone.  These guys were in groups together, so I can't

19   specifically say that Mr. Moerschel can't call someone.

20   **Q**    Okay.  Let's talk about Mr. Moerschel and Mr. Vallejo.

21   You know that they never met each other until recently,

22   correct?

23   **A**    I don't know that.

24   **Q**    Okay.  Do you have any evidence that they ever met

25   each other before recently?

1474

```
 1    A    No, sir.

 2    Q    And you have no evidence of them ever chatting on the

 3   telephone together or on the Signal app?

 4    A    I've never seen any messages exchanged between them.

 5    Q    And the same would go with Todd Kandaris, correct?

 6    A    Mr. Kandaris.

 7    Q    Kandaris?

 8    A    Correct.

 9    Q    Never spoke to my client that you know of?

10    A    Not that I know of.

11    Q    Or Paul Stamey never spoke to my client that you know

12   of?

13    A    I can't say if he did or didn't.

14    Q    Kevin Bittner did talk to my client, though?

15    A    Mr. Bittner?

16    Q    Bittner, yes.  They spoke together?

17    A    Yes, sir.

18    Q    They drove up to the city together?

19    A    Correct.

20    Q    Okay.  How old is Mr. Bittner?

21    A    You said how is he?

22    Q    How old is he at the time approximately?

23    A    I don't know his age.  He's pretty old, though.

24    Q    79 sounds about right --

25    A    Maybe so.
```

1  **Q**     -- at the time?

2              MR. WEINBERG:  If we can go to Government

3  Exhibit 6770.

4  BY MR. WEINBERG:

5  **Q**     So these are chats that you discussed earlier,

6  correct?

7  **A**     Yes, sir.

8  **Q**     And this is the Old Leadership chat, right?

9  **A**     Yes, sir.

10 **Q**     Which means nobody at this table had access to these

11 chats, to your knowledge?

12 **A**     No.  None of the defendants were in the Leadership

13 chat.

14 **Q**     And in this exhibit, I believe there are a couple of

15 Facebook messages, is that right?

16 **A**     I believe so.

17 **Q**     Okay.  And in your investigation you learned that

18 Mr. Moerschel doesn't have a Facebook, correct?

19 **A**     I don't recall if he does or if he doesn't.

20 **Q**     Okay.  Well, we can agree there's no evidence that he

21 has sent any messages via Facebook that you know of?

22 **A**     That's correct.  We haven't -- I don't believe we

23 presented any Facebook messages of Mr. Moerschel.

24 **Q**     Okay.  And the same of Instagram?

25 **A**     Correct.

```
 1                    MR. WEINBERG:  Could we go to 1525, please.

 2     BY MR. WEINBERG:

 3     Q     So this is the exhibit about the GoToMeetings,

 4     correct?

 5     A     Yes, sir.

 6     Q     And we heard recordings from the November 9th

 7     GoToMeeting?

 8                    MR. WEINBERG:  Can we go to the next page,

 9     please.

10     BY MR. WEINBERG:

11     Q     And this was the GoToMeeting with a lot of people that

12     was recorded, right?

13     A     Yes, sir.

14     Q     Okay.  Mr. Moerschel wasn't at this meeting?

15     A     I don't believe he was on the call.

16     Q     Okay.  So he was not on this call?

17     A     Not to my knowledge.

18     Q     Okay.  Actually, I recall something in this call where

19     somebody suggested bringing a flag with a lead pipe, do you

20     remember hearing that in the call?

21     A     Yes, sir.

22     Q     Nobody at this table did that, right, that you know

23     of?

24     A     I don't remember seeing them with flags.

25                    MR. WEINBERG:  Could we go to 1002?
```

1   BY MR. WEINBERG:

2   **Q**   This was the e-mail that you went over with the

3   government that Stewart Rhodes sent, do you recall?  This is

4   the one about the Serbian plan.

5   **A**   I believe this is posted to the Oath Keepers website.

6   **Q**   Okay.

7   **A**   I don't believe this is an e-mail.

8   **Q**   So it's a posting on the website?

9   **A**   Correct.

10  **Q**   And this talks about the Serbian plan?

11  **A**   Yes, sir.

12          MR. WEINBERG:  Can we zoom in at the top here?

13  BY MR. WEINBERG:

14  **Q**   It says:  "Call to Action, March on D.C., Stop the

15  Steal."  Right?

16  **A**   Amongst other things, yes, sir.

17  **Q**   This was a call to action to go to which march?

18          MR. WEINBERG:  If we could go to the top part.

19  **A**   The November 14th Million MAGA March.

20  BY MR. WEINBERG:

21  **Q**   So this posting has nothing to do with January 6th?

22  **A**   No.  I believe this is referring to the Million MAGA

23  March.

24          MR. WEINBERG:  Can we go to page 3?

25          And can you zoom into the heading there, please.

1    BY MR. WEINBERG:

2    **Q**    Could you just read what's in big letters for me?

3    **A**    "Oath Keepers volunteer security op for Washington,

4    D.C."

5    **Q**    So basically it's saying that the Oath Keepers were

6    going to the march on the 14th and are volunteering for

7    security?

8    **A**    Yes.  The first line there says that they're sending

9    some Oath Keepers.

10    **Q**    Okay.  And can you look at where it says something

11    about a QRF?  Do you see that?  I believe it's in the -- I

12    just had it.  It's in like the fourth paragraph down.  Just

13    the first sentence.

14    **A**    Do you want me to read it?

15    **Q**    Yeah.  If you could read just the first sentence

16    where --

17    **A**    "We call on all our LEO, military, fire, EMS, and

18    search and rescue brothers and sisters nationwide to also

19    volunteer either for the inside D.C. security op or for the

20    outside D.C. contingency QRF."

21    **Q**    Okay.  And we've already established this is about the

22    November 14th rally?

23    **A**    I believe so.

24    **Q**    And we can agree that my client did not attend that

25    event?

1479

1    **A**    I don't believe he did.

2    **Q**    Let's talk about the Combat Training Art.  Do you

3    recall that?

4    **A**    Yes, sir.

5    **Q**    And that was on September 20th, 2020?

6    **A**    Yes, sir.

7    **Q**    My client didn't go to that either?

8    **A**    He was not there.

9    **Q**    Do you recall when my client joined the Oath Keepers?

10    **A**    I believe it was in September of 2020.

11    **Q**    Yes, good memory.  September 28th.

12    **A**    Yes, sir.

13    **Q**    We can agree that before September 28th he wasn't

14    privy to any of those messages in your investigation?

15    **A**    Correct.

16    **Q**    Let's talk about these texts.  The OKFL Hangout.

17                  MR. WEINBERG:  Can we go to 1555?  It's

18    actually -- this is the composite exhibit of all of the text

19    chains.

20    BY MR. WEINBERG:

21    **Q**    Okay.  The first slide is DC Op Jan 6 21.  You

22    obviously see that?

23    **A**    Yes, sir.

24    **Q**    Mr. Moerschel is not on that?

25    **A**    No, sir.

1    **Q**    So Mr. Moerschel did not receive any of these

2    messages, to your knowledge?

3    **A**    I don't know if he did or if he didn't.

4    **Q**    So you don't know if he did then?

5    **A**    No, sir.

6                         MR. WEINBERG:  Can we go to the next slide?

7    BY MR. WEINBERG:

8    **Q**    This is the OKFL DC Op Jan 6.  Mr. Moerschel was on

9    this op?

10   **A**    Yes, sir.

11   **Q**    When did this chat get created?  Do you recall?

12   **A**    I do not recall when it was created.

13   **Q**    Do you recall it was like maybe a week before

14   January 6th?

15   **A**    That sounds about right.

16   **Q**    This is obviously the Old Leadership chat.

17   Mr. Moerschel's not on that?

18   **A**    Correct.

19   **Q**    This is the OKFL Hangout.  Mr. Moerschel is on this

20   one?

21   **A**    Yes, sir.

22   **Q**    He's also on the Vetted OK hangout, correct?

23   **A**    That's correct.

24   **Q**    What about this one?  He's not on this one, correct?

25   **A**    No, sir.

1  **Q**    Okay.  There's a Don Siekerman on this one, right?

2  **A**    Siekerman.

3  **Q**    Siekerman.  I always mispronounce names.

4       He was the number 2, I believe you referred to him as?

5  **A**    He was designated by Mr. Rhodes to be the operations

6  leader on January 6th.

7  **Q**    And January 6th was, according to the government, the

8  big day for Mr. Rhodes and the Oath Keepers, correct?

9            THE COURT:  That will be sustained.  I think

10  the question is vague.

11  BY MR. WEINBERG:

12  **Q**    So all of the buildup to January 6th -- there was a

13  lot of buildup to January 6th, we can agree?

14  **A**    In what regard?

15  **Q**    From the Oath Keepers.

16  **A**    Are you referring to planning and training and --

17  **Q**    Everything.  Messages, training, planning, hotel room

18  reservations.

19  **A**    Yes, sir.

20  **Q**    So it was a big day for the Oath Keepers?

21  **A**    I would say so.

22  **Q**    And Mr. Siekerman called in sick?

23  **A**    That's what the messages said, he was sick.

24  **Q**    And after January 6th he stayed active in the chats?

25  **A**    I believe so.

1    MR. WEINBERG:  If we can do the next.

2    BY MR. WEINBERG:

3    **Q**    Of course Friends of Stone, my client is not on this

4    one either?

5    **A**    No, sir.

6                THE COURT:  Let's take our afternoon break.

7    It's about 3:00.

8        How much longer do you have?

9                MR. WEINBERG:  Maybe five, 10 minutes.

10               THE COURT:  Why don't we go ahead and finish

11   this examination, and then we'll go ahead and take our break

12   after that.

13               MR. WEINBERG:  Can we pull up DM-001 to show

14   over here?

15   BY MR. WEINBERG:

16   **Q**    I'm showing you what has been marked as David

17   Moerschel Exhibit 0001.  This is part of the OKFL Hangout

18   chat?

19   **A**    Yes, sir.

20   **Q**    Do you recognize the format that this is in?

21   **A**    Yes, sir.  I believe this is probably one of the

22   original extractions.

23   **Q**    Okay.  And do you see I guess a couple of lines down

24   where it says:  "Welcome David from Punta Gorda"?

25   **A**    Yes, sir.

1    **Q**    What date is that?

2    **A**    This is the 20th, but I believe when converted into

3    eastern, it's the 19th.

4    **Q**    Because of the time?

5    **A**    I recall that Mr. Moerschel first joined the chat and

6    posted a message on December 19th.

7    **Q**    And what does he say?

8    **A**    "Haha, thanks gators."

9    **Q**    And then what does he say after that?

10   **A**    "I missed the discussion on Trump's call to protest on

11   Jan 6.  Always late to the party."

12            MR. WEINBERG:  Judge, I'd ask to admit David

13   Moerschel 1.

14            THE COURT:  Okay.  DM-1 is admitted.

15            MR. WEINBERG:  If we can publish.

16   BY MR. WEINBERG:

17   **Q**    So this message is him welcoming himself to the group,

18   correct?  Or them welcoming him?

19   **A**    Yes, sir.

20   **Q**    And then he talks about he missed the discussions on

21   Trump's call to protest on January 6th?

22   **A**    That's what it says.

23   **Q**    Okay.  So in David's mind, according to this text,

24   it's a call to protest on the 6th?

25            MR. NESTLER:  Objection.

1484

1    THE COURT:  Rephrase, please.

2    BY MR. WEINBERG:

3    **Q**    This message is Mr. Moerschel inquiring about Trump's

4    call to protest and what he missed?

5    **A**    I don't believe he inquired.  He just posted the

6    message.

7    **Q**    So he said he missed the info about that, correct?

8    **A**    That's correct.

9    **Q**    Just real quick.  The ProtonMail, David signed up for

10   ProtonMail on November 18th, correct, according to the bank

11   records?

12   **A**    Well, that was when one of the purchases were made.  I

13   don't know if he had already had a free account prior to

14   that or not.

15   **Q**    We can agree that was prior to the text message

16   telling people to get the ProtonMail on December 6, 2020?

17   **A**    Yes, sir.

18   **Q**    In fact, David wasn't on any messages until the 19th

19   or 20th?

20   **A**    Correct.

21              MR. WEINBERG:  Judge, I don't have any other

22   questions at this time.

23              THE COURT:  Thank you.

24       Let's take our afternoon break.  It's a little after

25   3, why don't we plan to resume at 3:20.

1    Thank you all very much.

2              (Jury exits courtroom.)

3              MR. EDWARDS:  The government received exhibits

4    for Mr. Vallejo's cross of Special Agent Harris during the

5    last two crosses.  We would just like to raise a few issues.

6    We can do it now or right before the jury comes in.  I just

7    wanted to flag it now.

8              THE COURT:  Mr. Harris, why don't you step

9    down.  I'll ask you to step outside the courtroom.  Thank

10   you.

11             MR. EDWARDS:  And we raised this with

12   Mr. Peed, too, via e-mail.

13        My understanding is there are a number of exhibits --

14   it's tough to count -- there were quite a few messages from

15   the time that Mr. Vallejo is traveling to D.C. and then in

16   D.C. and then post-January 6th messages.  As Your Honor's

17   aware, Special Agent Harris testified to one message from

18   Mr. Vallejo.  It was a January 5th message, and it was for

19   the simple purpose to show Mr. Vallejo and say what the word

20   "QRF" was to bring it up on the organizational chart.  It

21   was at that time that Mr. Peed Rule 106'd the government to

22   introduce that second message, but --

23             THE COURT:  So you're making a scope objection

24   at this point?

25             MR. EDWARDS:  Correct.  I should have started

1    with that.

2        Basically all of these messages will be appropriate

3    for the testimony of another witness when we start to get

4    into Mr. Vallejo's conduct and his messages.  So I'd defer

5    to Mr. Peed's response.

6        There was only one other exhibit.  There are

7    transcripts -- and I know Your Honor raised this yesterday

8    or the day before -- there are transcripts on the

9    GoToMeeting that Mr. Peed I think intends to introduce where

10   he changes one of the words in the transcript.  It was my

11   understanding that we would float to the Court the audio

12   recording in the two transcripts to the Court I think in the

13   last trial and then decide is this ambiguous, but maybe that

14   was my misunderstanding.  So I just wanted to flag it to

15   see --

16             THE COURT:  I think the -- I have to go back

17   and look, but I think the defense hasn't -- let's put it

18   this way.  Let me take a look because I -- certainly defense

19   has an opportunity to present a different transcript.  What

20   I can't recall is whether the Court needs to first determine

21   whether there's an ambiguity in the audio before that allows

22   the defense or the government in the case of the audio

23   submitted by the defendant to --

24             MR. EDWARDS:  To show it.

25             THE COURT:  -- to present a different

1    transcript.

2              MR. EDWARDS:  And it might very well be just

3    that question comes up to determine whether it's admissible

4    to then go back to the jury with two therapists.  It's just

5    unclear to me whether or not that question's been answered

6    before showing it to --

7              THE COURT:  I'll take a look in the break.

8         Mr. Peed, in terms of the scope of the examination,

9    is --

10             MR. PEED:  So the government's examination did

11   a couple things.  Directly from Mr. Vallejo they showed the

12   QRF text, but then they also put in messages from Stewart

13   Rhodes and Jessica Watkins discussing a QRF, discussing

14   establishing a regional QRF for D.C., discussing having

15   weapons there.  And then they had a whole series about

16   basically November and December intent of the people who

17   were working with the QRF.  So what they've done is they put

18   in messages as part of the group --

19             THE COURT:  Let's talk about what Mr. Edwards

20   has raised, which is a series of messages about while your

21   client was traveling and on January 6th that you're wanting

22   to introduce.

23             MR. PEED:  So what I want to introduce is

24   basically to show the communications that he's having in

25   terms of on his way to D.C. to show that he was unaware of

1    this QRF and to show that he was unaware of these chats at

2    all, that he was added to these chats on the 5th once he

3    gets there.  And then to show the texts the government chose

4    to show what came immediately before and after that to put

5    it in context.  And then just general questions about

6    Mr. Bittner and Mr. Stamey, who are the ones that are

7    working with the QRF.

8            THE COURT:  You know how this trial's going to

9    unfold.  There is going to be a future agent who is going to

10   testify with some high degree of specificity about the

11   travel to D.C., and maybe it's the same agent or a different

12   one who will talk about January 6th itself.

13       It's sort of consistent with that organization.  I

14   would like for the cross-examination to be sort of

15   consistent with that in terms of the scope of it.  Obviously

16   there's a little bit more leeway, but I mean, I -- this

17   obviously is not -- doesn't foreclose you with the

18   appropriate agent from getting into, for example, the travel

19   messages and so on and so forth.

20       If, for example, you want to establish through Agent

21   Harris he didn't join a particular chat until January 5th

22   and then, for example, the DC Op chat is the one in which

23   the messages were sent and whatever messages he actually

24   sent on that, to give some context to the one the government

25   showed, that's fine by me.  But --

1    MR. PEED:  I believe this is just putting a

2    little bit of meat on that bones because --

3    THE COURT:  That's what I'm saying.  You can

4    do that, I'm just urging you to -- whether we -- whether the

5    testimony about the 5th, the lead-up and his travel can come

6    through a different agent.

7    MR. PEED:  I think it needs to -- because the

8    government is starting with so many November and December

9    messages and so much antigovernment rhetoric and talking

10   about even parts of a plan, I think it's important not just

11   to say Mr. Vallejo wasn't on those chats, but then to show

12   the exhibit that he actually didn't even know where he was

13   supposed to go, he didn't know it was the hotel, he didn't

14   know it was the QRF hotel, and contrast that with messages

15   from Mr. Harrelson asking expressly where is the QRF hotel.

16   THE COURT:  Well, I don't think that came in

17   on direct.

18   MR. PEED:  The December intent -- the November

19   and December intent is the whole part of the direct.

20   THE COURT:  Again, I'll give you a little bit

21   of leeway, but everything that you just described we'll have

22   an opportunity to bring in with a different agent.  And --

23   MR. PEED:  But they have --

24   THE COURT:  Can you let me finish?

25   MR. PEED:  I'm sorry, Your Honor.

1    THE COURT:  I've said that you will have an

2    opportunity to build out some of what I just described,

3    which is context around the one Signal message in

4    particular, the one you asked completeness for.  If there

5    are other messages in and around the 6th that you think --

6    and maybe even the 5th that are appropriate, that he joined

7    that message group on the 5th, that's fine.  That's all

8    within the scope of Agent Harris's testimony.  Agent Harris

9    hasn't testified about anything Mr. Vallejo did or didn't do

10   prior to the 6th.

11        That said, there will undoubtedly be an opportunity

12   through a different agent to get into all of that.  And so

13   I'll limit you to what is on the 6th and maybe the 5th,

14   depending on what it is, but, you know, let's just -- let's

15   sort of do this in a way that is consistent with the scope

16   of direct examination.  And, again, you're not going to be

17   foreclosed from putting more in when it's appropriate, okay?

18        Thanks, everyone.

19          (Recess taken from 3:11 p.m. to 3:22 p.m.)

20               (Jury enters courtroom.)

21          THE COURT:  Mr. Shipley, are you up next?

22          MR. SHIPLEY:  I'm happy to wait.

23          THE COURT:  Let's go.  Everybody else is

24   ready, so let's proceed.

25          MR. SHIPLEY:  Fair enough.

1    **CROSS-EXAMINATION OF KELSEY HARRIS**

2    **BY MR. SHIPLEY:**

3    **Q**    Agent Harris, my name is Bill Shipley.  I represent

4    Roberto Minuta.  Thank you for being here today.

5    **A**    Good to meet you, sir.

6    **Q**    I think you testified right at the beginning of your

7    direct examination that an arrest is not the end of an

8    investigation, right?

9    **A**    Yes, sir.

10    **Q**    It can come kind of any time in an investigation

11    including right at the beginning, right?

12    **A**    That's correct.

13    **Q**    And in many cases such as this one, in a lot of

14    respects the investigation continues long after the arrest

15    and more evidence is accumulated?

16    **A**    Yes, sir.

17    **Q**    But sometimes a person is too dangerous to release, so

18    you have to make the arrest early to take them off the

19    street in order to keep public safety in mind?

20    **A**    That's one of the things we consider.

21    **Q**    Now, Stewart Rhodes's telephone was seized by the FBI

22    pursuant to a search warrant early May 2001, right?

23    **A**    I can't tell you when his phone was received.  I

24    believe that investigation was done partly from here and in

25    Texas.  I don't know specifically when his phone was

1    received.

2    **Q**    I read on the Internet that it was the first week of

3    May 2001.  Is there any reason to suspect it was at any

4    other time?

5    **A**    I believe you mean 2021?

6    **Q**    2021.

7    **A**    I have no reason to doubt it, but I think we have the

8    records where we have the exact date.

9    **Q**    And the phone then is exploited or downloaded by a

10    specially trained agent that's called a CART agent, right?

11    **A**    Yes, sir.

12    **Q**    And that's the Computer Analysis and Response Team?

13    **A**    Yes, sir.

14    **Q**    And CART agents or special agents carry guns and

15    badges just like you, right?

16    **A**    Some.  Not all CART personnel are agents.

17    **Q**    But the CART agents at least go through the normal

18    Quantico training, get assigned out into the field, spend a

19    little time working as a field agent, and then go through

20    the specialized training?

21    **A**    I couldn't tell you specific -- so, to break it down,

22    like I said, not all CART-trained personnel are agents.  I

23    believe there are professional staff that aren't gun-toting

24    agents that are CART personnel.  Everyone goes through

25    Quantico to be an agent.  When it comes to CART, yes, I do

1    believe their training is very extensive and they go through

2    continuous training.

3    **Q**    All right.  And they then download the data off the

4    phone consistent with what the search warrant authorizes?

5    **A**    That's correct.

6    **Q**    And then that data that they get off the phone is

7    provided to case agents or squad agents like you?

8    **A**    Yes, sir.

9    **Q**    And that happened with Stewart Rhodes's phone because

10   that's where these hundreds of thousands of messages came

11   from were off of his phone, right?

12   **A**    Not all of the messages.  Some of the messages we got

13   came from other people's phones that weren't on Mr. Rhodes's

14   phones.

15   **Q**    Fair enough.

16       And I think at the beginning of your testimony two

17   days ago you made reference to there being dozens or maybe

18   hundred or more chats, separate chats on Stewart's and the

19   Signal application on his phone, right?

20   **A**    Yes.  We know there are hundreds.

21   **Q**    In fact, there are more than 1,100 separate chats

22   created by Stewart Rhodes on his phone in Signal?

23   **A**    I can't give you a number on it.

24   **Q**    Okay.  Now, I want to -- I don't mean to pick nits

25   with that, though, but you're here testifying as to facts

1    regarding the guilt or innocence of these four people, and

2    Stewart Rhodes's phone is important, right?

3                    MR. NESTLER:  Objection.

4                    THE COURT:  It's overruled.  Go ahead.

5    **A**    I believe all the evidence that we have is important.

6    BY MR. SHIPLEY:

7    **Q**    It's not that difficult to know how many chats are on

8    the phone, is --

9    **A**    That's not something I've testified to as far as the

10   number of chats.  I believe we have looked at chat

11   number 696.  I don't believe we've gone up until the 1100s,

12   and I don't even know if those even relate to any of the

13   individuals sitting over at the table with the other chats.

14   **Q**    I'm not saying they are, but I'm saying that there are

15   more than 1,100 chats on his phone, is that inconsistent

16   with your understanding, or you just don't know?

17   **A**    I don't know, sir.

18   **Q**    Now, Stewart Rhodes wasn't arrested until January

19   of 2022, right?

20   **A**    I believe that's correct.

21   **Q**    So seven months passed from the time the FBI had his

22   phone and had access to all these incendiary messages until

23   he was finally arrested?

24   **A**    Sounds about right.

25   **Q**    Now, if you come into evidence as an FBI agent that

1    somebody has committed a crime and they're dangerous, you

2    have authority to arrest based upon probable cause without

3    even seeking or waiting for a warrant, right?

4    **A**    Very rarely do we make probable cause arrests.  We

5    don't determine when someone is arrested.

6    **Q**    Didn't ask you that question.

7         My question was on the FBI's front page of its online

8    website and as a matter of your understanding of your

9    authorization, an FBI agent such as yourself can make an

10   arrest based upon probable cause that the person has

11   committed a federal felony without waiting for a warrant?

12   **A**    No, sir.  I can tell you that we go through getting

13   sign-offs from an AUSA as well as a head of our division to

14   conduct probable cause arrests.  Very rarely do we make

15   probable cause arrests.

16   **Q**    So if you're walking up to a bank on your own time and

17   somebody runs out of the bank with a bag of money and a gun,

18   a federally-insured bank, a federal crime, you're not going

19   to arrest them?

20   **A**    Well, now you're referring to a felony being committed

21   in our presence.  But in an investigation, very rarely.  I

22   can give you an example such as we most likely, most of the

23   time, conduct probable cause arrests during child porn

24   investigations where we get evidence that, you know,

25   particular types of videos have been transmitted over an IP.

1    We may go to that address, conduct a search, find a device,

2    suggest an interview, maybe get a confession.  And usually

3    we'll make a call to an AUSA and head of our division and

4    they have to authorize our probable cause arrests.  But

5    that's not something we normally do.  In fact, the

6    Constitution actually says that it must be brought by an

7    indictment.

8    **Q**    That's a charge, that's not an arrest.  Those are

9    different things, right?

10   **A**    Correct.  But usually we have to get charging

11   documents to conduct an arrest.  Like I said, very rarely do

12   we make probable cause arrests, but there are special

13   circumstances for it.

14   **Q**    My question that I started with is you have the

15   authority to make a probable cause arrest without a warrant?

16   **A**    The FBI in general, yes.

17   **Q**    Thank you.

18        Now, based on your understanding of how Signal works,

19   Stewart Rhodes would be the one who originated these various

20   hundreds of chats that were on his phone, right?

21   **A**    No, sir.

22   **Q**    Well, you can tell from the Cellebrite download of his

23   phone which chats he originated, right?  It tells you.

24   **A**    I believe so.  Some of the chats, just because they're

25   on his phone, it just means that he was a part of that chat.

1    I can't specifically tell you which ones he created.

2    **Q**    Does that mean you don't know whether you can say

3    that, or just sitting here today you're not certain?

4    **A**    Well, you just said there are 1,100 messages or chats,

5    and I can't tell you of 1,100 which ones he created.

6    **Q**    But that's just because you don't have the report in

7    front of you?

8    **A**    That's correct.

9    **Q**    But the report itself tells you which one he

10    originated?

11    **A**    I believe it does.

12    **Q**    And it also tells you who he added, right?

13    **A**    I don't believe he's the only person that can add

14    someone to a chat.  We've seen multiple people add others to

15    various chats.

16    **Q**    Okay.  But the Cellebrite report that comes from the

17    CART agent tells you who was added and who they were added

18    by?

19    **A**    I don't know if it shows who they were added by, but

20    as we've seen on some of these reports we looked at, it

21    shows a certain person was added.  I don't believe -- if I'm

22    not mistaken, we can look at it, but I don't recall seeing

23    who adds people.

24    **Q**    And it shows you the date they were added, right?

25    **A**    It does.

1498

1  **Q**    And you also know from Signal that when somebody's

2  added to an already existing chat, they don't get all of the

3  message that predated them being added?

4  **A**    That's correct.

5  **Q**    So they only get what comes after the date they're

6  added?

7  **A**    That's correct.

8  **Q**    Okay.  So knowing what date a particular person is

9  added is important for investigative purposes to determine

10  what information they might have already learned?

11  **A**    That's one of the things we consider.

12  **Q**    Now, there's nothing illegal about Signal, right?

13  **A**    No, sir.

14  **Q**    Have you seen any message in the messages that you

15  have reviewed that suggest that any member of the Oath

16  Keepers used Signal to evade law enforcement detection?

17  **A**    I'm not sure if I understand your question.

18  **Q**    Well, it seemed like during your direct examination by

19  Mr. Nestler you were going out of your way to discuss how it

20  made law enforcement jobs more difficult when people were

21  using encrypted apps like Signal or ProtonMail or VPN,

22  right?

23  **A**    Yes, sir.

24  **Q**    There are no messages that suggest that the Oath

25  Keepers were using those for the purposes of frustrating law

1    enforcement or the FBI, are there?

2    **A**    I think we saw a big shift based off of dates where

3    it's several users changed from using their true names over

4    to using different monikers.

5    **Q**    But nothing about that suggests it's to evade

6    detection by law enforcement, right?

7    **A**    I would say when we talk about some of the defendants

8    and using VPNs, monikers, burner phones, all those different

9    things, if I was in a chat group and I thought nothing was

10    going on, I wouldn't go to such lengths to hide my identity.

11    **Q**    Title 18, United States Code, Section 1028A covers

12    identity theft as a federal crime, right?

13            MR. NESTLER:  Objection.  Calls for a legal

14    conclusion.

15    **A**    I don't know, sir.

16            THE COURT:  If he knows.  It's just whether a

17    statute covers something or not.

18        If you know, Agent.

19    **A**    I do not know any statute by heart, sir.

20    BY MR. SHIPLEY:

21    **Q**    You've never investigated identity theft as an FBI

22    agent?

23    **A**    Pretty sure I have.  I don't believe I've ever charged

24    anyone with identity theft before.

25    **Q**    You just don't know that 1028A is the statutory

1    provision?

2    **A**    I believe there are thousand of statutes.  I know a

3    couple, but I don't know that statute.  I investigate

4    terrorism, I can tell you about 2339A and B and some others,

5    but I can't tell you about identity theft statute.

6    **Q**    Well, 1029 -- well, let's just refer to it as the

7    identity theft statute, all right?

8         Entire industries developed for the benefit of people

9    trying to avoid identity theft on the Internet, right?

10   **A**    I'm not sure I'm sure what you're asking.

11   **Q**    Dozens of companies sell VPN services, right?

12   **A**    That's correct.

13   **Q**    And one of the purposes of VPN service is to hide your

14   location from people who might exploit your location for

15   credit fraud?

16   **A**    It can be used for that.

17   **Q**    Let me give you an example.  You have extensive

18   investigation experience in health care fraud, right?

19   **A**    Yes, sir.

20   **Q**    And a common scam in health care fraud is to bill

21   Medicare and Medicaid for fictitious patients, right?

22   **A**    I think that can occur.

23   **Q**    And one of the ways you create fictitious patients is

24   you find real people's date of births and addresses and

25   Social Security numbers and mothers' maiden names and the

1    other kinds of unique identifiers, right?

2    **A**    I believe so.

3    **Q**    And then with that roster of fake patients, you can

4    bill Medicare and Medicaid and get paid?

5    **A**    Sure.

6    **Q**    So these protections on the Internet, VPNs, even

7    Signals, anonymizers, those are all so that other people

8    can't figure out who you are and possibly do you harm,

9    right?

10   **A**    Probably, including law enforcement.

11   **Q**    But you have no -- you have no basis to sit here, do

12   you, to say that that's why these people did it?

13   **A**    I believe I do.

14   **Q**    ProtonMail.  ProtonMail is a foreign-based operation,

15   right?

16   **A**    Switzerland is where the -- I believe the headquarters

17   for the company is.

18   **Q**    And what that means is that their servers where they

19   store their data that runs their business are based outside

20   the continental United States?

21   **A**    I'm not sure where their servers are.  I've seen

22   companies have servers all over, but I know the company

23   itself is a Switzerland-based company.

24   **Q**    And is there anything illegal about people wanting to

25   have their e-mail communications hosted in a location that

1    is secure?

2    **A**    Not to my knowledge.

3    **Q**    Is there any requirement under law that individual

4    citizens' e-mails should be subject to Gmail or Google or

5    Yahoo surrendering them?

6    **A**    No, sir.

7    **Q**    Now, the Oath Keepers, in fact, you know cooperated

8    with local, state, and federal law enforcement on multiple

9    occasions long before the November 2020 election, right?

10                   MR. NESTLER:  Objection.

11                   THE COURT:  I think the question's a little

12   vague.  Can you be more specific about what you mean?

13   BY MR. SHIPLEY:

14   **Q**    Are you aware of instances where the Oath Keepers were

15   in communication with federal law enforcement at particular

16   events long before November 2020?

17                   MR. NESTLER:  Objection.  Calls for hearsay.

18   And outside the scope.

19                   MR. SHIPLEY:  Not for the truth.  Just whether

20   he's aware.

21                   THE COURT:  Can you get on the phone,

22   Mr. Shipley?

23                   (The following discussion was had between

24                   Court and counsel at sidebar.)

25                   THE COURT:  Look, the organization's been

1    around for a while, so I mean, just any time before is a

2    pretty open-ended question.  And what I fear is if you're

3    going to go down that road, is we're going to start hearing

4    about Ruby Rich, and I don't know that you want to have that

5    door opened.

6                    MR. SHIPLEY:  I was working with Ruby Rich.

7           No.  I'm not going to go very far on this subject.

8    Just a kind of way of basing premises and --

9                    THE COURT:  Just in terms of the timeframe, I

10   think that's the difficulty the agent is having and then

11   probably -- and then cooperation is a bit of a vague term.

12   But anyway, those are my concerns, and the government, so if

13   you'll just rephrase the question, I think that will help

14   us.

15                    (Sidebar concluded.)

16   BY MR. SHIPLEY:

17   **Q**    Let me back up on this question.  Maybe this will help

18   you and we don't need to go down this path.

19          As part of your investigation, to the extent that

20   you've been involved, have you done any backwards-looking

21   analysis on historical involvement by the Oath Keepers and

22   events where there was law enforcement security, whether it

23   be state, local, or federal?

24   **A**    I recall an event in Louisville where they were told

25   by the local sheriff's office that they didn't want them

1    involved and asked them to leave, but I don't recall seeing

2    anything where they coordinated with law enforcement to work

3    in tandem.

4    **Q**    Are you aware that they've been at various

5    presidential events and had contact with Secret Service?

6    **A**    I've seen messages suggesting that the Secret Service

7    also didn't want them involved.  I've seen messages where

8    they said that they thought it was a waste of time, and they

9    were disappointed because the Secret Service told them they

10   couldn't be.

11   **Q**    They couldn't be involved to the extent they expected

12   to, but that they were still there, correct?

13   **A**    No.  Like I said, the messages I read was suggesting

14   that the Secret Service told them that they couldn't.  And,

15   in fact, I recall also that when they went to the Ellipse to

16   see the speech, they had to take off all of their gear and

17   go through metal detectors just like everyone else, and they

18   were not as involved as they wanted to be.

19   **Q**    As involved as they expected, but they were still

20   involved, right?

21   **A**    They did not work in tandem with the Secret Service.

22   **Q**    Well, I didn't say work in tandem.  I asked you if

23   they were in communication with law enforcement.

24   **A**    I don't know if they were or they were -- I don't know

25   who they talked to from the Secret Service.

1    **Q**    Now, is it fair to say that none of the messages that

2    you've reviewed personally made any reference to any plan to

3    attack the Capitol on January 6th?

4    **A**    Not outside of the messages, just of them saying that

5    they needed to stop the process from happening.  Nothing

6    specific about attacking.

7    **Q**    I know what question you want to answer, Agent Harris,

8    and I'm going to ask you to pay attention to the question

9    I'm asking.

10                    MR. NESTLER:  Objection.

11                    THE COURT:  Go ahead.  Ask the question,

12    please.

13    BY MR. SHIPLEY:

14    **Q**    My question is:  Is there any message that you've seen

15    that addressed the question of whether there was a plan to

16    physically attack, to use force on the Capitol building on

17    January 6th?

18    **A**    If we want to point to a specific message, I'll refer

19    to Stewart Rhodes's message comparing what they want to do

20    to storming parliament.

21    **Q**    That's in November, right?

22    **A**    I don't recall the exact date on the message.

23    **Q**    That's the reference to the Serbian plan, right?

24    **A**    Correct.

25    **Q**    And that's in November?

1    **A**    Correct.

2    **Q**    And at that point there was no Stop the Steal rally

3    even scheduled for January 6th, right?

4    **A**    I don't know when it was planned, when that event was

5    planned.

6    **Q**    Whatever that November reference was, it's sort of

7    just a reference in general, but it's not a reference to a

8    plan on January 6th?

9    **A**    It was following the election, so I would say it would

10   refer to anything following the election.

11   **Q**    Now, there were actually three events.  I think you

12   were asked about this.  I'm not going to go into a lot of

13   detail, but there were three separate events where the Oath

14   Keepers had some form of operation following the election,

15   right?

16   **A**    Yes, sir.

17   **Q**    And you've talked about those.  That's the Million Man

18   March or the Million MAGA March on the 14th of November?

19   **A**    That's correct.

20   **Q**    Then we have the Jericho March on the 12th of

21   December?

22   **A**    That's correct.

23   **Q**    And then the Stop the Steal rally on the 6th of

24   January, which then led to the events at the Capitol later

25   that day, right?

1    **A**    Correct.

2    **Q**    And was it fair to say that in these collection of

3    messages that you gone through, that they tend to bunch kind

4    of just ahead of each one of those events?

5    **A**    Probably so.

6    **Q**    And it's fair to say, isn't it, that the messages are

7    really about the upcoming event and what's expected?

8    **A**    I don't know if I would say that.  I would say that

9    they were just -- all of the talk that they made following

10    the election was about the election and their disappointment

11    in it.

12    **Q**    Now, you were the case agent or maybe you still are

13    the case agent for Ken Harrelson from Florida?

14    **A**    Yes, sir.

15    **Q**    And that's an important designation because that means

16    you wrote the opening electronic communication, which is

17    serial number 1 in a file?

18    **A**    Yes, sir.

19    **Q**    Because you can't do an investigation without an

20    opening EC, right?

21    **A**    Or you just can't do an investigation without an open

22    case.

23    **Q**    And the opening EC opens the case?

24    **A**    That's correct.

25    **Q**    And law enforcement powers flow from that?

1    **A**    Yes.  Based off of what type of investigation we have

2    open, we have authorities to do certain investigative

3    techniques.

4    **Q**    Okay.  Now you're not the case agent for Roberto

5    Minuta?

6    **A**    No, sir.  I'm not.

7    **Q**    That's somebody else?

8    **A**    Yes.

9    **Q**    In a different office?

10   **A**    That's correct.

11   **Q**    But you ID'd Roberto Minuta here in court, right?

12   **A**    After he stood up and stated his name, I confirmed

13   that was him.

14   **Q**    And you said you were able to do so because you

15   reviewed certain videos and photographs and other items that

16   allowed you to confirm that that was him?

17   **A**    I don't recall saying that.  I just recall all of the

18   defendants standing up, taking off their masks, and stating

19   their name.  You know it wouldn't be too hard to identify

20   them after they done that.

21   **Q**    You were not part of the investigation of Roberto

22   Minuta in 2021?

23   **A**    No, sir.

24   **Q**    And we just talked about the opening EC.  You didn't

25   write the opening EC for Roberto Minuta, right?

1    **A**      No, sir.

2    **Q**      And I'm just going to cover this briefly.  After an EC

3    is opened, there's an electronic file established in the

4    FBI's filing system, is that right?

5    **A**      That's correct.

6    **Q**      Used to be paper, but now it's all electronic.  And

7    every document that an agent puts in that file is serialized

8    right?

9    **A**      Correct.

10   **Q**      And that simply means it's numbered?

11   **A**      Yes, sir.

12   **Q**      And they're numbered in chronological order that

13   they're uploaded?

14   **A**      Yes, sir.

15   **Q**      And that becomes the history of the investigation,

16   right?

17   **A**      Yes.

18   **Q**      And so as the case agent, if docket one is the opening

19   EC and then you get a grand jury subpoena and serve it,

20   that's a serialized document, right?

21   **A**      Correct.

22   **Q**      Got the grand jury subpoena and you serve it to

23   whoever.  Documents come back for that subpoena, that's a

24   serialized document, it goes into the file that documents

25   were received and here's what we got, right?

1    **A**    Correct.

2    **Q**    And that can happen over a long period of time, it can

3    involve hundreds or thousands of documents?

4    **A**    That's correct.

5    **Q**    Every one's numbered, right?

6    **A**    Yes, sir.

7    **Q**    And the reason for this is because the case agent

8    doesn't always stay with the file, right?

9    **A**    Correct.

10   **Q**    You get promoted, or you can just get transferred, and

11   then somebody has to take over?

12   **A**    Or it also depends on where the subject lives.  If

13   they move to a different state, it will get transferred to

14   where that defendant lives.

15   **Q**    Fair enough.

16         And so then when the new case agent is assigned to the

17   file, if you want to know the history of the case and what's

18   been done and what's been learned, you read the file, right?

19   **A**    Part of it, as well as do a brief with the previous

20   case agent to learn about it just by speaking to them and

21   getting up to date.

22   **Q**    But if you want to know comprehensively what's done,

23   you go to the file and look at the evidence that's been

24   collected?

25   **A**    Yes.

1    **Q**    Prior to coming here to testify in this case about

2    Roberto Minuta and identifying him and offering the other

3    evidence you had, did you review his case file?

4    **A**    Yes.  I review lots of documents from his case file.

5    **Q**    So you opened it on Sentinel and started from the EC

6    and went forward?

7    **A**    No.  Primarily what I do was review the documents that

8    correlate to my testimony.

9    **Q**    So the only documents that you reviewed are the

10   documents that are the subject of your testimony here today?

11   **A**    No, sir.  Because everything I've seen in regards to

12   Mr. Minuta's file we haven't introduced during my testimony.

13   **Q**    So you can't answer questions then of things that I

14   might ask you that you haven't read, right?

15   **A**    Correct.

16              MR. SHIPLEY:  Now let's just use the online

17   version of the big board.

18   BY MR. SHIPLEY:

19   **Q**    Now, Roberto Minuta is in the purple column captioned

20   line 2, right?

21   **A**    Yes, sir.

22   **Q**    In fairness, you just testified a few minutes ago that

23   you didn't assemble -- that you're not responsible for the

24   placement of the individual, right?

25   **A**    Correct.

1    **Q**    You're been in the U.S. Attorney's Office here in the

2    District of Columbia, right?

3    **A**    I have.

4    **Q**    Did you see the map in there that has New York and New

5    Jersey in the southeast?

6    **A**    I don't know if I know what you're referring to.

7    **Q**    Well, Mr. Minuta's in the southeast, but he's from New

8    York.

9    **A**    That's correct.

10   **Q**    Is that just because there wasn't a better place to

11   put him?

12   **A**    No, sir.  I think that's because he was with

13   individuals from the southeast during his time in the

14   Capitol.  Mr. James and Mr. Walden, we see on video

15   the three of them were together throughout the day.

16   **Q**    But he's not from the southeast, right?

17   **A**    No, sir.  He's not.

18   **Q**    Everybody listed here from Florida is from Florida,

19   right?

20   **A**    That's correct.

21   **Q**    Everybody listed from Ohio is from Ohio?

22   **A**    Yes, sir.

23   **Q**    And the southeast, they're either from Georgia or

24   Alabama except Mr. Minuta?

25   **A**    This is also a compilation of line 2 and the

1    individuals that went in together, and that's why I believe

2    he's placed in the southeast portion.  He's the only one I

3    believe that's not from the southeast.

4    **Q**    But it's fair, it was just constructed and these

5    labels were attached, even though as to him they're not

6    accurate?

7    **A**    No.  I believe that he was put there because it makes

8    sense.  Those are the individuals he was with throughout the

9    day and entered the Capitol with.

10    **Q**    Now, you read a message earlier, and I think I have

11    that number, I have it written down at another spot.  Let's

12    come back to it because I know I have it written down.

13         You read a message earlier and maybe you recall it

14    about Stewart Rhodes identifying Roberto Minuta as the New

15    York chapter leader, right?

16    **A**    I believe so, if you're referring to the message that

17    preceded the message saying he's one of his most trusted

18    men.

19    **Q**    Exactly.

20    **A**    Yes, sir.

21    **Q**    Mr. Minuta sent a text message, asked to be added to a

22    particular chat, and then waited, nothing happened, he sent

23    a followup, and then Rhodes added him and described him as

24    you just said.  That's what I'm referring to.

25    **A**    Yes, sir.

1    **Q**    All right.  How many people are in Roberto Minuta's

2    New York chapter of the Oath Keepers?

3    **A**    I couldn't tell you, sir.

4    **Q**    You think it's reflected in the investigative file?

5    **A**    I don't know off the top of my head.

6    **Q**    Well, in fact, there is no New York chapter, is there?

7    **A**    Yeah.  I don't recall seeing anything about a New York

8    chapter.  I've seen New York chapter, but I don't recall

9    seeing other people that were listed as members of a New

10   York chapter.

11   **Q**    In fact, Roberto Minuta is the only person from New

12   York, right?

13   **A**    That may be accurate.

14   **Q**    And you know because you were the case agent that

15   Kelly Meggs called Dan Harrelson the Florida ground leader,

16   right?

17   **A**    Kenneth Harrelson.

18   **Q**    Dan Harrelson's a lawyer I know.  He would be unhappy

19   that I...

20        Kenneth Harrelson.  Kelly Meggs called him the Florida

21   ground team leader?

22   **A**    For January 6th, yes, sir.

23   **Q**    Did you find any evidence that Ken Harrelson led

24   anything?

25   **A**    Yes.  He led GoToMeetings during their planning

1    sessions where he was an organizer.  He sent out

2    instructions for people to download ProtonMail.

3    **Q**    Let me stop you there.

4         The question was, he was called the Florida ground

5    team leader just before January 6th, all right?  So did you

6    find any evidence he led anything on the ground from Florida

7    on January 6th?

8    **A**    I believe he claimed to have led a security detail.

9    **Q**    Well, he was part of a security detail along with

10   Kelly Meggs?

11   **A**    Yes, sir.

12   **Q**    But my point is these labels that get slapped on by

13   Stewart Rhodes or Kelly Meggs don't necessarily have any

14   real reality necessarily, do they?

15   **A**    I can't say that.

16   **Q**    Now, I heard you only place Roberto Minuta in two

17   chats on -- two of the identified Signal chats.  One was the

18   DC Op January 6th, which is different from the DC Op

19   January 5-6 Intel, right?  Those are two different chats,

20   right?

21   **A**    Those are two different chats.

22   **Q**    But he's in one but not the other?

23   **A**    Correct.

24   **Q**    And a chat called Irish Whiskey?

25   **A**    Yes, sir.

1    **Q**    Now, I'm just going to ask you, and we can go through

2    them again if we need to, but do you recall any other chat

3    seeing him in?

4    **A**    I believe it was just those.

5    **Q**    All right.  And we don't have to go through the

6    others.

7          And that, as you said earlier, he would have only seen

8    the messages that came after he was added to those chats,

9    right?

10    **A**    That's the way Signal works.

11    **Q**    He didn't start either of those chats?

12    **A**    No, sir.

13    **Q**    And, in fact, he was still using the -- what was it --

14    Rocketchat application during a certain period of time and

15    wasn't even communicating via Signal, was he?

16    **A**    Not to my knowledge.

17    **Q**    Well, there was a series of Rocketchats in mid

18    December, right, that he -- that he was using, and

19    Rocketchat was the Oath Keeper website messaging system,

20    right?

21    **A**    Well, when I said to my knowledge when using Signal, I

22    wasn't referring to Rocketchat.  Yes, he was using

23    Rocketchat.

24    **Q**    Okay.  And so far as I recall in your testimony, he

25    was the only one where you showed a Rocketchat message?

1    **A**    I know we showed a Rocketchat message, I don't recall

2    if he was the only one, but I believe so.

3    **Q**    Fair enough.  That's my recollection, I could be

4    wrong.

5            MR. SHIPLEY:  Can we go to that 6773?

6            Let's back up to number 1 so we can identify where we

7    are, which is the Rocketchat message.

8    BY MR. SHIPLEY:

9    **Q**    This is what we were just talking about, okay?

10           And my recollection is this is the only group of

11   slides that had Rocketchat.  You have a different

12   recollection?

13   **A**    No, sir.  Not without looking through all of the

14   exhibits.

15   **Q**    Okay.  And this is on -- this is on November 8th, so

16   we're five days after the election, right?

17   **A**    Yes, sir.

18           MR. SHIPLEY:  Let's go to slide 5.

19   BY MR. SHIPLEY:

20   **Q**    Okay.  Now you read this one under direct examination

21   by Mr. Nestler, makes reference to a violent demonic -- or

22   being in a literal mob of violent demonic communists

23   protected by the crooked ass police.

24           And the date of this is 11-16, right?  November 16th?

25   **A**    That's correct.

1    **Q**    And that's two days after the Million MAGA March rally

2    here in Washington, right?

3    **A**    Yes, sir.

4    **Q**    And do you know whether or not Mr. Minuta was present

5    in Washington for that event?

6    **A**    I believe he was.

7    **Q**    And were there violent clashes between protest groups

8    during that event?

9    **A**    Honestly I can't tell you if -- I can't be sure.  I

10   can't say yes or no.  I --

11   **Q**    You were still in Florida?

12   **A**    Yes, sir.

13   **Q**    So you weren't in this region, so you might not have

14   had any personal --

15   **A**    Correct.

16   **Q**    Fair enough.

17               MR. SHIPLEY:  Let's go to the next one down.

18   I think it's the very next one.

19   BY MR. SHIPLEY:

20   **Q**    And this is the one we talked about earlier where he

21   asked -- your testimony was this was a direct message, so

22   it's not in Signal, it's not in Rocketchat, it was just a

23   text message on the phone from Roberto Minuta to Stewart

24   Rhodes, right?

25   **A**    No, sir.  This was Signal.

1  **Q**    Oh, you're right.  You're right.  That's right.  From

2  the Signal message down.

3        And he's being asked to be added to a D.C. chat, and

4  this is -- now we're three, three-and-a-half weeks later,

5  December 11th, right?

6  **A**    Yes, sir.

7              MR. SHIPLEY:  Let's go to the next one.

8        Actually go to slide 10.

9  BY MR. SHIPLEY:

10  **Q**    And this is where we talked about he gets added to

11  Irish Whiskey in this same -- within just a few minutes,

12  right?

13  **A**    Yes, sir.

14  **Q**    Fair to say that Irish Whiskey is actually the DC Op

15  chat that Roberto was referring to, not DC Op January 6th?

16  **A**    I can't speak on what he was referring to.  I can

17  misunderstand it or Mr. Rhodes could have misunderstood it.

18  We just know which one he was added to.

19  **Q**    Well, are you familiar with the saying if you hear

20  hoof beats, they're horses and not zebras?

21  **A**    I'm not familiar with that.

22              MR. SHIPLEY:  Let's go back to the slide that

23  he asked to be invited.  I think it was 5.

24        So this is at 8:20.  Let's go to the next one.

25  BY MR. SHIPLEY:

1    **Q**    11:22, three hours later, he asked again, right?

2    **A**    Just stated his name.

3    **Q**    He says Rob.  He's, again, still trying to communicate

4    with Stewart Rhodes.

5                    MR. SHIPLEY:  Go to the next one.

6    BY MR. SHIPLEY:

7    **Q**    Four minutes later he gets a thumbs up from Stewart

8    Rhodes.  That's 11:26.

9        Let's go to the next one.  11:32, six minutes later,

10    Rhodes tells everybody else on Irish Whiskey who he is and

11    he's been added?

12    **A**    Yes, sir.

13    **Q**    And this is on the 11th.  What happened on the 12th?

14    **A**    That was the Jericho March I believe.

15    **Q**    And that's where we have the photograph of him

16    marching with General Flynn as part of a personal security

17    detail, right?

18    **A**    Correct.

19    **Q**    Also in --

20                    MR. SHIPLEY:  Go back to the board.

21    BY MR. SHIPLEY:

22    **Q**    Another individual that's in line 2, the purple

23    southeast group down at the bottom right-hand side, is Rick

24    Jackson.  Do you see that?

25    **A**    Yes, sir.

1    **Q**    Have you done any review of Rick Jackson's file in

2    preparation for your testimony?

3    **A**    No, sir.  I'm not the case agent on Mr. Jackson.

4    **Q**    So is it fair to say you can't answer any questions

5    about Mr. Jackson?

6    **A**    That is fair to say.  And I also add there's going to

7    be other agent witnesses that testify, they may be able to

8    answer those questions for you.

9    **Q**    I was just going to wonder if that was an opportunity

10   to stop short.

11        Now, the rough sequence of events on the morning of

12   the 6th involving the southeast group, where they had spent

13   the night at the Mayflower Hotel, right?  Or at least four

14   of the six had spent the night at the Mayflower Hotel in

15   downtown Washington --

16   **A**    The southeast group, yes, sir.

17   **Q**    And then on the morning of the 6th they made contact

18   with Mr. Minuta and Josh James at the Willard Hotel, right?

19   **A**    I can't say for sure.  I've seen some references to

20   the Willard Hotel.  I don't know specifically the details

21   without going back in and looking at the messages.

22   **Q**    Well, refresh your recollection if I said the Willard

23   Hotel was where Roger Stone stayed?

24   **A**    Yes, sir.  That's -- yes, sir.  That's correct.

25   **Q**    And so the six of them, two from one location and four

1    from the Mayflower end up together at the Willard Hotel

2    where Roger Stone is, right?

3    **A**    That may be true.  I don't know the specific details

4    about that security detail.  I do know -- I believe they did

5    do that detail that morning.

6    **Q**    So you know at least that the southeast were the

7    detail for Roger Stone, you're just not sure exactly where?

8    **A**    Yes, sir.

9    **Q**    But they did in fact meet together and spend several

10    hours together as a group in the location where Roger Stone

11    was without understanding exactly where that might be,

12    right?

13    **A**    Honestly, I couldn't tell you.  I don't want to be --

14    not trying to evade your question, I just don't want to

15    speak on it.  I don't have the direct knowledge of it.

16    **Q**    Now, have you watched all of the video of the transit,

17    the transit by the -- that group of six?

18    **A**    No, sir.

19    **Q**    Now, you did watch the video of them entering the

20    Capitol, right?

21    **A**    Yes, sir.

22                 MR. SHIPLEY:  Why don't we go to that just

23    briefly.  The CCTV.

24                         (Video played.)

25                 MR. SHIPLEY:  And I'll ask you to start at

1    3:14:44.

2    BY MR. SHIPLEY:

3    **Q**    And I believe circled in purple there are Mr. James,

4    Mr. Minuta, and Mr. Walden, correct?

5    **A**    Yes, sir.

6                    (Video played.)

7                    MR. SHIPLEY:  Let's just let it run for about

8    30 seconds or so.

9    BY MR. SHIPLEY:

10   **Q**    So by 3:15:04, Mr. James and Mr. Minuta have

11   essentially entered the building passed Officers Carrion and

12   Salke, right?

13   **A**    Yes, sir.

14   **Q**    And Mr. Walden is still behind them just a little bit,

15   and he has the dog with him?

16   **A**    Yes, sir.

17                    MR. SHIPLEY:  Let's run it again.

18                    (Video played.)

19   BY MR. SHIPLEY:

20   **Q**    Fair to say that right there Mr. Walden at 3:15:32 is

21   inside and he was actually pulled inside by either Carrion

22   or Salke, whichever one it was, reached out and pulled him

23   and made room for him to come inside and --

24   **A**    Could you go back?  I was focusing in on Mr. Minuta.

25   I didn't know where you wanted me to focus.

1  **Q**    I apologize.  Let's go back and let's watch what

2  happens, the interaction between Mr. Walden and the U.S.

3  Capitol police officers.

4                      (Video played.)

5  BY MR. SHIPLEY:

6  **Q**    Right there you see they're actually parting, and the

7  one officer has his right hand on Mr. Walden's back and is

8  actually pulling him inside the building, isn't he?

9  **A**    No, sir.  It appears to me that the crowd was pushing

10  and that officer was falling over.  It looks like he stuck

11  his arm out to brace himself.

12                      (Video played.)

13  BY MR. SHIPLEY:

14  **Q**    At that point the officer's being pushed, right?

15            MR. SHIPLEY:  Let's stop.

16        Let's go forward to -- I think -- I hope I have this

17  time right, 3:21:45.

18                      (Video played.)

19            MR. SHIPLEY:  Stop there.

20  BY MR. SHIPLEY:

21  **Q**    Now, that's Mr. Oberick and Mr. Grods, right?

22  **A**    Yes, Mr. Grods and Mr. Oberick.

23  **Q**    3:21:45, we're now seven minutes beyond the first

24  three entering, correct?

25  **A**    Yes, sir.

1    **Q**    Now, from your limited review of Mr. Minuta's

2    investigative file, did you learn he has no law enforcement

3    background?

4    **A**    No.  I don't believe I've ever seen anything saying he

5    had law enforcement background.

6    **Q**    And have you seen anything that suggested or

7    established that he had any military background?

8    **A**    No, sir.

9    **Q**    Did you see references to him having some education

10   and experience in emergency medical services?

11   **A**    Yes, sir.

12   **Q**    And, in fact, he had worked in a hospital ER, right?

13   **A**    Yes, sir.

14   **Q**    And at this time he was living in upstate New York and

15   he owned a tattoo parlor, right?

16   **A**    Yes, sir.

17   **Q**    And there are messages from him indicating that he was

18   coming to Oath Keeper events to provide medical assistance

19   if somebody was injured?

20   **A**    There may be messages that suggest that.  I don't know

21   them, you know, offhand or, you know, by heart.  But I

22   believe --

23   **Q**    One specific message that said New York medic --

24   **A**    I recall a message by Mr. Rhodes.  When he added him,

25   I believe he said he always has his medic bag with him, or

1     something to that effect.

2                    MR. SHIPLEY:  Thank you.

3                    THE COURT:  Thank you.

4          Mr. Peed.

5              **CROSS-EXAMINATION OF KELSEY HARRIS**

6     **BY MR. PEED:**

7     **Q**     Good afternoon, Mr. Harris.

8     **A**     Good afternoon, sir.

9                    MR. PEED:  Can we pull up Exhibit 210.P.1,

10    please.

11         Actually, before we do, let's...

12    BY MR. PEED:

13    **Q**     You said on your direct that the search for truth is

14    something the FBI continues to do, right?

15    **A**     Yes, sir.

16    **Q**     And it's important in the search for truth to look at

17    all evidence, right?

18    **A**     Yes, sir.

19    **Q**     And you reviewed as part of your role in this case the

20    main DC Op chat, right?

21    **A**     Yes, sir.

22    **Q**     January 6 chat, DC Op.

23         And you knew this was a trial for these four

24    defendants, right?

25    **A**     Yes, sir.

1    **Q**    And did you focus your attention on those four

2    defendants in preparing to testify today?

3    **A**    Yes.  I focused on all the government exhibits that

4    we've gone through during my direct testimony.

5    **Q**    Okay.  Do you remember being shown a picture of

6    Mr. Vallejo on your direct?

7    **A**    Yes, sir.

8              MR. PEED:  Could we have Exhibit 210.P.1?

9    BY MR. PEED:

10   **Q**    Do you know the date of this picture?

11   **A**    I believe it was from January 5th.

12   **Q**    And you testified on direct this is a picture of

13   Mr. Vallejo in front of the Capitol, right?

14   **A**    Yes, sir.

15   **Q**    Mr. Nestler asked you that question, right?

16   **A**    Yes, sir.

17   **Q**    Look closely, is that the Capitol behind Mr. Vallejo?

18   **A**    No, sir.  I believe that's the Supreme Court.  I

19   believe I misspoke when -- for that.

20   **Q**    And Mr. Nestler didn't correct you, did he?

21   **A**    No, sir.

22             MR. PEED:  Can we have Exhibit EV-103 put up

23   for identification?

24   BY MR. PEED:

25   **Q**    Sir, do you recognize this message?

 1    **A**    Yes, sir.

 2    **Q**    This is a message from the DC Op Jan 6 chat, correct?

 3    **A**    Yes, sir.

 4    **Q**    Could you read it, please.

 5                    MR. PEED:  First I would move to admit EV-103.

 6                    MR. NESTLER:  Are there more messages, or is

 7    this the only one?

 8                    MR. PEED:  This is the only one.

 9                    MR. NESTLER:  No objection.

10                    THE COURT:  EV-103 is admitted.

11    BY MR. PEED:

12    **Q**    Could you please read the message.

13    **A**    "Add Ed V from Arizona Oath Keepers who has a team at

14    Supreme Court."

15    **Q**    And you reviewed this message?

16    **A**    Yes, sir.

17                    MR. PEED:  Take it down.

18          Can we please have Exhibit EV-301.B, for

19    identification only.

20    BY MR. PEED:

21    **Q**    Do you recognize this message, sir?

22    **A**    Yes, sir.  I do.

23    **Q**    And what is it?

24    **A**    It's a text message.

25    **Q**    From Mr. Vallejo to Mr. Rhodes, correct?

1    **A**    Correct.

2    **Q**    Is this a message you reviewed prior to your testimony

3    today?

4    **A**    No, sir.  I -- I don't know what you were going to

5    present, so I haven't reviewed it for my testimony today.  I

6    have seen the message before.

7    **Q**    Okay.  That's what I mean.  In your investigation

8    you've reviewed messages between Mr. Vallejo and Mr. Rhodes,

9    correct?

10    **A**    Yes.  I've seen messages.

11              MR. PEED:  Could you go to the next slide?

12    BY MR. PEED:

13    **Q**    Have you seen this message --

14    **A**    I believe I have.

15    **Q**    -- in your investigation?

16              MR. PEED:  Next slide.

17    BY MR. PEED:

18    **Q**    I'm just going to go through them.  Just let me know

19    if it's a message you haven't seen before.

20    **A**    Yes, sir.

21              MR. PEED:  Go ahead.

22          Go ahead.

23          Go ahead.

24          Go ahead.

25          Go ahead.

1      Go ahead.

2      Go ahead.

3      All right.

4   BY MR. PEED:

5   **Q**    You've seen all these messages before, right?

6   **A**    Yes, sir.

7   **Q**    And these are messages from Mr. Vallejo to Mr. Rhodes

8   and Mr. Kelly, correct?

9   **A**    And Mr. Rhodes to Mr. Kandaris.

10             MR. PEED:  Your Honor, I move to admit

11   Exhibit 301.V.

12             MR. NESTLER:  Objection.  That's beyond the

13   scope.

14             THE COURT:  I think we talked about this at

15   the break about being beyond the scope here.

16             MR. PEED:  I can lay a better foundation, Your

17   Honor.  It's within the scope.

18   BY MR. PEED:

19   **Q**    You were asked lots of questions about messages that

20   were being exchanged on Oath Keeper chat groups, right?

21   **A**    Yes, sir.

22   **Q**    In the time period of November and December?

23   **A**    Yes, sir.

24   **Q**    Some of those messages talked about coming to D.C.,

25   correct?

1    **A**    Yes, sir.

2    **Q**    And some of those messages talked about QRF in D.C.,

3    right?

4    **A**    That's correct.

5    **Q**    Mr. Vallejo was not on any of those chats, correct?

6        Well, I'll be more precise.

7            MR. PEED:  Can we go to 1557?

8        And this is in evidence.

9    BY MR. PEED:

10   **Q**    You were shown this slide, correct?

11   **A**    Yes, sir.

12   **Q**    DC Op Jan 6 21.  And Mr. Vallejo is highlighted as on

13   this chat, correct?

14   **A**    Yes, sir.

15   **Q**    What day was Mr. Vallejo added to this chat?

16   **A**    I couldn't tell you without looking at the chat

17   records.

18   **Q**    Okay.

19   **A**    Well, in this -- I will say this exhibit here is

20   current as of January 6th.  I don't know if Mr. Vallejo was

21   added prior to that and looking at the records.  I don't

22   know it off the top of my head.

23            MR. PEED:  Could we go back to EV-103?

24   BY MR. PEED:

25   **Q**    You see the date and time at the top of this message?

1    **A**    Yes, sir.

2    **Q**    And this message is -- occurred when Mr. Rhodes added

3    Ed Vallejo to the DC Op January 6 21 chat, correct?

4    **A**    Yes, sir.  That's what it says.

5    **Q**    What's the time he was added?

6    **A**    4:29 PM.

7    **Q**    On what day?

8    **A**    January 5th, 2021.

9    **Q**    So it's late in the afternoon prior to January 6th,

10   correct?

11   **A**    Yes, sir.

12   **Q**    And are you aware of any evidence that Mr. Vallejo

13   received any messages on this chat group prior to 4:29 PM on

14   January 5th?

15   **A**    Not to my knowledge.

16           MR. PEED:  Can we go back to 1557?

17   BY MR. PEED:

18   **Q**    So this is the DC Op chat, Jan 6 21, and we know now

19   Mr. Vallejo you have highlighted here was only added late in

20   the afternoon of January 5th, correct?

21   **A**    Yes, sir.

22           MR. PEED:  Could we go to the next slide?

23   BY MR. PEED:

24   **Q**    Mr. Vallejo was never on the OK Florida DC Op chat?

25   **A**    No, sir.

1   **Q**    Didn't receive any messages from that chat?

2   **A**    I don't know if he did or he didn't.  I just know he

3   wasn't in the chat.

4   **Q**    All right.  You have no evidence that someone showed

5   it to him or he had some other way of accessing this into an

6   encrypted app?

7   **A**    Yeah.  I don't know if anyone communicated what was

8   being said to him in these chats or not.  I just know he

9   wasn't in the chat.

10  **Q**    You have access in your investigation to Mr. Vallejo's

11  phone records, correct?

12  **A**    Yes, sir.

13  **Q**    His phone has been mirrored by the FBI, correct?

14  **A**    Yes, sir.

15  **Q**    Did he have any phone calls with anyone listed here

16  prior to January 5th?

17  **A**    Not to my knowledge.

18  **Q**    All right.

19              MR. PEED:  Next slide.

20  BY MR. PEED:

21  **Q**    Same questions for Old Leadership chat.  Mr. Vallejo's

22  not on this chat, right?

23  **A**    He is not.

24  **Q**    And you have no indication from your investigation

25  that he ever called, texted, or otherwise communicated with

1    anyone here prior to late on January 5th, correct?

2    **A**    Not without specifically going back and comparing his

3    call records and text message records.

4    **Q**    You've done that, right?  You've looked -- as part of

5    your investigation, you've looked at each of the defendants'

6    digital records to the extent the FBI has them, right?

7    **A**    Well, sir, like I said, I don't know the questions

8    you're going to ask me today, and so there are lots of

9    defendants in this case.  I testified several times, and I

10   don't remember everyone's call and text message records just

11   off the top of my head without looking at records.

12   **Q**    So here today you have no reason to say that

13   Mr. Vallejo communicated at all ever with Joshua James,

14   right?

15   **A**    Not to my knowledge.  I don't know if he did or if he

16   didn't.

17   **Q**    Same with Kellye SoRelle?

18   **A**    I don't know without checking our records.

19   **Q**    I'll skip the rest of this slide, but you could agree

20   with me that the only chat you discuss in your testimony of

21   all the Oath Keeper chats Mr. Vallejo was ever on was that

22   first one, the DC Op chat, correct?

23   **A**    I believe so.

24   **Q**    And he was added late on the 5th, correct?

25   **A**    Correct.

1    **Q**    Now, Mr. Vallejo did not even know where he was going

2    or where the people -- where the people that were part of

3    that chat were staying prior to January 5th?

4    **A**    I believe in that text message that you pulled up he

5    was asking for an address or I believe I seen -- I believe

6    he asked someone for the address of where he was going.

7    **Q**    Late on the night of the 4th, right?

8    **A**    That sounds about correct.

9    **Q**    Now, there were a series of events in the fall of 2020

10   that the Oath Keepers took part of, right, in D.C.?

11   **A**    Yes, sir.

12   **Q**    One was the Million MAGA March on November 14th, 2020?

13   **A**    That's correct.

14   **Q**    And another one was the December 20th, 2020, Jericho

15   March, right?

16   **A**    Correct.

17   **Q**    Mr. Vallejo was not at the November 14th rally, right?

18   **A**    Not to my knowledge.

19   **Q**    Not at the Jericho March, right?

20   **A**    I don't believe so.

21   **Q**    There were Oath Keeper events that you talked a little

22   bit about through the other questioners throughout 2020 like

23   Louisville and Fayetteville and Lafayette?

24   **A**    Correct.

25   **Q**    Mr. Vallejo not a part of any of those events?

1    **A**    I don't recall if he was or if he wasn't.  I can't say

2    with certainty.

3    **Q**    Well, they had chats, didn't they, for each of those

4    operations?

5    **A**    Maybe, but I don't recall reviewing those chats.

6    **Q**    You don't know, all right.

7                    MR. PEED:  Can we pull back up 210.P.1?

8    BY MR. PEED:

9    **Q**    You testified this was on the 5th, correct?

10   **A**    Yes, sir.

11   **Q**    This is not at the Comfort Inn, right?

12   **A**    No, sir.  This is at the Supreme Court.

13   **Q**    And Mr. Vallejo arrived at the Comfort Inn in the

14   early afternoon of January 5th, right?

15   **A**    Yes, sir.

16   **Q**    So he didn't stay there because this isn't the Comfort

17   Inn, right?

18   **A**    You mean overnight?

19   **Q**    I mean when he got to the D.C. area and he checked in,

20   he didn't stay at the Comfort Inn?

21   **A**    At some point he had to come to the Supreme Court.

22   **Q**    It's in this picture?

23   **A**    Correct.

24   **Q**    So on the 4th he didn't stage himself at the Comfort

25   Inn?

1    **A**     He arrived at the Comfort Inn, he dropped off some

2    things, and at some point he came here.

3    **Q**     And you were shown a text from Mr. Vallejo from

4    January 6th on your direct, right?  Do you recall that?

5    Would you like to see it?

6    **A**     Yes, sir.

7                    MR. PEED:  Just for the witness only, could

8    you pull up Exhibit 104?

9         Scroll forward.

10   BY MR. PEED:

11   **Q**     You were shown this message on your direct, correct?

12   **A**     I believe I was.

13                   MR. PEED:  Your Honor, I'd like to move to

14   admit Defense Exhibit 104.

15                   MR. NESTLER:  Same objection we discussed

16   earlier, Your Honor.

17                   THE COURT:  Is this the full slide that you

18   wanted to admit earlier?

19                   MR. PEED:  No, Your Honor.  There's several

20   exhibits the government's talking about.  This is solely

21   context for this one text.

22                   THE COURT:  It's not clear to me whether it's

23   just this text or the -- more than that.

24                   MR. PEED:  These are the texts between 1:25 PM

25   and 4 PM that Mr. Vallejo sent, and about --

1          THE COURT:  Can you just leaf through what you

2     want to show him to see whether there's an objection?

3               MR. PEED:  Sure.

4          Could you go back to the first slide and just roll

5     through it?

6               MR. NESTLER:  May we get on the phone for a

7     second, Your Honor?

8               THE COURT:  Sure.

9               (The following discussion was had between

10                  Court and counsel at sidebar.)

11               MR. NESTLER:  Mr. Peed is using this as basis

12     for completing or for scope this message here on slide 7,

13     which is at 2:24 PM.  It's not the one in front of Your

14     Honor, but it's the one that says:  "Vallejo back at hotel

15     and outfitted, have two trucks available."  That is the

16     message that Mr. Peed used Rule 106 to have the government

17     introduce on direct.  So he's using Rule 106 on direct to

18     then try to broaden the scope of what he wants to do on

19     cross.  We only introduced one message from Mr. Vallejo on

20     direct, it was at 2:38 PM.  It was not this message.

21               THE COURT:  Look.  What I want to avoid here

22     is on redirect the government getting up and putting a bunch

23     of stuff in that may relate to Mr. Vallejo or provide

24     different context.  So, you know, if you want to include a

25     handful of messages that Mr. Vallejo sent before, okay, but,

1    you know, the suggestion -- none of this is, again,

2    precluding you from bringing all this in later.  And the

3    question is simply what is relevant -- what completes or,

4    you know, within the scope of the government's direct

5    examination.

6        And so, you know, again, there was one message from

7    Mr. Vallejo and that's it.  And so, again, if -- and you

8    asked for a second one to complete.  And so if there are

9    other messages from him, I guess that's possible -- you

10   know, that may be admissible for cross, but you got messages

11   and they're from other people that it's not clear to me

12   whether Mr. Vallejo read them or not.

13                   MR. PEED:  Well, I mean, pretty essential --

14                   THE COURT:  What?

15                   MR. PEED:  I think they're pretty essential to

16   their theories that if a message is there, it's for use to

17   confer that it's been read.  Otherwise all these messages

18   would be irrelevant.  Their relevance is the inference that

19   they were there and read.

20       The problem with the government's direct is that they

21   focused on -- they talk about the QRF in the context of

22   Watkins and Rhodes, and so I think the government is having

23   a very narrow view of scope of Watkins's and Rhodes's intent

24   is all that gets to be questioned here.

25                   THE COURT:  What's happening here, Mr. Peed,

1    and, you know, is that this witness was just setting up the

2    framework for the government's case.  That's all that was

3    happening.  And I suspect there will be other witnesses that

4    go into greater detail about these various components.

5         And, again, I'm not saying you can't bring in some of

6    this, but you're now wanting to bring in another dozen or so

7    messages from in and around January 6th, and it just doesn't

8    seem this is time to do it given what the scope of the

9    government's examination was.  Now, I allowed you to bring

10   in something to complete the examination on direct.  And if

11   there are a couple more slides, that's fine if you want to

12   put them in for cross, but again what's going to happen here

13   is the government is going to say we want to bring in a

14   whole bunch of other stuff on redirect, and I'd rather avoid

15   that.

16                   MR. PEED:  Well, you know, I think the jury's

17   going to have to see these things over and over and over for

18   it to sink in, and so I want to get it in at every

19   opportunity.  And they can redirect and then --

20                   THE COURT:  No.  It's not going to come in

21   over and over again.  It's going to come in periodically so

22   long as it's not cumulative.  It's not going to come in over

23   and over again.  The jury's not going to see the same

24   messages, you know, a half dozen times, so --

25                   MR. PEED:  But this -- I'm sorry to interrupt

1    you.  This QRF message they put in -- that's the one they

2    picked, why did they pick that one?  Why don't they --

3                    THE COURT:  Let's -- because we just talked

4    about it.  It showed up in the direct because they provided

5    a framework through this witness of where to place

6    Mr. Vallejo in their theory of the case, okay?

7         There's going to be greater testimony about

8    Mr. Vallejo coming up.  I agree with you the fact the

9    government introduced this statement standing alone allows

10   you to bring in some other statements surrounding it to

11   provide some context.  But you're seeking to do more than

12   that here.  So if there are a couple of statements that

13   you'd like to bring in for greater context, I'll allow it.

14   But we're not going to bring in this entire slide deck

15   through this witness.  Okay?

16                    MR. PEED:  What I'd like to do then is just go

17   to the government's chart and talk about the relationships

18   between the people who stayed at the hotel who's on

19   their chart under their theory of the QRF --

20                    THE COURT:  That's fine.

21                    MR. PEED:  And then show -- the beginning of

22   the slide deck is just to show that Mr. Vallejo unlike

23   everyone else in that box left the hotel on January 6th.

24                    THE COURT:  Okay.

25                    (Sidebar concluded.)

1    MR. PEED:  Could we have Exhibit 1531, please.

2    BY MR. PEED:

3    **Q**    Agent Harris, the right side of this organization

4    chart that the government created is called Quick Reaction

5    Force, correct?

6    **A**    That's correct.

7    **Q**    And at the bottom it lists Paul Stamey who used the

8    moniker Western State Leader, right?

9    **A**    Yes, sir.

10   **Q**    And then there's also Doug Smith, Ranger Doug,

11   correct?

12   **A**    Yes.

13   **Q**    Kenneth Bittner, Gator Kane, correct?

14   **A**    Correct.

15   **Q**    Ed Vallejo, correct?

16   **A**    Yes, sir.

17   **Q**    Todd Kandaris?

18   **A**    Yes, sir.

19   **Q**    And Thomas Caldwell, all right.

20        Now, Mr. Caldwell had communications with Mr. Stamey

21   about setting up the QRF, right?

22   **A**    Can you be more specific in which -- are you referring

23   just to general communication?

24   **Q**    In the course of your investigation did you come

25   across discussions about a QRF between Mr. Caldwell and

1    Mr. Stamey?

2    **A**    I've seen just several communications about the QRF

3    for -- for the January 6th event.

4    **Q**    I was trying to connect between those two individuals

5    and if you don't know, maybe --

6    **A**    Yeah.  I can't think of any specific message you're --

7    may be referring to.  I just know there was a lot of talk

8    about the QRF for January 6th.

9    **Q**    Well, let's talk about that.  Mr. Bittner was

10   associated with Oath Keepers from Florida, correct?

11   **A**    Yes, sir.

12   **Q**    Mr. Bittner stayed at the Comfort Inn from January 5th

13   to 6th, correct?

14   **A**    Yes, sir.

15   **Q**    And Mr. Bittner did not leave the Comfort Inn on

16   January 6th, correct?

17   **A**    I believe he was there throughout the day.

18   **Q**    Mr. Stamey was from North Carolina, correct?

19   **A**    Yes, sir.

20   **Q**    And he was associated with Oath Keepers who came up

21   from North Carolina, right?

22   **A**    Yes, sir.

23   **Q**    And Oath Keepers from North Carolina gave weapons to

24   Mr. Stamey, correct?

25   **A**    Lots of Oath Keepers placed their weapons in the rooms

1    that they had for the QRF.

2    **Q**    All right.  Mr. Stamey on January 6th until the events

3    of the Capitol were over late in that day, he was there all

4    of January 6th, correct, during the day?

5    **A**    I believe he was.

6    **Q**    All right.  He didn't leave and go anywhere, right?

7    **A**    Not to my knowledge.  I can -- I can say for certain

8    that he wasn't at the Capitol.

9    **Q**    Did you review the Comfort Inn surveillance video as

10   part of your investigation?

11   **A**    I've seen the video.

12   **Q**    All right.

13   **A**    Or videos.

14              MR. PEED:  Could we have Exhibit EV-250,

15   please.

16   BY MR. PEED:

17   **Q**    Sir, do you see the timestamp at the top of this

18   exhibit?

19   **A**    Yes, sir.

20   **Q**    Do you recognize this photograph as a still from the

21   Comfort Inn surveillance video?

22   **A**    Yes, sir.

23              MR. PEED:  I would move to admit EV-250.

24              MR. NESTLER:  Objection.  It's beyond the

25   scope.

1    THE COURT:  I'll allow this.  Go ahead.

2  EV-250 is admitted.

3    MR. PEED:  Publish it to the jury.

4  BY MR. PEED:

5  **Q**    Sir, could you please read the timestamp at the top of

6  this video?

7  **A**    That's 11:25 AM.

8  **Q**    On what day?

9  **A**    January 6th.

10  **Q**    And this is a picture of Mr. Vallejo leaving the

11  Comfort Inn on January 6th, correct?

12  **A**    I don't know if he's leaving.  He's just entering an

13  elevator.

14  **Q**    Well, you've reviewed the video, correct?

15  **A**    Yes.  But I -- if you were to play it, we can confirm

16  it -- I just see him getting on the elevator.

17    Also, I do recall that the Comfort Inn confirmed or

18  one of our agents confirmed that the timestamp was not

19  correct, so there's a conversion that needs to be made.

20  **Q**    What's the conversion, do you recall?

21  **A**    It may have been somewhere around 40 minutes.

22  **Q**    So if it says 11:25, it's either 40 minutes later than

23  that or before?

24  **A**    I believe so.

25  **Q**    Okay.  Since you are familiar with what happens in

1    this particular video, are you generally aware that

2    Mr. Vallejo left the Comfort Inn on the morning of

3    January 6th?

4    **A**    No.  I'll say, just for your understanding, sir, you

5    probably seen in some of our other proceedings the

6    government's presentation of evidence is being presented in

7    a chronological order.  As you can kind of tell with the

8    evidence I've testified about, it goes from before

9    January 6th kind of up until the time they entered the

10   Capitol, you know, with starting throughout the middle of

11   the day and moving forward, that was not part of what I

12   focused for my testimony.  So, you know, you'll have to, you

13   know, excuse me if I can't answer all those questions.

14   **Q**    Well, this is pretty basic.  Do you know where

15   Mr. Vallejo was on the 6th of January?  It was an important

16   day, right?

17   **A**    Yes.  He was at the Comfort Inn hotel.

18   **Q**    On January 6th he was at the Comfort Inn hotel?

19   **A**    Yes, sir.

20   **Q**    What time did Congress start their certification?

21   **A**    I don't recall.

22   **Q**    Congress by statute begins about 1 PM, correct, with

23   the certification process?

24   **A**    That sounds about correct.

25   **Q**    At that time, 1 PM, President Trump was giving a

1    speech, right?

2    **A**    I believe the event started early in the morning, I

3    can't say how long his speech lasted, but we know after his

4    speech everyone moved to the Capitol, so we know they

5    arrived there around 2:40.  So, yes, this sounds about

6    right.

7    **Q**    So very high level, between, say, 12 and 2, where is

8    Mr. Vallejo on January 6th?

9    **A**    I believe he was at the Comfort Inn.

10    **Q**    Okay.  How sure are you about that?

11    **A**    I can't say while we're looking at video here or a

12    photo here without going back and referencing those Comfort

13    Inn records.  I'll say there is another agent that did all

14    the investigation into the Comfort Inn, and that wasn't my

15    direct focus.

16    **Q**    Okay.

17                MR. PEED:  Could we go to exhibit EV-104, just

18    the first slide?

19    BY MR. PEED:

20    **Q**    Have you seen this message before?

21    **A**    Earlier when it was up on my screen.

22    **Q**    As part of your investigation have you seen this

23    message before?

24    **A**    I don't -- I can't say for certain yeah, I have.

25                MR. PEED:  Let's go back to 1531.

1    BY MR. PEED:

2    **Q**    All right, sir.  So looking at the quick reaction

3    force crew here, you would agree that Mr. Bittner didn't

4    leave the Comfort Inn, right?

5    **A**    Yes, sir.

6    **Q**    Same for Mr. Stamey?

7    **A**    Yes, sir.

8    **Q**    How about Mr. Kandaris?

9    **A**    I believe he was there throughout the day.

10   **Q**    Being part of quick reaction force, you have to be

11   where the weapons are if it's an armed QRF, correct, if you

12   are a part of that QRF?

13   **A**    No, sir.  I wouldn't agree.

14   **Q**    Okay.

15   **A**    You know, and if you want to refer to this particular

16   situation, they have to be transported in some way.  Just

17   thinking logically, you can have people that are going to

18   transport the weapons from a room to a vehicle, and you may

19   need someone in the vehicle waiting.

20   **Q**    So the people who are transporting weapons need to be

21   with the weapons, right?

22   **A**    Or with the vehicle.

23   **Q**    Or with the vehicle.  I'll ask some of those questions

24   to the next agent I think.

25          You talked about a GoToMeeting that happened on

1    November 9th, 2020, correct?

2    **A**    Yes, sir.

3                    MR. PEED:  Could we pull up EV-1000.7.TR?

4                        (Pause in proceedings.)

5                    THE COURT:  Is this coming up, or can we move

6    to something else?

7                    MR. PEED:  Coming up, Your Honor.

8                    THE COURT:  I'm sorry?

9                    MR. PEED:  It's coming up.

10                   THE COURT:  Okay.

11                       (Pause in proceedings.)

12                   THE COURT:  If this doesn't come up in 30

13   seconds, we're moving on.

14                   MR. PEED:  We're moving on, Your Honor.  I'm

15   just trying to get it back to his screen.

16                       (Pause in proceedings.)

17   BY MR. PEED:

18   **Q**    So there was a GoToMeeting November 2022, right?  '20,

19   November 9th?

20   **A**    Yes, sir.

21   **Q**    And Mr. Vallejo was not on that GoToMeeting, correct?

22   **A**    I don't believe he was.

23   **Q**    There were other GoToMeetings held in that fall by

24   Oath Keepers leading up to the DC Op, correct?

25   **A**    Yes, sir.

1    **Q**    Mr. Vallejo is not on any of those GoToMeetings,

2    correct?

3    **A**    Not that I can recall.

4                    MR. PEED:  Can we pull up Exhibit 1002,

5    Government Exhibit 1002?

6    BY MR. PEED:

7    **Q**    This is the message about the upcoming Million MAGA

8    March posted by Mr. Rhodes on his website, correct?

9    **A**    Yes, sir.

10   **Q**    It was a call to action?

11   **A**    Yes, sir.  That's correct.

12   **Q**    And this call to action was for something happening on

13   November 14th, right?

14   **A**    Yes.  That's the logo at the top.

15   **Q**    That was a Saturday, right?

16   **A**    Yes, sir.

17   **Q**    Congress wasn't in session?

18   **A**    Not for the certification.  That happened on

19   January 6th.

20   **Q**    Nothing having to do with the Electoral College was

21   happening on this day, right?

22   **A**    That's beyond my scope.  I don't know if there is any

23   other proceedings, but as far as the certification, that's

24   January 6th.

25   **Q**    They had a QRF for this event, correct?

1   **A**    I believe so.  I believe they had QRFs usually at all

2   their events or at least most of them.

3   **Q**    And so even though they had a QRF, there was nothing

4   going on in Congress for them to stop, correct?

5   **A**    Not to my knowledge.

6   **Q**    You reference in this exhibit about some references to

7   Serbia?

8   **A**    Yes, sir.

9   **Q**    Now, in Serbia --

10                  MR. PEED:  Can we scroll down to the part

11  about Serbia, please.

12          Can you call up the top, please.

13          Go to the previous page and call it at the bottom.

14  BY MR. PEED:

15  **Q**    This is a message from an individual who's not Stewart

16  Rhodes that is embedded in Mr. Rhodes's general message,

17  correct?

18  **A**    My understanding of this was Mr. Rhodes had a

19  conversation with this individual and following their

20  conversation he sent Mr. Rhodes this, which Mr. Rhodes then

21  posted to the Oath Keepers website.

22  **Q**    Copied it and pasted it, right?

23  **A**    Well, I can't say if he copied it or pasted it, if he

24  typed it, I don't know.

25  **Q**    Well, there's other websites where this individual has

1    posted these exact words, aren't there?

2    **A**    I don't know that.

3    **Q**    You don't know that.

4         So this was a series of calls for action, correct?

5    **A**    Yes, sir.

6    **Q**    Now, the government pointed out on direct that one of

7    them says, "We stormed the parliament," right?

8    **A**    Yes, sir.

9    **Q**    It also says, "We burned down fake state television,"

10    right?

11    **A**    Yes, sir.

12    **Q**    There's no state television in the United States,

13    right?

14    **A**    No, sir.

15    **Q**    And Serbia, maybe you don't know this, but this is

16    about the October 2000 election in Serbia, correct?

17    **A**    I don't know, sir.

18    **Q**    You don't know.

19         You probably don't know then that the parliament in

20    Serbia has no connection to the electoral process, did you

21    know that?

22    **A**    You're referring to the electoral process in Serbia or

23    in the --

24    **Q**    In Serbia, in October 2000 the President of Serbia was

25    not chosen -- the parliament had no role in the choice of

1    President.

2    **A**    I don't know that.  All I know is Mr. Rhodes was

3    looking for solutions, and he thought this was important

4    enough to take and post to the Oath Keepers website for

5    Americans to see and for the Oath Keepers to see.

6    **Q**    So this is -- through your investigation you didn't

7    try to figure out what it meant to storm the parliament in

8    the context of October 20, 2000, in Serbia, is that when I'm

9    hearing?

10   **A**    No.  I think what I'm saying is Mr. Rhodes thought it

11   was a good plan and took it from this individual to post to

12   his website --

13   **Q**    Okay.

14   **A**    -- and also in the group messages with other Oath

15   Keepers following the November 3rd election.

16   **Q**    And so since this was for the November 14th rally, if

17   people had stormed the Capitol like this says stormed the

18   parliament, nothing would have happened in terms of the

19   election or the certification or anything having to do with

20   the transfer of power, correct?

21   **A**    No, sir.  I don't agree.  I wouldn't -- I think it

22   would be very short-sighted to think that everything they

23   posted to the website and discussed was only tied to those

24   dates.  All of these actions they were taking were following

25   the November 3rd election and --

1    **Q**    I'm sorry.  My question was if they had stormed the

2    Capitol on November 14th like Serbians stormed the

3    parliament in October 2000, nothing would have been affected

4    in terms of the Electoral College or the certification

5    process?

6    **A**    No.  I think it would have been affected.  I think

7    different actions would have been taken in preparation for

8    the certification of the election.

9    **Q**    But the legal process of certifying the election

10   would not have -- the legal process of certifying the

11   election, which happens on January 6th, would not have been

12   interrupted if anyone had read this and then stormed the

13   Capitol at the call to action rally on November 14th?

14   **A**    I don't agree with that.  I think it would have been.

15   I think it would have had to been altered moving forward if

16   people went and stormed the Capitol prior to the January 6th

17   certification.  If in November, you know, they -- anyone

18   stormed the Capitol, that would have affected that event,

19   and I don't know what actions would have been taken, but I

20   think it would have been a -- you know, it wouldn't have

21   been smart if no actions weren't taken.

22   **Q**    So I think if I understand what you're saying is

23   there's maybe some practical considerations in terms of the

24   delaying or structuring of that but --

25             THE COURT:  Let's move on.  He's not a legal

1    scholar on this.  Next topic, please.

2                    MR. PEED:  Can we pull up Exhibit 668?

3        For the record, I misspoke.  6778.

4        Could you go forward?

5        Go to the Stewart Rhodes message.

6    BY MR. PEED:

7    **Q**    Agent Harris, you've seen this message on your direct,

8    correct?

9    **A**    Yes, sir.

10   **Q**    And this is dated December 10th, 2020, correct?

11   **A**    Yes, sir.

12   **Q**    Could you read this message again, please.

13   **A**    "Will insurrection or the Insurrection Act be our only

14   option?  Ha, ha.  Well played.  Though it's in reverse,

15   either Trump gets off his ass and uses the Insurrection Act

16   to defeat the ChiCom puppet coup, or we will have to rise up

17   an insurrection, rebellion against the ChiCom puppet Biden.

18   Take your pick."

19                    MR. PEED:  Next slide.

20       I'm sorry.  Let's go back.

21   BY MR. PEED:

22   **Q**    All right.  As part of your investigation, you have

23   looked into what the Insurrection Act is, right?

24   **A**    I have not, sir.  That's more of a legal question.

25   **Q**    Okay.  So in this message Stewart Rhodes basically

1    lays out an either/or plan, right?

2    **A**    That's what the message says.

3    **Q**    "Either Trump uses the Insurrection Act to defeat the

4    ChiCom puppet coup or we will have to rise up an

5    insurrection."  Right?

6    **A**    Yes, sir.  That's what it says.

7    **Q**    Against Biden, correct?

8    **A**    Yes, sir.

9    **Q**    And an insurrection is going up against the

10    established government, right?

11    **A**    Throughout this investigation there's been a lot of

12    debate between the attorneys about what an insurrection is

13    or what the Insurrection Act is.  I can't speak on that.

14              MR. PEED:  Go to the next slide.

15    BY MR. PEED:

16    **Q**    Did you read this?

17    **A**    "Stewart, just to clarify, any initiative on the

18    Insurrection Act will include steps to prevent Biden or

19    Kamala from taking the oath, right?  My sis says, yes."

20              MR. PEED:  Next slide.

21    **A**    "What is Biden's recourse, if any, under that

22    scenario?"

23              MR. PEED:  Next slide.

24    **A**    "Yes.  Of course Biden and Kamala would be prevented

25    from being sworn in.  They'd be arrested and should be the

1    first two indicted."

2    BY MR. PEED:

3    **Q**    And this series of messages, Mr. Rhodes is talking

4    about a path that would involve stopping President Biden

5    from taking the oath, right?

6    **A**    That's what it appears.

7    **Q**    And he refers to being arrested and indicted, right?

8    **A**    Yes, sir.

9    **Q**    And as a law enforcement officer, who indicts in our

10    system?

11    **A**    A grand jury.

12    **Q**    And who presents evidence to a grand jury?

13    **A**    The government.

14    **Q**    So if someone were to be indicted, that means the

15    government agent has to present something to a group of

16    citizens called the grand jury, right?

17    **A**    Yes, sir.

18    **Q**    And the government agents work for the executive

19    branch who do that, correct?

20    **A**    Yes, sir.

21    **Q**    And then the citizens from the grand jury are just

22    regular people, right?

23    **A**    Correct.

24    **Q**    So in this plan when it's talking about stopping Biden

25    from taking the oath, it involves executive government

1    action through an indictment, right?

2    **A**    I can just tell you what the message said.  I can't,

3    you know, get into --

4    **Q**    Could you read the last line, please.

5    **A**    They'd be arrested and should be the first two

6    indicted.

7                    MR. PEED:  Can we go to the next slide?

8    BY MR. PEED:

9    **Q**    Could you read this?

10   **A**    "You can't let traitors and communist puppets who were

11   never duly elected be sworn in."

12                   MR. PEED:  The next slide.

13   **A**    "Exactly.  I spoke at the big Stop the Steal, Jericho

14   March at the national mall on Saturday and said just that.

15   He must do it.  We are already at war with communist China

16   in this domestic enemy proxies.  He must act now so we can

17   fight this war while he is commander in chief."

18   BY MR. PEED:

19   **Q**    Now, on your direct, the government showed a video of

20   this speech at the Jericho March that he's referring to

21   here, correct?

22   **A**    Yes, sir.

23   **Q**    And at that speech there was a rally, and Stewart

24   Rhodes presented pretty much this same topic of wanting

25   President Trump to use the Insurrection Act, right?

1   **A**     Yes, sir.

2   **Q**     And in this message and at that rally he said he

3   wanted him to do it while he was commander in chief, right?

4   **A**     That's what he says.

5                    MR. PEED:  Can we go to the next slide?

6                    THE COURT:  Mr. Peed, can I ask you how much

7   longer the cross-examination will be?  Only because we're

8   approaching the 5:00 hour.

9                    MR. PEED:  Probably 30 minutes, Your Honor.

10                    THE COURT:  Okay.  Why don't you fill this

11   line up and then we'll adjourn.

12                    MR. PEED:  Go to the next slide.

13   BY MR. PEED:

14   **Q**     Could you continue reading this, Agent Harris?

15   **A**     "If he doesn't use the Insurrection Act to keep a

16   ChiCom puppet out of the White House, then we would have to

17   fight a bloody revolution, civil war to defeat the

18   traitors."

19   **Q**     All right.  So in these series of messages, Stewart

20   Rhodes is continuing to lay out his plan, the same one he

21   laid out at the Jericho March, right?

22   **A**     I wouldn't call it his plan.  It's just what he's

23   saying that he thinks the President should do.

24   **Q**     And so he says if the President doesn't use

25   Insurrection Act to keep Biden out of the -- he calls him

1    ChiCom puppet, but that's a reference to President Biden?

2    **A**    Yes, sir.

3    **Q**    "And if President Trump doesn't use the Insurrection

4    Act to stop Biden from coming into the White House, then

5    there will be a bloody civil war to defeat the traitors,"

6    right?

7    **A**    That's what it says.

8    **Q**    And so based on this message, the any bloody civil war

9    he's referring to would happen while President Biden was in

10   the White House, correct?

11   **A**    Well, the previous message referred -- stated they

12   have to prevent them from being sworn in, so it seems as if

13   they wanted to do something to prevent -- do just that.

14   **Q**    Right.  They wanted to prevent them from being sworn

15   in by using the Insurrection Act and arrests and indictment,

16   that's what we saw in the previous message, right?

17   **A**    Can you go back to the previous message?

18   **Q**    Sure.

19              MR. PEED:  Go back to where it talks about

20   arrests, please.

21   **A**    I was referring to the preventing from being sworn in.

22   BY MR. PEED:

23   **Q**    This statement we're about to look at is an answer to

24   a question about the Insurrection Act, right?

25   **A**    I believe it was.

1    **Q**    And the question was:  "Will the Insurrection Act be

2    used by President Trump to stop incoming-President Biden

3    from being sworn in?"  Right?

4    **A**    You're asking --

5    **Q**    That's what you were saying, that this is about

6    stopping President-Elect Biden from being sworn in?

7    **A**    Well, I was actually referring to the next message

8    that said that "you just can't elect a President that wasn't

9    duly elected be sworn in."

10                THE COURT:  I think we've exhausted this.

11    Let's break for the day.

12         Ladies and gentlemen, thank you for your time and

13    attention.  I remind you that tomorrow's only a half day, so

14    we'll conclude right around 12:30 or so, and then you'll

15    have the weekend.  So thank you very much for braving the

16    conditions and elements to be here today.  Thank you very

17    much.  Have a great night, and we'll see you in the morning.

18    Thank you, everyone.

19                (Jury exits courtroom.)

20                THE COURT:  Agent Harris, you may step down.

21    I instruct you not to discuss your testimony overnight.

22    We'll see you in the morning.

23         Have a seat everybody.

24         One very firm request, and that is please make sure

25    you know how to use your electronics so that we don't have

1    long pauses in bringing up exhibits.  And that is directed

2    to both sides.  If you need a tutorial on how all this

3    works, we'll bring John Cramer in to get it done, but these

4    long pauses in order to bring exhibits up is not going to

5    make them happy and make me unhappy.  That's one.

6         Two.  Unsolicited piece of advice for the defense, if

7    you want to ask him to continue to interpret Stewart

8    Rhodes's messages, it's not going to go well.

9                   MR. EDWARDS:  Your Honor, one issue for

10   tomorrow.

11                  THE COURT:  Of course.

12                  MR. EDWARDS:  I mentioned to the Court that I

13   would try and dig into how to handle the transcripts.

14                  THE COURT:  I've looked at it too.  Thank you

15   for the reminder.

16        And the bottom line is, at least as I read it, and

17   tell me if you disagree, the defense can present alternative

18   transcripts as evidence.

19        Mr. Peed, if you've got an alternative transcript

20   you'd like to present through your examination, you are free

21   to do that.  I'll instruct the jury that ultimately these

22   are competing transcripts from each side, and ultimately it

23   will be the jury's determination as to which one is the

24   correct one, but ultimately it is the audio that is the

25   evidence.  So that's the process.

1    MR. EDWARDS:  And then there's one other

2    issue -- that was exactly what we've had as well.

3         And then tomorrow we have a witness we need to get on

4    and off the stand.  We had a little bit of an issue with

5    going down yesterday, and then we didn't expect the length

6    of cross on at least some of these, so what we'd request is

7    to break after the final cross, put this witness on, and

8    then do the redirect of Special Agent Harris after that

9    witness I think is the best plan.

10              THE COURT:  So you want to finish up

11   Mr. Peed's cross-examination, then put your witness on?

12              MR. EDWARDS:  I think that's right.  Unless --

13   yeah, I think that's right.

14              THE COURT:  But is -- okay.  I mean, is this

15   an out-of-town witness?

16              MR. EDWARDS:  It is.

17              THE COURT:  And is that someone we think

18   will --

19              MS. HUGHES:  It's Mike Adams, Your Honor.

20   He's been here all week.  We would very much like to get him

21   on tomorrow.

22              THE COURT:  I guess the question, Mr. Nestler,

23   is how long do you think your redirect examination is going

24   to be?

25              MR. NESTLER:  Probably a half hour to 40

1    minutes because we're stopping at 12:30 strict tomorrow, I

2    think it's safer to do Mr. Adams first and then come back to

3    Agent Harris's redirect.

4                    THE COURT:  Okay.  So do we think we can get

5    Mr. Adams done in a timely manner if we allow Mr. Peed to

6    complete his cross-examination?  He says he needs another

7    half hour or so.

8                    MS. HUGHES:  I think if it is a true half

9    hour -- if there's a chance it leads into an hour, then I do

10   have some concerns.

11                   THE COURT:  Mr. Peed?

12                   MR. PEED:  Based on -- I think his level of

13   knowledge is not quite what I expected, so I'm going to trim

14   it.  I think the safest thing would be to go with Mr. Adams,

15   but I think it will be less -- it will be 30 minutes.

16                   THE COURT:  Want to just start with Mr. Adams

17   tomorrow?

18                   MS. HUGHES:  That's amenable to us, Your

19   Honor.

20                   THE COURT:  If you're amenable to that, that's

21   fine by me.

22       So first witness will be Mr. Adams, he'll be on deck

23   first tomorrow, and we'll then conclude with Mr. Peed's

24   cross-examination, and then have the redirect of Agent

25   Harris.

1    MR. MANZO:  And, Your Honor, solely for the

2    purpose of reminding Mr. Harris not to talk about prior

3    proceedings more -- solely to remind Mr. Harris not to bring

4    up prior proceedings or to bring it up as little as possible

5    unless strict -- can we just remind him of that?

6    THE COURT:  Yes.

7    MS. HALIM:  I would ask that the Court do the

8    reminding, not the government, while he is pending cross.

9    THE COURT:  Let me ask, is there anything

10   else?

11       Hang on for a second.

12   MS. HALIM:  I do have one thing, and I just

13   want to raise it so I don't forget.

14       Agent Harris testified about a number of summary

15   exhibits that he did not prepare.  They weren't

16   objectionable exhibits.  My understanding from the D.C.

17   circuit case law is that there a preference for the person

18   who prepared the summary to be the person that testifies

19   about the summary.  When it comes to those that there is

20   objection to, those montages, compilations, I just -- if the

21   person who is testifying about it didn't prepare it, that's

22   an additional objection that the defense will raise.

23   THE COURT:  Well, I mean, I'll go back and

24   take a look, but it's not -- I don't think it requires the

25   person to have actually prepared it.  And we're living in a

1   world that's very specialized and presumably it was some

2   litigation specialist who put it together, and if the person

3   testifying about it can testify about its component parts, I

4   think that's enough.

5        But you don't mean to suggest that the litigation

6   specialist who actually put it together is the person that

7   should come testify?  Because I'm not sure that that person

8   would have terribly much to offer.

9            MS. HALIM:  I don't suggest that, but I do

10  suggest that there are a lot of moving component parts, and

11  the government's been very clear that their agents are

12  segregated as to their information.  So I've just got an eye

13  on it, and I just want to flag it.

14           THE COURT:  Again, I'm only drawing from the

15  past trial which was -- in which whoever -- the testifying

16  agent as to Exhibit 1500, that agent had awareness about the

17  entirety of the events of the day of January 6th, and that

18  was that person's subject matter.  So presumably that will

19  still be the -- that will be the case this time around.  And

20  so to the extent that you either want to cross about the

21  exhibit or what's not in the exhibit, that person should be

22  in a position to testify about those subject matters.  Okay?

23           MR. EDWARDS:  Yes, Your Honor.

24           THE COURT:  Anything else?

25           MR. MARTIN:  Your Honor, I had one issue to

1    bring up.

2         Your Honor, I had an objection as to some of the

3    contents of one of the government's exhibits that's going to

4    come in under Agent Hilgeman.  Should I make that objection

5    now or --

6                   THE COURT:  Sure.  We're all here.

7                   MR. MARTIN:  Your Honor, it's contained under

8    Exhibit 9514.  The cite, as I'll refer to it on the message,

9    is 1.S.6567 --

10                  THE COURT:  Hang on, counsel.  That's not

11   going to help me.

12        Can somebody bring it up so I can take a look at it

13   while it's being objected to?

14                  MR. MARTIN:  Yes, Your Honor.  I was just

15   saying that for the record.  To continue, though, it's

16   message number 10,230.

17        And, Your Honor, to provide a little bit of context as

18   we're getting the message pulled up, this was in reference

19   to an article that was -- that was posted in the group chat,

20   the OK Florida Hangout chat about Congressman Adam Schiff

21   for California.  It was a story that alleged that

22   Congressman Schiff was allegedly arrested for a child sex

23   offense, and the message -- it has appeared here on screen,

24   it reads:  "I hope Schiff gets the broomstick treatment in

25   jail."

1    Your Honor, I think this is subject to 403, the

2    probative value being substantially outweighed by the danger

3    of unfair prejudice.  The probative value I would say is --

4    I would argue is nil.  It adds nothing to the alleged

5    conspiracy.  It simply shows a disdain for the alleged

6    actions of the Congressman.  It's not a direct threat on the

7    Congressman.  It's a fair reading to say it's something that

8    the author would hope would happen to that person, but it's

9    not saying that the author is going to or is encouraging

10    anybody else, and it's quite inflammatory.

11            THE COURT:  Okay.  But help me for a moment.

12    Is the prior message or messages immediately preceding this

13    one, it contains a news article that suggests that

14    Congressman Schiff is involved in some sort of child abuse?

15            MR. MARTIN:  That is correct, Your Honor.  It

16    suggests that he has been arrested for such.  That was the

17    topic of conversation in the messages preceding.

18            MR. MANZO:  I think we would have a factual

19    disagreement, and we can pull up a full exhibit here.

20            MR. MARTIN:  Albeit, it was a factually

21    inaccurate article that's the subject of conversation in the

22    messages preceding it.

23            MR. MANZO:  So we have 9514 pulled up here.

24    And so we're at message 10227.  We're going to try to get

25    this on the full screen.

1   A message from Mr. Moerschel.  It says:  "Pence is

2   literally our last hope in Congress.  I don't think anyone

3   believes that they have enough votes in Congress to change

4   the outcome.  Need simple majority."

5   Then the next messages is Kelly Meggs saying:  "I

6   heard Pence is compromised."

7   And then the next message is Mr. Moerschel saying:  "I

8   hope Schiff gets the broomstick treatment in jail."

9   Maybe there's an article about child sex earlier, but

10  that's something that defense can argue.  I actually was not

11  aware of that, but we can go back.  But I think the thing

12  is that --

13   MR. MARTIN:  I can read the portions that I'm

14  referring to, if Your Honor will hear me.

15   THE COURT:  Well, help me understand.  This

16  message is at 10:04, that is the "I hope Schiff gets the

17  broomstick."  That's at 10:04 PM on December 25th, 2020.

18  What time is the article sent and is it --

19  Two questions.  One, is it -- when is it sent?

20  And two, is it sent to the OKFL Hangout chat?

21   MR. MARTIN:  Your Honor, I have a message at

22  two -- now, the agent testified that these timestamps can be

23  a little bit off because they're recorded from -- I

24  didn't -- I'll be truthful, I didn't exactly follow his

25  difference in timeframes, but I'm not so sure that 10:04 PM

1    was when this message was sent.

2                    THE COURT:  Well, for the record to be clear

3    here, the time on the slide can only be inaccurate if it was

4    inaccurately transcribed.  In other words, the time that's

5    from the phone and the Cellebrite report is accurate.  Now,

6    whether somebody mistyped it, that's a separate issue.  But

7    I'm presuming that this is accurate right now.  So I'm

8    asking when was the circulation of the article that you

9    think this is a response to?

10                   MR. MARTIN:  It's because of the UTC time

11   so --

12                   MR. WEINBERG:  If I may, Scott Weinberg for

13   the record, Your Honor.

14        There was a message sent at 2:40 UTC time on the 26th

15   of December, which states that Schiff had been arrested.

16   And then there's discussion of Schiff being arrested to when

17   Mr. Moerschel says the broomstick message at 3:04 UTC time.

18   The first message about the allegation against Mr. Schiff

19   was at 2:40 UTC time.  So only 20 or --

20                   THE COURT:  20 or 30 minutes before.

21                   MR. MARTIN:  There's a message at 2:42 UTC

22   time.  There's a message at 2:52 UTC time.  And then

23   Mr. Moerschel makes his statement at 3:04.  So between the

24   last message concerning it and Mr. Moerschel's message are

25   12 minutes.

1           MR. MANZO:  And, again, that's something they

2   can cross on.  They can say he's talking about whatever he's

3   talking about.

4           THE COURT:  I know it's something they can

5   cross on, but it's --

6           MR. MANZO:  But I think what Your Honor drew

7   the line on last time with Mr. Caldwell's death list was

8   that Mr. Caldwell -- where it was a kind of probative

9   message of intent to do harm or have animus toward Congress,

10  which is of course where January 6th ended up.  And

11  you said -- and you said there was a -- where he had a list

12  of election workers and you drew the line at, well, those

13  are state workers and not federal workers.  Here we're

14  talking an actual federal worker in D.C., where they're

15  going.

16          THE COURT:  I understand that.  And I'd be

17  surprised if -- well, anyway --

18          MR. WEINBERG:  Well, Judge, the difference, if

19  I may --

20          THE COURT:  Please don't compare this to

21  Mr. Caldwell.  That's not a frame of reference for me right

22  now.  I'm just trying to understand what the sequencing is

23  and what each side believes to the import or the lack of

24  import of these messages.

25          MR. WEINBERG:  Unfortunately, Your Honor, in

1   our society, this is the type of message people send when

2   somebody is arrested for a sex crime.  We've heard this

3   numerous times in other cases.  This is discussing an

4   alleged arrest for a sex crime.  Unfortunately this is what

5   people say when they think people are arrested for that type

6   of crime.  It has nothing to do with the alleged conspiracy,

7   it has nothing to do with January 6th, it has nothing to do

8   with frankly even being an Oath Keeper.  This is just hot

9   air talking about --

10             THE COURT:  Can you send me the articles, the

11   full --

12             MR. WEINBERG:  There wasn't an article, Judge,

13   I apologize.  There was a rumor on the chats about somebody

14   reading something.

15             THE COURT:  Can you send me what the relevant

16   documents are, the relevant messages and the timeframes?

17   I'll take a look at them and decide.

18             MR. MANZO:  And our argument is at best it's

19   open to interpretation.

20             THE COURT:  I understand.

21       It's just a dumb thing to say.  Just send them to me

22   overnight and I'll take a look.

23       Anything else?

24             MR. MARTIN:  No, Your Honor.

25             THE COURT:  Thank you, everyone.  See you in

1    the morning.

2                    (Court adjourns at 5:17 p.m.)

3

4

5                    **C E R T I F I C A T E**

6

7        I certify that the foregoing is a correct transcript

8    of the record of proceedings in the above-entitled matter

9    prepared from my stenotype notes.

10               */s/ Gregory S. Mizanin       December 16, 2022*
11               GREGORY S. MIZANIN, RDR, CRR              DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

'20 [1] - 1549:18
'residence' [1] - 1409:14

**/**

/s [1] - 1573:10

**0**

0001 [1] - 1482:17

**1**

1 [6] - 1414:13; 1483:13; 1507:17; 1517:6; 1546:22, 25
1,100 [4] - 1493:21; 1494:15; 1497:4
1-1302.16(a [1] - 1409:13
1-1302.16(a) [1] - 1411:5
1.S.656.10075 [1] - 1414:8
1.S.656.1854.V [1] - 1431:13
1.S.656.6541 [1] - 1418:2
1.S.6567 [1] - 1567:9
1.S.696.12391 [1] - 1436:22
1.S.696.13376 [1] - 1440:5
10 [2] - 1482:9; 1519:8
10,000 [1] - 1415:7
10,075 [1] - 1415:3
10,075th [1] - 1415:3
10,230 [1] - 1567:16

10-17-2020 [1] - 1450:16
1002 [3] - 1476:25; 1550:4
10227 [1] - 1568:24
1028A [2] - 1499:11, 25
1029 [1] - 1500:6
104 [2] - 1537:8, 14
105.1.E.2 [1] - 1462:12
1056.029 [1] - 1457:7
1056A [1] - 1465:15
106 [2] - 1538:16
106'd [1] - 1485:21
10:04 [3] - 1569:16, 25
10th [1] - 1555:10
11 [4] - 1426:8; 1453:10, 13, 16
11-16 [1] - 1517:24
11-ish [1] - 1471:19
1100s [1] - 1494:11
114 [1] - 1402:14
1150 [1] - 1402:19
11:22 [1] - 1520:1
11:25 [2] - 1545:7, 22
11:26 [1] - 1520:8
11:32 [1] - 1520:9
11th [2] - 1519:5; 1520:13
12 [3] - 1463:1; 1547:7; 1570:25
12,391 [2] - 1437:10, 12
12-19 [1] - 1419:15
12-6 [1] - 1419:15

125 [1] - 1453:5
125-minute [1] - 1453:24
12:30 [2] - 1561:14; 1564:1
12th [3] - 1438:21; 1506:20; 1520:13
13 [1] - 1450:3
13376 [1] - 1440:7
14 [6] - 1426:14, 20; 1462:24; 1463:7; 1464:23
1411 [1] - 1403:5
1462 [1] - 1403:6
1491 [1] - 1403:7
14th [11] - 1438:13; 1477:19; 1478:6, 22; 1506:18; 1535:12, 17; 1550:13; 1553:16; 1554:2, 13
15 [1] - 1401:5
1500 [1] - 1566:16
1525 [1] - 1476:1
1526 [1] - 1403:8
1531 [3] - 1432:19; 1542:1; 1547:25
1532 [1] - 1402:11
1555 [1] - 1479:17
1557 [3] - 1415:22; 1531:7; 1532:16
15:30 [1] - 1469:20
16 [5] - 1404:6, 17, 19; 1449:15; 1573:10
16th [1] - 1517:24

17 [1] - 1449:15
1775 [1] - 1402:18
17th [1] - 1449:21
18 [4] - 1413:25; 1414:1; 1499:11
1867(a) [1] - 1410:5
1868 [1] - 1409:8
18th [2] - 1413:21; 1484:10
19129 [1] - 1402:7
19:51:53 [1] - 1461:14
19th [5] - 1418:16; 1419:12; 1483:3, 6; 1484:18
1:23 [2] - 1401:5; 1404:1
1:25 [1] - 1537:24

**2**

2 [5] - 1481:4; 1511:20; 1512:25; 1520:22; 1547:7
20 [6] - 1413:24; 1448:5; 1553:8; 1570:19
2000 [4] - 1552:16, 24; 1553:8; 1554:3
2000.T.89 [1] - 1439:9
20006 [1] - 1402:19
2001 [2] - 1491:22; 1492:3
2004 [1] - 1413:21
2014 [3] - 1413:14, 18
2016 [1] - 1406:1
2017 [1] - 1406:3

202 [2] - 1401:18; 1402:20
2020 [29] - 1413:16; 1418:6; 1419:11; 1421:17; 1425:11, 13; 1429:4; 1437:19, 21; 1438:13, 22; 1441:11; 1443:7, 14; 1447:21; 1449:21; 1453:25; 1479:5, 10; 1484:16; 1502:9, 16; 1535:9, 12, 14, 22; 1549:1; 1555:10; 1569:17
2021 [8] - 1406:4; 1412:12; 1421:13; 1454:11; 1492:5; 1508:22; 1532:8
2022 [4] - 1401:5; 1494:19; 1549:18; 1573:10
20579 [1] - 1401:17
20th [7] - 1425:13; 1429:4; 1430:12; 1479:5; 1483:2; 1484:19; 1535:14
21 [5] - 1416:25; 1479:21; 1531:12; 1532:3, 18
210.P.1 [3] - 1526:9; 1527:8;

1536:7
215 [1] - 1402:8
22-15 [1] - 1401:4
228-1341 [1] -
1402:4
2339A [1] -
1500:4
239 [1] - 1402:12
2413.2 [2] -
1412:20, 25
252-7277 [1] -
1401:18
25th [3] -
1453:25;
1454:2; 1569:17
265 [1] - 1402:14
26th [1] - 1570:14
28 [1] - 1410:5
28th [5] -
1441:11;
1443:7, 14;
1479:11, 13
29 [8] - 1447:21;
1453:4, 9, 17,
24; 1454:16, 19
2:13 [1] - 1467:5
2:24 [1] - 1538:13
2:38 [1] - 1538:20
2:40 [5] -
1457:16;
1471:20;
1547:5;
1570:14, 19
2:42 [1] - 1570:21
2:51 [2] -
1469:23;
1471:20
2:51:53 [1] -
1461:19
2:52 [1] - 1570:22

**3**

3 [2] - 1477:24;
1484:25
30 [10] - 1409:23;
1426:6; 1446:3;
1448:5; 1523:8;
1549:12;

1559:9;
1564:15;
1570:20
30-second [2] -
1431:14; 1446:2
300-3229 [1] -
1402:8
301.V [1] -
1530:11
337-9755 [1] -
1402:12
33901 [1] -
1402:11
33950 [1] -
1402:15
3580 [1] - 1402:7
3:00 [1] - 1482:7
3:04 [2] -
1570:17, 23
3:11 [1] - 1490:19
3:14:44 [1] -
1523:1
3:15:04 [1] -
1523:10
3:15:32 [1] -
1523:20
3:20 [1] - 1484:25
3:21:45 [2] -
1524:17, 23
3:22 [1] - 1490:19
3rd [3] - 1436:10;
1553:15, 25

**4**

4 [2] - 1425:25;
1537:25
40 [4] - 1448:5;
1545:21;
1563:25
403 [1] - 1568:1
4:29 [2] - 1532:6,
13
4:30 [1] - 1426:4
4th [4] - 1437:19;
1439:3; 1535:7;
1536:24

**5**

5 [2] - 1517:18;
1519:23
5-6 [2] - 1417:11;
1515:19
50s [1] - 1464:11
575-8000 [1] -
1402:15
59 [1] - 1464:10
5:00 [1] - 1559:8
5:17 [1] - 1573:2
5th [18] -
1485:18;
1488:2, 21;
1489:5; 1490:6,
13; 1527:11;
1532:8, 14, 20;
1533:16;
1534:1, 24;
1535:3; 1536:9,
14; 1543:12

**6**

6 [13] - 1413:14;
1416:25;
1418:10;
1419:11;
1479:21;
1480:8;
1483:11;
1484:16;
1526:22;
1528:2;
1531:12;
1532:3, 18
601 [1] - 1401:17
6396 [1] -
1449:24
656 [2] - 1414:21,
24
656th [1] -
1414:21
668 [1] - 1555:2
6770 [2] -
1436:20; 1475:3
6773 [1] - 1517:5
6776 [2] - 1441:2;

1447:19
6778 [3] - 1414:5;
1417:25; 1555:3
696 [1] - 1494:11
696th [1] - 1437:7
6th [68] - 1418:6;
1424:6, 25;
1433:23;
1434:1, 20;
1435:7, 23;
1437:24;
1438:6, 11;
1439:4;
1440:19, 23;
1454:14;
1456:5;
1477:21;
1480:14;
1481:6, 12-13,
24; 1483:21, 24;
1485:16;
1487:21;
1488:12;
1490:5, 10, 13;
1505:3, 17;
1506:3, 8, 23;
1514:22;
1515:5, 7, 18;
1519:15;
1521:12, 17;
1531:20;
1532:9; 1537:4;
1540:7;
1541:23;
1543:3, 8, 13,
16; 1544:2, 4;
1545:9, 11;
1546:3, 9, 15,
18; 1547:8;
1550:19, 24;
1554:11, 16;
1566:17;
1571:10; 1572:7

**7**

7 [3] - 1401:6;
1442:23;
1538:12

7029 [2] -
1457:13;
1460:17
745 [1] - 1402:3
79 [1] - 1474:24

**8**

80 [1] - 1447:15
808 [1] - 1402:4
8:20 [1] - 1519:24
8th [1] - 1517:15

**9**

9-18-20 [1] -
1441:13
9-28-2020 [1] -
1445:10
9.1 [1] - 1409:2
919-9491 [1] -
1402:20
941 [1] - 1402:15
941-704-6396 [3]
- 1444:25;
1450:20; 1451:8
9514 [2] - 1567:8;
1568:23
96734 [1] -
1402:4
9th [7] - 1440:13,
15; 1452:19;
1453:3; 1476:6;
1549:1, 19

**A**

able [5] -
1406:11;
1409:22;
1430:15;
1508:14; 1521:7
abode [2] -
1409:16
above-entitled [1]
- 1573:8
absence [2] -
1409:20
absent [1] -
1409:19
absolutely [1] -

1404:24
abuse [1] - 1568:14
acceptable [1] - 1410:18
access [3] - 1475:10; 1494:22; 1533:10
accessing [1] - 1533:5
according [4] - 1472:7; 1481:7; 1483:23; 1484:10
account [1] - 1484:13
accounts [1] - 1404:8
accumulated [1] - 1491:15
accurate [5] - 1426:3; 1513:6; 1514:13; 1570:5, 7
accurately [1] - 1418:11
act [3] - 1410:12; 1462:9; 1558:16
Act [15] - 1409:8, 25; 1555:13, 15, 23; 1556:3, 13, 18; 1558:25; 1559:15, 25; 1560:4, 15, 24; 1561:1
acting [1] - 1467:21
Action [1] - 1477:14
action [6] - 1477:17; 1550:10, 12; 1552:4; 1554:13; 1558:1
actions [5] - 1553:24; 1554:7, 19, 21;

1568:6
active [1] - 1481:24
activity [1] - 1455:15
actual [6] - 1406:24; 1428:8; 1439:15; 1442:11, 17; 1571:14
Adam [1] - 1567:20
Adams [6] - 1563:19; 1564:2, 5, 14, 16, 22
add [4] - 1497:13; 1521:6; 1528:13
added [25] - 1488:2; 1497:12, 17, 19, 21, 24; 1498:2, 6, 9; 1513:21, 23; 1516:8; 1519:3, 10, 18; 1520:11; 1525:24; 1531:15, 21; 1532:2, 5, 19; 1534:24
additional [4] - 1408:15, 21; 1411:18; 1565:22
address [5] - 1405:8; 1455:15; 1496:1; 1535:5
addressed [1] - 1505:15
addresses [1] - 1500:24
adds [2] - 1497:23; 1568:4
adjourn [1] - 1559:11
adjourns [1] -

1573:2
admissible [2] - 1487:3; 1539:10
admit [7] - 1460:20; 1483:12; 1528:5; 1530:10; 1537:14, 18; 1544:23
admitted [9] - 1412:21; 1414:5; 1426:15, 20; 1431:1; 1460:23; 1483:14; 1528:10; 1545:2
advance [2] - 1447:19; 1448:24
advice [1] - 1562:6
affected [3] - 1554:3, 6, 18
Afternoon [1] - 1401:7
afternoon [11] - 1412:1; 1462:7; 1482:6; 1484:24; 1526:7; 1532:9, 20; 1536:14
age [3] - 1464:8; 1474:23
Agent [32] - 1411:20; 1412:1; 1413:1; 1414:12; 1421:8; 1430:17; 1436:24; 1444:2; 1446:16; 1458:5; 1460:14; 1461:2, 25; 1462:7; 1485:4,

17; 1488:20; 1490:8; 1491:3; 1499:18; 1505:7; 1542:3; 1555:7; 1559:14; 1561:20; 1563:8; 1564:3, 24; 1565:14; 1567:4
agent [40] - 1421:21; 1422:1, 9; 1423:2; 1431:20; 1433:1; 1454:6; 1488:9, 11, 18; 1489:6, 22; 1490:12; 1492:10, 19, 25; 1494:25; 1495:9; 1497:17; 1499:22; 1503:10; 1507:12; 1508:4; 1509:7, 18; 1510:7, 16, 20; 1514:14; 1521:3, 7; 1547:13; 1548:24; 1557:15; 1566:16; 1569:22
agents [12] - 1421:25; 1492:14, 16-17, 22, 24; 1493:7; 1545:18; 1557:18; 1566:11
ago [2] - 1493:17; 1511:22
agree [24] - 1419:10; 1431:20, 22; 1464:23;

1465:4, 11; 1466:6; 1467:19; 1469:6, 15; 1470:18; 1471:9; 1475:20; 1478:24; 1479:13; 1481:13; 1484:15; 1534:19; 1541:8; 1548:3, 13; 1553:21; 1554:14
Ahab [5] - 1443:3, 5; 1455:2, 5
ahead [18] - 1427:22; 1441:3; 1458:6; 1459:6; 1473:2; 1482:10; 1494:4; 1505:11; 1507:4; 1529:21-25; 1530:1; 1545:1
air [1] - 1572:9
AL [1] - 1401:6
Alabama [1] - 1512:24
albeit [1] - 1568:20
Alexandra [1] - 1401:15
Alexandria [4] - 1404:10; 1405:2; 1406:18; 1407:13
allegation [1] - 1570:18
allegations [1] - 1422:23
alleged [5] - 1567:21; 1568:4; 1572:4,

6
allegedly [1] -
1567:22
allow [3] -
1541:13;
1545:1; 1564:5
allowed [2] -
1508:16; 1540:9
allows [3] -
1452:4;
1486:21; 1541:9
almost [3] -
1413:24;
1459:20; 1461:7
Alondra [1] -
1435:15
alone [1] - 1541:9
altered [1] -
1554:15
alternative [2] -
1562:17, 19
AM [1] - 1545:7
ambiguity [1] -
1486:21
ambiguous [1] -
1486:13
amenable [2] -
1564:18, 20
AMERICA [1] -
1401:3
Americans [1] -
1553:5
AMIT [1] - 1401:9
amount [1] -
1407:9
Analysis [1] -
1492:12
analysis [1] -
1503:21
Andrew [2] -
1427:1
Angela [1] -
1402:6
Angie [1] - 1412:3
animus [1] -
1571:9
anonymizers [1] -
1501:7

answer [9] -
1418:11;
1427:20;
1430:4; 1505:7;
1511:13;
1521:4, 8;
1546:13;
1560:23
answered [1] -
1487:5
Anthem [1] -
1465:9
antigovernment
[1] - 1489:9
anyway [2] -
1503:12;
1571:17
apartment [3] -
1406:10, 14
apologize [2] -
1524:1; 1572:13
app [4] - 1445:11;
1474:3; 1533:6
appear [4] -
1420:1, 4;
1460:16
APPEARANCES
[2] - 1401:13;
1402:1
appeared [1] -
1567:23
application [3] -
1452:8;
1493:19;
1516:14
applies [1] -
1410:13
appreciate [2] -
1419:17;
1426:12
approach [1] -
1470:22
approaching [1] -
1559:8
appropriate [5] -
1408:21;
1486:2;
1488:18;

1490:6, 17
apps [1] -
1498:21
area [4] -
1407:17;
1435:3;
1456:23;
1536:19
Ares [3] - 1427:8;
1428:7; 1429:9
argue [2] -
1568:4; 1569:10
argument [1] -
1572:18
Arizona [1] -
1528:13
Arlington [1] -
1471:22
arm [7] -
1459:3-5, 23;
1460:1; 1524:11
armed [1] -
1548:11
arranged [1] -
1429:4
arrangements [1]
- 1429:12
arrest [10] -
1491:7, 14, 18;
1495:2, 10, 19;
1496:8, 11, 15;
1572:4
arrested [12] -
1494:18, 23;
1495:5;
1556:25;
1557:7; 1558:5;
1567:22;
1568:16;
1570:15;
1572:2, 5
arrests [8] -
1495:4, 14-15,
23; 1496:4, 12;
1560:15, 20
arrived [3] -
1536:13;
1537:1; 1547:5

Art [1] - 1479:2
article [7] -
1567:19;
1568:13, 21;
1569:9, 18;
1570:8; 1572:10
articles [1] -
1572:10
Arts [8] - 1425:8,
24; 1426:5, 7,
16, 24; 1427:2,
5
ass [2] - 1517:23;
1555:15
assemble [1] -
1511:23
assess [1] -
1404:14
asset [1] - 1407:4
assigned [4] -
1421:12;
1422:4;
1492:18;
1510:16
assistance [1] -
1525:18
associated [6] -
1413:4; 1429:8;
1433:17;
1445:13;
1543:10, 20
assume [2] -
1422:19;
1454:17
assumes [1] -
1472:24
AT&T [3] -
1445:5, 13;
1451:11
attached [2] -
1445:16; 1513:5
attaches [1] -
1414:24
attachment [1] -
1430:2
attack [2] -
1505:3, 16
attacking [1] -

1505:6
attend [1] -
1478:24
attending [1] -
1424:15
attention [8] -
1407:2;
1413:12;
1419:3;
1453:25;
1458:9; 1505:8;
1527:1; 1561:13
attic [1] - 1406:10
ATTORNEY'S [1]
- 1401:16
Attorney's [1] -
1512:1
attorneys [1] -
1556:12
audio [9] -
1452:8, 13-14,
16; 1470:23;
1486:11, 21-22;
1562:24
AUSA [6] -
1401:14-16;
1495:13; 1496:3
author [2] -
1568:8
authorities [1] -
1508:2
authority [3] -
1433:6; 1495:2;
1496:15
authorization [1] -
1495:9
authorize [1] -
1496:4
authorizes [1] -
1493:4
automatic [5] -
1430:2, 19,
21-22; 1431:9
available [1] -
1538:15
Avenue [1] -
1402:14
avid [1] - 1455:8

5

avoid [3] - 1500:9; 1538:21; 1540:14

aware [11] - 1427:7; 1455:5, 7-8; 1485:17; 1502:14, 20; 1504:4; 1532:12; 1546:1; 1569:11

awareness [1] - 1566:16

**B**

background [3] - 1525:3, 5, 7

backwards [3] - 1461:8; 1468:13; 1503:20

backwards-looking [1] - 1503:20

badges [1] - 1492:15

bag [2] - 1495:17; 1525:25

bank [4] - 1484:10; 1495:16

barely [1] - 1449:7

based [10] - 1495:2, 10; 1496:18; 1499:2; 1501:14, 19, 23; 1508:1; 1560:8; 1564:12

basement [4] - 1405:13; 1406:10, 14

basic [1] - 1546:14

basing [1] - 1503:8

basis [3] -

1410:3; 1501:11; 1538:11

bathroom [1] - 1406:15

beanie [1] - 1468:15

bear [1] - 1454:24

beats [1] - 1519:20

becomes [2] - 1410:3; 1509:15

Beeks [1] - 1464:21

BEFORE [1] - 1401:9

began [2] - 1442:22; 1443:1

begin [1] - 1411:21

beginning [5] - 1415:15; 1491:6, 11; 1493:16; 1541:21

begins [2] - 1410:6; 1546:22

behind [7] - 1461:7; 1468:9, 18; 1469:2, 14; 1523:14; 1527:17

believes [2] - 1569:3; 1571:23

benefit [1] - 1500:8

Berry [1] - 1464:3

best [3] - 1464:24; 1563:9; 1572:18

better [4] - 1428:10; 1457:4; 1512:10; 1530:16

between [17] - 1405:6; 1407:18;

1417:16; 1429:7; 1474:4; 1502:23; 1518:7; 1524:2; 1529:8; 1537:24; 1538:9; 1541:18; 1542:25; 1543:4; 1547:7; 1556:12; 1570:23

beyond [5] - 1524:23; 1530:12, 15; 1544:24; 1550:22

Biden [13] - 1448:3; 1555:17; 1556:7, 18, 24; 1557:4, 24; 1559:25; 1560:1, 4, 9; 1561:2, 6

Biden's [1] - 1556:21

big [9] - 1419:7; 1432:23; 1433:12; 1478:2; 1481:8, 20; 1499:2; 1511:17; 1558:13

bigger [1] - 1451:2

bike [1] - 1455:5

bill [2] - 1500:20; 1501:4

Bill [1] - 1491:3

births [1] - 1500:24

bit [15] - 1404:13; 1412:15; 1458:25; 1468:4; 1469:7; 1471:21; 1488:16;

1489:2, 20; 1503:11; 1523:14; 1535:22; 1563:4; 1567:17; 1569:23

Bittner [10] - 1474:14-16, 20; 1488:6; 1542:13; 1543:9, 12, 15; 1548:3

blanking [1] - 1457:20

blind [1] - 1457:1

bloody [3] - 1559:17; 1560:5, 8

blue [3] - 1441:19, 22; 1460:5

board [8] - 1432:23; 1433:12; 1434:6; 1435:13; 1436:6, 13; 1511:17; 1520:20

bolt [3] - 1419:20, 24; 1420:19

bones [1] - 1489:2

bottom [11] - 1414:12; 1415:2; 1437:1; 1446:15, 18, 24; 1469:25; 1520:23; 1542:7; 1551:13; 1562:16

box [1] - 1541:23

Box [1] - 1402:3

brace [1] - 1524:11

branch [1] -

1557:19

braving [1] - 1561:15

breach [1] - 1466:14

breached [1] - 1466:21

break [10] - 1404:6, 22; 1482:6, 11; 1484:24; 1487:7; 1492:21; 1530:15; 1561:11; 1563:7

brick [1] - 1427:6

brief [1] - 1510:19

briefly [2] - 1509:2; 1522:23

bring [18] - 1404:12; 1408:9; 1485:20; 1489:22; 1540:5, 9, 13; 1541:10, 13-14; 1562:3; 1565:3; 1567:1, 12

bringing [3] - 1476:19; 1539:2; 1562:1

broaden [1] - 1538:18

broke [3] - 1466:4, 7, 13

broken [4] - 1435:2; 1466:1, 9, 11

broomstick [4] - 1567:24; 1569:8, 17; 1570:17

brother [1] - 1405:21

brothers [1] - 1478:18

brought [2] - 1407:1; 1496:6

BROWN [2] -
1402:10, 13
bubbles [2] -
1441:19, 22
build [1] - 1490:2
building [11] -
1407:2; 1456:5,
8, 15, 18, 21;
1461:11, 24;
1505:16;
1523:11; 1524:8
buildup [2] -
1481:12
built [1] - 1406:10
bunch [3] -
1507:3;
1538:22;
1540:14
burned [1] -
1552:9
burner [1] -
1499:8
business [7] -
1426:24;
1427:2, 6, 16,
21; 1428:1;
1501:19
buy [1] - 1407:15

C

Caldwell [14] -
1472:5, 7, 10,
19-20, 23;
1473:5, 12, 15;
1542:19, 25;
1571:8, 21
Caldwell's [3] -
1473:8; 1571:7
Caleb [1] -
1464:3
California [1] -
1567:21
camera [2] -
1457:13;
1460:17
cameras [2] -
1456:14, 18
Capitol [43] -

1434:4;
1435:10;
1436:3; 1456:5,
8, 15, 18, 23;
1457:5, 19;
1465:12, 14;
1466:14, 22;
1467:2; 1470:7,
11, 15; 1471:4,
10, 13, 16, 18;
1472:18;
1473:16;
1505:3, 16;
1506:24;
1512:14;
1513:9;
1522:20;
1524:3;
1527:13, 17;
1544:3, 8;
1546:10;
1547:4;
1553:17;
1554:2, 13, 16,
18
captioned [1] -
1511:19
care [3] -
1411:18;
1500:18, 20
Carolina [3] -
1543:18, 21, 23
Carrion [4] -
1457:21;
1523:11, 21
carry [1] -
1492:14
cars [1] - 1405:6
CART [8] -
1492:10, 14,
16-17, 22,
24-25; 1497:17
CART-trained [1]
- 1492:22
case [35] -
1405:3, 7;
1406:12;
1407:16;

1421:12, 21, 25;
1422:1;
1428:23;
1434:12;
1454:10;
1486:22;
1493:7;
1507:12, 22-23;
1508:4;
1509:18;
1510:7, 16-17,
20; 1511:1, 3-4;
1514:14;
1521:3;
1526:19;
1534:9; 1540:2;
1541:6;
1565:17;
1566:19
cases [3] -
1410:5;
1491:13; 1572:3
cat [1] - 1406:20
CCTV [6] -
1456:9, 12;
1460:17;
1465:21;
1522:23
celebrating [2] -
1471:12, 14
cell [9] - 1445:2,
10; 1449:24;
1451:10;
1452:20, 22;
1470:25;
1471:1, 4
Cellebrite [5] -
1442:14;
1496:22;
1497:16; 1570:5
center [2] -
1458:13, 22
certain [9] -
1420:25;
1435:3; 1497:3,
21; 1508:2, 15;
1516:14;
1544:7; 1547:24

certainly [2] -
1428:4; 1486:18
certainty [1] -
1536:2
certification [8] -
1546:20, 23;
1550:18, 23;
1553:19;
1554:4, 8, 17
certify [1] -
1573:7
certifying [2] -
1554:9
cetera [1] -
1406:15
chains [1] -
1479:19
chance [2] -
1409:23; 1564:9
change [4] -
1446:8;
1451:25;
1471:21; 1569:3
changed [1] -
1499:3
changes [1] -
1486:10
chapter [6] -
1513:15;
1514:2, 6, 8, 10
charge [1] -
1496:8
charged [1] -
1499:23
charging [1] -
1496:10
chart [5] - 1472:7;
1485:20;
1541:17, 19;
1542:4
chat [59] -
1414:21, 24;
1415:4, 7;
1416:13;
1417:1, 6, 9, 11,
17-19; 1437:13;
1440:9; 1441:7;
1447:11, 15, 25;

1475:8, 13;
1480:11, 16;
1482:18;
1483:5;
1488:21;
1494:10;
1496:25;
1497:14;
1498:2; 1499:9;
1513:22;
1515:24;
1516:2; 1519:3,
15; 1526:20, 22;
1528:2;
1530:20;
1531:13, 15-16;
1532:3, 13, 18,
24; 1533:1, 3, 9,
21-22; 1534:20,
22; 1535:3;
1567:19;
1569:20
chats [37] -
1449:6, 8;
1472:11, 15, 21;
1473:11, 13;
1475:5, 11;
1481:24;
1488:1;
1489:11;
1493:18, 21;
1494:7, 10, 13,
15; 1496:20,
23-24; 1497:4,
15; 1515:17, 19,
21; 1516:8, 11;
1531:5; 1533:8;
1534:21;
1536:3, 5;
1572:13
chatting [1] -
1474:2
check [1] -
1425:21
checked [2] -
1409:8; 1536:19
checkered [1] -
1460:6

checking [1] - 1534:18
ChiCom [5] - 1555:16; 1556:4; 1559:16; 1560:1
chief [2] - 1558:17; 1559:3
child [4] - 1495:23; 1567:22; 1568:14; 1569:9
China [1] - 1558:15
chiropractor [1] - 1422:15
choice [1] - 1552:25
chose [5] - 1446:4; 1449:3; 1451:20; 1488:3
chosen [2] - 1442:16; 1552:25
Chris [2] - 1436:9, 13
chronological [2] - 1509:12; 1546:7
circle [3] - 1458:17, 20; 1461:2
circled [1] - 1523:3
circles [3] - 1457:18, 23; 1468:3
circuit [2] - 1456:12; 1565:17
circulation [1] - 1570:8
circumstances [1] - 1496:13
cite [1] - 1567:8
cites [1] - 1411:4
citizens [2] - 1557:16, 21
citizens' [1] -

1502:4
city [1] - 1474:18
civil [3] - 1559:17; 1560:5, 8
claimed [1] - 1515:8
clarify [1] - 1556:17
clashes [1] - 1518:7
class [2] - 1429:18, 21
clear [5] - 1444:12; 1537:22; 1539:11; 1566:11; 1570:2
clearly [2] - 1408:25; 1458:5
client [12] - 1473:4, 7, 12, 15; 1474:9, 11, 14; 1478:24; 1479:7, 9; 1482:3; 1487:21
CLINTON [1] - 1402:18
clip [4] - 1445:25; 1446:2; 1447:8, 10
clips [5] - 1453:10, 14, 16, 19
closed [1] - 1456:12
closely [2] - 1430:6; 1527:17
closer [1] - 1410:14
cobble [1] - 1409:22
Code [3] - 1409:13; 1411:5; 1499:11
code [1] - 1411:4
collar [1] - 1421:18
collected [1] -

1510:24
collection [1] - 1507:2
College [2] - 1550:20; 1554:4
COLUMBIA [1] - 1401:1
Columbia [3] - 1409:1, 5; 1512:2
Columbus [4] - 1465:5, 16; 1466:1; 1467:16
column [1] - 1511:19
Combat [9] - 1425:8, 23; 1426:4, 6, 15, 24; 1427:2, 5; 1479:2
Comfort [20] - 1471:22; 1536:11, 13, 16, 20, 24; 1537:1; 1543:12, 15; 1544:9, 21; 1545:11, 17; 1546:2, 17-18; 1547:9, 12, 14; 1548:4
coming [9] - 1404:20; 1511:1; 1525:18; 1530:24; 1541:8; 1549:5, 7, 9; 1560:4
commander [2] - 1558:17; 1559:3
comment [3] - 1439:11, 17; 1448:20
commentary [2] - 1445:17; 1448:21
committed [4] - 1428:21; 1495:1, 11, 20

common [2] - 1407:17; 1500:20
communicate [1] - 1520:3
communicated [3] - 1533:7, 25; 1534:13
communicating [1] - 1516:15
communication [4] - 1502:15; 1504:23; 1507:16; 1542:23
communications [4] - 1487:24; 1501:25; 1542:20; 1543:2
communist [2] - 1558:10, 15
communists [1] - 1517:22
companies [2] - 1500:11; 1501:22
company [3] - 1501:17, 22
compare [1] - 1571:20
compared [1] - 1416:10
comparing [2] - 1505:19; 1534:2
competing [1] - 1562:22
compilation [4] - 1436:19; 1441:1; 1449:16; 1512:25
compilations [1] - 1565:20
complete [3] - 1539:8; 1540:10; 1564:6
completeness [1] - 1490:4

completes [1] - 1539:3
completing [1] - 1538:12
comply [1] - 1410:11
component [2] - 1566:3, 10
components [1] - 1540:4
composite [1] - 1479:18
compound [1] - 1472:25
comprehensively [1] - 1510:22
compromised [1] - 1569:6
Computer [1] - 1492:12
conceal [1] - 1413:9
concept [1] - 1407:4
concerning [1] - 1570:24
concerns [2] - 1503:12; 1564:10
concert [1] - 1467:21
conclude [2] - 1561:14; 1564:23
concluded [2] - 1503:15; 1541:25
conclusion [4] - 1427:19; 1438:1; 1467:23; 1499:14
conditions [2] - 1406:7; 1561:16
conduct [5] - 1486:4; 1495:14, 23; 1496:1, 11

confer [1] -
1539:17
conference [1] -
1452:4
confession [1] -
1496:2
confidently [3] -
1434:24;
1435:11
confirm [4] -
1420:23;
1458:24;
1508:16;
1545:15
confirmed [3] -
1508:12;
1545:17
confronting [1] -
1470:19
Congress [7] -
1546:20, 22;
1550:17;
1551:4; 1569:2;
1571:9
Congressman [5]
- 1567:20, 22;
1568:6, 14
connect [1] -
1543:4
connection [6] -
1424:8, 11, 13,
15; 1428:23;
1552:20
Connie [2] -
1464:5, 7
Connor [1] -
1402:10
consider [5] -
1420:17, 19-20;
1491:20;
1498:11
considerations [1]
- 1554:23
consistent [4] -
1488:13, 15;
1490:15; 1493:4
conspiracy [2] -
1568:5; 1572:6

Constitution [2] -
1423:16; 1496:6
constructed [1] -
1513:4
contact [5] -
1472:22;
1473:8; 1504:5;
1521:17
contained [1] -
1567:7
contains [2] -
1409:13;
1568:13
contents [1] -
1567:3
context [13] -
1410:23;
1452:12;
1466:23;
1488:5, 24;
1490:3;
1537:21;
1538:24;
1539:21;
1541:11, 13;
1553:8; 1567:17
continental [1] -
1501:20
contingency [1] -
1478:20
continue [7] -
1407:3, 12;
1446:21;
1447:5;
1559:14;
1562:7; 1567:15
CONTINUED [1]
- 1402:1
continues [2] -
1491:14;
1526:14
continuing [1] -
1559:20
continuous [1] -
1493:2
contrast [1] -
1489:14
conversation [5] -

1404:21;
1551:19;
1568:17, 21
conversion [4] -
1442:10, 13;
1545:19
convert [2] -
1444:18;
1461:18
converted [1] -
1483:2
cooperated [1] -
1502:7
cooperation [1] -
1503:11
coordinated [1] -
1504:2
coordination [1] -
1429:11
copied [2] -
1551:22
corner [4] -
1414:12;
1415:3; 1437:1;
1441:10
Corner [1] -
1408:12
corporate [1] -
1408:13
correct [332] -
1404:18;
1405:11, 19;
1407:22, 25;
1412:8, 22;
1413:6, 24;
1414:14, 19-20;
1415:5, 8, 19,
25; 1416:19, 24;
1417:1, 12, 20;
1418:4, 8, 10;
1420:2, 9;
1421:1, 10, 20,
22; 1422:3, 13,
18; 1423:3, 6,
9-10; 1424:2, 7,
9-10, 12, 20;
1425:12, 19-20;
1427:14, 17;

1428:5, 8-9, 13;
1429:18, 21, 24;
1430:19;
1431:2, 6, 9, 16,
25; 1432:2, 11,
14-15; 1433:8,
18, 23-24;
1434:4, 14, 23;
1435:14, 16,
19-20; 1436:4;
1437:5, 8-9, 11,
13, 16, 18-19;
1438:6, 11, 15,
17, 22-23;
1439:11, 16, 19,
21; 1440:7, 10,
14, 17; 1441:8,
14, 18, 20-21;
1442:8, 18, 21,
23; 1443:6, 8-9,
13, 15; 1444:14,
17, 25; 1445:3,
7, 10, 12-13, 18,
25; 1447:8, 13,
21-22; 1448:6,
9, 18, 22-23;
1449:4, 8-9, 14,
16-17, 25;
1450:20;
1451:4, 6, 8,
11-12; 1452:7,
9, 16-17, 21;
1453:6, 17;
1454:1, 3,
14-15, 20;
1455:16, 20-21;
1456:11, 16, 18,
24; 1457:16;
1458:23;
1459:24;
1460:19;
1461:9, 14, 20,
23; 1462:22;
1463:8, 12-14;
1464:10;
1465:5, 9, 13,
19; 1467:17;
1468:18;

1469:12, 23;
1470:3, 8, 11,
16, 19; 1471:8,
20, 25; 1472:5,
8, 11, 19;
1473:5, 8, 14,
22; 1474:5, 8,
19; 1475:6, 18,
22, 25; 1476:4;
1477:9;
1479:15;
1480:18, 22-24;
1481:8;
1483:18;
1484:7, 10, 20;
1485:25;
1491:12;
1493:5;
1494:20;
1496:10;
1497:8; 1498:4,
7; 1500:12;
1504:12;
1505:24;
1506:1, 19, 22;
1507:1, 24;
1508:10;
1509:5, 9, 21;
1510:1, 4, 9;
1511:15, 25;
1512:9, 20;
1515:23;
1517:25;
1518:15;
1520:18;
1521:24;
1523:4;
1524:24;
1527:20;
1528:2, 25;
1529:1, 9;
1530:8, 25;
1531:4, 10, 13;
1532:3, 10, 20;
1533:11, 13;
1534:1, 22,
24-25; 1535:8,
13, 16, 24;

1536:9, 23;
1537:11;
1542:5, 11,
13-15; 1543:10,
13, 16, 18, 24;
1544:4;
1545:11, 14, 19;
1546:22, 24;
1548:11;
1549:1, 21, 24;
1550:2, 8, 11,
25; 1551:4, 17;
1552:4, 16;
1553:20;
1555:8, 10;
1556:7;
1557:19, 23;
1558:21;
1560:10;
1562:24;
1568:15; 1573:7
correlate [1] -
1511:8
correspondence
[1] - 1429:7
counsel [4] -
1408:15;
1502:24;
1538:10;
1567:10
count [2] -
1426:18;
1485:14
coup [2] -
1555:16; 1556:4
couple [7] -
1433:11;
1475:14;
1482:23;
1487:11;
1500:3;
1540:11;
1541:12
course [6] -
1418:24;
1482:3;
1542:24;
1556:24;

1562:11;
1571:10
Court [12] -
1404:1;
1486:11, 20;
1502:24;
1527:18;
1528:14;
1536:12, 21;
1538:10;
1562:12; 1565:7
COURT [111] -
1401:1; 1404:5,
17, 19; 1405:8,
17, 20, 22;
1406:5, 16, 21;
1407:11, 20, 23;
1408:1, 4, 8, 15,
19, 24; 1410:21;
1411:3, 13, 17;
1427:20;
1438:2; 1439:6;
1446:12;
1460:23;
1462:3;
1467:24;
1473:2; 1481:9;
1482:6, 10;
1483:14;
1484:1, 23;
1485:8, 23;
1486:16, 25;
1487:7, 19;
1488:8; 1489:3,
16, 20, 24;
1490:1, 21, 23;
1494:4;
1499:16;
1502:11, 21, 25;
1503:9;
1505:11;
1526:3;
1528:10;
1530:14;
1537:17, 22;
1538:1, 8, 21;
1539:14, 25;
1540:20;

1541:3, 20, 24;
1545:1; 1549:5,
8, 10, 12;
1554:25;
1559:6, 10;
1561:10, 20;
1562:11, 14;
1563:10, 14, 17,
22; 1564:4, 11,
16, 20; 1565:6,
9, 23; 1566:14,
24; 1567:6, 10;
1568:11;
1569:15;
1570:2, 20;
1571:4, 16, 20;
1572:10, 15, 20,
25
court [3] - 1409:2;
1508:11; 1573:2
courtroom [7] -
1404:16;
1408:23;
1411:16;
1485:2, 9;
1490:20;
1561:19
cover [1] - 1509:2
coverage [1] -
1457:2
covered [1] -
1456:24
covers [2] -
1499:11, 17
COVID [1] -
1406:14
CR [1] - 1401:4
Cramer [1] -
1562:3
create [2] -
1416:2; 1500:23
created [11] -
1416:4, 8;
1441:22, 25;
1442:12;
1480:11;
1493:22;
1497:1, 5;

1542:4
credit [2] -
1407:6; 1500:15
crew [1] - 1548:3
crime [6] -
1495:1, 18;
1499:12;
1572:2, 4, 6
crimes [2] -
1421:18;
1428:21
criminal [1] -
1410:5
crooked [1] -
1517:23
cross [16] -
1411:21;
1485:4;
1488:14;
1538:19;
1539:10;
1540:12;
1559:7; 1563:6,
11; 1564:6, 24;
1565:8;
1566:20;
1571:2, 5
CROSS [8] -
1403:5-8;
1411:24;
1462:5; 1491:1;
1526:5
cross-
examination [6] -
1411:21;
1488:14;
1559:7;
1563:11;
1564:6, 24
CROSS-
EXAMINATION
[8] - 1403:5-8;
1411:24;
1462:5; 1491:1;
1526:5
crosses [1] -
1485:5
crowd [4] -

1469:16;
1470:14; 1524:9
Crowl [2] -
1464:19
CRR [1] -
1573:11
Cummings [2] -
1433:14, 17
cumulative [1] -
1540:22
current [1] -
1531:20
customer [1] -
1413:13
cut [1] - 1446:16
cyclist [1] -
1455:8

D

D.C [49] - 1401:4,
17; 1402:19;
1404:8, 25;
1405:1, 4;
1407:15, 18;
1408:13;
1409:10, 13;
1411:4, 7-8,
14-15; 1418:10;
1424:6, 25;
1433:22;
1434:20;
1435:7, 23;
1437:24;
1438:8-10, 21;
1440:22;
1454:5;
1477:14;
1478:4, 19-20;
1485:15;
1487:14, 25;
1488:11;
1519:3;
1530:24;
1531:2;
1535:10;
1536:19;
1565:16;
1571:14

Dan [2] - 1514:15, 18
danger [1] - 1568:2
dangerous [2] - 1491:17; 1495:1
data [3] - 1493:3, 6; 1501:19
DATE [1] - 1573:11
date [18] - 1413:21; 1418:22; 1419:3, 6; 1437:19; 1441:11; 1442:25; 1483:1; 1492:8; 1497:24; 1498:5, 8; 1500:24; 1505:22; 1510:21; 1517:24; 1527:10; 1531:25
dated [2] - 1450:16; 1555:10
dates [5] - 1418:13; 1419:9; 1443:22; 1499:2; 1553:24
David [8] - 1402:10; 1472:18, 22; 1482:16, 24; 1483:12; 1484:9, 18
David's [1] - 1483:23
days [5] - 1410:3, 6; 1493:17; 1517:16; 1518:1
DC [19] - 1416:25; 1417:11;

1418:12; 1479:21; 1480:8; 1488:22; 1515:18; 1519:14; 1526:20, 22; 1528:2; 1531:12; 1532:3, 18, 24; 1534:22; 1549:24
dead [1] - 1457:1
death [1] - 1571:7
debate [5] - 1448:6, 9, 16, 22; 1556:12
December [25] - 1401:5; 1406:1; 1413:14, 21; 1418:6, 16; 1419:11; 1438:21; 1483:6; 1484:16; 1487:16; 1489:8, 18-19; 1506:21; 1516:18; 1519:5; 1530:22; 1535:14; 1555:10; 1569:17; 1570:15; 1573:10
decide [4] - 1410:17; 1453:19; 1486:13; 1572:17
decided [1] - 1407:7
decision [2] - 1416:20; 1433:6
decision-making [1] - 1433:6
deck [3] -

1541:14, 22; 1564:22
defeat [4] - 1555:16; 1556:3; 1559:17; 1560:5
defendant [6] - 1410:4, 7, 9; 1421:23; 1486:23; 1510:14
Defendant [4] - 1402:2, 6, 9, 17
defendants [6] - 1475:12; 1499:7; 1508:18; 1526:24; 1527:2; 1534:9
Defendants [1] - 1401:7
defendants' [1] - 1534:5
Defense [1] - 1537:14
defense [7] - 1486:17, 22; 1562:6, 17; 1565:22; 1569:10
defer [1] - 1486:4
define [2] - 1409:6, 9
definition [1] - 1409:14
degree [1] - 1488:10
delaying [1] - 1554:24
demonic [2] - 1517:21
departure [1] - 1409:20
describe [1] - 1406:6
described [3] - 1489:21; 1490:2; 1513:23

designated [1] - 1481:5
designation [1] - 1507:15
despite [1] - 1454:2
destroying [1] - 1471:10
detail [10] - 1404:13; 1406:12; 1506:13; 1515:8; 1520:17; 1522:4, 7; 1540:4
details [2] - 1521:20; 1522:3
detection [2] - 1498:16; 1499:6
detectors [1] - 1504:17
determination [1] - 1562:23
determine [4] - 1486:20; 1487:3; 1495:5; 1498:9
developed [1] - 1500:8
device [2] - 1473:10; 1496:1
difference [2] - 1569:25; 1571:18
different [19] - 1410:22; 1444:17; 1486:19, 25; 1488:11; 1489:6, 22; 1490:12; 1496:9; 1499:4, 8; 1508:9; 1510:13; 1515:18, 21; 1517:11; 1538:24; 1554:7

difficult [2] - 1494:7; 1498:20
difficulty [1] - 1503:10
dig [1] - 1562:13
digital [1] - 1534:6
diligence [1] - 1410:8
dire [2] - 1410:2, 6
direct [32] - 1413:1, 8, 12; 1415:16; 1454:6; 1456:24; 1489:17, 19; 1490:16; 1491:7; 1498:18; 1517:20; 1518:21; 1522:15; 1526:13; 1527:4, 6, 12; 1537:4, 11; 1538:17, 20; 1539:4, 20; 1540:10; 1541:4; 1547:15; 1552:6; 1555:7; 1558:19; 1568:6
directed [1] - 1562:1
directly [5] - 1461:7; 1468:9; 1469:11, 14; 1487:11
disabled [1] - 1430:23
disagree [1] - 1562:17
disagreement [1] - 1568:19
disappointed [1] - 1504:9
disappointment

11

[1] - 1507:10
discovered [2] -
1410:7
discuss [4] -
1440:16;
1498:19;
1534:20;
1561:21
discussed [4] -
1419:8; 1475:5;
1537:15;
1553:23
discussing [5] -
1418:12;
1487:13; 1572:3
discussion [4] -
1483:10;
1502:23;
1538:9; 1570:16
discussions [2] -
1483:20;
1542:25
disdain [1] -
1568:5
dismiss [1] -
1410:9
disperse [1] -
1465:8
dispute [2] -
1425:25; 1426:5
disqualification
[1] - 1410:3
disqualified [1] -
1409:5
DISTRICT [3] -
1401:1, 10
district [9] -
1405:10;
1407:16, 18, 21;
1408:2, 9-10;
1409:12;
1410:20
District [3] -
1409:1, 4;
1512:2
division [3] -
1435:1;
1495:13; 1496:3

DM-001 [1] -
1482:13
DM-1 [1] -
1483:14
docket [1] -
1509:18
document [4] -
1412:25;
1509:7, 20, 24
documents [9] -
1496:11;
1509:23;
1510:3; 1511:4,
7, 9-10; 1572:16
dog [1] - 1523:15
Dolan [3] -
1463:5, 14;
1468:10
domestic [1] -
1558:16
domiciled [1] -
1409:12
Dominic [1] -
1466:19
Don [1] - 1481:1
done [12] -
1442:10;
1454:7;
1487:17;
1491:24;
1503:20;
1508:20;
1510:18, 22;
1521:1; 1534:4;
1562:3; 1564:5
door [6] -
1459:11, 20;
1465:5;
1467:16; 1503:5
doors [2] -
1465:16; 1466:1
doorway [2] -
1458:10, 12
double [1] -
1425:21
doubt [1] - 1492:7
Doug [2] -
1542:10

Douyon [2] -
1404:7, 21
down [30] -
1413:21;
1414:2; 1415:2;
1417:22;
1421:3;
1422:10;
1426:3; 1432:5,
16; 1436:15;
1445:21;
1450:11;
1451:18;
1460:9;
1478:12;
1482:23;
1485:9;
1492:21;
1503:3, 18;
1513:11;
1518:17;
1519:2;
1520:23;
1528:17;
1551:10;
1552:9;
1561:20; 1563:5
download [3] -
1493:3;
1496:22; 1515:2
downloaded [1] -
1492:9
downtown [1] -
1521:15
dozen [2] -
1540:6, 24
dozens [2] -
1493:17;
1500:11
drawing [1] -
1566:14
drew [2] - 1571:6,
12
driver's [1] -
1408:2
dropped [1] -
1537:1
drove [1] -

1474:18
due [1] - 1410:8
dull [1] - 1404:6
duly [2] -
1558:11; 1561:9
dumb [1] -
1572:21
duration [1] -
1409:20
during [16] -
1404:6, 22;
1418:24;
1434:18;
1439:13;
1455:25;
1485:4;
1495:23;
1498:18;
1511:12;
1512:13;
1514:25;
1516:14;
1518:8; 1527:4;
1544:4

E

e-mail [5] -
1429:7; 1477:2,
7; 1485:12;
1501:25
e-mails [1] -
1502:4
early [6] -
1421:13;
1438:5;
1491:18, 22;
1536:14; 1547:2
Eastern [2] -
1442:5, 16
eastern [2] -
1461:18; 1483:3
EC [7] - 1507:20,
23; 1508:24;
1509:2, 19;
1511:5
Ed [3] - 1528:13;
1532:3; 1542:15
education [1] -

1525:9
Edward [1] -
1402:17
Edwards [2] -
1401:15;
1487:19
EDWARDS [13] -
1408:17;
1411:2; 1485:3,
11, 25; 1486:24;
1487:2; 1562:9,
12; 1563:1, 12,
16; 1566:23
effect [1] - 1526:1
efforts [1] -
1424:16
either [16] -
1408:16;
1409:9;
1423:13;
1429:8; 1436:6;
1472:16;
1478:19;
1479:7; 1482:4;
1512:23;
1516:11;
1523:21;
1545:22;
1555:15;
1556:3; 1566:20
either/or [1] -
1556:1
Elect [1] - 1561:6
elect [1] - 1561:8
elected [2] -
1558:11; 1561:9
Election [1] -
1437:21
election [23] -
1409:13;
1425:15, 18;
1436:10;
1440:17;
1443:8, 11;
1447:13;
1502:9; 1506:9,
14; 1507:10;
1517:16;

1552:16;
1553:15, 19, 25;
1554:8, 11;
1571:12
Electoral [2] -
1550:20; 1554:4
electoral [2] -
1552:20, 22
electronic [3] -
1507:16;
1509:3, 6
electronics [1] -
1561:25
elements [1] -
1561:16
elevator [2] -
1545:13, 16
elicited [1] -
1465:18
Ellipse [6] -
1433:25;
1434:4, 22;
1435:10, 25;
1504:15
embedded [1] -
1551:16
emergency [2] -
1451:15;
1525:10
employees [1] -
1456:1
employers [1] -
1455:25
EMS [1] -
1478:17
enabled [1] -
1430:23
encouraging [2] -
1470:22; 1568:9
encrypted [2] -
1498:21; 1533:6
end [6] - 1412:12;
1426:8;
1448:18;
1450:12;
1491:7; 1522:1
ended [2] -
1503:2; 1571:10

enemy [1] -
1558:16
enforcement [19]
- 1423:8, 13-14;
1470:19, 22;
1498:16, 20;
1499:1, 6;
1501:10;
1502:8, 15;
1503:22;
1504:2, 23;
1507:25;
1525:2, 5;
1557:9
enhance [1] -
1459:14
enter [1] -
1465:11
entered [4] -
1466:12;
1513:9;
1523:11; 1546:9
entering [3] -
1522:19;
1524:24;
1545:12
enters [4] -
1404:16;
1411:16;
1467:16;
1490:20
entire [6] -
1446:6, 11;
1447:10;
1457:10;
1500:8; 1541:14
entirety [3] -
1421:24;
1447:8; 1566:17
entitled [1] -
1573:8
equity [1] -
1407:6
ER [1] - 1525:12
escorted [1] -
1470:10
essential [2] -
1539:13, 15

essentially [2] -
1410:2; 1523:11
establish [1] -
1488:20
established [4] -
1478:21;
1509:3; 1525:7;
1556:10
establishing [2] -
1437:23;
1487:14
et [1] - 1406:15
ET [1] - 1401:6
EV-1000.7.TR [1]
- 1549:3
EV-103 [4] -
1527:22;
1528:5, 10;
1531:23
EV-104 [1] -
1547:17
EV-250 [3] -
1544:14, 23;
1545:2
EV-301.B [1] -
1528:18
evade [3] -
1498:16;
1499:5; 1522:14
event [11] -
1438:21;
1478:25;
1503:24;
1506:4; 1507:7;
1518:5, 8;
1543:3; 1547:2;
1550:25;
1554:18
events [18] -
1408:14;
1438:7, 10;
1502:16;
1503:22;
1504:5;
1506:11, 13, 24;
1507:4;
1521:11;
1525:18;

1535:9, 21, 25;
1544:2; 1551:2;
1566:17
evidence [27] -
1420:20;
1428:21;
1431:1;
1442:11;
1472:25;
1473:4, 7, 24;
1474:2;
1475:20;
1491:15;
1494:5, 25;
1495:24;
1510:23;
1511:3;
1514:23;
1515:6;
1526:17;
1531:8;
1532:12;
1533:4; 1546:6,
8; 1557:12;
1562:18, 25
exact [3] -
1492:8;
1505:22; 1552:1
exactly [7] -
1418:20;
1513:19;
1522:7, 11;
1558:13;
1563:2; 1569:24
EXAMINATION
[8] - 1403:5-8;
1411:24;
1462:5; 1491:1;
1526:5
examination [22]
- 1410:6;
1411:21;
1413:1, 8;
1415:16;
1482:11;
1487:8, 10;
1488:14;
1490:16;

1491:7;
1498:18;
1517:20;
1539:5; 1540:9;
1559:7;
1562:20;
1563:11, 23;
1564:6, 24
example [8] -
1405:9;
1423:20;
1455:19;
1488:18, 20, 22;
1495:22;
1500:17
Excel [4] -
1444:7, 10, 17
except [1] -
1512:24
exchanged [2] -
1474:4; 1530:20
excuse [1] -
1546:13
executive [2] -
1557:18, 25
exercise [1] -
1410:8
exhausted [1] -
1561:10
Exhibit [25] -
1412:20;
1414:5;
1415:22;
1432:19;
1436:20;
1441:2;
1447:19;
1457:7;
1465:15;
1475:3;
1482:17;
1526:9; 1527:8,
22; 1528:18;
1530:11;
1537:8, 14;
1542:1;
1544:14;
1550:4; 1555:2;

1566:16; 1567:8
exhibit [30] -
  1414:12;
  1415:25;
  1416:2, 4, 9-10,
  12, 21; 1432:22;
  1433:2, 12;
  1439:8; 1440:4;
  1444:21;
  1449:11, 16;
  1462:18;
  1473:11;
  1475:14;
  1476:3;
  1479:18;
  1486:6;
  1489:12;
  1531:19;
  1544:18;
  1547:17;
  1551:6;
  1566:21;
  1568:19
exhibits [12] -
  1426:15, 20;
  1485:3, 13;
  1517:14;
  1527:3;
  1537:20;
  1562:1, 4;
  1565:15; 1567:3
existing [1] -
  1498:2
exiting [1] -
  1460:18
exits [3] -
  1408:23;
  1485:2; 1561:19
expect [1] -
  1563:5
expected [4] -
  1504:11, 19;
  1507:7; 1564:13
experience [14] -
  1410:19;
  1421:14, 17;
  1423:6, 9;
  1430:17;

1463:8, 11, 18,
  20; 1464:24;
  1500:18;
  1525:10
experienced [1] -
  1431:21
explain [1] -
  1434:25
explained [1] -
  1439:13
exploit [1] -
  1500:14
exploited [1] -
  1492:9
expressly [1] -
  1489:15
extensive [2] -
  1493:1; 1500:17
extent [5] -
  1427:21;
  1503:19;
  1504:11;
  1534:6; 1566:20
extracted [2] -
  1441:17; 1442:4
extraction [8] -
  1442:7, 18;
  1444:5, 7, 9, 11,
  13, 16
extractions [1] -
  1482:22
Eye [1] - 1402:18
eye [1] - 1566:12

F

face [1] - 1460:6
Facebook [9] -
  1439:11, 20, 23;
  1440:1;
  1465:21;
  1475:15, 18, 21,
  23
facility [2] -
  1427:9; 1428:7
fact [19] -
  1422:19;
  1425:4;
  1426:13;

1429:7;
1438:10;
1455:25;
1466:9;
1470:21;
1484:18;
1493:21;
1496:5; 1502:7;
1504:15;
1514:6, 11;
1516:13;
1522:9;
1525:12; 1541:8
facts [4] -
  1404:15;
  1410:24;
  1472:24;
  1493:25
factual [1] -
  1568:18
factually [1] -
  1568:20
failure [1] -
  1410:11
fair [19] - 1443:2;
  1453:12;
  1457:6;
  1470:10;
  1471:18;
  1490:25;
  1493:15;
  1505:1; 1507:2,
  6; 1510:15;
  1513:4; 1517:3;
  1518:16;
  1519:14;
  1521:4, 6;
  1523:20; 1568:7
fairness [1] -
  1511:22
Faith [6] -
  1441:15;
  1442:20;
  1443:3, 14;
  1445:9; 1449:24
fake [2] - 1501:3;
  1552:9
fall [2] - 1535:9;

1549:23
falling [1] -
  1524:10
familiar [8] -
  1419:1;
  1433:14;
  1434:8;
  1435:15;
  1455:2;
  1519:19, 21;
  1545:25
family [6] -
  1405:5;
  1406:11;
  1407:5;
  1419:20, 23;
  1420:19
family's [3] -
  1405:4, 9;
  1406:22
far [12] - 1409:7;
  1422:23;
  1428:15;
  1429:12, 24;
  1441:19;
  1443:22;
  1494:9; 1503:7;
  1516:24;
  1550:23
fast [1] - 1431:14
fast-forward [1] -
  1431:14
Fayetteville [1] -
  1535:23
FBI [17] - 1421:8,
  15, 17; 1422:9;
  1435:1; 1454:3,
  11; 1491:21;
  1494:21, 25;
  1495:9;
  1496:16;
  1499:1, 21;
  1526:14;
  1533:13; 1534:6
FBI's [3] -
  1453:25;
  1495:7; 1509:4
fear [1] - 1503:2

feature [3] -
  1452:9, 12
Federal [1] -
  1409:25
federal [9] -
  1409:7;
  1495:11, 18;
  1499:12;
  1502:8, 15;
  1503:23;
  1571:13
federally [1] -
  1495:18
federally-insured
  [1] - 1495:18
felony [2] -
  1495:11, 20
Ferguson [1] -
  1424:11
few [8] - 1405:12,
  16; 1408:6;
  1417:3; 1485:5,
  14; 1511:22;
  1519:11
fictitious [2] -
  1500:21, 23
field [3] - 1444:9;
  1492:18
fight [2] -
  1558:17;
  1559:17
figure [4] -
  1404:15;
  1411:1; 1501:8;
  1553:7
file [14] -
  1507:17;
  1509:3, 7, 24;
  1510:8, 17-18,
  23; 1511:3, 12;
  1514:4; 1521:1;
  1525:2
filing [1] - 1509:4
fill [1] - 1559:10
filtered [1] -
  1430:14
final [1] - 1563:7
finally [1] -

1494:23
finance [1] - 1407:6
financial [1] - 1421:18
fine [5] - 1488:25; 1490:7; 1540:11; 1541:20; 1564:21
finish [3] - 1482:10; 1489:24; 1563:10
fire [1] - 1478:17
firearm [1] - 1431:9
firearms [5] - 1429:23, 25; 1430:4, 21; 1431:3
fired [3] - 1430:16; 1431:4, 23
firing [1] - 1432:6
firm [1] - 1561:24
first [29] - 1406:9; 1410:22; 1416:25; 1438:13; 1441:7; 1444:12, 20; 1452:1; 1466:14, 21; 1467:15; 1478:8, 13, 15; 1479:21; 1483:5; 1486:20; 1492:2; 1524:23; 1528:5; 1534:22; 1538:4; 1547:18; 1557:1; 1558:5; 1564:2, 22-23; 1570:18

fist [1] - 1471:15
fist-pumping [1] - 1471:15
five [7] - 1421:9; 1429:15, 21; 1430:9; 1446:8; 1482:9; 1517:16
five-and-a-half [1] - 1421:9
fixed [1] - 1409:18
FL [2] - 1402:11, 15
flag [4] - 1476:19; 1485:7; 1486:14; 1566:13
flags [1] - 1476:24
flip [1] - 1420:10
float [1] - 1486:11
floor [1] - 1406:8
Florida [23] - 1422:5, 7, 13; 1433:20, 22; 1434:14, 19-20, 25; 1435:18, 22; 1454:5; 1507:13; 1512:18; 1514:15, 20; 1515:4, 6; 1518:11; 1532:24; 1543:10; 1567:20
flow [1] - 1507:25
Flynn [1] - 1520:16
focus [6] - 1414:11; 1455:1; 1458:9; 1523:25; 1527:1; 1547:15
focused [3] - 1527:3; 1539:21; 1546:12

focusing [1] - 1523:24
folks [2] - 1412:8; 1429:8
follow [2] - 1404:20; 1569:24
followed [1] - 1454:8
following [12] - 1404:7; 1410:15; 1462:9; 1502:23; 1506:9, 14; 1507:9; 1538:9; 1551:19; 1553:15, 24
followup [1] - 1513:23
footage [2] - 1456:7, 9
footwork [1] - 1431:21
FOR [1] - 1401:1
force [4] - 1424:22; 1505:16; 1548:3, 10
Force [1] - 1542:5
foreclose [1] - 1488:17
foreclosed [1] - 1490:17
foregoing [1] - 1573:7
foreign [1] - 1501:14
foreign-based [1] - 1501:14
forensic [1] - 1442:17
forensically [1] - 1444:13
foreseeable [1] - 1407:13
forget [1] - 1565:13

form [1] - 1506:14
format [1] - 1482:20
formats [1] - 1444:17
former [3] - 1418:15; 1434:22; 1435:25
Fort [1] - 1402:11
forth [1] - 1488:19
forward [13] - 1431:14; 1448:24; 1458:25; 1459:25; 1468:4; 1469:7, 17; 1511:6; 1524:16; 1537:9; 1546:11; 1554:15; 1555:4
foundation [1] - 1530:16
four [6] - 1494:1; 1520:7; 1521:13, 25; 1526:23; 1527:1
fourth [2] - 1448:12; 1478:12
Fox [2] - 1446:24; 1447:4
fraction [1] - 1449:7
frame [2] - 1470:13; 1571:21
framework [2] - 1540:2; 1541:5
frankly [1] - 1572:8
fraud [5] - 1421:18; 1440:17; 1500:15, 18, 20

free [2] - 1484:13; 1562:20
friend [1] - 1439:20
Friends [2] - 1446:25; 1482:3
friends [3] - 1439:22, 25; 1440:2
front [8] - 1450:9; 1461:4; 1468:7; 1469:11; 1495:7; 1497:7; 1527:13; 1538:13
frustrating [1] - 1498:25
full [8] - 1406:4, 6, 14; 1407:3; 1537:17; 1568:19, 25; 1572:11
fully [5] - 1430:2, 19, 21-22; 1431:8
future [3] - 1406:25; 1407:13; 1488:9

---

**G**

GA [1] - 1417:6
gaiter [1] - 1460:6
game [1] - 1436:11
gather [1] - 1404:14
Gator [1] - 1542:13
gators [1] - 1483:8
gear [1] - 1504:16
General [1] - 1520:16
general [7] - 1417:6; 1472:12; 1488:5;

1496:16;
1506:7;
1542:23;
1551:16
generally [3] -
1423:18;
1452:1; 1546:1
generations [1] -
1405:5
gentleman [2] -
1466:21; 1469:2
gentlemen [1] -
1561:12
Georgia [1] -
1512:23
girlfriend [5] -
1404:10;
1405:2, 15;
1406:19;
1407:12
given [1] - 1540:8
glasses [1] -
1458:19
Gmail [1] -
1502:4
Google [1] -
1502:4
Gorda [2] -
1402:15;
1482:24
GoToMeeting [9]
- 1440:14;
1452:8; 1453:3;
1476:7, 11;
1486:9;
1548:25;
1549:18, 21
GoToMeetings
[7] - 1451:25;
1452:1, 15;
1476:3;
1514:25;
1549:23; 1550:1
government [30] -
1408:17;
1412:10;
1441:23;
1442:12;

1444:21;
1467:9; 1477:3;
1481:7; 1485:3,
21; 1486:22;
1488:3, 24;
1489:8;
1503:12;
1527:3;
1538:16, 22;
1539:22;
1540:13;
1541:9; 1542:4;
1552:6;
1556:10;
1557:13, 15, 18,
25; 1558:19;
1565:8
Government [10]
- 1401:14;
1412:20;
1414:5;
1415:22;
1432:19;
1436:19;
1447:18;
1457:7; 1475:2;
1550:5
government's
[11] - 1472:7;
1487:10;
1537:20;
1539:4, 20;
1540:2, 9;
1541:17;
1546:6;
1566:11; 1567:3
Government's [1]
- 1417:25
grabbed [1] -
1460:1
grabs [1] -
1459:23
graduated [2] -
1405:12, 25
graduation [1] -
1405:24
grand [6] -
1509:19, 22;

1557:11, 16, 21
grasping [1] -
1459:10
gray [1] - 1460:5
Graydon [4] -
1464:16;
1469:4, 14
great [1] -
1561:17
greater [3] -
1540:4; 1541:7,
13
green [1] -
1431:16
Gregory [1] -
1573:10
GREGORY [1] -
1573:11
Grods [2] -
1524:21
ground [4] -
1514:15, 21;
1515:4, 6
grounds [5] -
1410:8, 10;
1434:4;
1435:10; 1436:4
group [33] -
1414:24;
1417:1, 7, 12,
17-19; 1423:12;
1430:14;
1433:22;
1436:3; 1437:7;
1441:7;
1447:11, 15;
1448:8; 1449:5;
1472:15;
1473:11;
1483:17;
1487:18;
1490:7; 1499:9;
1517:10;
1520:23;
1521:12, 16;
1522:10, 17;
1532:13;
1553:14;

1557:15;
1567:19
groups [4] -
1416:13;
1473:18;
1518:7; 1530:20
guess [5] -
1407:5; 1462:9;
1482:23;
1539:9; 1563:22
guilt [1] - 1494:1
gun [3] - 1430:16;
1492:23;
1495:17
gun-toting [1] -
1492:23
guns [1] -
1492:14
guys [1] -
1473:18

**H**

habitation [1] -
1409:18
Hackett [37] -
1402:6; 1413:5,
13; 1417:1, 6;
1418:4;
1422:13, 25;
1423:5;
1429:16;
1430:10, 13;
1431:16;
1437:17;
1438:24;
1439:20;
1440:1; 1441:1;
1442:22;
1443:21;
1445:9, 17;
1447:10;
1448:15;
1449:23;
1455:8;
1458:23;
1459:4, 17;
1460:5; 1461:4,
11, 22; 1463:24;

1470:2
Hackett's [10] -
1417:19;
1420:5;
1430:16;
1439:24;
1445:2;
1451:10;
1454:20;
1455:1;
1459:10; 1469:5
hacking [1] -
1455:19
haha [1] - 1483:8
half [9] - 1421:9,
14; 1458:4;
1519:4;
1540:24;
1561:13;
1563:25; 1564:7
HALIM [86] -
1411:10, 15, 23,
25; 1412:19, 23;
1414:2, 9;
1415:21, 24;
1417:22;
1418:1, 3;
1421:3, 5;
1427:24;
1431:12, 15, 19;
1432:16, 20-21;
1436:15, 17, 21,
23; 1438:4;
1439:7, 10;
1441:3, 5;
1443:24;
1444:1;
1445:21, 23;
1446:10, 14, 21,
23; 1447:5, 7,
18, 20; 1448:11,
14, 24; 1449:1,
18, 20; 1450:2,
8, 11, 13, 25;
1451:18;
1454:24;
1457:9, 11, 25;
1458:2, 6, 8,

15-16; 1459:6, 9, 13, 16, 18-19; 1460:4, 9-10, 20, 24; 1461:1, 25; 1468:22; 1565:7, 12; 1566:9
Halim [6] - 1402:6; 1411:22; 1412:3; 1462:3, 10; 1465:18
HALIM................ [1] - 1403:5
hand [8] - 1412:8; 1414:12; 1415:2; 1437:1; 1460:2; 1469:5; 1520:23; 1524:7
handful [1] - 1538:25
handle [1] - 1562:13
handled [1] - 1430:3
hands [1] - 1459:10
hang [2] - 1565:11; 1567:10
hangout [1] - 1480:22
Hangout [10] - 1414:24; 1415:7; 1441:7; 1447:15, 25; 1479:16; 1480:19; 1482:17; 1567:20; 1569:20
happy [2] - 1490:22; 1562:5
hard [1] - 1508:19
harm [2] - 1501:8; 1571:9
Harrelson [8] - 1463:5, 11;

1489:15; 1507:13; 1514:15, 17, 20, 23
Harrelson's [1] - 1514:18
HARRIS [5] - 1403:4; 1411:24; 1462:5; 1491:1; 1526:5
Harris [22] - 1411:20; 1412:1; 1413:1; 1421:8; 1462:7; 1485:4, 8, 17; 1488:21; 1490:8; 1491:3; 1505:7; 1526:7; 1542:3; 1555:7; 1559:14; 1561:20; 1563:8; 1564:25; 1565:2, 14
Harris's [3] - 1411:21; 1490:8; 1564:3
hat [2] - 1461:8; 1468:13
head [10] - 1418:14; 1420:5; 1436:9; 1458:19; 1463:9; 1495:13; 1496:3; 1514:5; 1531:22; 1534:11
heading [1] - 1477:25
headquarter [1] - 1435:2
headquarters [2] - 1422:9; 1501:16
health [2] - 1500:18, 20
hear [6] -

1430:15; 1435:9; 1454:19, 22; 1519:19; 1569:14
heard [11] - 1430:25; 1431:3, 5; 1434:10, 18; 1435:5; 1476:6; 1515:16; 1569:6; 1572:2
hearing [4] - 1430:18; 1476:20; 1503:3; 1553:9
hearsay [1] - 1502:17
heart [5] - 1420:8, 13, 16; 1499:19; 1525:21
held [2] - 1440:14; 1549:23
helmet [1] - 1461:4
help [9] - 1405:17; 1406:11; 1421:12; 1473:16; 1503:13, 17; 1567:11; 1568:11; 1569:15
HI [1] - 1402:4
hide [2] - 1499:10; 1500:13
high [2] - 1488:10; 1547:7
highlighted [2] - 1531:12; 1532:19
Hilgeman [1] - 1567:4
himself [5] - 1467:19;

1472:19; 1483:17; 1524:11; 1536:24
historical [1] - 1503:21
history [2] - 1509:15; 1510:17
hit [1] - 1432:9
hits [1] - 1431:24
hitting [1] - 1432:7
hold [1] - 1407:7
home [10] - 1405:18; 1406:22; 1407:6, 21; 1408:11; 1409:15-17; 1455:15; 1456:2
honestly [2] - 1518:9; 1522:13
Honor [39] - 1408:18; 1411:2, 23; 1446:10; 1450:4; 1460:21; 1462:1; 1473:1; 1486:7; 1489:25; 1530:10, 17; 1537:13, 16, 19; 1538:7, 14; 1549:7, 14; 1559:9; 1562:9; 1563:19; 1564:19; 1565:1; 1566:23, 25; 1567:2, 7, 14, 17; 1568:1, 15; 1569:14, 21; 1570:13; 1571:6, 25; 1572:24
Honor's [1] -

1485:16
HONORABLE [1] - 1401:9
hoof [1] - 1519:20
hope [7] - 1427:15; 1524:16; 1567:24; 1568:8; 1569:2, 8, 16
hopefully [1] - 1426:3
horses [1] - 1519:20
hospital [1] - 1525:12
hosted [1] - 1501:25
hot [1] - 1572:8
hotel [13] - 1471:23, 25; 1472:3, 5; 1481:17; 1489:13-15; 1538:14; 1541:18, 23; 1546:17
Hotel [6] - 1521:13, 18, 20, 23; 1522:1
hour [5] - 1559:8; 1563:25; 1564:7, 9
hours [2] - 1520:1; 1522:10
House [3] - 1559:16; 1560:4, 10
house [7] - 1405:4, 14; 1406:18; 1407:3, 15; 1408:5
Hughes [1] - 1401:15
HUGHES [3] - 1563:19; 1564:8, 18

hundred [1] -
1493:18
hundreds [8] -
1415:9, 17;
1456:17;
1465:23;
1493:10, 20;
1496:20; 1510:3
hurricane [1] -
1424:15

**I**

I.. [1] - 1514:19
ID'd [1] - 1508:11
identification [4] -
1450:5;
1460:11;
1527:23;
1528:19
identified [1] -
1515:17
identifiers [1] -
1501:1
identifies [1] -
1462:18
identify [2] -
1508:19; 1517:6
identifying [2] -
1511:2; 1513:14
identity [8] -
1413:10;
1499:10, 12, 21,
24; 1500:5, 7, 9
illegal [3] -
1430:21;
1498:12;
1501:24
immediately [2] -
1488:4; 1568:12
import [2] -
1571:23
important [10] -
1419:2, 6;
1489:10;
1494:2, 5;
1498:9;
1507:15;
1526:16;

1546:15; 1553:3
impossible [1] -
1465:25
IN [1] - 1401:1
inaccurate [2] -
1568:21; 1570:3
inaccurately [1] -
1570:4
incendiary [1] -
1494:22
include [3] -
1416:20;
1538:24;
1556:18
including [2] -
1491:11;
1501:10
incoming [1] -
1561:2
incoming-
President [1] -
1561:2
inconsistent [1] -
1494:15
Indian [1] -
1402:7
indicated [1] -
1441:13
indicating [1] -
1525:17
indication [1] -
1533:24
indicative [1] -
1431:8
indicted [4] -
1557:1, 7, 14;
1558:6
indictment [4] -
1410:9; 1496:7;
1558:1; 1560:15
indicts [1] -
1557:9
individual [8] -
1454:11;
1502:3;
1511:24;
1520:22;
1551:15, 19, 25;

1553:11
individuals [7] -
1430:9;
1469:25;
1494:13;
1512:13;
1513:1, 8;
1543:4
industries [1] -
1500:8
inference [1] -
1539:18
inflammatory [1] -
1568:10
info [1] - 1484:7
information [4] -
1411:6; 1473:8;
1498:10;
1566:12
informed [1] -
1404:6
initiative [1] -
1556:17
injured [1] -
1525:19
Inn [20] -
1471:22;
1536:11, 13, 17,
20, 25; 1537:1;
1543:12, 15;
1544:9, 21;
1545:11, 17;
1546:2, 17-18;
1547:9, 13-14;
1548:4
innocence [1] -
1494:1
inquired [1] -
1484:5
inquiring [1] -
1484:3
inside [15] -
1456:5, 7, 15;
1458:19;
1470:15;
1471:4, 10, 13,
16, 18; 1478:19;
1523:21, 23;

1524:8
Instagram [1] -
1475:24
instances [1] -
1502:14
instead [1] -
1442:17
instruct [2] -
1561:21;
1562:21
instructions [3] -
1408:21;
1432:8; 1515:2
insured [1] -
1495:18
insurrection [5] -
1555:13, 17;
1556:5, 9, 12
Insurrection [13] -
1555:13, 15, 23;
1556:3, 13, 18;
1558:25;
1559:15, 25;
1560:3, 15, 24;
1561:1
Intel [2] -
1417:11;
1515:19
intends [1] -
1486:9
intent [5] -
1487:16;
1489:18;
1539:23; 1571:9
intention [6] -
1406:22-24;
1407:9, 11;
1409:19
interaction [1] -
1524:2
interest [1] -
1407:7
Internet [5] -
1455:14, 21;
1492:2; 1500:9;
1501:6
interpret [1] -
1562:7

interpretation [1] -
1572:19
interrupt [1] -
1540:25
interrupted [1] -
1554:12
interview [1] -
1496:2
introduce [5] -
1485:22;
1486:9;
1487:22;
1538:17
introduced [3] -
1511:12;
1538:19; 1541:9
investigate [5] -
1422:21;
1428:4;
1434:11;
1435:4; 1500:3
investigated [6] -
1422:23;
1427:11;
1434:16;
1466:23;
1499:21
investigating [1] -
1421:18
investigation [44]
- 1418:25;
1419:3;
1421:22, 24;
1422:2, 12;
1423:2, 4, 11;
1428:24;
1434:19;
1438:5, 24;
1452:14;
1454:9;
1455:11;
1456:25;
1472:2;
1475:17;
1479:14;
1491:8, 10, 14,
24; 1495:21;
1500:18;

1503:19;
1507:19, 21;
1508:1, 21;
1509:15;
1529:7, 15;
1533:10, 24;
1534:5;
1542:24;
1544:10;
1547:14, 22;
1553:6;
1555:22;
1556:11
investigations [2]
 - 1435:1;
 1495:24
investigative [4] -
 1498:9; 1508:2;
 1514:4; 1525:2
invited [1] -
 1519:23
involve [2] -
 1510:3; 1557:4
involved [8] -
 1503:20;
 1504:1, 7, 11,
 18-20; 1568:14
involvement [1] -
 1503:21
involves [1] -
 1557:25
involving [1] -
 1521:12
IP [2] - 1455:15;
 1495:25
Irish [4] -
 1515:24;
 1519:11, 14;
 1520:10
irrelevant [1] -
 1539:18
Isaacs [3] -
 1464:1;
 1467:16, 19
issue [6] -
 1440:17;
 1562:9; 1563:2,
 4; 1566:25;

1570:6
issues [1] -
 1485:5
it'd [1] - 1419:7
items [1] -
 1508:15
itself [4] - 1420:6;
 1488:12;
 1497:9; 1501:23

J

Jackson [4] -
 1402:11;
 1520:24;
 1521:3, 5
Jackson's [1] -
 1521:1
jail [2] - 1567:25;
 1569:8
James [5] -
 1512:14;
 1521:18;
 1523:3, 10;
 1534:13
Jan [8] - 1416:25;
 1417:11;
 1479:21;
 1480:8;
 1483:11;
 1528:2;
 1531:12;
 1532:18
January [78] -
 1412:12;
 1418:10;
 1424:6, 25;
 1433:23;
 1434:1, 20;
 1435:7, 23;
 1437:24;
 1438:6, 11;
 1439:4;
 1440:19, 23;
 1442:23;
 1454:14;
 1456:5;
 1477:21;
 1480:14;

1481:6, 12-13,
 24; 1483:21;
 1485:16, 18;
 1487:21;
 1488:12, 21;
 1494:18;
 1505:3, 17;
 1506:3, 8, 24;
 1514:22;
 1515:5, 7,
 18-19; 1519:15;
 1526:22;
 1527:11;
 1531:20;
 1532:3, 8-9, 14,
 20; 1533:16;
 1534:1; 1535:3;
 1536:14;
 1537:4; 1540:7;
 1541:23;
 1543:3, 8, 12,
 16; 1544:2, 4;
 1545:9, 11;
 1546:3, 9, 15,
 18; 1547:8;
 1550:19, 24;
 1554:11, 16;
 1566:17;
 1571:10; 1572:7
Jeffrey [2] -
 1401:14; 1434:8
Jericho [8] -
 1438:23;
 1506:20;
 1520:14;
 1535:14, 19;
 1558:13, 20;
 1559:21
Jersey [1] -
 1512:5
Jessica [1] -
 1487:13
JH-12 [2] -
 1443:25; 1450:2
JH-13 [1] -
 1450:5
JH-17 [3] -
 1460:12, 20, 23

job [1] - 1423:1
jobs [1] - 1498:20
Joe [3] - 1443:21;
 1448:3
John [1] - 1562:3
join [1] - 1488:3
joined [3] -
 1479:9; 1483:5;
 1490:6
Joseph [1] -
 1402:6
Josh [1] -
 1521:18
Joshua [1] -
 1534:13
Jr [1] - 1402:2
Judge [4] -
 1483:12;
 1484:21;
 1571:18;
 1572:12
JUDGE [1] -
 1401:10
July [1] - 1406:4
June [1] -
 1407:16
juror [6] - 1404:6,
 16; 1408:23;
 1409:4; 1410:1
Juror [2] -
 1404:17, 19
JUROR [16] -
 1404:18, 24;
 1405:11, 19, 21,
 25; 1406:9, 19;
 1407:1, 14, 22,
 25; 1408:3, 5,
 11, 22
juror's [1] -
 1410:13
jurors [1] -
 1410:20
JURY [1] -
 1401:9
Jury [3] - 1409:8,
 25; 1490:20
jury [25] - 1404:3;
 1408:20;

1409:1, 6-7, 25;
 1411:7, 16;
 1414:5;
 1453:10;
 1460:25;
 1485:2, 6;
 1487:4;
 1509:19, 22;
 1545:3;
 1557:11, 16, 21;
 1561:19;
 1562:21
jury's [3] -
 1540:16, 23;
 1562:23
Justin [6] -
 1412:19;
 1414:7;
 1415:23;
 1418:1;
 1431:12;
 1450:12
JW [4] - 1443:5;
 1444:23;
 1450:18; 1451:6

K

Kailua [1] -
 1402:4
Kamala [2] -
 1556:19, 24
Kandaris [6] -
 1474:5-7;
 1530:9;
 1542:17; 1548:8
Kane [1] -
 1542:13
keep [4] - 1459:6;
 1491:19;
 1559:15, 25
Keeper [11] -
 1423:12;
 1434:14, 20;
 1435:6;
 1467:15;
 1516:19;
 1525:18;
 1530:20;

19

1534:21;
1535:21; 1572:8
Keepers [38] -
1433:17, 25;
1434:3;
1435:10, 20, 22;
1436:3;
1462:25;
1465:11;
1466:7, 10, 13;
1477:5; 1478:3,
5, 9; 1479:9;
1481:8, 15, 20;
1498:16, 25;
1502:7, 14;
1503:21;
1506:14;
1514:2;
1528:13;
1535:10;
1543:10, 20, 23,
25; 1549:24;
1551:21;
1553:4, 15
Kelly [9] - 1429:4,
12; 1463:22;
1514:15, 20;
1515:10, 13;
1530:8; 1569:5
Kellye [1] -
1534:17
KELSEY [5] -
1403:4;
1411:24;
1462:5; 1491:1;
1526:5
Ken [2] -
1507:13;
1514:23
Kenneth [3] -
1514:17, 20;
1542:13
Kentucky [1] -
1424:8
kept [1] - 1408:1
Kevin [1] -
1474:14
kind [11] -

1407:3;
1414:18;
1451:1;
1452:25;
1456:14;
1491:10;
1503:8; 1507:3;
1546:7, 9;
1571:8
kinds [1] - 1501:1
kit [1] - 1449:19
kitchen [1] -
1406:15
kits [2] - 1451:14,
22
knowing [1] -
1498:8
knowledge [25] -
1427:21;
1428:3, 17, 20;
1429:22;
1452:11;
1454:4, 7;
1455:24;
1463:19;
1464:24;
1475:11;
1476:17;
1480:2; 1502:2;
1516:16, 21;
1522:15;
1532:15;
1533:17;
1534:15;
1535:18;
1544:7; 1551:5;
1564:13
known [2] -
1410:4; 1471:22
knows [1] -
1499:16

---

L

---

labels [2] -
1513:5; 1515:12
lack [2] -
1428:10;
1571:23

ladies [1] -
1561:12
Lafayette [2] -
1424:13;
1535:23
laid [1] - 1559:21
land [2] - 1428:8,
13
Lane [1] - 1402:7
large [1] -
1469:14
last [11] -
1405:15;
1407:8, 10;
1415:2; 1421:7;
1485:5;
1486:13;
1558:4; 1569:2;
1570:24; 1571:7
lasted [2] -
1453:4; 1547:3
lastly [3] -
1448:11;
1456:4; 1460:11
late [7] - 1483:11;
1532:9, 19;
1534:1, 24;
1535:7; 1544:3
LAW [1] - 1402:3
law [23] -
1404:15;
1410:25;
1423:8, 13-14;
1470:19, 22;
1498:16, 20, 25;
1499:6;
1501:10;
1502:3, 8, 15;
1503:22;
1504:2, 23;
1507:25;
1525:2, 5;
1557:9; 1565:17
lawyer [1] -
1514:18
lay [2] - 1530:16;
1559:20
lays [1] - 1556:1

lead [4] -
1421:21;
1422:1;
1476:19; 1489:5
lead-up [1] -
1489:5
Leader [1] -
1542:8
leader [5] -
1481:6;
1513:15;
1514:15, 21;
1515:5
Leadership [7] -
1417:9;
1437:15;
1440:9; 1475:8,
12; 1480:16;
1533:21
leading [1] -
1549:24
leads [1] - 1564:9
leaf [1] - 1538:1
learn [3] -
1434:18;
1510:20; 1525:2
learned [12] -
1422:12, 15, 17;
1423:4, 8, 11;
1434:13;
1452:15;
1455:10;
1475:17;
1498:10;
1510:18
least [10] -
1429:16;
1437:12, 14;
1438:10;
1492:17;
1521:13;
1522:6; 1551:2;
1562:16; 1563:6
leave [4] -
1504:1;
1543:15;
1544:6; 1548:4
leaving [3] -

1470:7;
1545:10, 12
led [5] - 1506:24;
1514:23, 25;
1515:6, 8
Lee [1] - 1402:2
leeway [2] -
1488:16;
1489:21
left [14] -
1414:12;
1415:2; 1437:1;
1441:10;
1458:12, 20, 22;
1461:11, 22;
1465:6, 8;
1467:2;
1541:23; 1546:2
left-hand [3] -
1414:12;
1415:2; 1437:1
legal [7] -
1427:18;
1467:22;
1499:13;
1554:9, 25;
1555:24
length [1] -
1563:5
lengths [1] -
1499:10
LEO [1] - 1478:17
less [1] - 1564:15
lessons [1] -
1446:17
let's.. [1] -
1526:11
letters [1] -
1478:2
level [2] - 1547:7;
1564:12
license [3] -
1404:25;
1405:9; 1408:2
lift [1] - 1459:3
likely [4] - 1416:5;
1422:20;
1433:10;

1495:22
limit [1] - 1490:13
limited [1] - 1525:1
line [19] - 1407:6; 1419:19; 1462:12, 16, 19, 22, 24; 1463:1; 1465:4, 12; 1478:8; 1511:20; 1512:25; 1520:22; 1558:4; 1559:11; 1562:16; 1571:7, 12
lines [1] - 1482:23
lingo [1] - 1423:19
list [2] - 1571:7, 11
listed [6] - 1425:2; 1430:9; 1512:18, 21; 1514:9; 1533:15
listened [1] - 1454:16
lists [1] - 1542:7
literal [1] - 1517:22
literally [1] - 1569:2
litigation [2] - 1566:2, 5
live [4] - 1405:1; 1406:19, 22; 1407:12
lived [7] - 1405:11, 14-15; 1406:4, 9, 13
lives [4] - 1422:13, 20; 1510:12, 14
living [6] - 1404:9; 1406:5, 7, 18; 1525:14;

1565:25
local [3] - 1502:8; 1503:23, 25
location [5] - 1500:14; 1501:25; 1521:25; 1522:10
logically [1] - 1548:17
logo [1] - 1550:14
look [29] - 1409:24; 1410:14, 25; 1413:20; 1419:18; 1439:2; 1440:4; 1441:6, 18; 1443:16, 20; 1444:10; 1459:25; 1473:11; 1478:10; 1486:17; 1487:7; 1497:22; 1502:25; 1510:23; 1526:16; 1527:17; 1538:21; 1560:23; 1565:24; 1567:12; 1572:17, 22
looked [7] - 1409:10; 1494:10; 1497:20; 1534:4; 1555:23; 1562:14
looking [14] - 1415:6; 1432:22; 1442:25; 1450:1; 1456:7; 1503:20;

1517:13; 1521:21; 1531:16, 21; 1534:11; 1547:11; 1548:2; 1553:3
looks [7] - 1444:5; 1458:24; 1460:1; 1469:17, 19; 1470:12; 1524:10
loser [1] - 1443:11
lost [1] - 1425:18
Louis [1] - 1401:16
Louisville [3] - 1424:8; 1503:24; 1535:23
lunch [1] - 1409:23

M

ma'am [132] - 1412:2, 13; 1413:3, 11, 15, 23; 1414:17, 23; 1415:1; 1416:1, 3, 7, 15; 1417:2, 10, 21; 1418:5; 1419:21; 1421:11; 1422:6, 11, 14; 1423:3, 7, 22; 1424:5, 17, 23; 1425:10, 16; 1427:4, 23; 1428:6; 1429:1, 6, 10, 14, 17; 1431:7, 17, 22; 1432:25; 1433:5, 16, 19, 21; 1434:7, 17; 1435:8, 17, 21, 24; 1436:12, 14,

25; 1437:20, 22; 1438:9, 12, 20; 1439:12; 1440:8, 12, 18, 24; 1441:9, 12, 16, 24; 1442:1, 3, 6, 19; 1443:4; 1444:4, 15, 22, 24; 1445:1, 6, 8, 11, 14, 19; 1446:1, 9, 19; 1447:1, 9, 14, 24; 1448:1, 10, 19; 1449:12, 22; 1450:10, 15, 17, 19, 21; 1451:3, 5, 7, 9, 16; 1452:3, 24; 1453:15, 20, 22; 1454:18, 21, 23; 1455:4, 7, 9, 22; 1456:11, 13, 22; 1457:13, 17; 1458:18, 21; 1459:5, 12, 22; 1460:7, 15; 1461:3, 10
MAGA [6] - 1477:19, 22; 1506:18; 1518:1; 1535:12; 1550:7
maiden [1] - 1500:25
mail [7] - 1404:9; 1408:4; 1429:7; 1477:2, 7; 1485:12; 1501:25
mails [1] - 1502:4
main [1] - 1526:20
majority [1] - 1569:4
mall [1] - 1558:14
man [1] - 1431:21
Man [2] - 1438:17;

1506:17
manipulate [1] - 1444:16
manner [1] - 1564:5
Manzo [1] - 1401:16
MANZO [6] - 1565:1; 1568:18, 23; 1571:1, 6; 1572:18
map [1] - 1512:4
March [18] - 1438:17, 23; 1454:10; 1477:14, 19, 23; 1506:18, 20; 1518:1; 1520:14; 1535:12, 15, 19; 1550:8; 1558:14, 20; 1559:21
march [2] - 1477:17; 1478:6
marching [1] - 1520:16
Marion [1] - 1402:14
mark [1] - 1431:14
marked [5] - 1412:20; 1443:25; 1450:4; 1460:11; 1482:16
Martin [1] - 1402:10
MARTIN [10] - 1566:25; 1567:7, 14; 1568:15, 20; 1569:13, 21; 1570:10, 21; 1572:24
masks [1] -

1508:18
mass [1] - 1469:14
massive [1] - 1428:13
math [1] - 1421:13
matter [3] - 1495:8; 1566:18; 1573:8
matters [1] - 1566:22
Matthew [1] - 1402:17
Mayflower [3] - 1521:13; 1522:1
mean [18] - 1406:23; 1420:12, 25; 1421:14; 1428:4; 1488:16; 1492:5; 1493:24; 1497:2; 1502:12; 1503:1; 1529:7; 1536:18; 1539:13; 1563:14; 1565:23; 1566:5
means [15] - 1404:14; 1409:15; 1414:13, 16, 21; 1415:3, 6; 1432:1; 1437:12; 1475:10; 1496:25; 1501:18; 1507:15; 1509:10; 1557:14
meant [5] - 1419:22; 1420:4, 15, 18; 1553:7

meat [1] - 1489:2
med [1] - 1449:19
media [1] - 1447:3
media's [1] - 1448:21
medic [2] - 1525:23, 25
Medicaid [2] - 1500:21; 1501:4
medical [6] - 1451:14, 22; 1525:10, 18
Medicare [2] - 1500:21; 1501:4
meet [4] - 1412:6; 1491:5; 1522:9
meeting [5] - 1452:19; 1453:4, 7, 24; 1476:14
meetings [1] - 1408:13
Meggs [15] - 1429:4, 8, 12, 15; 1430:14; 1439:20; 1463:22; 1464:5, 7; 1468:7; 1514:15, 20; 1515:10, 13; 1569:5
Meggs's [3] - 1439:17, 23; 1464:8
MEHTA [1] - 1401:9
member [3] - 1417:1; 1435:20; 1498:15
members [3] - 1447:15; 1448:8; 1514:9
memory [2] - 1418:17; 1479:11

men [1] - 1513:18
mental [2] - 1420:21, 24
mentioned [2] - 1456:17; 1562:12
message [127] - 1414:10, 16, 18; 1415:3; 1418:2, 4, 6; 1419:8, 18; 1420:6; 1423:24; 1436:11; 1437:5, 7, 10; 1439:2; 1440:5, 7, 19; 1443:7; 1444:20; 1445:10, 16; 1447:19, 23; 1448:4, 12, 15; 1449:18; 1450:22; 1451:4, 6, 13, 20-21; 1483:6, 17; 1484:3, 6, 15; 1485:17, 22; 1490:3, 7; 1498:3, 14; 1505:14, 18-19, 22; 1513:10, 13, 16-17, 21; 1516:25; 1517:1, 7; 1518:21, 23; 1519:2; 1525:23; 1527:25; 1528:2, 12, 15, 21, 24; 1529:2, 6, 13, 19; 1531:25; 1532:2; 1534:3, 10; 1535:4; 1537:11; 1538:12, 16, 19-20; 1539:6, 16; 1541:1; 1543:6;

1547:20, 23; 1550:7; 1551:15; 1555:5, 7, 12, 25; 1556:2; 1558:2; 1559:2; 1560:8, 11, 16-17; 1561:7; 1567:8, 16, 18, 23; 1568:12, 24; 1569:1, 7, 16, 21; 1570:1, 14, 17-18, 21-22, 24; 1571:9; 1572:1
messages [95] - 1413:6; 1414:4; 1415:7, 10, 16, 18; 1417:15; 1418:12; 1419:7, 9; 1420:25; 1423:19; 1424:3; 1425:6; 1436:18; 1437:12; 1438:6; 1441:1, 17; 1448:5; 1449:3-5, 8, 10, 15; 1451:14, 21, 24; 1474:4; 1475:15, 21, 23; 1479:14; 1480:2; 1481:17, 23; 1484:18; 1485:14, 16; 1486:2, 4; 1487:12, 18, 20; 1488:19, 23; 1489:9, 14; 1490:5; 1493:10, 12; 1494:22; 1497:4; 1498:14, 24; 1504:6, 13; 1505:1, 4;

1507:3, 6; 1516:8; 1521:21; 1525:17, 20; 1528:6; 1529:8, 10; 1530:5, 7, 19, 24; 1531:2; 1532:13; 1533:1; 1538:25; 1539:9, 17; 1540:7, 24; 1553:14; 1557:3; 1559:19; 1562:8; 1568:12, 17, 22; 1569:5; 1571:24; 1572:16
messaging [1] - 1516:19
met [3] - 1412:3; 1473:21, 24
metal [1] - 1504:17
Michael [1] - 1422:1
mid [1] - 1516:17
middle [2] - 1468:14; 1546:10
might [8] - 1412:14; 1417:5; 1487:2; 1498:10; 1500:14; 1511:14; 1518:13; 1522:11
Mike [2] - 1467:1; 1563:19
military [11] - 1423:5, 13-14; 1463:8, 11, 18; 1464:15, 18, 24; 1478:17; 1525:7
Million [8] -

1438:16;
1477:19, 22;
1506:17;
1518:1;
1535:12; 1550:7
mind [2] -
1483:23;
1491:19
minimize [1] -
1455:18
MINUTA [1] -
1401:6
Minuta [19] -
1402:2; 1491:4;
1508:5, 11, 22,
25; 1511:2, 19;
1512:24;
1513:14, 21;
1514:11;
1515:16;
1518:4, 23;
1521:18;
1523:4, 10, 24
Minuta's [5] -
1440:1;
1511:12;
1512:7; 1514:1;
1525:1
minutes [25] -
1409:23;
1426:6; 1446:8;
1453:4, 9, 17,
24; 1454:16, 19;
1471:19;
1482:9;
1511:22;
1519:11;
1520:7, 9;
1524:23;
1545:21;
1559:9; 1564:1,
15; 1570:20, 25
mirrored [1] -
1533:13
mispronounce [1]
- 1481:3
missed [4] -
1483:10, 20;

1484:4, 7
misses [1] -
1432:1
Missouri [1] -
1424:11
misspelling [1] -
1419:25
misspoke [2] -
1527:19; 1555:3
mistaken [2] -
1457:14;
1497:22
mistyped [1] -
1570:6
misunderstand
[1] - 1519:17
misunderstanding
[1] - 1486:14
misunderstood
[1] - 1519:17
Mizanin [1] -
1573:10
MIZANIN [1] -
1573:11
MMM [1] -
1438:19
Moab [1] - 1455:6
mob [1] - 1517:22
Moerschel [35] -
1402:10;
1461:8, 11, 22;
1463:18;
1468:17, 21;
1469:3, 11;
1470:2, 18, 21;
1471:2, 6, 10,
25; 1472:10, 22;
1473:19;
1475:18, 23;
1476:14;
1479:24;
1480:1, 8, 19;
1482:17;
1483:5, 13;
1484:3; 1569:1,
7; 1570:17, 23
Moerschel's [2] -
1480:17;

1570:24
moment [4] -
1404:6;
1454:24;
1460:13;
1568:11
money [2] -
1407:9; 1495:17
moniker [1] -
1542:8
monikers [2] -
1499:4, 8
montages [1] -
1565:20
months [3] -
1405:16;
1406:1; 1494:21
Morelock [5] -
1434:8, 11, 19,
21; 1435:4
morning [10] -
1410:17;
1411:1;
1521:11, 17;
1522:5; 1546:2;
1547:2;
1561:17, 22;
1573:1
mortar [1] -
1427:7
most [10] -
1416:5;
1422:20;
1423:24;
1432:3;
1433:10;
1452:5;
1495:22;
1513:17; 1551:2
mostly [1] -
1408:11
mothers' [1] -
1500:25
mountain [1] -
1455:5
move [11] -
1407:18;
1410:9; 1439:7;

1460:20;
1510:13;
1528:5;
1530:10;
1537:13;
1544:23;
1549:5; 1554:25
moved [1] -
1547:4
moves [1] -
1458:24
moving [9] -
1406:17;
1407:16;
1440:4;
1546:11;
1549:13;
1554:15;
1566:10
multiple [5] -
1431:3; 1438:7;
1497:14; 1502:8
must [4] - 1448:5;
1496:6; 1558:15
Myers [1] -
1402:11

N

name [21] -
1412:3;
1433:14;
1434:9-11;
1435:5, 16;
1439:24;
1442:22, 24;
1445:13;
1449:25;
1455:2;
1457:20;
1466:19, 24;
1491:3;
1508:12, 19;
1520:2
named [1] -
1436:9
names [6] -
1433:2;
1443:22;

1463:10;
1481:3; 1499:3;
1500:25
narrow [1] -
1539:23
national [2] -
1447:2; 1558:14
National [1] -
1465:9
nationwide [1] -
1478:18
nature [2] -
1408:8, 14
navigate [1] -
1417:4
near [1] - 1406:25
necessarily [2] -
1515:13
necessary [1] -
1406:12
need [9] -
1409:11;
1451:1;
1503:18;
1516:2;
1548:19;
1562:2; 1563:3;
1569:4
needed [1] -
1505:5
needs [7] -
1408:25;
1410:1;
1422:22;
1486:20;
1489:7;
1545:19; 1564:6
negotiation [1] -
1429:11
NESTLER [20] -
1427:18;
1437:25;
1439:5;
1460:22;
1467:22;
1472:24;
1483:25;
1494:3;

1499:13;
1502:10, 17;
1505:10;
1528:6, 9;
1530:12;
1537:15;
1538:6, 11;
1544:24;
1563:25
Nestler [10] -
1401:14;
1415:15;
1445:24;
1446:5;
1453:13;
1498:19;
1517:21;
1527:15, 20;
1563:22
never [14] -
1404:5;
1410:21;
1466:23;
1470:18;
1471:6;
1472:10, 15;
1473:21;
1474:4, 9, 11;
1499:21;
1532:24;
1558:11
new [1] - 1510:16
New [12] -
1512:4, 7;
1513:14;
1514:2, 6-9, 11;
1525:14, 23
news [2] -
1404:11;
1568:13
News's [1] -
1447:4
next [31] -
1420:10;
1459:3; 1462:4;
1468:15;
1476:8; 1480:6;
1482:1;

1490:21;
1518:17;
1519:7, 24;
1520:5, 9;
1529:11, 16;
1532:22;
1533:19;
1548:24;
1555:1, 19;
1556:14, 20, 23;
1558:7, 12;
1559:5, 12;
1561:7; 1569:5,
7
nice [2] - 1412:6
night [5] - 1472:3;
1521:13;
1535:7; 1561:17
nil [1] - 1568:4
nits [1] - 1493:24
nobody [2] -
1475:10;
1476:22
none [3] -
1475:12;
1505:1; 1539:1
normal [1] -
1492:17
normally [1] -
1496:5
North [3] -
1543:18, 21, 23
note [2] -
1425:22;
1426:11
notes [2] -
1426:21; 1573:9
nothing [23] -
1427:13, 16;
1428:1, 15-16,
18; 1429:20, 23;
1455:23;
1477:21;
1498:12;
1499:5, 9;
1505:5;
1513:22;
1550:20;

1551:3;
1553:18;
1554:3; 1568:4;
1572:6
November [38] -
1436:10;
1437:19;
1438:13;
1439:3;
1440:13, 15;
1452:19;
1453:3, 25;
1454:2; 1476:6;
1477:19;
1478:22;
1484:10;
1487:16;
1489:8, 18;
1502:9, 16;
1505:21, 25;
1506:6, 18;
1517:15, 24;
1530:22;
1535:12, 17;
1549:1, 18-19;
1550:13;
1553:15, 25;
1554:2, 13, 17
number [30] -
1413:9; 1415:2,
11, 14; 1418:1;
1440:7;
1444:25;
1445:2, 10, 12;
1448:8;
1449:24;
1450:20;
1451:8, 10;
1457:8, 10, 13;
1460:17;
1467:8; 1481:4;
1485:13;
1493:23;
1494:10;
1507:17;
1513:11;
1517:6;
1565:14;

1567:16
numbered [3] -
1509:10, 12;
1510:5
numbers [2] -
1413:5; 1500:25
numerous [1] -
1572:3
NW [2] - 1401:17;
1402:18

O

Oath [49] -
1423:12;
1433:17, 25;
1434:3, 13, 19;
1435:6, 10, 20,
22; 1436:3;
1462:25;
1465:11;
1466:6, 10, 12;
1467:15;
1477:5; 1478:3,
5, 9; 1479:9;
1481:8, 15, 20;
1498:15, 24;
1502:7, 14;
1503:21;
1506:13;
1514:2;
1516:19;
1525:18;
1528:13;
1530:20;
1534:21;
1535:10, 21;
1543:10, 20, 23,
25; 1549:24;
1551:21;
1553:4, 14;
1572:8
oath [5] -
1423:12, 15;
1556:19;
1557:5, 25
Oberick [2] -
1524:21
objected [1] -

1567:13
objecting [1] -
1410:13
objection [23] -
1410:1;
1427:18;
1437:25;
1439:5;
1460:22;
1467:22;
1472:24;
1483:25;
1485:23;
1494:3;
1499:13;
1502:10, 17;
1505:10;
1528:9;
1530:12;
1537:15;
1538:2;
1544:24;
1565:20, 22;
1567:2, 4
objectionable [1] -
1565:16
obtained [2] -
1413:9, 16
obvious [2] -
1425:17;
1443:10
obviously [4] -
1479:22;
1480:16;
1488:15, 17
occasionally [1] -
1408:12
occasions [1] -
1502:9
occupied [2] -
1405:18, 20
occur [2] -
1435:1; 1500:22
occurred [1] -
1532:2
October [5] -
1449:21;
1552:16, 24;

1553:8; 1554:3
OF [8] - 1401:1,
3, 9; 1402:3;
1411:24;
1462:5; 1491:1;
1526:5
offense [1] -
1567:23
offer [1] - 1566:8
offering [1] -
1511:2
offhand [1] -
1525:21
office [6] -
1422:17, 24;
1435:2; 1454:5;
1503:25; 1508:9
Office [1] -
1512:1
OFFICE [1] -
1401:16
officer [3] -
1524:7, 10;
1557:9
Officer [1] -
1457:20
officer's [1] -
1524:14
officers [4] -
1457:5, 19;
1470:13; 1524:3
Officers [2] -
1457:19;
1523:11
OFFICES [1] -
1402:3
offices [1] -
1435:3
offs [1] - 1495:13
often [3] -
1407:19;
1408:11;
1438:16
Ohio [2] -
1512:21
OK [4] - 1417:6;
1480:22;
1532:24;

1567:20
OKFL [10] -
1414:24;
1415:7; 1441:7;
1447:15, 25;
1479:16;
1480:8, 19;
1482:17;
1569:20
old [4] - 1464:7;
1474:20, 22
Old [6] - 1417:9;
1437:15;
1440:9; 1475:8;
1480:16;
1533:21
once [7] - 1408:6;
1440:6;
1442:14;
1458:9, 24;
1461:22; 1488:2
one [95] - 1411:7,
10; 1413:4;
1414:4; 1419:9;
1421:25;
1422:19;
1425:3, 18;
1437:17;
1438:13;
1440:1; 1447:2,
4; 1451:6, 24;
1454:2, 24;
1457:5;
1462:15;
1468:13, 18, 20;
1477:4;
1480:20, 24;
1481:1; 1482:4,
21; 1484:12;
1485:17;
1486:6, 10;
1488:12, 22, 24;
1490:3;
1491:13, 20;
1496:19;
1497:9;
1498:11;
1500:13, 23;

1507:4;
1509:18;
1513:2, 17;
1515:17, 22;
1516:25;
1517:2, 20;
1518:17, 20;
1519:7, 18, 24;
1520:5, 9;
1521:25;
1523:22;
1524:7;
1525:23;
1528:7;
1534:22;
1535:12, 14;
1537:21;
1538:13, 19;
1539:6, 8;
1541:1;
1545:18;
1552:6;
1559:20;
1561:24;
1562:5, 9,
23-24; 1563:1;
1565:12;
1566:25;
1567:3;
1568:13;
1569:19
one's [1] - 1510:5
ones [3] - 1488:6;
1497:1, 5
online [2] -
1495:7; 1511:16
op [4] - 1424:4;
1478:3, 19;
1480:9
Op [19] -
1416:25;
1417:11;
1418:13;
1479:21;
1480:8;
1488:22;
1515:18;
1519:14;

1526:20, 22;
1528:2;
1531:12;
1532:3, 18, 24;
1534:22;
1549:24
open [5] -
1442:14;
1503:2;
1507:21;
1508:2; 1572:19
open-ended [1] -
1503:2
opened [3] -
1503:5; 1509:3;
1511:5
opening [6] -
1507:16, 20, 23;
1508:24;
1509:18
opens [1] -
1507:23
operates [2] -
1427:17; 1428:2
operation [2] -
1501:14;
1506:14
operations [3] -
1424:1; 1481:5;
1536:4
opportunity [9] -
1419:20, 23;
1420:18;
1486:19;
1489:22;
1490:2, 11;
1521:9; 1540:19
opposed [1] -
1414:18
ops [6] - 1423:20;
1424:8, 11, 13,
15; 1425:2
OPS [1] -
1423:23
option [3] -
1442:14;
1444:8; 1555:14
order [6] -

1409:1;
1465:12;
1491:19;
1509:12;
1546:7; 1562:4
organization [2] -
1488:13; 1542:3
organization's [1]
- 1502:25
organizational [1]
- 1485:20
organizer [1] -
1515:1
orient [1] - 1437:2
original [1] -
1482:22
originals [1] -
1416:11
originated [3] -
1496:19, 23;
1497:10
otherwise [2] -
1533:25;
1539:17
ourselves [1] -
1437:2
out-of-district [1] -
1410:20
out-of-town [1] -
1563:15
outcome [1] -
1569:4
outfitted [1] -
1538:15
outlet [1] - 1447:3
outside [6] -
1461:23;
1478:20;
1485:9;
1501:19;
1502:18; 1505:4
outweighed [1] -
1568:2
overall [1] -
1422:2
overnight [5] -
1410:17, 25;
1536:18;

1561:21;
1572:22
overruled [2] -
1427:22; 1494:4
own [3] -
1406:10;
1470:12;
1495:16
owned [2] -
1426:24;
1525:15
owning [2] -
1407:24;
1455:23
owns [4] -
1407:23;
1427:2, 17;
1428:2

**P**

PA [1] - 1402:7
page [6] -
1420:11;
1442:11;
1476:8;
1477:24;
1495:7; 1551:13
PAGE [1] -
1403:3
pages [3] -
1451:13
paid [1] - 1501:4
Palian [1] -
1422:1
pandemic [1] -
1455:25
paper [2] -
1432:4; 1509:6
paragraph [2] -
1409:2; 1478:12
paraphrasing [1] -
1404:7
parents [1] -
1405:21
parents' [2] -
1407:3; 1408:5
Parker [1] -
1464:21

parliament [7] -
1505:20;
1552:7, 19, 25;
1553:7, 18;
1554:3
Parlor [1] -
1465:21
parlor [1] -
1525:15
part [37] - 1417:6,
9, 11; 1421:13;
1422:12;
1423:1, 4, 11,
24; 1437:17;
1452:5; 1454:9;
1455:10;
1472:8;
1477:18;
1482:17;
1487:18;
1489:19;
1496:25;
1503:19;
1508:21;
1510:19;
1515:9;
1520:16;
1526:19;
1534:4; 1535:2,
10, 25; 1544:10;
1546:11;
1547:22;
1548:10, 12;
1551:10;
1555:22
participant [2] -
1417:14, 19
participants [5] -
1416:13, 16, 18,
20; 1452:5
participating [1] -
1413:6
particular [17] -
1415:4;
1416:12;
1421:23;
1429:2, 5;
1433:2;

1441:10;
1446:4;
1448:15;
1488:21;
1490:4;
1495:25;
1498:8;
1502:15;
1513:22;
1546:1; 1548:15
particularly [2] -
1435:4; 1467:8
parties [4] -
1412:22;
1443:25;
1450:6; 1460:12
parting [1] -
1524:6
partly [1] -
1491:24
parts [3] -
1489:10;
1566:3, 10
party [1] -
1483:11
passed [2] -
1494:21;
1523:11
passive [2] -
1444:20;
1445:16
past [1] - 1566:15
pasted [2] -
1551:22
path [2] -
1503:18; 1557:4
patience [1] -
1411:18
patients [3] -
1500:21, 23;
1501:3
Paul [2] -
1474:11; 1542:7
pause [8] -
1450:24;
1458:2, 15;
1467:25;
1468:11;

1549:4, 11, 16
pauses [2] -
1562:1, 4
pay [4] - 1405:1;
1406:8; 1419:3;
1505:8
PDF [1] - 1444:8
Peed [13] -
1402:17;
1485:12, 21;
1486:9; 1487:8;
1526:4;
1538:11, 16;
1539:25;
1559:6;
1562:19;
1564:5, 11
PEED [93] -
1402:18;
1487:10, 23;
1489:1, 7, 18,
23, 25; 1526:6,
9, 12; 1527:8,
22, 24; 1528:5,
8, 11, 17, 20;
1529:11, 16-17,
21; 1530:4, 10,
16, 18; 1531:7,
9, 23-24;
1532:16, 22-23;
1533:19;
1536:7; 1537:7,
10, 13, 19, 24;
1538:3;
1539:13, 15;
1540:16, 25;
1541:16, 21;
1542:1;
1544:14, 16, 23;
1545:3;
1547:17, 19, 25;
1548:1; 1549:3,
7, 9, 14, 17;
1550:4, 6;
1551:10, 14;
1555:2, 6, 19,
21; 1556:14, 20,
23; 1557:2;

1558:7, 12, 18;
1559:5, 9,
12-13; 1560:19,
22; 1564:12
Peed's [3] -
1486:5;
1563:11;
1564:23
PEED.................
[1] - 1403:8
Pence [3] -
1467:2; 1569:1,
6
pending [1] -
1565:8
people [48] -
1407:17;
1420:24;
1422:5;
1428:18;
1429:15, 21;
1433:12;
1448:5;
1454:22;
1456:7;
1462:24;
1463:1, 5, 7;
1469:15;
1470:22;
1471:4;
1476:11;
1484:16;
1487:16;
1494:1;
1497:14, 23;
1498:20;
1500:8, 14;
1501:7, 12, 24;
1514:1, 9;
1515:2; 1535:2;
1539:11;
1541:18;
1548:17, 20;
1553:17;
1554:16;
1557:22;
1572:1, 5
people's [2] -

1493:13;
1500:24
performance [1] -
1448:21
perhaps [1] -
1420:17
period [4] -
1404:10;
1510:2;
1516:14;
1530:22
periodically [1] -
1540:21
permits [1] -
1407:2
permitting [1] -
1407:8
person [24] -
1409:16, 18;
1422:25;
1433:1;
1452:18;
1453:24;
1454:3; 1459:3;
1461:7;
1491:17;
1495:10;
1497:13, 21;
1498:8;
1514:11;
1565:17, 21, 25;
1566:2, 6-7, 21;
1568:8
person's [2] -
1409:17;
1566:18
personal [4] -
1406:17;
1407:6;
1518:14;
1520:16
personally [3] -
1427:12;
1434:10; 1505:2
personnel [3] -
1492:16, 22, 24
perspective [1] -
1409:5

pertained [1] -
1433:7
Pezzola [1] -
1466:19
Philadelphia [1] -
1402:7
phone [43] -
1413:5, 9;
1414:13, 22;
1437:3, 8;
1441:18;
1442:4, 8;
1444:6; 1445:2,
10; 1449:24;
1450:20;
1451:8, 10;
1452:20, 23;
1470:25;
1471:1;
1491:23, 25;
1492:9; 1493:4,
6, 9, 11, 19, 22;
1494:2, 8, 15,
22; 1496:20, 23,
25; 1502:21;
1518:23;
1533:11, 13, 15;
1538:6; 1570:5
phones [4] -
1471:4;
1493:13; 1499:8
photo [3] -
1460:14, 16;
1547:12
photograph [2] -
1520:15;
1544:20
photographs [1] -
1508:15
photos [1] -
1433:1
phrase [1] -
1418:20
physical [1] -
1442:13
physically [5] -
1408:9;
1420:15;

1465:25;
1505:16
pick [3] -
1493:24;
1541:2; 1555:18
picked [2] -
1449:15; 1541:2
picture [6] -
1433:7; 1527:5,
10, 12; 1536:22;
1545:10
piece [1] - 1562:6
ping [3] -
1431:24;
1432:1, 9
pings [2] -
1432:11, 13
pink [1] - 1461:2
pipe [1] - 1476:19
place [9] -
1409:16;
1424:4; 1427:8;
1429:3;
1512:10;
1515:16; 1541:5
placed [2] -
1513:2; 1543:25
placement [1] -
1511:24
places [1] -
1405:6
Plaintiff [1] -
1401:4
plan [18] -
1409:2, 6;
1436:11;
1477:4, 10;
1484:25;
1489:10;
1505:2, 15, 23;
1506:8;
1553:11;
1556:1;
1557:24;
1559:20, 22;
1563:9
planned [2] -
1506:4

planning [4] -
1440:22;
1481:16;
1514:25
plans [1] - 1418:9
play [15] -
1446:10;
1453:11, 19;
1457:18, 25;
1458:4; 1459:2,
13, 25; 1465:1;
1467:11;
1468:4; 1469:7;
1470:4; 1545:15
played [28] -
1431:18;
1445:24;
1446:13, 22;
1447:6; 1453:9,
13; 1458:1, 7,
14; 1459:8, 15;
1460:3;
1462:20;
1465:2;
1467:13;
1468:6, 24;
1469:8, 21;
1470:5;
1522:24;
1523:6, 18;
1524:4, 12, 18;
1555:14
playing [3] -
1458:10;
1459:6; 1467:15
plot [2] - 1428:8,
13
PM [14] -
1425:25;
1441:13;
1457:16;
1461:21;
1532:6, 13;
1537:24;
1538:13, 20;
1546:22, 25;
1569:17, 25
PO [1] - 1402:3

point [14] -
1410:16;
1413:24;
1418:9;
1419:13;
1425:17;
1443:10;
1485:24;
1505:18;
1506:2;
1515:12;
1524:14;
1536:21; 1537:2
pointed [1] -
1552:6
police [4] -
1457:19;
1463:20;
1517:23; 1524:3
pool [1] - 1411:7
pop [1] - 1466:24
porn [1] - 1495:23
portion [6] -
1428:4;
1452:18;
1455:3; 1457:8;
1459:14; 1513:2
portions [1] -
1569:13
position [1] -
1566:22
possibility [1] -
1420:17
possible [5] -
1419:22;
1420:4; 1453:2;
1539:9; 1565:4
possibly [1] -
1501:8
post [5] -
1439:15, 18;
1485:16;
1553:4, 11
post-January [1] -
1485:16
posted [11] -
1440:15;
1445:17;

1447:10;
1477:5; 1483:6;
1484:5; 1550:8;
1551:21;
1552:1;
1553:23;
1567:19
posting [2] -
1477:8, 21
potentially [1] -
1428:22
power [2] -
1470:12;
1553:20
powers [1] -
1507:25
practical [1] -
1554:23
preceded [1] -
1513:17
preceding [3] -
1568:12, 17, 22
precise [1] -
1531:6
precision [1] -
1414:1
precluding [1] -
1539:2
predated [1] -
1498:3
predates [2] -
1419:11, 15
preference [1] -
1565:17
prejudice [1] -
1568:3
premises [1] -
1503:8
preparation [2] -
1521:2; 1554:7
prepare [2] -
1565:15, 21
prepared [3] -
1565:18, 25;
1573:9
preparing [1] -
1527:2
presence [1] -

1495:21
present [12] -
1404:3;
1406:24;
1409:19;
1434:22;
1435:25;
1486:19, 25;
1518:4; 1529:5;
1557:15;
1562:17, 20
presentation [1] -
1546:6
presented [3] -
1475:23;
1546:6; 1558:24
presents [1] -
1557:12
President [17] -
1418:15;
1434:23;
1436:1;
1546:25;
1552:24;
1553:1; 1557:4;
1558:25;
1559:23;
1560:1, 3, 9;
1561:2, 6, 8
President-Elect
[1] - 1561:6
presidential [3] -
1425:18;
1443:11; 1504:5
press [1] - 1465:1
presumably [3] -
1433:9; 1566:1,
18
presuming [1] -
1570:7
pretty [10] -
1407:18;
1419:7;
1456:21;
1474:23;
1499:23;
1503:2;
1539:13, 15;

1546:14;
1558:24
prevent [4] -
1556:18;
1560:12
prevented [1] -
1556:24
preventing [1] -
1560:21
previous [5] -
1510:19;
1551:13;
1560:11, 16
primarily [1] -
1511:7
primary [2] -
1409:15
principal [2] -
1409:15
privy [1] -
1479:14
probable [9] -
1495:2, 4, 10,
14-15, 23;
1496:4, 12, 15
probative [3] -
1568:2; 1571:8
problem [1] -
1539:20
procedures [2] -
1451:15, 22
proceed [3] -
1410:16;
1411:19;
1490:24
PROCEEDINGS
[1] - 1401:9
proceedings [10]
- 1410:10;
1450:24;
1546:5; 1549:4,
11, 16; 1550:23;
1565:3; 1573:8
process [9] -
1407:24;
1505:5;
1546:23;
1552:20, 22;

1554:5, 9-10;
1562:25
profession [1] -
1464:18
professional [1] -
1492:23
promoted [1] -
1510:10
property [1] -
1471:10
Propes [1] -
1435:15
propose [2] -
1404:12;
1410:15
prosecution [7] -
1416:5, 8, 22;
1433:9; 1442:2;
1449:13;
1453:21
prospective [1] -
1409:4
protected [1] -
1517:23
protections [1] -
1501:6
protest [5] -
1483:10, 21, 24;
1484:4; 1518:7
ProtonMail [7] -
1484:9, 16;
1498:21;
1501:14; 1515:2
provide [5] -
1408:20;
1525:18;
1538:23;
1541:11;
1567:17
provided [3] -
1416:23;
1493:7; 1541:4
provider [1] -
1445:7
provision [2] -
1411:4; 1500:1
provisions [1] -
1410:11

proxies [1] -
1558:16
public [1] -
1491:19
publish [3] -
1460:24;
1483:15; 1545:3
pull [21] -
1412:19;
1414:4;
1415:22;
1431:12;
1432:20;
1436:21;
1441:3;
1443:24;
1445:22;
1450:2; 1457:9;
1462:11;
1467:6;
1482:13;
1526:9; 1536:7;
1537:8; 1549:3;
1550:4; 1555:2;
1568:19
pulled [5] -
1523:21;
1535:4;
1567:18;
1568:23
pulling [1] -
1524:8
pumping [1] -
1471:15
Punta [2] -
1402:15;
1482:24
puppet [5] -
1555:16;
1556:4;
1559:16; 1560:1
puppets [1] -
1558:10
purchased [1] -
1407:21
purchases [1] -
1484:12
purple [3] -

1511:19;
1520:22; 1523:3
purpose [2] -
1485:19; 1565:2
purposes [6] -
1409:10, 15;
1460:12;
1498:9, 25;
1500:13
pursuant [1] -
1491:22
pushed [1] -
1524:14
pushing [2] -
1469:17; 1524:9
put [23] -
1418:15;
1433:1, 7;
1442:16;
1449:3, 10, 15;
1451:20;
1452:25;
1459:3;
1486:17;
1487:12, 17;
1488:4;
1512:11;
1513:7;
1527:22;
1540:12;
1541:1; 1563:7,
11; 1566:2, 6
puts [1] - 1509:7
putting [3] -
1489:1;
1490:17;
1538:22

**Q**

QRF [30] -
1424:18, 21, 24;
1437:24;
1471:23;
1472:8;
1478:11, 20;
1485:20;
1487:12-14, 17;
1488:1, 7;

1489:14;
1531:2;
1539:21;
1541:1, 19;
1542:21, 25;
1543:2, 8;
1544:1;
1548:11;
1550:25; 1551:3
QRFs [3] -
1425:3, 5;
1551:1
Quantico [2] -
1492:18, 25
Queen [1] -
1402:7
question's [2] -
1487:5; 1502:11
questioned [1] -
1539:24
questioners [1] -
1535:22
questions [16] -
1408:15;
1412:24;
1432:18;
1436:18;
1453:13;
1484:22;
1488:5;
1511:13;
1521:4, 8;
1530:19;
1533:21;
1534:7;
1546:13;
1548:23;
1569:19
quick [5] -
1409:23;
1424:21;
1484:9; 1548:2,
10
Quick [1] - 1542:4
quickly [3] -
1405:7;
1409:10;
1411:11

quite [4] -
1424:18;
1485:14;
1564:13;
1568:10
quote [1] -
1415:17

**R**

raise [3] - 1485:5;
1565:13, 22
raised [3] -
1485:11;
1486:7; 1487:20
rally [9] -
1478:22;
1506:2, 23;
1518:1;
1535:17;
1553:16;
1554:13;
1558:23; 1559:2
range [4] -
1428:11, 16, 19;
1432:6
Ranger [1] -
1542:10
ranges [3] -
1428:12;
1432:3, 5
rarely [4] -
1495:4, 14, 21;
1496:11
rates [1] - 1407:9
rather [2] -
1449:2; 1540:14
RDR [1] -
1573:11
reached [4] -
1454:3, 11-12;
1523:22
reaches [1] -
1459:23
Reaction [1] -
1542:4
reaction [4] -
1424:22;
1448:21;

1548:2, 10
read [23] -
1478:2, 14-15;
1492:2;
1504:13;
1510:18;
1511:14;
1513:10, 13;
1517:20;
1528:4, 12;
1539:12, 17, 19;
1545:5;
1554:12;
1555:12;
1556:16;
1558:4, 9;
1562:16;
1569:13
reading [4] -
1439:2;
1559:14;
1568:7; 1572:14
reads [1] -
1567:24
ready [2] -
1414:7; 1490:24
Reagan [1] -
1446:17
real [3] - 1484:9;
1500:24;
1515:14
reality [1] -
1515:14
really [3] -
1435:4;
1456:23; 1507:7
reason [8] -
1405:3;
1406:17;
1425:25;
1426:5; 1492:3,
7; 1510:7;
1534:12
reasons [1] -
1407:6
rebellion [1] -
1555:17
receive [3] -

1408:4; 1480:1;
1533:1
received [7] -
1453:23;
1454:4; 1485:3;
1491:23;
1492:1;
1509:25;
1532:13
receives [1] -
1404:9
receiving [1] -
1454:2
recently [2] -
1473:21, 25
recess [1] -
1490:19
recognize [7] -
1457:12;
1460:14;
1469:25;
1482:20;
1527:25;
1528:21;
1544:20
recollection [4] -
1517:3, 10, 12;
1521:22
record [9] -
1412:25;
1413:2, 4;
1450:9; 1555:3;
1567:15;
1570:2, 13;
1573:8
recorded [5] -
1452:18;
1453:24;
1465:21;
1476:12;
1569:23
recording [4] -
1453:4; 1454:8,
13; 1486:12
recordings [1] -
1476:6
records [20] -
1411:8;

1439:14, 23;
1442:25;
1443:16, 20;
1450:1;
1484:11;
1492:8;
1531:17, 21;
1533:11;
1534:3, 6,
10-11, 18;
1547:13
recourse [1] -
1556:21
red [1] - 1468:15
redirect [7] -
1538:22;
1540:14, 19;
1563:8, 23;
1564:3, 24
reentered [1] -
1461:24
refer [9] -
1415:21;
1417:24;
1440:25;
1445:15;
1500:6;
1505:18;
1506:10;
1548:15; 1567:8
reference [14] -
1423:12, 15;
1440:13;
1493:17;
1505:2, 23;
1506:6;
1517:21;
1551:6; 1560:1;
1567:18;
1571:21
referenced [1] -
1417:15
references [4] -
1438:19;
1521:19;
1525:9; 1551:6
referencing [2] -
1425:9; 1547:12

referred [3] -
1438:16;
1481:4; 1560:11
referring [21] -
1418:18;
1432:23;
1462:15;
1468:19;
1477:22;
1481:16;
1495:20;
1512:6;
1513:16, 24;
1516:22;
1519:15;
1542:22;
1543:7;
1552:22;
1558:20;
1560:9, 21;
1561:7; 1569:14
refers [2] -
1455:5; 1557:7
reflected [1] -
1514:4
refresh [2] -
1418:17;
1521:22
regard [1] -
1481:14
regarding [2] -
1413:2; 1494:1
regardless [1] -
1409:20
regards [1] -
1511:11
region [1] -
1518:13
regional [1] -
1487:14
register [1] -
1432:9
registered [4] -
1411:13;
1445:5;
1449:25;
1451:10
registering [1] -

1430:25
registration [1] -
1408:2
regular [1] -
1557:22
relate [2] -
1494:12;
1538:23
relating [1] -
1426:15
relationships [1] -
1541:17
release [1] -
1491:17
relevance [1] -
1539:18
relevant [3] -
1539:3; 1572:15
relief [1] -
1424:16
rely [1] - 1420:5
remainder [1] -
1406:13
remained [1] -
1461:22
remember [16] -
1417:4, 14;
1418:16, 20-22;
1419:6, 8;
1436:8, 11;
1445:20;
1476:20, 24;
1527:5; 1534:10
remind [3] -
1561:13;
1565:3, 5
reminder [1] -
1562:15
reminding [2] -
1565:2, 8
renovating [1] -
1407:4
renovation [3] -
1405:4, 13, 15
rent [2] - 1406:8,
11
repeat [1] -
1427:23

rephrase [4] -
1438:2; 1473:1;
1484:1; 1503:13
report [6] -
1442:15;
1444:7; 1497:6,
9, 16; 1570:5
reports [1] -
1497:20
represent [1] -
1491:3
request [2] -
1561:24; 1563:6
requirement [1] -
1502:3
requirements [1] -
1409:11
requires [1] -
1565:24
rescue [1] -
1478:18
reservations [1] -
1481:18
reside [3] -
1409:4, 6, 9
residence [3] -
1405:9;
1409:14;
1422:18
resident [7] -
1404:8, 25;
1408:25;
1409:7, 9, 11;
1435:18
resides [1] -
1409:12
respects [1] -
1491:14
response [2] -
1486:5; 1570:9
Response [1] -
1492:12
responsible [1] -
1511:23
rest [1] - 1534:19
resume [1] -
1484:25
resumed [1] -

1404:1
return [3] -
1406:22, 24;
1408:20
returning [1] -
1409:19
reveal [1] -
1438:5
revealed [2] -
1438:24;
1452:14
reverse [1] -
1555:14
review [7] -
1418:12;
1511:3, 7;
1521:1; 1525:1;
1544:9
reviewed [14] -
1415:16;
1419:7; 1430:6;
1498:15;
1505:2;
1508:15;
1511:9;
1526:19;
1528:15;
1529:2, 5, 8;
1545:14
reviewing [1] -
1536:5
revolution [1] -
1559:17
rhetoric [1] -
1489:9
Rhodes [40] -
1417:16;
1437:23;
1439:3;
1440:11;
1447:23;
1448:2; 1477:3;
1481:5, 8;
1487:13;
1493:22;
1494:18;
1496:19;
1513:14, 23;

1515:13;
1518:24;
1519:17;
1520:4, 8, 10;
1525:24;
1528:25;
1529:8; 1530:7,
9; 1532:2;
1539:22;
1550:8;
1551:16, 18, 20;
1553:2, 10;
1555:5, 25;
1557:3;
1558:24;
1559:20
Rhodes's [13] -
1414:13, 22;
1437:2, 7;
1441:18;
1491:21;
1493:9, 13;
1494:2;
1505:19;
1539:23;
1551:16; 1562:8
Rich [2] - 1503:4,
6
Rick [2] -
1520:23; 1521:1
rifle [2] - 1430:1,
11
rifles [1] - 1430:1
right-hand [1] -
1520:23
RIOS [2] -
1402:10, 13
rise [2] - 1555:16;
1556:4
rising [1] - 1407:7
risk [3] - 1425:17;
1443:10;
1455:18
road [1] - 1503:3
Rob [1] - 1520:3
Robert [1] -
1402:10
ROBERTO [1] -

1401:6
Roberto [14] -
1402:2; 1491:4;
1508:4, 11, 21,
25; 1511:2, 19;
1513:14;
1514:1, 11;
1515:16;
1518:23;
1519:15
Rocketchat [9] -
1516:14, 19,
22-23, 25;
1517:1, 7, 11;
1518:22
Rocketchats [1] -
1516:17
Roger [4] -
1521:23;
1522:2, 7, 10
role [2] - 1526:19;
1552:25
roll [2] - 1468:22;
1538:4
Ronald [1] -
1446:17
room [6] -
1406:8, 10;
1408:20;
1481:17;
1523:23;
1548:18
rooms [1] -
1543:25
roster [1] - 1501:3
rough [1] -
1521:11
rounds [1] -
1430:16
Ruby [2] -
1503:4, 6
Rule [3] -
1485:21;
1538:16
rumor [1] -
1572:13
run [2] - 1523:7,
17

runs [2] -
1495:17;
1501:19

S

safer [1] - 1564:2
safest [1] -
1564:14
safety [1] -
1491:19
Salke [3] -
1457:20;
1523:12, 22
Sarasota [2] -
1422:13, 17
satellite [1] -
1435:2
Saturday [2] -
1550:15;
1558:14
saw [16] -
1424:8, 11, 13,
15, 18; 1429:7;
1430:11;
1432:7;
1452:18;
1459:12;
1470:18;
1471:6, 25;
1499:2; 1560:16
scam [1] -
1500:20
scenario [1] -
1556:22
scheduled [1] -
1506:3
Schiff [9] -
1567:20, 22, 24;
1568:14;
1569:8, 16;
1570:15, 18
scholar [1] -
1555:1
school [1] -
1405:12
scope [16] -
1485:23;
1487:8;

1488:15;
1490:8, 15;
1502:18;
1530:13, 15, 17;
1538:12, 18;
1539:4, 23;
1540:8;
1544:25;
1550:22
scores [1] -
1451:21
Scott [2] -
1402:13;
1570:12
screaming [1] -
1471:16
screen [12] -
1441:7; 1443:3;
1446:15, 18;
1458:10, 13, 20;
1470:1;
1547:21;
1549:15;
1567:23;
1568:25
scroll [3] -
1450:11;
1537:9; 1551:10
search [6] -
1478:18;
1491:22;
1493:4; 1496:1;
1526:13, 16
searched [1] -
1439:24
seat [2] - 1404:6;
1561:23
Seat [1] -
1404:19
seated [1] -
1410:14
second [9] -
1419:19;
1438:21;
1447:19;
1458:15;
1462:9;
1485:22;

1538:7; 1539:8;
1565:11
seconds [5] -
1446:3;
1468:23;
1523:8; 1549:13
Secret [6] -
1504:5, 9, 14,
21, 25
Section [1] -
1499:11
secure [3] -
1455:21;
1456:21; 1502:1
security [8] -
1478:3, 7, 19;
1503:22;
1515:8;
1520:16; 1522:4
Security [1] -
1500:25
see [68] -
1413:13, 20;
1414:6;
1416:25;
1418:13;
1419:19;
1420:11;
1424:3; 1430:8,
15; 1432:5;
1436:24;
1438:19;
1439:14, 17;
1444:2, 19, 23;
1446:15, 24;
1449:21;
1450:9, 14;
1451:1, 3;
1457:9, 19;
1458:4, 10, 17,
19; 1459:2, 4-5,
10, 17; 1461:2;
1468:25;
1470:13;
1471:12, 15;
1473:12;
1478:11;
1479:22;

1482:23;
1486:15;
1504:16;
1512:4, 14;
1520:24;
1524:6; 1525:9;
1531:25;
1537:5; 1538:2;
1540:17, 23;
1544:17;
1545:16;
1553:5;
1561:17, 22;
1572:25
seeing [8] -
1439:23;
1473:9;
1476:24;
1497:22;
1504:1; 1514:7,
9; 1516:3
seeking [2] -
1495:3; 1541:11
seem [1] - 1540:8
segments [1] -
1447:4
segregated [1] -
1566:12
seized [1] -
1491:21
select [2] -
1442:15; 1449:4
selected [2] -
1416:16;
1449:10
Selection [1] -
1409:8
selection [2] -
1409:25;
1416:17
sell [1] - 1500:11
send [5] - 1445:9;
1572:1, 10, 15,
21
sending [1] -
1478:8
sense [1] -
1513:8

sent [21] -
1418:4, 6, 16;
1444:23;
1445:10;
1451:6;
1475:21;
1477:3;
1488:23;
1513:21;
1515:1;
1537:25;
1538:25;
1551:20;
1569:18-20;
1570:1, 14
sentence [2] -
1478:13, 15
Sentinel [1] -
1511:5
separate [5] -
1426:14;
1493:18, 21;
1506:13; 1570:6
separately [1] -
1426:18
September [12] -
1425:11, 13;
1429:4;
1430:12;
1441:11;
1443:7, 14;
1447:21;
1479:5, 10-11,
13
sequence [2] -
1432:10;
1521:11
sequencing [1] -
1571:22
Serbia [10] -
1551:7, 9, 11;
1552:15, 20, 22,
24; 1553:8
Serbian [3] -
1477:4, 10;
1505:23
Serbians [1] -
1554:2

serial [1] -
1507:17
serialized [3] -
1509:7, 20, 24
series [7] -
1487:15, 20;
1516:17;
1535:9; 1552:4;
1557:3; 1559:19
serve [4] -
1409:1, 6;
1509:19, 22
servers [3] -
1501:18, 21
service [3] -
1413:21;
1445:7; 1500:13
Service [7] -
1409:8; 1504:5,
9, 14, 21, 25
services [2] -
1500:11;
1525:10
Session [1] -
1401:7
session [2] -
1429:5; 1550:17
sessions [1] -
1515:1
setting [2] -
1540:1; 1542:21
seven [4] -
1410:2, 6;
1494:21;
1524:23
several [11] -
1421:25;
1433:25;
1434:3; 1435:9;
1439:24;
1443:21;
1499:3; 1522:9;
1534:9;
1537:19; 1543:2
sex [4] - 1567:22;
1569:9; 1572:2,
4
share [1] -

1404:22
shared [1] -
1430:14
sheriff's [1] -
1503:25
shift [1] - 1499:2
SHIPLEY [41] -
1402:3;
1410:19;
1490:22, 25;
1491:2; 1494:6;
1499:20;
1502:13, 19;
1503:6, 16;
1505:13;
1511:16, 18;
1517:5, 8,
18-19; 1518:17,
19; 1519:7, 9,
22, 25; 1520:5,
20-21; 1522:22,
25; 1523:2, 7, 9,
17, 19; 1524:5,
13, 15, 19-20;
1526:2
Shipley [4] -
1402:2;
1490:21;
1491:3; 1502:22
SHIPLEY..............
. [1] - 1403:7
shirt [1] - 1431:16
shoot [2] -
1430:8; 1432:8
shooting [7] -
1428:10, 12, 16,
18-19; 1430:8,
13
short [2] -
1521:10;
1553:22
short-sighted [1] -
1553:22
shorthand [1] -
1424:1
shot [5] -
1431:23;
1432:4;

1460:16; 1465:7
shots [9] -
1430:18, 25;
1431:3, 5, 8, 10;
1432:10, 13
shoulder [2] -
1460:2; 1469:6
shoulders [1] -
1460:2
show [13] -
1467:9;
1482:13;
1485:19;
1486:24;
1487:24;
1488:1, 3-4;
1489:11;
1538:2; 1541:21
showed [9] -
1416:9;
1430:13;
1487:11;
1488:25;
1516:25;
1517:1; 1533:4;
1541:4; 1558:19
showing [4] -
1428:18;
1449:2;
1482:16; 1487:6
shown [4] -
1527:5;
1531:10;
1537:3, 11
shows [4] -
1497:19, 21, 24;
1568:5
sick [2] - 1481:22
side [9] -
1408:16;
1458:12;
1459:20;
1466:17, 22;
1520:23;
1542:3;
1562:22;
1571:23
sidebar [4] -

1502:24;
1503:15;
1538:10;
1541:25
sides [2] -
    1469:16; 1562:2
Siekerman [4] -
    1481:1-3, 22
sighted [1] -
    1553:22
sign [1] - 1495:13
sign-offs [1] -
    1495:13
Signal [26] -
    1413:6;
    1414:16;
    1415:10;
    1420:25;
    1423:19;
    1437:5;
    1441:17;
    1445:11;
    1455:2; 1474:3;
    1490:3;
    1493:19, 22;
    1496:18;
    1498:1, 12, 16,
    21; 1515:17;
    1516:10, 15, 21;
    1518:22, 25;
    1519:2
Signals [1] -
    1501:7
signed [1] -
    1484:9
similar [1] -
    1452:2
simple [2] -
    1485:19; 1569:4
simply [3] -
    1509:10;
    1539:3; 1568:5
sing [1] - 1465:8
single [3] -
    1419:8; 1425:3;
    1431:5
sink [1] - 1540:18
sis [1] - 1556:19

sisters [1] -
    1478:18
sit [3] - 1406:21;
    1407:11;
    1501:11
sitting [2] -
    1494:13; 1497:3
situation [1] -
    1548:16
six [5] - 1406:1;
    1520:9;
    1521:14, 25;
    1522:17
skip [1] - 1534:19
skipping [1] -
    1412:15
slapped [1] -
    1515:12
slide [28] -
    1416:25;
    1441:11;
    1479:21;
    1480:6;
    1517:18;
    1519:8, 22;
    1529:11, 16;
    1531:10;
    1532:22;
    1533:19;
    1534:19;
    1537:17;
    1538:4, 12;
    1541:14, 22;
    1547:18;
    1555:19;
    1556:14, 20, 23;
    1558:7, 12;
    1559:5, 12;
    1570:3
slides [2] -
    1517:11;
    1540:11
slightly [2] -
    1410:22;
    1434:10
small [1] - 1451:1
smart [1] -
    1554:21

Smith [1] -
    1542:10
Smrecek [7] -
    1427:1, 13-14,
    17; 1428:2;
    1429:8
so-to-speak [1] -
    1427:6
Social [1] -
    1500:25
society [1] -
    1572:1
software [1] -
    1452:4
solely [3] -
    1537:20;
    1565:1, 3
solutions [1] -
    1553:3
someone [22] -
    1408:25;
    1409:12;
    1416:5, 8;
    1432:6, 12, 14;
    1433:9;
    1434:16;
    1436:9; 1442:2;
    1449:13;
    1453:21;
    1459:23;
    1473:19;
    1495:5;
    1497:14;
    1533:4; 1535:6;
    1548:19;
    1557:14;
    1563:17
sometimes [2] -
    1438:19;
    1491:17
somewhere [2] -
    1447:17;
    1545:21
SoRelle [2] -
    1417:16;
    1534:17
sorry [12] -
    1406:16;

1409:25;
1411:8; 1420:2;
1448:13;
1450:4, 23;
1489:25;
1540:25;
1549:8; 1554:1;
1555:20
sort [7] - 1404:14;
    1406:6;
    1488:13;
    1490:15;
    1506:6; 1568:14
sound [5] -
    1426:14;
    1438:14;
    1464:10;
    1466:22; 1467:5
sounds [9] -
    1406:16;
    1421:16;
    1471:20;
    1474:24;
    1480:15;
    1494:24;
    1535:8;
    1546:24; 1547:5
sources [1] -
    1411:7
southeast [11] -
    1512:5, 7, 13,
    16, 23; 1513:2;
    1520:23;
    1521:12, 16;
    1522:6
speaker [1] -
    1452:25
speaking [2] -
    1465:14;
    1510:20
special [2] -
    1492:14;
    1496:12
Special [3] -
    1485:4, 17;
    1563:8
specialist [2] -
    1566:2, 6

specialized [2] -
    1492:20; 1566:1
specially [1] -
    1492:10
specific [13] -
    1418:1;
    1424:24;
    1430:10;
    1442:25;
    1453:3;
    1492:21;
    1502:12;
    1505:6, 18;
    1522:3;
    1525:23;
    1542:22; 1543:6
specifically [16] -
    1409:3; 1422:4;
    1423:23;
    1425:13, 23;
    1426:15;
    1430:15;
    1431:13;
    1436:22;
    1448:9;
    1458:12;
    1473:19;
    1491:25;
    1497:1;
    1521:20; 1534:2
specificity [1] -
    1488:10
specifics [2] -
    1408:24; 1435:5
speech [6] -
    1504:16;
    1547:1, 3-4;
    1558:20, 23
speed [1] -
    1458:4
spelled [1] -
    1423:25
spend [3] -
    1472:2;
    1492:18; 1522:9
spent [2] -
    1521:12, 14
spot [1] - 1513:11

spots [2] - 1457:1
squad [1] -
  1493:7
staff [1] - 1492:23
stage [1] -
  1536:24
Stamey [9] -
  1474:11;
  1488:6; 1542:7,
  20; 1543:1, 18,
  24; 1544:2;
  1548:6
stand [1] - 1563:4
Standard [2] -
  1442:5, 16
standing [2] -
  1508:18; 1541:9
stands [2] -
  1424:21;
  1456:12
start [10] -
  1412:15, 18;
  1413:21;
  1435:15;
  1486:3; 1503:3;
  1516:11;
  1522:25;
  1546:20;
  1564:16
started [8] -
  1425:22-24;
  1456:6;
  1485:25;
  1496:14;
  1511:5; 1547:2
starting [2] -
  1489:8; 1546:10
state [8] -
  1420:21, 24;
  1502:8;
  1503:23;
  1510:13;
  1552:9, 12;
  1571:13
State [1] - 1542:8
statement [3] -
  1541:9;
  1560:23;

1570:23
statements [2] -
  1541:10, 12
states [2] -
  1409:3; 1570:15
States [5] -
  1420:9, 13;
  1499:11;
  1501:20;
  1552:12
STATES [3] -
  1401:1, 3, 10
stating [3] -
  1425:17;
  1443:10;
  1508:18
statute [8] -
  1409:8, 13;
  1499:17, 19;
  1500:3, 5, 7;
  1546:22
statutes [1] -
  1500:2
statutory [1] -
  1499:25
stay [6] -
  1410:10;
  1420:8, 15;
  1510:8;
  1536:16, 20
stayed [4] -
  1481:24;
  1521:23;
  1541:18;
  1543:12
staying [2] -
  1420:8; 1535:3
Steal [4] -
  1477:15;
  1506:2, 23;
  1558:13
steel [3] - 1432:7;
  1464:12
stenotype [1] -
  1573:9
step [3] - 1485:8;
  1561:20
steps [4] -

1462:16, 25;
  1463:3; 1556:18
Stewart [27] -
  1414:13, 21;
  1437:2;
  1440:11;
  1447:23;
  1448:2; 1477:3;
  1487:12;
  1491:21;
  1493:9, 22;
  1494:2, 18;
  1496:19;
  1505:19;
  1513:14;
  1515:13;
  1518:23;
  1520:4, 7;
  1551:15;
  1555:5, 25;
  1556:17;
  1558:23;
  1559:19; 1562:7
Stewart's [1] -
  1493:18
stick [5] -
  1415:11, 14;
  1419:10;
  1443:23; 1467:7
still [13] - 1426:4;
  1432:4;
  1448:16;
  1460:16;
  1504:12, 19;
  1507:12;
  1516:13;
  1518:11;
  1520:3;
  1523:14;
  1544:20;
  1566:19
Stone [5] -
  1482:3;
  1521:23;
  1522:2, 7, 10
stood [1] -
  1508:12
Stop [4] -

1477:14;
  1506:2, 23;
  1558:13
stop [10] -
  1459:18;
  1465:8; 1505:5;
  1515:3;
  1521:10;
  1524:15, 19;
  1551:4; 1560:4;
  1561:2
stopping [4] -
  1557:4, 24;
  1561:6; 1564:1
store [2] - 1427:7;
  1501:19
storm [1] - 1553:7
stormed [8] -
  1552:7;
  1553:17;
  1554:1, 12, 16,
  18
storming [1] -
  1505:20
story [1] -
  1567:21
straight [1] -
  1465:4
street [1] -
  1491:19
Street [3] -
  1401:17;
  1402:11, 18
strict [2] - 1564:1;
  1565:5
structuring [1] -
  1554:24
stubs [1] - 1405:1
stuck [1] -
  1524:10
stuff [2] -
  1538:23;
  1540:14
SUAREZ [2] -
  1402:10, 13
subject [8] -
  1502:4; 1503:7;
  1510:12;

1511:10;
  1566:18, 22;
  1568:1, 21
submitted [1] -
  1486:23
subpoena [3] -
  1509:19, 22
substance [2] -
  1414:11;
  1419:18
substantial [1] -
  1410:11
substantially [1] -
  1568:2
suggest [7] -
  1496:2;
  1498:15, 24;
  1525:20;
  1566:5, 9
suggested [3] -
  1413:8;
  1476:19; 1525:6
suggesting [2] -
  1504:6, 13
suggestion [1] -
  1539:1
suggests [4] -
  1416:17;
  1499:5;
  1568:13, 16
Suite [2] -
  1402:14, 19
summary [8] -
  1415:25;
  1416:9, 13, 21;
  1433:2;
  1565:14, 18
summer [1] -
  1406:3
summertime [1] -
  1406:3
summoning [1] -
  1409:3
supposed [3] -
  1430:3;
  1472:22;
  1489:13
Supreme [4] -

1527:18;
1528:14;
1536:12, 21
surprised [1] -
1571:17
surrendering [1] -
1502:5
surrounding [1] -
1541:10
surveillance [2] -
1544:9, 21
suspect [3] -
1417:4; 1492:3;
1540:3
sustained [3] -
1439:6;
1467:24; 1481:9
switches [1] -
1430:22
Switzerland [2] -
1501:16, 23
Switzerland-
based [1] -
1501:23
sworn [8] -
1556:25;
1558:11;
1560:12, 14, 21;
1561:3, 6, 9
system [3] -
1509:4;
1516:19;
1557:10

## T

T-shirt [1] -
1431:16
table [4] -
1412:10;
1475:10;
1476:22;
1494:13
tail [1] - 1448:18
talks [3] -
1477:10;
1483:20;
1560:19
tandem [3] -

1504:3, 21
target [4] -
1431:24;
1432:2, 5, 7
targets [2] -
1432:4
tattoo [1] -
1525:15
tax [2] - 1411:4, 7
Team [1] -
1492:12
team [10] -
1416:5, 8, 22;
1433:9; 1442:2;
1449:13;
1453:21;
1514:21;
1515:5; 1528:13
techniques [1] -
1508:3
telephone [2] -
1474:3; 1491:21
television [2] -
1552:9, 12
ten [1] - 1468:22
tend [1] - 1507:3
term [5] - 1409:6,
9, 14; 1424:18;
1503:11
terms [7] -
1487:8, 25;
1488:15;
1503:9;
1553:18;
1554:4, 23
terribly [1] -
1566:8
terrorism [1] -
1500:4
Terry [2] -
1433:14, 17
testified [14] -
1413:1; 1429:3;
1445:24;
1485:17;
1490:9; 1491:6;
1494:9;
1511:22;

1527:12;
1534:9; 1536:9;
1546:8;
1565:14;
1569:22
testifies [1] -
1565:18
testify [7] -
1488:10;
1511:1; 1521:7;
1527:2; 1566:3,
7, 22
testifying [7] -
1425:23;
1462:14;
1493:25;
1565:21;
1566:3, 15
testimony [25] -
1419:4;
1420:23;
1421:6; 1423:2;
1426:6;
1439:13;
1456:6; 1486:3;
1489:5; 1490:8;
1493:16;
1511:8, 10, 12;
1516:24;
1518:21;
1521:2; 1527:4;
1529:2, 5;
1534:20;
1541:7;
1546:12;
1561:21
Texas [1] -
1491:25
text [16] -
1414:18;
1417:15;
1444:9;
1479:18;
1483:23;
1484:15;
1487:12;
1513:21;
1518:23;

1528:24;
1534:3, 10;
1535:4; 1537:3,
21, 23
texted [1] -
1533:25
texts [3] -
1479:16;
1488:3; 1537:24
THE [114] -
1401:1, 9;
1404:5, 17, 19;
1405:8, 17, 20,
22; 1406:5, 16,
21; 1407:11, 20,
23; 1408:1, 4, 8,
15, 19, 24;
1410:21;
1411:3, 13, 17;
1427:20;
1438:2; 1439:6;
1446:12;
1460:23;
1462:2;
1467:24;
1473:2; 1481:9;
1482:6, 10;
1483:14;
1484:1, 23;
1485:8, 23;
1486:16, 25;
1487:7, 19;
1488:8; 1489:3,
16, 20, 24;
1490:1, 21, 23;
1494:4;
1499:16;
1502:11, 21, 25;
1503:9;
1505:11;
1526:3;
1528:10;
1530:14;
1537:17, 22;
1538:1, 8, 21;
1539:14, 25;
1540:20;
1541:3, 20, 24;

1545:1; 1549:5,
8, 10, 12;
1554:25;
1559:6, 10;
1561:10, 20;
1562:11, 14;
1563:10, 14, 17,
22; 1564:4, 11,
16, 20; 1565:6,
9, 23; 1566:14,
24; 1567:6, 10;
1568:11;
1569:15;
1570:2, 20;
1571:4, 16, 20;
1572:10, 15, 20,
25
theft [6] -
1499:12, 21, 24;
1500:5, 7, 9
theoretical [1] -
1406:24
theories [1] -
1539:16
theory [2] -
1541:6, 19
therapists [1] -
1487:4
therefore [1] -
1410:8
therefrom [1] -
1409:20
they've [2] -
1487:17; 1504:4
thinking [2] -
1411:11;
1548:17
thinks [1] -
1559:23
third [1] - 1453:7
Thomas [1] -
1542:19
thousand [1] -
1500:2
thousands [6] -
1415:9;
1456:19;
1465:23;

1493:10; 1510:3
threat [1] - 1568:6
three [12] -
    1417:16;
    1421:14;
    1429:16;
    1463:7;
    1464:23;
    1506:11, 13;
    1512:15;
    1519:4; 1520:1;
    1524:24
three-and-a-half
    [2] - 1421:14;
    1519:4
throughout [11] -
    1434:11, 13;
    1456:18, 25;
    1512:15;
    1513:8;
    1535:22;
    1543:17;
    1546:10;
    1548:9; 1556:11
thumbs [1] -
    1520:7
tie [1] - 1455:15
tied [1] - 1553:23
timeframe [2] -
    1426:9; 1503:9
timeframes [2] -
    1569:25;
    1572:16
timely [1] -
    1564:5
timestamp [4] -
    1461:14;
    1544:17;
    1545:5, 18
timestamps [1] -
    1569:22
timing [1] -
    1419:3
tip [2] - 1453:23;
    1454:2
title [1] - 1410:11
Title [1] - 1499:11
today [14] -

1406:21;
1407:12;
1412:16;
1415:15;
1417:15;
1491:4; 1497:3;
1511:10;
1527:2; 1529:3,
5; 1534:8, 12;
1561:16
Todd [2] - 1474:5;
1542:17
together [17] -
    1409:22;
    1449:3;
    1461:12;
    1472:12, 21;
    1473:18;
    1474:3, 16, 18;
    1512:15;
    1513:1; 1522:1,
    9-10; 1566:2, 6
tomorrow [6] -
    1562:10;
    1563:3, 21;
    1564:1, 17, 23
tomorrow's [1] -
    1561:13
took [9] -
    1416:10;
    1425:22;
    1426:6, 11;
    1429:3, 18;
    1453:16;
    1535:10;
    1553:11
top [20] -
    1418:13;
    1436:8;
    1441:10;
    1458:10, 13, 20,
    22; 1463:2, 9;
    1469:23;
    1477:12, 18;
    1514:5;
    1531:22, 25;
    1534:11;
    1544:17;

1545:5;
1550:14;
1551:12
topic [3] - 1555:1;
    1558:24;
    1568:17
topics [2] -
    1451:25;
    1471:21
total [4] -
    1421:10;
    1429:15;
    1453:5, 17
toting [1] -
    1492:23
touch [1] -
    1459:12
tough [2] -
    1462:9; 1485:14
toward [1] -
    1571:9
towards [1] -
    1422:4
town [1] -
    1563:15
townhouse [1] -
    1407:3
TracFone [1] -
    1413:2
trail [1] - 1455:6
trained [2] -
    1492:10, 22
training [11] -
    1427:8-10;
    1429:2, 5;
    1481:16;
    1492:18, 20;
    1493:1
Training [9] -
    1425:8, 24;
    1426:5, 7, 16,
    24; 1427:3, 5;
    1479:2
traitors [3] -
    1558:10;
    1559:18; 1560:5
transcribed [1] -
    1570:4

TRANSCRIPT [1]
    - 1401:9
transcript [5] -
    1486:10, 19;
    1487:1;
    1562:19; 1573:7
transcripts [6] -
    1486:7, 12;
    1562:13, 18, 22
transfer [2] -
    1405:6; 1553:20
transferred [2] -
    1510:10, 13
transient [1] -
    1407:18
transit [2] -
    1522:16
transmitted [1] -
    1495:25
transport [1] -
    1548:18
transported [1] -
    1548:16
transporting [1] -
    1548:20
travel [4] -
    1406:1;
    1488:11, 18;
    1489:5
traveled [3] -
    1433:22;
    1434:20;
    1435:22
traveling [3] -
    1427:6;
    1485:15;
    1487:21
travels [1] -
    1427:9
treatment [2] -
    1567:24; 1569:8
TRIAL [1] -
    1401:9
trial [6] - 1410:22;
    1431:1;
    1467:10;
    1486:13;
    1526:23;

1566:15
trial's [1] - 1488:8
trim [1] - 1564:13
Troy [1] - 1401:15
trucks [1] -
    1538:15
true [4] - 1420:10;
    1499:3; 1522:3;
    1564:8
Trump [7] -
    1468:15;
    1546:25;
    1555:15;
    1556:3;
    1558:25;
    1560:3; 1561:2
Trump's [4] -
    1448:21;
    1483:10, 21;
    1484:3
Trump/Biden [1] -
    1448:6
trusted [1] -
    1513:17
truth [3] -
    1502:19;
    1526:13, 16
truthful [1] -
    1569:24
try [6] - 1420:21,
    24; 1538:18;
    1553:7;
    1562:13;
    1568:24
trying [7] -
    1463:10;
    1500:9; 1520:3;
    1522:14;
    1543:4;
    1549:15;
    1571:22
Tuesday [7] -
    1421:7; 1426:8;
    1439:13;
    1445:20, 24;
    1456:6; 1462:14
turn [3] - 1421:6;
    1425:8; 1465:8

turned [2] -
    1454:13; 1465:6
tutorial [1] -
    1562:2
TV [1] - 1456:12
tweet [7] -
    1418:16, 21-22;
    1419:1, 4, 13
tweeted [1] -
    1418:23
twice [1] - 1408:6
two [26] - 1405:6,
    21; 1406:13;
    1438:10;
    1457:19;
    1463:2, 5;
    1469:25;
    1485:5;
    1486:12;
    1487:4;
    1493:16;
    1515:16, 19, 21;
    1518:1;
    1521:25;
    1538:15;
    1543:4; 1557:1;
    1558:5; 1562:6;
    1569:19, 22
type [4] - 1432:5;
    1508:1; 1572:1,
    5
typed [1] -
    1551:24
types [2] -
    1429:25;
    1495:25
typo [2] -
    1419:22, 25
Tysons [1] -
    1408:12

U

U.S [4] - 1401:16;
    1420:16;
    1512:1; 1524:2
U.S.C [1] -
    1410:5
ultimately [3] -

1562:21, 24
unaware [2] -
    1487:25; 1488:1
uncertain [1] -
    1446:17
unclear [1] -
    1487:5
uncover [1] -
    1428:24
uncovered [1] -
    1456:25
under [7] -
    1470:12;
    1502:3;
    1517:20;
    1541:19;
    1556:21;
    1567:4, 7
undoubtedly [1] -
    1490:11
unexpected [1] -
    1404:11
unfair [1] - 1568:3
unfold [1] -
    1488:9
unfortunately [2] -
    1571:25; 1572:4
unhappy [2] -
    1514:18; 1562:5
unique [2] -
    1424:24; 1501:1
UNITED [3] -
    1401:1, 3, 10
United [5] -
    1420:9, 13;
    1499:11;
    1501:20;
    1552:12
unknown [1] -
    1439:18
unlawful [9] -
    1427:13, 16;
    1428:1, 16, 18,
    24; 1429:20, 23;
    1455:23
unless [2] -
    1563:12; 1565:5
unlike [1] -

1541:22
unsolicited [1] -
    1562:6
up [93] - 1404:20;
    1407:10;
    1410:21;
    1411:20;
    1412:19;
    1414:4;
    1415:22;
    1418:24;
    1423:19, 23;
    1424:18;
    1426:13, 18;
    1428:18;
    1431:12;
    1432:20;
    1433:22;
    1434:20;
    1435:2, 23;
    1436:21;
    1441:4, 10;
    1443:24;
    1444:3;
    1445:22;
    1450:2;
    1453:17;
    1454:8; 1457:9;
    1459:3, 23;
    1461:18;
    1462:11, 16, 22;
    1466:24;
    1467:6;
    1474:18;
    1482:13;
    1484:9;
    1485:20;
    1487:3; 1489:5;
    1490:21;
    1494:11;
    1495:16;
    1503:17;
    1508:12, 18;
    1510:21;
    1517:6; 1520:7;
    1522:1; 1526:9;
    1527:22;
    1535:4; 1536:7;

1537:8;
    1538:22;
    1540:1; 1541:4,
    8; 1542:21;
    1543:20;
    1546:9;
    1547:21;
    1549:3, 5, 7, 9,
    12, 24; 1550:4;
    1551:12;
    1555:2, 16;
    1556:4, 9;
    1559:11;
    1562:1, 4;
    1563:10;
    1565:4; 1567:1,
    12, 18; 1568:19,
    23; 1571:10
upcoming [2] -
    1507:7; 1550:7
uphold [1] -
    1423:15
uploaded [1] -
    1509:13
upstate [1] -
    1525:14
urging [1] -
    1489:4
users [2] -
    1448:8; 1499:3
uses [3] - 1452:8;
    1555:15; 1556:3
ushered [1] -
    1467:3
Utah [1] - 1455:6
UTC [11] -
    1442:6, 11, 17;
    1461:16;
    1570:10, 14, 17,
    19, 21

V

vague [3] -
    1481:10;
    1502:12;
    1503:11
Vallejo [46] -
    1402:17;

1473:20;
    1485:15, 18-19;
    1487:11;
    1489:11;
    1490:9; 1527:6,
    13, 17; 1528:25;
    1529:8; 1530:7;
    1531:5, 12, 15,
    20; 1532:3, 12,
    19, 24; 1534:13,
    21; 1535:1, 17,
    25; 1536:13;
    1537:3, 25;
    1538:14, 19, 23,
    25; 1539:7, 12;
    1541:6, 8, 22;
    1542:15;
    1545:10;
    1546:2, 15;
    1547:8;
    1549:21; 1550:1
Vallejo's [4] -
    1485:4; 1486:4;
    1533:10, 21
value [2] - 1568:2
various [4] -
    1496:19;
    1497:15;
    1504:4; 1540:4
vehicle [4] -
    1548:18, 22
version [2] -
    1511:17
Vetted [1] -
    1480:22
via [3] - 1475:21;
    1485:12;
    1516:15
victim [1] -
    1455:19
video [67] -
    1430:6, 13-14;
    1431:1, 13, 18;
    1445:15, 17, 22,
    25; 1446:6, 11,
    13, 22; 1447:6;
    1452:9, 12;
    1456:4, 7, 24;

1457:18, 25;
1458:1, 7, 14;
1459:8, 15;
1460:3;
1462:11, 20;
1465:2, 16;
1467:3, 6, 9, 11,
13, 15; 1468:6,
24; 1469:8,
20-21; 1470:5,
7, 21; 1471:1, 9,
12; 1512:14;
1522:16, 19, 24;
1523:6, 18;
1524:4, 12, 18;
1544:9, 11, 21;
1545:6, 14;
1546:1;
1547:11;
1558:19
videos [13] -
1465:19, 24;
1470:15, 20, 23,
25; 1471:3,
14-15, 23;
1495:25;
1508:15;
1544:13
view [2] -
1442:15;
1539:23
viewed [2] -
1444:7, 9
violent [3] -
1517:21; 1518:7
Virginia [3] -
1404:10;
1405:2; 1408:12
voice [1] -
1454:20
voices [1] -
1454:22
voir [2] - 1410:2,
6
volunteer [2] -
1478:3, 19
volunteering [1] -
1478:6

vote [1] - 1404:25
voter [3] - 1408:2;
1411:8, 13
votes [3] -
1404:8;
1411:12; 1569:3
voting [2] -
1409:11, 15
VPN [7] -
1455:18, 21, 23;
1456:1;
1498:21;
1500:11, 13
VPNs [4] -
1455:13;
1499:8; 1501:6
vs [1] - 1401:5

W

wait [1] - 1490:22
waited [1] -
1513:22
waiting [3] -
1495:3, 11;
1548:19
Walden [5] -
1512:14;
1523:4, 14, 20;
1524:2
Walden's [1] -
1524:7
walk [1] - 1453:1
walked [3] -
1434:3; 1435:9;
1436:3
walking [3] -
1470:12, 14;
1495:16
wants [1] -
1538:18
war [5] - 1558:15,
17; 1559:17;
1560:5, 8
warrant [5] -
1491:22;
1493:4; 1495:3,
11; 1496:15
warranted [1] -

1423:1
Washington [7] -
1401:4, 17;
1402:19;
1478:3; 1518:2,
5; 1521:15
waste [1] -
1504:8
watch [2] -
1522:19; 1524:1
watched [8] -
1465:19, 22, 24;
1467:7;
1470:15, 25;
1522:16
watching [3] -
1448:5; 1471:1,
23
Watkins [3] -
1463:16;
1487:13;
1539:22
Watkins's [1] -
1539:23
ways [1] -
1500:23
weapon [1] -
1430:20
weaponry [1] -
1430:19
weapons [7] -
1487:15;
1543:23, 25;
1548:11, 18, 20
website [9] -
1477:5, 8;
1495:8;
1516:19;
1550:8;
1551:21;
1553:4, 12, 23
websites [1] -
1551:25
week [7] -
1407:8, 10;
1408:6;
1480:13;
1492:2; 1563:20

weekend [1] -
1561:15
weeks [1] -
1519:4
WEINBERG [58]
- 1402:10, 13;
1462:6, 11, 13,
21; 1465:1, 3,
15, 17; 1467:11,
14, 25; 1468:1,
8, 11-12;
1469:1, 10, 20,
22; 1470:4, 6;
1473:1, 3;
1475:2, 4;
1476:1, 8, 10,
25; 1477:1,
12-13, 18, 20,
24; 1478:1;
1479:17, 20;
1480:6;
1481:11;
1482:1, 9, 13,
15; 1483:12,
15-16; 1484:2,
21; 1570:12;
1571:18, 25;
1572:12
Weinberg [2] -
1402:13;
1570:12
WEINBERG........
..... [1] - 1403:6
welcome [1] -
1411:17
Welcome [1] -
1482:24
welcoming [2] -
1483:17
west [2] -
1466:17, 22
Western [1] -
1542:8
whatsoever [1] -
1418:9
whichever [2] -
1410:8; 1523:22
Whiskey [4] -

1515:24;
1519:11, 14;
1520:10
white [1] -
1421:18
White [3] -
1559:16;
1560:4, 10
whole [1] -
1470:14;
1487:15;
1489:19;
1540:14
wife [1] - 1464:8
wild [1] - 1418:21
Willard [4] -
1521:18, 20, 22;
1522:1
WILLIAM [1] -
1402:3
William [1] -
1402:2
willing [1] -
1426:19
windows [5] -
1466:1, 4, 7, 9,
13
winner [1] -
1443:11
wish [2] -
1408:16;
1411:11
witness [15] -
1412:22;
1443:25;
1450:6;
1460:13;
1486:3; 1537:7;
1540:1; 1541:5,
15; 1563:3, 7, 9,
11, 15; 1564:22
WITNESS [1] -
1462:2
WITNESSES [1]
- 1403:3
witnesses [2] -
1521:7; 1540:3
won [1] - 1425:18

wonder [1] -
  1521:9
word [9] -
  1419:25;
  1420:2;
  1423:20;
  1424:3;
  1426:10, 19, 22;
  1428:10;
  1485:19
words [5] -
  1406:7;
  1446:18;
  1486:10;
  1552:1; 1570:4
worker [1] -
  1571:14
workers [3] -
  1571:12
works [7] -
  1422:20, 24;
  1434:25;
  1448:13;
  1496:18;
  1516:10; 1562:3
world [1] - 1566:1
worried [1] -
  1414:10
write [1] -
  1508:25
written [2] -
  1513:11
wrongdoing [1] -
  1428:5
wrote [2] -
  1426:3; 1507:16

Y

Yahoo [1] -
  1502:5
year [3] -
  1404:11;
  1405:16;
  1406:13
years [6] -
  1405:12, 23;
  1413:24;
  1421:9, 14

yelling [1] -
  1471:16
yellow [4] -
  1458:20; 1468:2
yesterday [2] -
  1486:7; 1563:5
York [11] -
  1512:4, 8;
  1513:15;
  1514:2, 6-8, 10,
  12; 1525:14, 23
Young [5] -
  1464:16;
  1469:4, 14
yourself [1] -
  1495:9

Z

zebras [1] -
  1519:20
zone [1] -
  1442:15
Zoom [1] -
  1452:2
zoom [2] -
  1477:12, 25